**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ITR CONCESSION COMPANY LLC, et al.,[1] | ) | Case No. 14-34284 (PSH) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF FERNANDO REDONDO, CHIEF**
**EXECUTIVE OFFICER OF ITR CONCESSION COMPANY LLC,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST-DAY PLEADINGS**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  ITR Concession Company LLC (0293); ITR Concession Company Holdings LLC (0285); and Statewide Mobility Partners LLC (1312).  The location of the Debtors' service address for the purposes of these chapter 11 cases is:   c/o ITR Concession Company LLC, 205 North Michigan Avenue, Suite 2510, Chicago, Illinois 60601.

# Table of Contents

Page

**Preliminary Statement**..................................................................................................3

**Overview of the Debtors' History and Operations** .......................................................9
    I.       The Debtors' Prepetition Corporate Structure .........................................9
    II.      The Debtors' Entry into the Concession Agreement ............................10
          A.      History of the Private Toll Road Business..............................10
          B.      The Major Moves Initiative and the Debtors' Entry into the Concession Agreement .................................................11
    III.    The Debtors' Operations........................................................................12
          A.      The Debtors' Operation of the Toll Road................................12
          B.      The Debtors' Capital Expenditure Program ............................13
          C.      The Debtors' Employees.........................................................14
    IV.    The Toll Road's Relationship with the Equity Sponsors and the Chicago Skyway Toll Bridge .................................................................15
    V.     The Debtors' Prepetition Capital Structure...........................................18
          A.      The Loans................................................................................18
          B.      The Swaps...............................................................................19
          C.      Collateral and Security Arrangements ....................................19

**The Events Leading to the Debtors' Financial Difficulties** ........................................21
    I.       The Global Recession Arises After the Debtors Enter into the Concession Agreement.............................................................................21
    II.      The Debtors' Negotiations with the Equity Sponsors, Steering Committee, and Committee of Secured Parties..........................................................22
    III.    The Debtors' Entry into the Restructuring Support Agreement ............23
    IV.    The Debtors' Solicitation Process and Proposed Confirmation Timeline............26

**Overview of the First-Day Pleadings**........................................................................27

**Evidentiary Support for First-Day Pleadings** ..............................................**Exhibit A**

**Corporate Structure** ...................................................................................**Exhibit B**

i

I, Fernando Redondo, hereby declare under penalty of perjury:

1.      I am the Chief Executive Officer of ITR Concession Company LLC
(the "Concessionaire"), a Delaware limited liability company with its headquarters in Chicago,
Illinois, and one of the above-captioned debtors and debtors in possession
(collectively, the "Debtors").   In this capacity, I am familiar with the Debtors' day-to-day
operations, financial affairs, and books and records.

2.      On the date hereof (the "Petition Date"), the Concessionaire and its Debtor
affiliates, Statewide Mobility Partners LLC ("Statewide") and ITR Concession Company
Holdings LLC ("Holdings"), filed voluntary petitions for relief under chapter 11 of title 11 of the
United States Code (as amended, the "Bankruptcy Code").  The Debtors continue to operate their
businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and
1108 of the Bankruptcy Code.  Concurrently herewith, the Debtors filed a motion seeking joint
administration of these chapter 11 cases pursuant to rule 1015(b) of the Federal Rules of
Bankruptcy Procedure (the "Bankruptcy Rules").

3.      As discussed in more detail herein, following extensive, good-faith discussions
with a committee of their senior secured lenders (the "Committee of Secured Parties") and the
Equity Sponsors (as defined below), the Debtors reached agreement regarding the proposed
terms of a consensual prepackaged plan of reorganization.  As a result, concurrently with the
commencement of these chapter 11 cases, the Debtors filed the Joint Prepackaged Plan of
Reorganization of ITR Concession Company LLC, et al., Pursuant to Chapter 11 of the
Bankruptcy Code (the "Plan"), a related disclosure statement (the "Disclosure Statement"), and a
motion seeking to schedule a combined hearing to approve the adequacy of the Disclosure
Statement and to confirm the Plan.  The Plan contemplates that the Debtors, with the support of

the Committee of Secured Parties and their existing equity sponsors, will seek to confirm a chapter 11 plan contemplating either (a) a sale of substantially all of the Company's assets following a competitive sale process (the "Sale Transaction") or (b) a comprehensive balance-sheet restructuring (the "Reorganization Transaction").   The general terms of the Sale Transaction and the Reorganization Transaction are set forth below.

4.      I submit this declaration (this "Declaration") to provide an overview of the Debtors and these chapter 11 cases and to support the Debtors' chapter 11 petitions and "first-day" pleadings (each, a "First-Day Pleading," and, collectively, the "First-Day Pleadings").

5.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management team or the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.   I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

**Preliminary Statement**

6.      The Debtors operate a 157-mile, four- to six-lane toll road in Northern Indiana commonly referred to as the Indiana Toll Road (the "Toll Road").  The Toll Road is an important piece of infrastructure.  It is a vital artery for interstate commerce, linking the City of Chicago and Lake Michigan to the interstate highway system, as well as markets, ports, and commercial and financial centers across the United States.

7.      As depicted on the following map, the Toll Road extends from the Illinois state line in East Chicago to the Ohio state line and comprises portions of U.S. Interstates 80 and 90.



8.     The Toll Road opened in 1956 and is used by nearly 130,000 vehicles per day. The Debtors operate the Toll Road pursuant to that certain Indiana Toll Road Concession and Lease Agreement, dated as of April 12, 2006 (as amended, modified, or supplemented from time to time, the "Concession Agreement"), between the Concessionaire and the Indiana Finance Authority (the "IFA"). Under the Concession Agreement, the Debtors have the rights to manage, operate, and collect tolls on the Toll Road through 2081.

9.     The Debtors financed their entry into the Concession Agreement with approximately $3.25 billion in first-lien, variable-rate, syndicated bank-debt obligations. In connection with their entry into the Concession Agreement, the Debtors also entered into a $665 million facility to finance certain capital expenditures and a $150 million liquidity facility to finance certain early interest payments under the acquisition and capital expenditure facilities. In an effort to protect against interest rate fluctuations, the Debtors also entered into certain interest rate hedging, or "swap," transactions that, as of the Petition Date, represent an aggregate secured liability of approximately $2.15 billion. This amount became due and payable following the early termination of the Swaps due to the Debtors' failure to make an interest payment on June 30, 2014. The Debtors' obligations under the swaps rank pari passu with the Debtors' first-lien syndicated bank-debt obligations.

4

KE 27288081

10.     The Toll Road represents a unique public-private collaboration that provides fast and convenient access to and from communities in Northern Illinois and Northern Indiana and plays a vital role in the regional and national economies, serving as a critical transportation route for individuals and businesses throughout the United States.   The Debtors, with financial and operational support from the Equity Sponsors, have used the Toll Road's status as the "Main Street of the Midwest" and a channel for interstate commerce to generate substantial value for their stakeholders.   Specifically, since assuming control over the Toll Road in 2006, the Debtors have made valuable improvements to the Toll Road, including:

- adopting the E-ZPass Interagency Group's ("E-ZPass") interoperable electronic tolling system, which replaced the previous cash-only system and has resulted in significant traffic increases each year;

- installing automatic ticket-issuing machines and automatic toll payment machines in the Toll Road's ramp and main plazas, which replaced outdated equipment;

- deploying approximately $458 million for capital expenditure projects, which, as of the Petition Date, have resulted in the:  (a) completion of a third traffic lane for certain high-traffic segments; (b) construction of new winter salt storage facilities; (c) completion of a new Indiana State Police post; (d) expansion of certain high-traffic toll plazas; (e) rehabilitation of outdated bridges and other structures; (f) resurfacing of hundreds of miles of roadway; (g) installation of a new cash and electronic toll collection system; and (h) establishment of a new back office system; and

- executing innovative cost-savings measures, such as sharing senior management personnel with their affiliate, Skyway Concession Company LLC (the "Skyway Concessionaire"), the operator of the Chicago Skyway Toll Bridge.

11.     Through these and other actions, the Debtors have generated substantial value for the benefit of their stakeholders:

- revenue has increased 36 percent since 2007 (a CAGR[2] of 5.3 percent);

---

[2]     As used herein, "CAGR" means compound annual growth rate, which is equal to the year-over-year growth rate of an investment over a specified period of time.

- EBITDA has increased 53 percent since 2007 (a CAGR of 7.3 percent);

- EBITDA margins have grown every year, increasing 8.8 percent, from 73.8 percent to 82.6 percent since 2007; and

- operating costs are 27 percent lower than under the previous operator.

12.     As suggested by the fact that EBITDA increased every year during the worst economic recession in seventy years, the Debtors' EBITDA will continue to increase over time. Indeed, the Concession Agreement provides the Debtors with a decades-long term to manage and collect tolls on the Toll Road, which will remain a predominant channel for interstate transportation for the foreseeable future.  The Toll Road lacks any significant competitors, which are unlikely to materialize in the near future given the Toll Road's length (at 157 miles long, the Toll Road traverses the width of the State of Indiana) and the significant (and potentially insurmountable) financial, political, contractual, and regulatory entry barriers associated with the construction of a neighboring roadway.  Absent extreme circumstances, there is no reason to believe that the Debtors' revenues and EBITDA will not continue to increase year over year for the foreseeable future.

13.     Tolls collected on the Toll Road historically outpace the Debtors' operating costs (excluding their funded debt obligations) and the Debtors earn nearly $4.00 in profit for each $1.00 in operating expenses.  Moreover, the Concession Agreement and its enabling statute provide the Debtors with the authority to raise tolls annually on the Toll Road during the Concession Agreement's term, which is a substantial benefit in light of the significant barriers to entry described above.

14.     Even though the Toll Road's performance has improved every year since the Concession Agreement was signed, the Debtors assumed control of the Toll Road shortly before the collapse of the subprime housing market.  The global economic recession stifled interstate

6

commerce, which depressed the interstate trucking activity that accounts for a significant part of the Toll Road's revenues.   As a result, even though the Debtors' earnings, EBITDA, and EBITDA margins increased every year between 2008 and 2013, they were lower than projected. Though economic conditions have since improved and the path forward is strong, the Debtors have been forced to devote an increasing share of their operating income towards servicing their debt obligations each year.

15.   In particular, the global economic recession and actions undertaken by the United States and various European governments in response thereto have driven interest rates down to historic lows, creating a substantial net obligation under the Debtors' interest rate hedging obligations.  As a result, absent a restructuring, the Debtors will not have sufficient cash flows to service their funded debt obligations (including an interest payment of approximately $102 million on June 30, 2014) and operate the Toll Road in a prudent manner.

16.   Faced with the prospect of future defaults under their prepetition funded debt obligations, the Debtors retained legal counsel and financial advisors and commenced discussions with their major stakeholders, including the Equity Sponsors and a steering committee of certain major financial institutions (collectively, the "Steering Committee") regarding a potential consensual resolution.  These discussions culminated in an agreement in principle among the Debtors, the Equity Sponsors, and the Steering Committee in December 2013 regarding the terms of a balance sheet restructuring.  In early 2014, the Debtors, the Equity Sponsors, and the Steering Committee finalized the terms of their restructuring proposal to be implemented through a prepackaged chapter 11 process.  The parties later began to seek support for the proposal from other lenders and swap counterparties.  Unfortunately, the Steering Committee's proposal did not ultimately achieve sufficient creditor support.

KE 27288081

17.     Thereafter, as part of their continuing effort to forge a consensual resolution, the Debtors engaged in discussions with the Equity Sponsors and the Committee of Secured Parties regarding potential reorganization and sale alternatives.   These extensive, arm's-length discussions, which occurred over several months and resulted in the parties exchanging multiple proposals, were productive and paved the way for an 83-day forbearance following the Debtors' failure to make an interest payment of approximately $102 million on June 30, 2014.   The Debtors, the Equity Sponsors, and the Committee of Secured Parties utilized the forbearance period to finalize the terms of the global settlement memorialized in that certain Restructuring Support Agreement, dated as of September 4, 2014, among the Debtors, the Equity Sponsors, and consenting secured parties party thereto (as amended, modified, or supplemented from time to time, the "Restructuring Support Agreement"), which is the bedrock of these chapter 11 cases and describes the restructuring transactions that will be consummated if the Plan is confirmed.

18.     The Restructuring Support Agreement contemplates a prepackaged chapter 11 process.   As such, following execution of the Restructuring Support Agreement, the Debtors commenced a prepackaged solicitation of the Plan on September 11, 2014, by delivering a copy of the Plan and a related Disclosure Statement (including ballots) to the administrative agent (the "Administrative Agent") that maintains a registry of holders of Loan and Swap claims (for subsequent distribution to such holders) and holders of existing equity interests in Statewide, the only claims and interests entitled to vote to accept or reject the Plan.   Consistent with the terms set forth in the Restructuring Support Agreement, the Debtors set September 17, 2014, as the date by which votes to accept or reject the Plan must have been provided to the Debtors' proposed solicitation agent or the Administrative Agent, as applicable.   As of the Petition Date, the Debtors have obtained votes accepting the plan from holders of more than 87 percent (in

8

amount) and 89 percent (in number) of the Debtors' senior secured bank debt and interest rate hedging obligations and 100 percent (in amount) of the existing equity interests in Statewide. As such, and in accordance with the Restructuring Support Agreement, the Debtors are seeking a joint hearing in the first 30 days of these chapter 11 cases for the Court to consider the adequacy of the Disclosure Statement and confirmation of the Plan.

19.     To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of these chapter 11 cases, this Declaration is organized as follows. *First*, this Declaration provides background on the Debtors, including their organizational and corporate structure, operations, and prepetition capital structure. *Second*, this Declaration describes the events leading to the filing of these chapter 11 cases and the Debtors' recent restructuring initiatives. *Finally*, this Declaration and **Exhibit A** hereto summarize the relief requested in, and facts supporting, each of the First-Day Pleadings.

### Overview of the Debtors' History and Operations

**I.      The Debtors' Prepetition Corporate Structure**.

20.     The Concessionaire was formed in January 2006 in connection with the Debtors' entry into the Concession Agreement and their assumption of control over the Toll Road. The Concessionaire is a wholly owned subsidiary of Holdings, which, in turn, is a wholly owned subsidiary of Statewide. Each Debtor is a limited liability company formed under the laws of Delaware. A diagram illustrating the current corporate structure of the Debtors is attached hereto as **Exhibit B**.

21.     The Debtors are indirectly owned by affiliates of Cintra Infraestructuras, S.A. ("Cintra") and Macquarie Atlas Roads and Macquarie Infrastructure Partners (collectively, "Macquarie," and, together, with Cintra, the "Equity Sponsors"). The Equity Sponsors are among the world's leading developers and operators of critical public infrastructure assets.

9

Based in Madrid, Spain, Cintra is one of the largest private developers of transportation infrastructure assets in the world and holds interests in numerous critical real estate and public infrastructure assets, including over 1,340 miles of highways in the United States, Canada, Spain, Greece, Ireland, the United Kingdom, and Portugal.  Together with various partners, Macquarie, which is based in Sydney, Australia, holds interests in and/or operates multiple notable public infrastructure assets such as:  (a) the Dulles Greenway, a toll road that links Leesburg, Virginia, and Washington, D.C.; (b) the Warnow Tunnel, a two-kilometer toll road located in Rostock, Germany; (c) the M6 toll road in the United Kingdom; and (d) the APRR motorway network in France.  Cintra and Macquarie also own interests in and operate the Chicago Skyway Toll Bridge, which, as described below, engages in intercompany cost-savings measures with the Debtors.

**II.**     **The Debtors' Entry into the Concession Agreement**.

> **A.**     **History of the Private Toll Road Business**.

22.     Over the past 40 years, governments in various countries, including Australia, Canada, Ireland, Portugal, Spain, the United Kingdom, and the United States, faced with fiscal pressures and growing needs for new public infrastructure assets, have privatized the operation of existing toll roads and the right to develop new toll roads.  Privatization of critical infrastructure assets results in the transfer of certain risks and costs from governments to the private sector, including development risk, construction delay and cost overrun risks, reduced traffic usage, increased maintenance costs, and risks arising from regulations and taxes.  In exchange, private firms receive the right to capture the economic upside from operating, maintaining, collecting tolls on, and, in some cases, constructing, toll road assets.

10

B.    **The Major Moves Initiative and the Debtors' Entry into the Concession Agreement**.

23.    In 2005, faced with a multibillion-dollar gap between statewide transportation project needs and projected revenues and the significant financial costs to maintain the Toll Road, former Indiana Governor Mitch Daniels launched the Major Moves initiative.  The Major Moves initiative tasked the IFA with exploring the feasibility of leasing the Toll Road, which Governor Daniels described at the time as the state's "most valuable asset,"[3] to a private entity.[4] Thereafter, the IFA engaged various advisors to prepare traffic and revenue forecasts and an investment banker, Goldman Sachs & Co., to provide financial advice and solicit bids from potentially interested parties.

24.    In connection with these efforts, on September 28, 2005, the IFA released its Request for Toll Road Concessionaire Proposals, pursuant to which the IFA proposed to auction the right to operate and collect toll revenues on the Toll Road.  Four entities, including the Debtors, submitted proposals by the October 26, 2005, bid deadline.  Following the competitive bidding process, the IFA selected the Debtors' $3.8 billion bid to manage the Toll Road for an initial term of 75 years as the highest and best bid received.  The Debtors' bid was contingent on, among other things, the passage of appropriate authorizing legislation, which former Governor Daniels signed into law on March 22, 2006.  On April 26, 2006, the Debtors and the IFA executed the Concession Agreement, pursuant to which the Debtors acquired the exclusive right to manage, operate, and collect tolls on the Toll Road through 2081.

---

[3]    Joe Donohue, *Indiana Toll Road Lease Holds Lessons for N.J.:  Will New Jersey Follow the Hoosier State and Lease the Turnpike?*, NEWARK STAR LEDGER, May 21, 2007, at 1.

[4]    The Major Moves initiative also proposed to auction the right to develop, manage, and collect toll revenues on the proposed Southern Indiana Toll Road.  Due to a lack of interest from potential developers, however, the State of Indiana subsequently determined to abandon plans for the Southern Indiana Toll Road and to instead develop a toll-free expressway along Indiana State Route 69, which extends from Indianapolis to Evansville.

III.    **The Debtors' Operations**.

A.    **The Debtors' Operation of the Toll Road**.

25.    The Debtors formally assumed operational responsibility for the Toll Road on June 29, 2006.  Pursuant to the Concession Agreement, the Debtors have the exclusive right to establish and collect tolls on the Toll Road through 2081.  The Debtors have established appropriate toll levels to satisfy operation and maintenance costs over the 75-year term of the Concession Agreement.  Toll amounts vary based on, among other factors, how far and the direction in which a vehicle is travelling, the vehicle's number of axles, and whether the toll is paid in cash or electronically.

26.    In 2013, the Toll Road generated toll receipts of approximately $196 million, of which approximately 73 percent, or approximately $143 million, were paid electronically through the E-ZPass interoperability system.  The E-ZPass system consists of a small electronic device that is mounted on a vehicle's windshield.  Transponders work together with electronic readers installed at certain points along the Toll Road.  When travelling in an E-ZPass-equipped lane, an overhead antenna and a lane level reader detect the data stored in the E-ZPass transponder and the toll is automatically deducted from the account owner's prepaid E-ZPass account or documented in a customer's postpaid account.[5]  E-ZPass transponders also can be used on other toll roads managed by toll road operators that are parties to E-ZPass

---

[5]    As described in the Customer Programs Motion (as defined in **Exhibit A** attached hereto), approximately 400 significant commercial and governmental Toll Road customers participate in the Post-Payment Program (as defined in the Customer Programs Motion).  This program enables participating customers, which typically are government agencies or businesses engaged in the freight, manufacturing, food and beverage, and fuel industries, to utilize their Debtor-issued E-ZPass electronic transponders to make toll payments in arrears based on the amount of actual usage during predefined usage periods.  To participate in the Post-Payment Program, participants must post cash collateral or a surety bond to secure their obligations to the Debtors.  In 2013, participating customers paid approximately $3.9 million to the Debtors pursuant to the Post-Payment Program.

12

interoperability agreements.  E-ZPass is the largest interoperability network in the world, with over 23 million members and generating over $6.0 billion in toll receipts in 2013 alone.

27.    Since the Debtors assumed control over the Toll Road, the Debtors have distributed more than 238,000 E-ZPass transponders to their customers.[6]  Upon opening a customer's E-ZPass account, the Debtors charge or debit a customer's credit or debit card, as applicable, as a prepayment of tolls.  The Debtors deduct toll charges as the customer uses the Toll Road.  Once the prepaid balance dips below a minimum threshold, the account is replenished automatically with cash debited from the customer's credit or debit card.

### B.    The Debtors' Capital Expenditure Program.

28.    The Debtors have made substantial investments in the Toll Road since their assumption of control over the Toll Road.  From 2006 through 2081, the Debtors have committed to invest approximately $4 billion in improvements to the Toll Road.  Through December 31, 2013, the Debtors already have invested approximately $458 million in capital expenditures to improve the Toll Road, including:

- approximately $250 million to expand the Toll Road to relieve traffic and construct a third lane in certain high-traffic segments;

- approximately $74 million to fund resurfacing projects designed to maintain the Toll Road for years to come;

- approximately $40 million to expand the E-ZPass transponder system and existing cash-pay tolling system;

- approximately $39 million in capital improvements to repair and rehabilitate certain outdated bridges and other structures on the Toll Road;

---

[6]    Between 2007 and 2012, the Debtors administered an electronic transponder system known as "iZoom."  iZoom electronic transponders utilized E-ZPass interopability technology; however, the iZoom program was targeted exclusively at Indiana residents.  In 2012, the Debtors suspended the iZoom program and now exclusively provide E-ZPass-branded electronic transponders to their customers.  Each iZoom and E-ZPass electronic transponder is fully interoperable on infrastructure assets operated by other toll road operators that utilize E-ZPass.

KE 27288081

- approximately $9 million to expand the Westpoint, Portage, and Eastpoint toll plazas;

- approximately $5 million to construct an Indiana State Police post that serves as the hub for a multi-agency public safety facility; and

- approximately $3.5 million to construct state-of-the-art salt storage facilities located near the Toll Road and related critical maintenance facilities.

29.     In addition, the Debtors have made substantial investments in services that benefit the Toll Road as well as nearby communities.  More specifically, since 2006, the Debtors have purchased more than $7 million in new snowplows and maintenance vehicles to replace the Debtors' aging fleet of snowplows and maintenance vehicles.  In addition, the Debtors are slated to pay in excess of $150,000 per year for the foreseeable future in license plate renewal fees and wheel taxes that state and local governments otherwise would not have collected under the Indiana Department of Transportation's management.  Finally, each year, the Debtors pay approximately $7 million to the Indiana State Police to patrol and maintain the Toll Road to ensure public safety and minimize the risk of accidents.

**C.     The Debtors' Employees**.

30.     As of the Petition Date, the Debtors employ approximately 283 employees; 223 full time and 60 part time.   Approximately 34 employees are salaried; approximately 249 employees are paid on an hourly basis.  In addition, and as discussed below, the Debtors complement their dedicated employee workforce with: one Cintra employee temporarily assigned, or "seconded," to the Debtors; approximately twelve employees from their non-Debtor affiliate, the Skyway Concessionaire; and approximately thirty temporary employees through a third-party staffing agency.[7]

---

[7]   Approximately 44 percent of the Debtors' employees are represented by labor unions that are party to collective bargaining agreements with the Concessionaire.

KE 27288081

31.     The Debtors' employees perform a variety of critical functions, including management, engineering, accounting, business administration, finance, human resources, information technology, marketing, facilities maintenance, security, and other key functions, and they are essential to the preservation of value and the administration of the Debtors' estates during the Debtors' ongoing restructuring process.

## IV.     The Toll Road's Relationship with the Equity Sponsors and the Chicago Skyway Toll Bridge.

32.     A key component of the Debtors' operations is the financial, operational, and managerial support that the Equity Sponsors and the Debtors' non-Debtor affiliate, the Skyway Concessionaire, historically have provided to the Debtors.  Specifically, the Debtors and the Skyway Concessionaire, the operator of the Chicago Skyway Toll Bridge, a neighboring toll road that is linked to the Toll Road and that serves as the source of a significant amount of eastbound traffic from Illinois on the Toll Road, are parties to various cost-sharing and related intercompany agreements pursuant to which the Debtors have been able to take advantage of operational synergies.  As a result of these synergies and other factors, the Debtors have to date successfully operated the Toll Road at 27 percent lower costs than the prior operator.   In addition, Cintra periodically seconds its personnel to the Debtors.  Finally, the Equity Sponsors, which own and operate infrastructure concessions across the globe, regularly advise the Debtors on their operations and utilize the Equity Sponsors' institutional relationships with financial institutions, vendors, and other contract counterparties.  The support provided to the Debtors by the Equity Sponsors and the Skyway Concessionaire generates substantial value for the Debtors and their stakeholders.

KE 27288081

### 1. The Skyway Toll Collection Agreement.

33.     Pursuant to that certain Electronic Toll Collection Agreement, effective as of June 10, 2008 (as amended, modified, or supplemented from time to time, the "Skyway Toll Collection Agreement"), between the Concessionaire and the Skyway Concessionaire, the Debtors process E-ZPass payments on behalf of the Skyway Concessionaire.  The Skyway Toll Collection Agreement ensures that any customers with an E-ZPass transponder can access the Chicago Skyway Toll Bridge and pay with their transponder, which relies exclusively on the Skyway Toll Collection Agreement to process E-ZPass toll payments.  This inures to the benefit of the Debtors and their stakeholders because the Chicago Skyway Toll Bridge is the origination point for significant eastbound Toll Road traffic from Illinois.   As of the Petition Date, the Debtors transfer approximately $5 million each month to the Skyway Concessionaire on account of electronic toll payments processed by the Debtors on behalf of the Skyway Concessionaire in accordance with the terms of the Skyway Toll Collection Agreement.

### 2. The Cost-Sharing and Secondment Arrangements.

34.     The Debtors supplement their workforce with certain individuals that are seconded to the Debtors by the Equity Sponsors or whose salaries are split on a pro rata basis among the Debtors and the Skyway Concessionaire.   More specifically, one individual, the Debtors' chief operating officer (the "COO"), is seconded by Cintra to the Debtors pursuant to a secondment arrangement between the Debtors and Cintra.  Pursuant to the terms of the COO's secondment arrangement and as set forth in more detail in the First-Day Pleadings, the Debtors reimburse Cintra for the COO's salary and also provide the COO with a local salary to cover the expenses of living overseas.

35.     In addition, pursuant to the terms of the cost-sharing arrangement, the Concessionaire and the Skyway Concessionaire share office space as well as the services of

16

approximately twenty employees, approximately twelve of which are employed by the Skyway Concessionaire and approximately eight of which are employed by the Debtors. Under the cost-sharing arrangement, the Debtors typically pay a portion of the costs of maintaining the Debtors' and the Skyway Concessionaire's office as well as each shared employee's salary and annual incentive compensation, if any. From time to time, the Debtors and the Skyway Concessionaire also incur on behalf of each other joint expenses and provide each other with miscellaneous goods and services. The costs of such miscellaneous goods and services and the amounts of such expenses are generally shared among the Debtors and the Skyway Concessionaire on a pro rata basis. As of the Petition Date and net of amounts owed to the Debtors by the Skyway Concessionaire, the Debtors have historically paid the Skyway Concessionaire approximately $94,000 each month on account of their cost-sharing structure.

### 3. The Equity Sponsors' Other Support to the Debtors.

36. In addition to the foregoing, the Equity Sponsors provide various forms of ad hoc operational and managerial support to the Debtors. For example, as described in the Insurance Motion (as defined in **Appendix A** attached hereto), the Equity Sponsors allow the Debtors to participate in group insurance policies that the Equity Sponsors obtain for certain of their affiliates, allowing the Debtors obtain certain types of insurance at a discount. In addition, Cintra and Macquarie and their respective personnel (including their respective representatives on the Statewide board of directors) regularly advise the Debtors and the Debtors' management regarding Toll Road operations and harness the Equity Sponsors' extensive institutional knowledge and existing relationships with vendors, financial institutions, and other critical contract counterparties on behalf of the Debtors. As a result, the Debtors are able to generate substantial value for their stakeholders in the form of reduced operating costs and greater Toll Road revenues.

17

KE 27288081

## V.    The Debtors' Prepetition Capital Structure.

37.    As of the Petition Date, the Debtors have outstanding funded debt of approximately $6.0 billion that is comprised of approximately $3.855 billion in principal amount of first-priority syndicated bank-debt obligations under the Loan Agreement (as defined below) and approximately $2.15 billion in principal amount of pari passu first-lien interest rate hedging obligations.

### A.    The Loans.

38.    As of June 26, 2006, the Concessionaire, Wilmington Trust, National Association, as successor administrative agent (in its capacity thereunder, the "Administrative Agent"), and the lenders from time to time party thereto (collectively, the "Lenders") entered into that certain Loan Agreement (as amended, modified, or supplemented from time to time, the "Loan Agreement"). Pursuant to the Loan Agreement, the Concessionaire became the obligor with respect to three tranches of debt: (a) a $3.25 billion acquisition facility, due June 29, 2015 (the "Series A Facility"); (b) a $150 million liquidity facility, due June 15, 2015, to fund certain early period interest payments (the "Series B Facility"); and (c) a $665 million liquidity facility to fund certain capital improvements required under the Concession Agreement (the "Series C Facility," and, collectively with the Series A Facility and the Series B Facility, the "Loans"). The Administrative Agent syndicated interests in the Loans to the Lenders, each of which is a lender of record under the Loan Agreement. As of the Petition Date, the outstanding principal amount of the Loans was approximately $3.855 billion and the interest rate per annum was equal to LIBOR plus 1.25 percent.

39.    As of the Petition Date, the Debtors have no additional borrowing capacity under the Loans. As of July 25, 2014, the Administrative Agent terminated the Debtors'

then-remaining $67 million in borrowing capacity under the Series C Facility, in accordance with the Loan Agreement.

**B.     The Swaps**.

40.     To hedge the interest rate risk associated with the floating interest rates on the Loans and as required under the Loan Agreement, the Concessionaire and certain financial institutions (collectively, the "Swap Counterparties") entered into ISDA Master Agreements and Schedules (collectively, and as amended, modified, or supplemented from time to time, the "Swap Agreements").  Pursuant to the Swap Agreements, the Concessionaire entered into interest rate swaps (the "Swaps").  Under the Swap Agreements, the Concessionaire agreed to pay the Swap Counterparties a fixed rate of interest in exchange for receiving from such Swap Counterparty a floating interest rate.

41.     At their inception, the Swaps were "at the money," meaning that the total value of the fixed interest payments to be paid by the Concessionaire to the Swap Counterparty was essentially equal to the expected total value of the floating interest payments to be paid by the applicable Swap Counterparty to the Concessionaire.  As interest rates precipitously declined to historic lows following the Debtors' entry into the Loan Agreement, however, the Swaps have turned into a net liability of the Debtors of approximately $2.15 billion as of the Petition Date. This liability became due and payable following the early termination of the Swaps due to the Debtors' failure to make an interest payment of approximately $102 million on June 30, 2014.

**C.     Collateral and Security Arrangements**.

42.     In connection with the Debtors' entry into the Loan Agreement, certain Debtors entered into various collateral arrangements, including the Collateral Agency Agreement, Security Agreement, and Pledge Agreement, as each is defined and described in greater detail below.

### 1.    The Collateral Agency Agreement.

43.    Pursuant to that certain Collateral Agency and Account Agreement, dated as of June 26, 2006 (as amended, modified, or supplemented from time to time, the "Collateral Agency Agreement"), between the Concessionaire, the Administrative Agent, and Citibank, N.A., as collateral agent (in its capacity thereunder, the "Collateral Agent"), the Concessionaire agreed to maintain certain bank accounts from which the Collateral Agent may make withdrawals, transfers, and payments from revenues from the Concessionaire's business operations and borrowings under the Loan Agreement to make payments of payable operating, debt service, and capital expenditure obligations.

### 2.    The Security Agreement.

44.    As of June 26, 2006, the Concessionaire entered into that certain Security Agreement (as amended, modified, or supplemented from time to time, the "Security Agreement"), with the Collateral Agent, pursuant to which the Concessionaire pledged all of its interests under the Concession Agreement and interests and rights otherwise related to the Toll Road to the Collateral Agent as collateral for its secured obligations under the Loan Agreement, including the Loans and the Swaps.

### 3.    The Pledge Agreement.

45.    Finally, Holdings entered into that certain Pledge Agreement, dated as of June 26, 2006 (as amended, modified, or supplemented from time to time, the "Pledge Agreement"), with the Collateral Agent, pursuant to which Holdings pledged to the Collateral Agent, in support of the Concessionaire's secured obligations with respect to the Loans and Swaps, all of Holdings' membership interests in the Concessionaire, any indebtedness owed to Holdings by the Concessionaire, and all proceeds, products, and accession of and to any and all of the foregoing.

KE 27288081

## The Events Leading to the Debtors' Financial Difficulties

**I.     The Global Recession Arises After the Debtors Enter into the Concession Agreement**.

46.     As discussed above, the Debtors assumed control of the Toll Road shortly before the collapse of the capital markets in 2007.   The resulting global economic recession fundamentally affected interstate trucking activity, tourism, and economic development.   More specifically, interstate trucking activity declined by 6.1 percent between 2007 and 2008 and a further 14.6 percent between 2008 and 2009.   The national economic decline, in turn, had a cascade effect, dragging down economic growth in the State of Indiana by 6.01 percent and the neighboring Chicago, Illinois region by 4.12 percent between 2008 and 2009.   These national and regional economic forces, in turn, reduced overall traffic on the Toll Road, which declined by more than 10.5 percent between 2007 and 2013, negatively affecting the Debtors' cash flows and forcing the Debtors to commit a greater share of their operating income to honor their financing obligations.

47.     The steady-but-slow recovery of Toll Road traffic has affected the Debtors' ability to satisfy their financial obligations on a go-forward basis.  For example, during 2013, the Debtors paid approximately $193 million in debt servicing obligations, while generating approximately $158 million in EBITDA.[8]  The Debtors' 2014 debt service obligations also are projected to exceed the Debtors' EBITDA and, without any remaining availability under the Series B Facility, the Debtors lacked sufficient liquidity to make the required payments under the Loans and Swaps at the end of June 2014.

---

[8]     The Debtors funded the shortfall through draws on the Series B Facility which, as discussed above, was exhausted in December 2013.

KE 27288081

## II.   The Debtors' Negotiations with the Equity Sponsors, Steering Committee, and Committee of Secured Parties.

48.     Recognizing that their current and projected debt service profiles were not sustainable given the weakened business performance brought on by the global economic recession, the Debtors determined that a restructuring of their balance sheet was necessary to ensure that the Debtors could satisfy their financial obligations going forward.

49.     Accordingly, the Debtors retained Kirkland & Ellis LLP as legal counsel and Moelis & Co. LLC and Morgan Stanley & Co. LLC as financial co-advisors to assess potential restructuring alternatives, including a potential chapter 11 filing.  Throughout 2013, the Debtors engaged in discussions with the Steering Committee regarding a potential consensual resolution. These discussions culminated in an agreement in principle among the Debtors, the Equity Sponsors, and the Steering Committee in December 2013 regarding the terms of a balance sheet restructuring.  The parties agreed to negotiate and document the final terms of the proposed restructuring in early 2014.  This agreement in principle cleared the way for the Debtors to make approximately $104.5 million in debt service payments on December 30, 2013, that, if not made, would have enabled the Debtors' creditors to exercise remedies against the Debtors' assets, to the detriment of the Debtors' stakeholders.

50.     In early 2014, the Debtors, the Equity Sponsors, and the Steering Committee finalized the terms of their restructuring proposal.  Thereafter, the parties began to seek support for a comprehensive restructuring proposal to be implemented through a prepackaged chapter 11 process from other lenders and swap counterparties, a group primarily comprised of financial institutions based in Spain, Italy, the United Kingdom, Germany, Greece, and Portugal that regularly invest in long-term infrastructure assets such as toll road concessions.  The parties' efforts to solicit support for the proposal included convening back-to-back in-person lender

KE 27288081

meetings in Madrid, Spain and New York, New York, engaging in extensive telephonic and in person discussions with the Debtors' lenders and their respective advisors, and providing additional diligence information to potentially interested parties.  And, in an effort to garner additional support for the proposal, the Debtors, in consultation with their advisors and potentially interested parties, assessed potential modifications to the proposal.

51.     Unfortunately, the Steering Committee's proposal did not achieve sufficient creditor support.  In addition, numerous lenders and swap counterparties (including multiple Steering Committee members) entered into participation agreements with members of the Committee of Secured Parties that favored alternative restructuring strategies, including a potential sale of substantially all of the Debtors' assets.

52.     In an effort to forge a consensual resolution, the Debtors, the Equity Sponsors, and the Committee of Secured Parties engaged in discussions regarding potential reorganization and sale alternatives.  These extensive, arm's-length discussions, which occurred over several months and resulted in the parties exchanging multiple proposals, were productive and paved the way for an 83-day forbearance following the Debtors' failure to make an interest payment of approximately $102 million on June 30, 2014.

## III.   The Debtors' Entry into the Restructuring Support Agreement.

53.     The parties used the forbearance period to finalize a global resolution—memorialized in the Restructuring Support Agreement—that serves as the foundation for these chapter 11 cases.  The Restructuring Support Agreement provides that the parties thereto will support the Plan, in the form attached thereto as an exhibit.[9]  The Plan provides for the two alternative transactions: the Sale Transaction and the Reorganization Transaction.

---

[9]   This Declaration is intended only to provide a summary of certain key terms provided under the Plan and is qualified in its entirety by reference to the Plan and all exhibits related thereto.

23

A.    **Overview of Sale Transaction**.

54.    The general terms of the Sale Transaction as follows.

- Sale Process to Maximize Value.  Three newly-appointed independent directors of Statewide, who were acceptable to the Debtors and the Committee of Secured Parties, form the membership of a committee of the board of Statewide (the "Special Committee") charged with conducting a competitive sale process for substantially all of the Debtors' assets following confirmation of the Plan, which process could extend through, at the latest, August 1, 2015.

- Sale Procedures.  The Plan authorizes the Special Committee, in good-faith consultation with a steering group of the Committee of Secured Parties (the "Committee of Secured Parties Steering Group"), to adopt and implement procedures that the Special Committee determines will facilitate the solicitation and evaluation of potential sale proposals without further notice to or approval by the Court.

- Evaluation of Bids.  Following the sale process and no later than the August 1, 2015 outside date, the Special Committee,  in good-faith consultation with and subject to the reasonable consent of the holders of a majority of senior secured claims that became party to the Restructuring Support Agreement on the effective date thereof (the "Required Consenting Secured Parties"), will determine whether any asset sale proposals provide greater value to the Debtors and their stakeholders than the Reorganization Transaction described below or are otherwise in the best interests of all stakeholders.  If the Debtors do not consummate the Sale Transaction following the sale process, the Debtors will consummate the Reorganization Transaction described below.

- Consummation of the Sale Transaction.  If the Special Committee, in good-faith consultation with and subject to the reasonable consent of the Required Consenting Secured Parties, determines to pursue and implement the Sale Transaction, the Sale Transaction shall be consummated on the effective date of the Plan.  A majority of the Debtors' senior secured creditors, however, may elect to pursue the Reorganization Transaction notwithstanding the Special Committee's selection of a successful bid.  Following consummation of the Sale Transaction, the Debtors shall make distributions to holders of claims and interests on the effective date of the Plan in accordance with the Bankruptcy Code and the Plan, and the Debtors shall be wound down and dissolved in accordance with applicable law to the extent that their equity interests are not acquired in connection with the Sale Transaction.

B.    **Overview of Reorganization Transaction**.

55.    Alternatively, the Debtors will pursue the Reorganization Transaction.    The

general terms of the Reorganization Transaction as follows.

- New Financing.  If no Sale Transaction is consummated, the Debtors either will (a) enter into a $2.75 billion loan facility comprising $2.0 billion in first-lien loans and $750 million in second-lien loans (collectively, the "New Loans"), which loans will be distributed *pro rata* to

the Debtors' prepetition senior secured creditors, or (b) obtain new third-party financing on terms no less favorable than the New Loans, the cash proceeds of which will be distributed *pro rata* to the Debtors' prepetition senior secured creditors. The Required Consenting Secured Parties shall determine whether the Debtors issue New Loans or obtain new third-party financing.

- <u>Distribution of Reorganized Equity Interests</u>. The Debtors' prepetition senior secured creditors will receive 95.75 percent of the equity interests in reorganized ITR Concession Company Holdings LLC ("<u>Reorganized Holdings</u>"), reorganized Statewide Mobility Partners LLC ("<u>Reorganized Statewide</u>") will receive the remaining 4.25 percent of the equity interests in Reorganized Holdings, and the Equity Sponsors will retain their equity interests in Reorganized Statewide. Prior to the effective date of the Plan and subject to certain other conditions, the Equity Sponsors may elect to receive some or all of $80 million in cash in lieu of the distribution of Reorganized Holdings interests to Reorganized Statewide. The amount of equity interests distributed to the Debtors' senior secured creditors and Reorganized Statewide is subject to adjustment if the principal amount of new debt or the new third-party financing is less than or greater than $2.75 billion. Additionally, the amount of the equity interests to be distributed to the Debtors' senior secured creditors is subject to dilution by an equity award to the new operator described below and increase if the Equity Sponsors elect to receive cash in lieu of some or all of the distribution of Reorganized Holdings interests, as described above.

- <u>New Manager</u>. The Equity Sponsors will have the right to operate and manage the Toll Road for an initial term of 10 years in exchange for consideration in the form of either cash reimbursement for the cost of services provided or up to three percent of the equity interests in Reorganized Holdings as elected by the equity sponsors, which equity interests shall vest on a straight line and *pro rata* basis over 10 years after the effective date of the Plan, commencing on the effective date of the Plan and ceasing upon termination of the management agreement pursuant to which the operator shall operate the Toll Road.

- <u>Post-Reorganization Put and Call Rights</u>. In the event of a change of control of, or sale of substantially all of the assets of, the reorganized Debtors during the 18-month period after consummation of the Plan, the Equity Sponsors and/or Reorganized Statewide, as applicable, shall have the right to cause Reorganized Holdings to purchase their share of the Reorganized Holdings interests for their share of $80 million, and Reorganized Holdings shall have the right to purchase the Reorganized Holdings interests held by Statewide for $100 million.

56.     Under both the Sale Transaction and the Reorganization Transaction, except as specifically provided in the Plan, all outstanding and undisputed general unsecured claims against the Debtors will be unimpaired and unaffected by the restructuring and will be paid in full in cash on the effective date of the Plan or in the ordinary course of business when such claims become due and owing.

25

IV.    **The Debtors' Solicitation Process and Proposed Confirmation Timeline**.

57.    Following the execution of the Restructuring Support Agreement, the Debtors commenced a prepackaged solicitation of the Plan on September 11, 2014, by delivering a copy of the Plan and a related Disclosure Statement (including ballots and, if applicable, a master ballot) to the Administrative Agent that maintains a registry of holders of Loan and Swap claims (for subsequent distribution to such holders) and holders of existing equity interests in Statewide, the only claims and interests entitled to vote to accept or reject the Plan.  The Debtors established September 17, 2014, at 4:00 p.m., prevailing Pacific Time, as the deadline by which votes to accept or reject the Plan must have been provided to the Debtors' proposed solicitation agent or the Administrative Agent, as applicable.  As of the Petition Date, Kurtzman Carson Consultants LLC ("KCC"), the Debtors' proposed solicitation agent, has confirmed that the master ballot submitted by the Administrative Agent reflecting the votes of holders of claims in Class 3, which comprises claims on account of the Loans and Swaps, and the ballots submitted by holders of interests in Class 7, which comprises existing equity interests in Statewide, demonstrate that holders of claims and interests entitled to vote on the Plan have voted overwhelmingly to accept the plan.

58.    Accordingly, contemporaneously with the filing of this Declaration, the Debtors have filed a motion seeking a joint hearing to both approve the adequacy of the Disclosure Statement and confirm the Plan (the "Combined Hearing").  The following table sets forth the anticipated timeline for these chapter 11 cases, subject to the Court's approval.

| Proposed Solicitation and Confirmation Timeline | |
|---|---|
| Voting Record Date[10] | September 10, 2014 |
| Distribution of Solicitation Package | September 11, 2014 |
| Voting Deadline[11] | September 17, 2014, at 4:00 p.m., prevailing Pacific Time |
| Class 3 Master Ballot Deadline[12] | September 19, 2014, at 4:00 p.m., prevailing Pacific Time |
| Distribution of Combined Hearing Notice | No later than two Business Days after entry of the Order, or such other date as the Court may direct |
| Publication of Publication Notice | No later than five Business Days after entry of the Order, or such other date as the Court may direct |
| Objection Deadline | October 14, 2014, at 4:00 p.m., prevailing Central Time, or such other date as the Court may direct |
| Cure Objection Deadline | On or before the later of the commencement of the Combined Hearing and ten Business Days following receipt of the Cure Notice, or such other date as the Court may direct |
| Deadline to File the Confirmation and Reply Brief | 12:00 p.m., prevailing Central Time, on the date that is two Business Days before the Combined Hearing |
| Combined Hearing | October 21, 2014, prevailing Central Time, or such date as the Court may direct |

## Overview of the First-Day Pleadings

59.     The Debtors have filed the First-Day Pleadings seeking targeted relief intended to

allow the Debtors to minimize the adverse effects of the commencement of these chapter 11

---

[10]   The "Voting Record Date" is the date on which it was determined which Holders of Claims in Class 3 and Interests in Class 7 were entitled to vote to accept or reject the Plan and whether Claims had been properly assigned or transferred such that an assignee could vote as the Holder of a Claim.

[11]   The "Voting Deadline" is the date and time on or before which all ballots must have been properly executed, completed, delivered, and actually received by KCC or the Administrative Agent, as applicable.

[12]   The "Class 3 Master Ballot Deadline" is the date and time on or before which the Administrative Agent's master ballot must have properly executed, completed, delivered, and actually received by KCC.

KE 27288081

cases on their ongoing business operations and preserve value for all stakeholders. The

First-Day Pleadings include the following motions seeking authority to:

- use cash collateral and ensure the holders of claims under the Loans and the Swaps are adequately protected;

- pay prepetition wages, and certain administrative costs related to those wages, to ensure their business operations can continue in the ordinary course;

- pay certain taxes and fees that accrued or arose in the ordinary course of business before the Petition Date;

- approve procedures governing the Debtors' proposed adequate assurance of payment for future service to the utility providers and procedures governing any requests for additional or different adequate assurance;

- honor prepetition obligations related to the customer programs that come due following the Petition Date and to continue the customer programs in the ordinary course of business in the postpetition period;

- continue to engage in transactions under the Skyway Toll Collection Agreement in the ordinary course of business after the Petition Date; and

- continue utilizing the Debtors' prepetition cash management system, including with to respect intercompany transactions.

60.     Court approval of the relief requested in the First-Day Pleadings is essential to

providing the Debtors with an opportunity to successfully meet their creditor obligations in a

manner that benefits all of the Debtors' constituents.

61.     I have reviewed each of the First-Day Pleadings.  The facts stated therein, the

description of the relief requested, and the facts supporting each motion and pleading are detailed

in **Exhibit A** to this declaration and are true and correct to the best of my information and belief.

I believe that the relief sought in each of the First-Day Pleadings is necessary because it will

among other things: (a) allow the Debtors to maintain baseline operations following the

commencement of these chapter 11 cases; (b) enable the Debtors to operate in chapter 11 with

minimal disruption to their business operations; and (c) minimize any loss of value to the

Debtors' business.   I believe that if the Court grants the relief requested in the First-Day Pleadings, the prospect of achieving these objectives—to the maximum benefit of the Debtors' estates, their creditors, and other parties in interest—will be substantially enhanced. Accordingly, I believe that the Court should grant each of the First-Day Pleadings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  September 21, 2014                  /s/ Fernando Redondo
Chicago, Illinois                           Fernando Redondo
                                            Chief Executive Officer
                                            ITR Concession Company LLC
                                            205 North Michigan Avenue
                                            Suite 2510
                                            Chicago, Illinois 60601

KE 27288081