NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, OR A LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST.  THIS PLAN IS SUBJECT TO APPROVAL OF THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES. YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE (INCLUDING IN CONNECTION WITH THE PURCHASE OR SALE OF THE DEBTORS' SECURITIES) BEFORE THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
|  | ) |
| ITR CONCESSION COMPANY LLC, *et al.*,[1] | ) Case No. 14-34284 (PSH) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |

### JOINT PREPACKAGED PLAN OF REORGANIZATION
### OF ITR CONCESSION COMPANY LLC, *ET AL.*,
### PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

James H.M. Sprayregen, P.C.
Marc Kieselstein, P.C.
Chad J. Husnick
Jeffrey D. Pawlitz
Gregory F. Pesce
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

*Proposed Counsel to the*
*Debtors and Debtors in Possession*

Dated:  September 11, 2014

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: ITR Concession Company LLC (0293); ITR Concession Company Holdings LLC (0285); and Statewide Mobility Partners LLC (1312).  The location of the Debtors' service address for the purposes of these chapter 11 cases is:  c/o ITR Concession Company LLC, 205 North Michigan Avenue, Suite 2510, Chicago, Illinois 60601.

# **TABLE OF CONTENTS**

**Page**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
GOVERNING LAW ......................................................................................................................... 1
  A.    Defined Terms. ................................................................................................................. 1
  B.    Rules of Interpretation. ................................................................................................... 13
  C.    Computation of Time. ..................................................................................................... 14
  D.    Governing Law. ............................................................................................................... 14
  E.    Reference to Monetary Figures. ...................................................................................... 14

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ............................ 14
  A.    Administrative Claims. .................................................................................................... 15
  B.    Professional Compensation. ............................................................................................ 15
  C.    Priority Tax Claims. ........................................................................................................ 16

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............ 16
  A.    Classification of Claims and Interests. ........................................................................... 16
  B.    Treatment of Claims and Interests. ................................................................................. 17
  C.    Certain Sale Transaction Considerations. ....................................................................... 19
  D.    Special Provision Governing Unimpaired Claims. ......................................................... 19
  E.    Acceptance or Rejection of the Plan. .............................................................................. 20
  F.    Elimination of Vacant Classes. ....................................................................................... 20
  G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .. 20
  H.    Controversy Concerning Impairment. ............................................................................. 20
  I.    Subordinated Claims. ...................................................................................................... 20

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................. 20
  A.    No Substantive Consolidation. ....................................................................................... 20
  B.    Restructuring Transactions. ............................................................................................ 21
  C.    Sources of Consideration for Plan Distributions. ........................................................... 21
  D.    Sale Transaction. ............................................................................................................. 21
  E.    Principal Means for Implementation of the Reorganization Transaction. ...................... 22
  F.    General Settlement of Claims and Interests. ................................................................... 26
  G.    Corporate Existence. ....................................................................................................... 26
  H.    Cancellation of Existing Securities and Agreements. ..................................................... 27
  I.    Corporate Action. ............................................................................................................ 27
  J.    Effectuating Documents; Further Transactions. .............................................................. 27
  K.    Section 1146 Exemption. ................................................................................................ 28
  L.    Preservation of Causes of Action. ................................................................................... 28
  M.    Payment of Certain Fees and Expenses. .......................................................................... 28

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...... 29
  A.    Assumption, Assumption and Assignment, and Rejection of Executory Contracts and
        Unexpired Leases. ........................................................................................................... 29
  B.    Claims Based on Rejection of Executory Contracts and Unexpired Leases. .................. 29
  C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ................. 29
  D.    Indemnification Obligations. ........................................................................................... 30
  E.    Insurance Policies. ........................................................................................................... 30
  F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements. ......... 31
  G.    Reservation of Rights. ..................................................................................................... 31
  H.    Nonoccurrence of Effective Date. ................................................................................... 31
  I.    Contracts and Leases Entered Into After the Petition Date. ............................................ 31

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .................................................31
   A.     Disbursing Agent. .................................................................................................31
   B.     Rights and Powers of Disbursing Agent. ...........................................................31
   C.     Delivery of Distributions and Undeliverable or Unclaimed Distributions.........32
   D.     Compliance with Tax Requirements. ..................................................................32
   E.     Allocations. .........................................................................................................32
   F.     No Postpetition Interest on Claims. ....................................................................32
   G.     Setoffs and Recoupment. ....................................................................................33
   H.     Claims Paid or Payable by Third Parties.............................................................33

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND DISPUTED
CLAIMS ...............................................................................................................................................33
   A.     Disputed Claims. ................................................................................................33
   B.     Objections to Claims and Interests.....................................................................34
   C.     Compromises and Settlements. ...........................................................................34
   D.     No Distributions Pending Allowance. .................................................................34
   E.     Distributions After Allowance. ..........................................................................34

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...........34
   A.     Discharge of Claims and Termination of Interests..............................................34
   B.     Release of Liens. .................................................................................................35
   C.     Releases by the Debtors. .....................................................................................35
   D.     Releases by Holders of Claims and Interests. .....................................................35
   E.     Exculpation. ........................................................................................................36
   F.     Injunction. ...........................................................................................................36
   G.     Protections Against Discriminatory Treatment. ..................................................37
   H.     Setoffs. ................................................................................................................37
   I.     Recoupment. ........................................................................................................37
   J.     Subordination Rights. .........................................................................................37
   K.     Document Retention. ..........................................................................................37

ARTICLE IX. EFFECT OF CONFIRMATION OF THE PLAN ......................................................37

ARTICLE X. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ...................38
   A.     Conditions Precedent to the Effective Date. .......................................................38
   B.     Waiver of Conditions. ........................................................................................38
   C.     Effect of Failure of Conditions. .........................................................................38

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN...................38
   A.     Sale Transaction. .................................................................................................38
   B.     Modification and Amendments. ..........................................................................39
   C.     Effect of Confirmation on Modifications. ...........................................................39
   D.     Revocation or Withdrawal of Plan. .....................................................................39

ARTICLE XII. RETENTION OF JURISDICTION.................................................................................39

ARTICLE XIII. MISCELLANEOUS PROVISIONS .............................................................................40
   A.     Immediate Binding Effect. ..................................................................................40
   B.     Additional Documents. .......................................................................................41
   C.     Payment of Statutory Fees. .................................................................................41
   D.     Statutory Committee and Cessation of Fee and Expense Payment. .....................41
   E.     Reservation of Rights. ........................................................................................41
   F.     Successors and Assigns.......................................................................................41
   G.     Notices. ...............................................................................................................41
   H.     Term of Injunctions or Stays...............................................................................43
   I.     Entire Agreement. ...............................................................................................43

J.      Exhibits...........................................................................................................43
K.      Nonseverability of Plan Provisions................................................................43
L.      Votes Solicited in Good Faith.........................................................................43
M.      Closing of Chapter 11 Cases...........................................................................44
N.      Waiver or Estoppel..........................................................................................44
O.      Conflicts............................................................................................................44

ITR Concession Company LLC, ITR Concession Company Holdings LLC, and Statewide Mobility Partners LLC, as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") propose this joint prepackaged plan of reorganization for the resolution of the outstanding claims against and interests in the Debtors pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A of the Plan. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, projections of future operations, and a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY, PARTICULARLY HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

**ARTICLE I.
DEFINED TERMS, RULES OF INTERPRETATION,
COMPUTATION OF TIME, AND GOVERNING LAW**

A.     *Defined Terms.*

As used in the Plan, capitalized terms have the meanings set forth below. Capitalized terms not defined herein shall have the meaning assigned to them in the Restructuring Support Agreement, or if not defined therein, in the Loan Agreement.

1.     "Accrued Professional Compensation Claims" means, at any given moment, all Claims for accrued fees and expenses for services rendered by a Professional through and including the Confirmation Date, to the extent such fees and expenses have not been paid pursuant to any order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim. For the avoidance of doubt, Accrued Professional Compensation Claims shall include the aggregate holdback (if any) of those Professional fees billed to the Debtors during the Chapter 11 Cases that are held back pursuant to any other order of the Bankruptcy Court. For the avoidance of doubt, the Committee of Secured Parties Restructuring Fees shall not constitute Accrued Professional Compensation Claims.

2.     "Administrative Agent" means The Royal Bank of Scotland plc, in its capacity as administrative agent under the Loan Agreement, and/or its successors in such capacity.

3.     "Administrative Claim" means any Claim for costs and expenses of administration of the Estates pursuant to section 503(b) of 507(a)(2) of the Bankruptcy Code, including any Cure Claim and the Committee of Secured Parties Restructuring Fees, other than any Accrued Professional Compensation Claim.

4.     "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

5.     "Allowed" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that either is not a Disputed Claim or has been allowed by a Final Order; (b) a Claim that is allowed (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; (c) a Claim relating to a rejected Executory Contract or Unexpired Lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order; or (d) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed by January 1, 2015; *provided* that the Senior Secured Claims, the Committee of Secured Parties Restructuring Fees shall be deemed Allowed in the absence of the filing of Proofs of Claim.

6.     "Assumed Insider Executory Contract and Unexpired Lease List" means the list (as may be amended from time to time prior to the Effective Date with the reasonable consent of the Debtors, the Required

1

Consenting Secured Parties, and the Consenting Interest Holders) of Insider Executory Contracts and Insider Unexpired Leases (including any amendments or modifications thereto) that will be assumed by the Debtors pursuant to Article V of the Plan.

7.    "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101−1532.

8.    "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Northern District of Illinois.

9.    "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

10.    "<u>Bar Date</u>" means the deadline for filing Proofs of Claim, as set forth in a separate Final Order of the Bankruptcy Court.

11.    "<u>Business Day</u>" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

12.    "<u>Cash</u>" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

13.    "<u>Causes of Action</u>" means any claims, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

14.    "<u>Certificate</u>" means any instrument evidencing a Claim or an Interest.

15.    "<u>Change in Control</u>" has the meaning set forth in the Reorganized Holdings LLC Agreement attached hereto as **Exhibit 3**.

16.    "<u>Chapter 11 Cases</u>" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

17.    "<u>Cintra</u>" means, collectively, Cintra ITR, LLC, Cintra Holdings US Corp., and Cintra Infraestructuras, S.A. and their respective Affiliates and managed funds and the managed funds of their respective Affiliates.

18.    "<u>Claim</u>" means any claim against the Debtors, as defined in section 101(5) of the Bankruptcy Code.

19.    "<u>Claims and Balloting Agent</u>" means Kurtzman Carson Consultants LLC, located at 2335 Alaska Avenue, El Segundo, California 90245.

20.    "<u>Class</u>" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

21.    "<u>Collateral Agent</u>" means Citibank, N.A., in its capacity as collateral agent under the Collateral Agreement.

22.     "Collateral Agreement" means that certain Collateral Agency and Account Agreement dated as of June 26, 2006, among the Concessionaire, the Administrative Agent, and Citibank, N.A., in its capacity as collateral agent thereunder.

23.     "Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Cases by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code, if any.

24.     "Committee of Secured Parties" means the group of certain Holders of Senior Secured Claims represented by Milbank, Tweed, Hadley & McCloy LLP and Houlihan Lokey Capital, Inc.

25.     "Committee of Secured Parties Restructuring Fees" means, as of the Effective Date, (a) all accrued and unpaid reasonable, actual, and documented fees and out-of-pocket expenses of Milbank, Tweed, Hadley & McCloy LLP payable pursuant to that certain letter agreement, dated as of July 7, 2014; (b) all accrued and unpaid reasonable, actual, and documented fees and out-of-pocket expenses of Taft Stettinius & Hollister LLP payable pursuant to that certain letter agreement, dated as of July 8, 2014; (c) all accrued and unpaid reasonable and documented fees and out-of-pocket expenses of Houlihan Lokey Capital, Inc. payable pursuant to that certain letter agreement, dated as of March 26, 2014; (d) all accrued and unpaid reasonable and documented fees and out-of-pocket expenses of RPA Advisors, LLC payable pursuant to that certain letter agreement, dated as of July 10, 2014; and (e) all accrued and unpaid reasonable and documented fees and out-of-pocket expenses of any additional professionals retained with the prior written consent of the Debtors, such consent not to be unreasonably withheld, by the Committee of Secured Parties or by Milbank, Tweed, Hadley & McCloy LLP.

26.     "Committee of Secured Parties Steering Group" means the steering group of members of the Committee of Secured Parties identified by counsel to the Committee of Secured Parties.

27.     "Concession Agreement" means that certain Indiana Toll Road Concession and Lease Agreement, dated as of April 12, 2006, between the Concessionaire and the IFA, as amended, modified, or supplemented from time to time.

28.     "Concessionaire" means ITR Concession Company LLC, a Delaware limited liability company and a Debtor in the Chapter 11 Cases.

29.     "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

30.     "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

31.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider approval of the Disclosure Statement pursuant to sections 1125(a) and 1126 of the Bankruptcy Code and Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

32.     "Confirmation Order" means the order of the Bankruptcy Court finding that the Disclosure Statement contained "adequate information" (as such term is defined in section 1125(a) and used in section 1126(b)(2) of the Bankruptcy Code) and confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

33.     "Confirmation Order Findings of Fact and Conclusions of Law" means the proposed findings of fact and conclusions of law made by the Bankruptcy Court, each of which shall be: (a) reasonably acceptable to the Debtors, the Consenting Secured Parties, and the Consenting Interest Holders; (b) deemed to have been made and issued pursuant to Bankruptcy Rule 7052; and (c) made applicable to the Chapter 11 Cases pursuant to Bankruptcy Rule 9014.  Upon entry of the Confirmation Order, the Confirmation Order Findings of Fact and Conclusions of Law shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if they are stated as findings of fact.

34.     "<u>Consenting Hedging Parties</u>" means the Holders of Hedging Claims party to the Restructuring Support Agreement.

35.     "<u>Consenting Interest Holders</u>" means the Holders of Interests in the Debtors party to the Restructuring Support Agreement.

36.     "<u>Consenting Lenders</u>" means the Holders of the Loan Claims party to the Restructuring Support Agreement.

37.     "<u>Consenting Secured Parties</u>" means, collectively:   (a) the Consenting Lenders; and (b) the Consenting Hedging Parties.

38.     "<u>Consummation</u>" means the occurrence of the Effective Date.

39.     "<u>Cure Claim</u>" means a Claim based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

40.     "<u>Debtors</u>" has the meaning ascribed to it in the preamble to the Plan.

41.     "<u>Disbursing Agent</u>" means the Entity or Entities selected by the Debtors or Reorganized Debtors, as applicable, to make or facilitate distributions pursuant to the Plan.

42.     "<u>Disclosure Statement</u>" means the *Disclosure Statement Relating to the Joint Prepackaged Plan of Reorganization of ITR Concession Company LLC, et. al., Pursuant to Chapter 11 of the Bankruptcy Code*, dated September 11, 2014, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

43.     "<u>Disputed</u>" means (a) any Claim or Interest for which a Proof of Claim is required to be filed and (i) no Proof of Claim has been timely filed, (ii) an objection has been timely interposed, or (iii) the time for filing an objection to such Claim has not expired and no order of the Bankruptcy Court allowing such Claim has been entered, or (b) any Claim or Interest (other than a Senior Secured Claim, Holdings Interest, or Statewide Interest) with respect to which the Debtors otherwise dispute the amount, enforceability or validity of or liability.

44.     "<u>Distribution Record Date</u>" means the record date for purposes of making distributions under the Plan on account of Allowed Claims and Allowed Interests, which date shall be the 5 Business Days prior to the Effective Date.

45.     "<u>DTC</u>" means the Depository Trust Corporation or any successor thereto.

46.     "<u>Effective Date</u>" means, with respect to the Plan, the date that is a Business Day selected by the Debtors pursuant to the procedures set forth in the Restructuring Support Agreement on which:  (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article X of the Plan have been satisfied or waived (in accordance with Article X.B of the Plan); (c) the Plan is declared effective by the Debtors; and (d) the Debtors shall have Filed notice of the Effective Date with the Bankruptcy Court.  Any action to be taken on the Effective Date, other than distributions to the Senior Secured Parties pursuant to Article III.B.3(c) of the Plan and distributions to the Consenting Interest Holders pursuant to Article III.B.7 of the Plan, both of which distributions must be made on the Effective Date, may be taken on or as soon as reasonably practicable after the Effective Date.

47.     "<u>Entity</u>" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

48.     "<u>Equity Security</u>" means any equity security, as defined in section 101(16) of the Bankruptcy Code, in a Debtor.

49.    "Estate" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

50.    "Exculpated Claim" means any Claim related to any act or omission in connection with, relating to, or arising out of the Plan or Restructuring Transactions, the formulation, preparation, dissemination, negotiation of any document in connection with the Plan, the Restructuring Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property pursuant to the Plan.

51.    "Executory Contract" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

52.    "E-ZPass Agreement" means that certain E-ZPass Operations Interagency Agreement, dated as of February 20, 1998, among the Concessionaire, E-ZPass Group, Inc., as successor in interest to Interagency Group, Inc., and the toll operations party thereto from time to time.

53.    "Federal Judgment Rate" means the federal judgment interest rate in effect as of the Petition Date.

54.    "File" or "Filed" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

55.    "Final Order" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

56.    "General Unsecured Claim" means any Unsecured Claim other than:  (a) Intercompany Claims; (b) Administrative Claims; (c) Accrued Professional Compensation Claims; (d) Priority Tax Claims; and (e) Other Priority Claims.

57.    "Governmental Unit" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

58.    "Hedging Agreements" means those certain ISDA Master Agreements and Schedules, between the Concessionaire and the hedge counterparties thereto, described in the Loan Agreement, pursuant to which, among other things, the Concessionaire hedged certain interest rate payment obligations under the Loans, as amended, modified, or supplemented from time to time.

59.    "Hedging Parties" means the banks and other financial institutions from time to time parties to the Hedging Agreements.

60.    "Hedging Claim" means any Claim on account of the Hedging Agreements which shall be deemed Allowed as set forth in **Exhibit 4** hereto plus accrued interest through the Effective Date at the Hedging Claim Interest Rate, as well as any other fees, expenses, or other obligations owed to the Senior Secured Parties under the Loan Agreement, the Hedging Agreements, and any related documents.

61.    "Hedging Claim Interest Rate" means 4.4% per annum.

62.    "Holder" means an Entity holding a Claim or an Interest, as applicable.

5

63. "<u>Holdings</u>" means ITR Concession Company Holdings LLC, a Delaware limited liability company and a Debtor in the Chapter 11 Cases.

64. "<u>Holdings Interests</u>" means all existing Interests in Holdings.

65. "<u>IFA</u>" means the Indiana Finance Authority.

66. "<u>Impaired</u>" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

67. "<u>Indemnification Obligations</u>" means each of the Debtors' indemnification provisions in place as of the Effective Date, whether in the bylaws, certificates of incorporation, other formation documents, board resolutions, or employment contracts for their current and former directors, members, trustees, officers, and managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors, members, trustees, officers, and managers' respective Affiliates.

68. "<u>Initial Consenting Secured Parties</u>" means those Consenting Secured Parties that became party to the Restructuring Support Agreement on the effective date thereof.

69. "<u>Insider</u>" has the meaning set forth in section 101(31) of the Bankruptcy Code.

70. "<u>Insider Executory Contract</u>" means an Executory Contract to which one or more Debtors and one or more non-Debtor Insiders or Affiliates of Insiders are parties.

71. "<u>Insider Unexpired Lease</u>" means an Unexpired Lease to which one or more Debtors and one or more non-Debtor Insiders or Affiliates of Insiders are parties.

72. "<u>Intercompany Claim</u>" means any Claim against a Debtor held by another Debtor.

73. "<u>Intercompany Interest</u>" means any Interest in a Debtor held by another Debtor.

74. "<u>Interest</u>" means any: (a) Equity Security; and (b) all issued, unissued, authorized, or outstanding shares of capital stock and partnership, limited liability company interests, and similar interests in the Debtors together with any warrants, options, or contractual rights to purchase or acquire such capital stock or interests at any time and all rights arising with respect thereto.

75. "<u>Judicial Code</u>" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

76. "<u>Lenders</u>" means the banks and other financial institutions from time to time party to the Loan Agreement.

77. "<u>Lien</u>" means a lien as defined in section 101(37) of the Bankruptcy Code.

78. "<u>Loans</u>" means the loans in the outstanding aggregate principal amount, as of the Petition Date, of $3,855,454,497.83 (exclusive of unpaid interest, whether or not such interest was accrued but unpaid as of the Petition Date), arising under the Loan Agreement. For the avoidance of doubt, the Loans shall not include any amounts due under the Hedging Agreements.

79. "<u>Loan Agreement</u>" means that certain Loan Agreement, dated as of June 26, 2006, among the Concessionaire, the Administrative Agent, and the Lenders, as amended, modified, or supplemented from time to time.

80. "<u>Loan Claim</u>" means any Claim on account of the Loans plus accrued interest through the Effective Date at the default rate, as well as any other fees, expenses, or other obligations owed to the Senior Secured Parties under the Loan Agreement, the Hedging Agreements, and any related documents.

81.    "Local Rules" means the Local Rules promulgated by the Bankruptcy Court, effective January 1, 2012.

82.    "Macquarie" means, collectively, Macquarie Atlas Roads, Macquarie Infrastructure Partners, Inc., Indiana Toll Road Partnership, and MQA Indiana Holdings LLC and their respective Affiliates and managed funds and the managed funds of their respective Affiliates.

83.    "Majority Secured Parties" means Senior Secured Parties representing at least 50 percent in amount of Senior Secured Claims.

84.    "Management Consideration" means, at the Consenting Interest Holders' sole and exclusive discretion, either:  (a) the Management Equity Consideration; or (b) the Management Cash Consideration.

85.    "Management Cash Consideration" has the meaning ascribed to it in the Omnibus Services Agreement.

86.    "Management Equity Consideration" has the meaning ascribed to it in the Omnibus Services Agreement.

87.  "Manager" means, solely with respect to the Reorganization Transaction, Cintra and/or Macquarie and/or any Affiliate or personnel thereof providing services under the Omnibus Services Agreement and operating the Toll Road on behalf of Reorganized Holdings and the Reorganized Concessionaire in accordance with the terms thereof.

88.    "Net Sale Transaction Proceeds" means, solely upon closing of the Sale Transaction, the Sale Transaction Proceeds less the aggregate amount of the following Claims to the extent they do not constitute assumed liabilities pursuant to the Purchase Agreement or are not paid in full in Cash by the Debtors, the Reorganized Debtors, or the Purchaser, as applicable, prior to the Effective Date:  (a) Allowed Other Secured Claims (except to the extent the Purchase Agreement provides for a different method of rendering such Claims Unimpaired); (b) Allowed Administrative Claims; (c) Allowed Accrued Professional Compensation Claims; (d) Allowed Priority Tax Claims; (d) Allowed Other Priority Claims (unless paid in another manner permitted by section 1129(a)(9)(C) of the Bankruptcy Code); (e) Allowed General Unsecured Claims; and (f) any other Cash to be paid or reserved for payments pursuant to and in accordance with the Plan and the Purchase Agreement, including sufficient Cash necessary for the Wind Down as determined by the Debtors and the Consenting Secured Parties.

89.    "New Credit Agreement" means, solely with respect to the Reorganization Transaction, the credit agreement to be entered into by the Reorganized Concessionaire and the Holders of Allowed Senior Secured Claims on the Effective Date, the form of which shall be included in the Plan Supplement and consistent with the New Debt Term Sheet.

90.    "New Debt Documents" means, solely with respect to the Reorganization Transaction, the New Credit Agreement and the New Intercreditor Agreement.

91.    "New Debt Term Sheet" means the term sheet attached hereto as **Exhibit 1**.

92.    "New Holdings Interests" means the Equity Securities in Reorganized Holdings to be issued pursuant to the Plan, the form of which Equity Securities shall be included in the Plan Supplement and issued or certificated, as applicable, in accordance with the Reorganized Holdings LLC Agreement.

93.    "New Intercreditor Agreement" means, solely with respect to the Reorganization Transaction, the Intercreditor Agreement to be entered into by the Reorganized Concessionaire and the parties classified as lenders under the New Credit Agreement or the parties providing the New Third-Party Financing, as applicable, on the Effective Date, the form of which shall be included in the Plan Supplement and materially consistent with the New Debt Term Sheet.

94.     "New Loans" means, solely with respect to the Reorganization Transaction, the loans to be entered into by the Reorganized Concessionaire and Holders of Allowed Senior Secured Claims on the Effective Date, in accordance with the terms of the New Credit Agreement, to the extent that New Third-Party Financing is not obtained pursuant to the Plan.

95.     "New Organizational Documents" means, solely with respect to the Reorganization Transaction, collectively, the following documents, the forms of which agreements shall be consistent with the Restructuring Support Agreement and included in the Plan Supplement (to the extent not attached hereto):  (a) the Reorganized Concessionaire LLC Agreement; (b) the Reorganized Holdings LLC Agreement; and (c) the certificates or articles of incorporation, by-laws, or such other applicable formation documents of each of the Reorganized Debtors.

96.     "New Security Documents" means the Security Agreement and other related documents reasonably required by the Required Consenting Secured Parties to perfect the security interests granted by the Reorganized Concessionaire pursuant to the New Debt Documents or Third-Party Financing Documents, as applicable, the forms of which shall be included in the Plan Supplement.

97.     "New Third-Party Financing" means, solely with respect to a Reorganization Transaction, one or more new loans to, or issuances of notes, bonds, or other instruments by, either Reorganized Holdings or the Reorganized Concessionaire on terms no less favorable, when taken as a whole, than the New Loans pursuant to which the Debtors will receive Cash on the Effective Date to the extent that the New Loans are not issued pursuant to the Plan.

98.     "New Third-Party Financing Documents" means, solely with respect to the Reorganization Transaction, the New Security Documents, the New Intercreditor Agreement, and the other documents implementing the New Third-Party Financing.

99.     "New Third-Party Financing Proceeds" means the Cash proceeds of the New Third-Party Financing.

100.     "Omnibus Services Agreement" means, with respect to the Reorganization Transaction, the agreement pursuant to which the Manager shall operate the Toll Road on behalf of Reorganized Holdings and the Reorganized Concessionaire, the form of which shall be included in the Plan Supplement, consistent with the terms of the Omnibus Services Agreement Term Sheet, and the form and substance of which shall be reasonably acceptable to the Manager and the Required Consenting Secured Parties.

101.     "Omnibus Services Agreement Term Sheet" means the term sheet setting forth the material terms of the Omnibus Services Agreement attached hereto as **Exhibit 2**.

102.     "Other Priority Claims" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

103.     "Other Secured Claim" means any Secured Claim other than a Senior Secured Claim.

104.     "Petition Date" means the date on which the Debtors commenced the Chapter 11 Cases.

105.     "Plan" means this *Joint Prepackaged Plan of Reorganization of ITR Concession Company LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement, which is incorporated herein by reference.

106.     "Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits, each of which shall be reasonably acceptable to the Debtors, the Required Consenting Secured Parties, and the Consenting Interest Holders except as provided herein, to be Filed by the Debtors, no later than five (5) Business Days prior to the Confirmation Hearing, including the following:  (a) the form of the New Organizational Documents (to the extent not attached hereto); (b) to the extent identified, a list of retained Causes of Action; (c) the form of the New Debt Documents; (d) to the extent known, the identity of the directors, managers, officers, and

other management for the Reorganized Debtors; (e) the form of the Omnibus Services Agreement; (f) the form of the New Holdings Interests; (g) to the extent available, the form of any Sale Transaction Documents distributed by the Special Committee to potentially interested parties; (h) to the extent available, the form of the New Third-Party Financing Documents; (i) the New Security Documents; (j) the Confirmation Order Findings of Fact and Conclusions of Law; and (k) the Reorganization Transaction Steps Memorandum. Any reference to the Plan Supplement in the Plan shall include each of the documents identified above. The Debtors shall have the right to amend the documents contained in the Plan Supplement through and including the Effective Date in accordance with Article X of the Plan (including, for the avoidance of doubt, to reflect the terms and conditions of the Sale Transaction).

107. "Postpetition Period" means the period of time following the Petition Date through the Effective Date.

108. "Priority Tax Claim" means the Claims of Governmental Units of the type specified in section 507(a)(8) of the Bankruptcy Code.

109. "Pro Rata" means the proportion that a Claim or Interest in a particular Class bears to the aggregate amount of the Claims or Interests in that Class, or the proportion of the Claims or Interests in a particular Class and other Classes entitled to share in the same recovery as such Claim or Interest under the Plan.

110. "Professional" means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code, including, for the avoidance of doubt, Entities employed by the Debtors in connection with any Sale Transaction.

111. "Professional Fee Account" means a segregated interest-bearing escrow account to hold and maintain an amount of Cash equal to the Professional Fee Amount funded by the Debtors before the Effective Date solely for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

112. "Professional Fee Amount" means the aggregate Accrued Professional Compensation Claims through the Confirmation Date as estimated in accordance with Article II.B.3 of the Plan.

113. "Proof of Claim" means the proof of Claim Filed by a holder on account of such Claim; *provided* that Holders of Senior Secured Claims and Entities to which all or a portion of the Committee of Secured Parties Restructuring Fees are owed shall not be required to file a proof of any such Claims.

114. "Purchase Agreement" means, solely with respect to the Sale Transaction, the asset purchase agreement between the Debtors and the Purchaser, which shall be in form and substance reasonably acceptable to the Required Consenting Secured Parties.

115. "Put Election" means, solely with respect to the Reorganization Transaction, no more than one (1) election by Macquarie on behalf of Macquarie Atlas Roads, no more than one (1) election by Macquarie on behalf of Macquarie Infrastructure Partners, Inc., and no more than one (1) election by Cintra, in each case prior to the Effective Date, to receive with respect to each such election, in lieu of the treatment afforded under Article III.B.7(b)(ii) of the Plan, in an amount equal to its Pro Rata share of $80,000,000 in the aggregate payable either in Cash (to the extent that the Debtors reasonably determine that Reorganized Holdings and/or the Reorganized Concessionaire shall have sufficient Cash to operate the Toll Road in a prudent manner based upon historical practices and otherwise in accordance with the Concession Agreement after making such payment) or, to the extent Cash is not available, such other form of consideration agreed upon by Statewide, the Debtors, and the Required Consenting Secured Parties. For the avoidance of doubt, Statewide shall receive its Pro Rata Share of the Statewide Interest Equity Distribution in respect of the portion of the $80,000,000 for which no election is made by (x) Macquarie on behalf of Macquarie Atlas Road and/or Macquarie Infrastructure Partners and/or (y) Cintra.

116.    "Qualified Bid" means a bid to purchase all or substantially all of the Debtors' assets, or Interests in the Debtors owning all or substantially all of the Debtors' assets, that the Special Committee determines, in an exercise of its business judgment:  (a) provides, or is reasonably likely to provide, sufficient Cash consideration to satisfy the following Claims in full in Cash in accordance with the priorities set forth in the Plan: (i) Allowed Other Secured Claims (except to the extent the Purchase Agreement provides for a different method of rendering such Claims Unimpaired); (ii) Allowed Administrative Claims; (iii) Allowed Professional Fee Claims; (iv) Allowed Priority Tax Claims (unless paid in another manner permitted by section 1129(a)(9)(C) of the Bankruptcy Code); (v) Allowed Other Priority Claims; and (vi) Allowed General Unsecured Claims (to the extent that such bid does not propose to pay Allowed General Unsecured Claims in full in Cash in the ordinary course of business after the Effective Date); (b) provides consideration that the Debtors and the Required Consenting Secured Parties determine is sufficient to pay or reserve for payments pursuant to and in accordance with the Plan and the Purchase Agreement, including consideration sufficient to wind down the Debtors' Estates following the closing of the Sale Transaction, it being understood that any Qualified Bid must provide the means to pay the Statewide Interest Sale Transaction Distribution in Cash on the Effective Date; (c) with respect to Allowed General Unsecured Claims, provides, or is reasonably likely to provide, for payment of such Claims in full in Cash, Reinstates such Claims, or provides other treatment rendering such Claims Unimpaired; and (d) includes such other terms and conditions as the Special Committee may reasonably require.

117.    "Reinstated" or "Reinstatement" means:  notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:  (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of such Claim or Interest (other than a Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder such that the applicable Claim or Interest is Unimpaired.

118.    "Rejected Executory Contract and Unexpired Lease List" means the list (as may be amended from time to time prior to the Effective Date) of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Debtors pursuant to Article V of the Plan.

119.    "Released Party" means each of the following in its respective capacity as such:  (a) Cintra; (b) Macquarie; (c) the Committee (if any) and the members thereof; (d) the Skyway Concessionaire; (e) the Administrative Agent; (f) the Collateral Agent; (g) the Senior Secured Parties; (h) Committee of Secured Parties and the members thereof; (i) with respect to each of the Entities in clauses (a) through (h), each such Entity's current and former Affiliates and subsidiaries and each such Entity's, Affiliate's, and subsidiary's respective current and former officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; and (j) with respect to the Debtors and Reorganized Debtors, their respective current and former Affiliates and subsidiaries and such Affiliates' and subsidiaries' respective current and former officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

120.    "Releasing Parties" means each of the following in its respective capacity as such:  (a) Cintra; (b) Macquarie; (c) the Consenting Senior Secured Parties; (d) those Holders of Claims and Interests that are presumed to accept the Plan; (e) all Holders of Claims and Interests who vote to accept the Plan; and (f) all Holders in a voting Class who abstain from voting on the Plan and who do not opt out of the releases provided by the Plan. To the extent that any Entity is a Releasing Party for any purpose, such Entity shall constitute a Releasing Party for all purposes.

121.    "Reorganized Concessionaire" means, solely with respect to the Reorganization Transaction, the Concessionaire, as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

122.    "Reorganized Debtors" means, solely with respect to the Reorganization Transaction, collectively: (a) the Reorganized Concessionaire; (b) Reorganized Holdings; (c) Reorganized Statewide; and (d) with respect to each of the foregoing entities in clauses (a) through (c), any Affiliates of the Debtors or Reorganized Debtors, as applicable, formed to effectuate the Restructuring Transactions.

123.    "Reorganized Holdings" means, solely with respect to the Reorganization Transaction, Holdings, as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

124.    "Reorganized Holdings LLC Agreement" means, solely with respect to the Reorganization Transaction, the limited liability company agreement for Reorganized Holdings, the form of which is attached hereto as **Exhibit 3.**

125.    "Reorganized Statewide" means, solely with respect to the Reorganization Transaction, Statewide, as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

126.    "Reorganization Transaction" means, collectively, (a) the issuance of the New Holdings Interests, (b) the entry into the New Loans or the New Third-Party Financing, as applicable, (c) the execution of the Omnibus Services Agreement, (d) the execution of the New Organizational Documents, (e) the vesting of the Debtors' assets in the Reorganized Debtors, in each case in accordance with the Plan; and (f) the other transactions that either (x) the Debtors and the Required Consenting Secured Parties, or (y) Reorganized Holdings, as applicable, determine are necessary or appropriate to implement the foregoing, in each case in accordance with the Plan and the Restructuring Support Agreement.

127.    "Reorganization Transaction Election Notice" means a notice from the Majority Secured Parties to the Special Committee directing the Debtors to pursue the Reorganization Transaction notwithstanding any decision to the contrary by the Special Committee with respect to the Sale Transaction.  Upon receipt of a Reorganization Transaction Election Notice, the Special Committee will be deemed to have terminated the sale process in all respects and the Debtors shall be required to pursue the Reorganization Transaction.

128.    "Required Consenting Secured Parties" means Initial Consenting Secured Parties representing at least a majority of the outstanding principal amount of Senior Secured Claims held by all Initial Consenting Secured Parties.

129.    "Restructuring Documents" means the Plan, Disclosure Statement, Plan Supplement, New Debt Documents, New Security Documents, Sale Transaction Documents (if any), New Third-Party Financing Documents, and various agreements and other documentation formalizing the Plan, in each case in accordance with the Restructuring Support Agreement.

130.    "Restructuring Support Agreement" means that certain Restructuring Support Agreement, effective as of or prior to the Petition Date, among the Debtors, the Consenting Secured Parties, and the Consenting Interest Holders.

131.    "Restructuring Transactions" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions contemplated by either the Reorganization Transaction or the Sale Transaction, as applicable; *provided* that each such transaction shall be consistent with the terms of the Restructuring Support Agreement.

132.    "Reorganization Transaction Steps Memorandum" means the memorandum setting forth the Restructuring Transactions that will occur on the Effective Date with respect to the Reorganization Transaction.

133. "<u>Sale Transaction</u>" means a sale of all or substantially all of the Debtors' assets, or Interests in the Debtors owning all or substantially all of the Debtors' assets, contemplated by the Successful Bid, which sale shall be approved by the Special Committee, subject to the terms and conditions set forth in Article IV.D of the Plan.

134. "<u>Sale Transaction Documents</u>" means the documents setting forth the definitive terms of the Sale Transaction (if any), including the Purchase Agreement, which documents shall be reasonably acceptable to the Required Consenting Secured Parties.

135. "<u>Sale Transaction Proceeds</u>" means the Cash and non-Cash consideration provided by an Entity in connection with the Sale Transaction.

136. "<u>Second Lien Loans</u>" shall have the meaning ascribed to it in the New Debt Term Sheet.

137. "<u>Second Lien Loan Purchase Proceeds</u>" shall mean the Cash proceeds of the Second Lien Loan Purchase Election

138. "<u>Second Lien Loan Purchase Election</u>" means, solely with respect to the Reorganization Transaction, each Consenting Interest Holder's right to purchase for cash at par, upon and subject to the issuance of Second Lien Loans, its pro rata share, but not less than its pro rata share, of 4.25 percent of the total amount of Second Lien Loans issued pursuant to the Plan.

139. "<u>Secured</u>" means when referring to a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed as such pursuant to the Plan.

140. "<u>Securities Act</u>" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder.

141. "<u>Security</u>" means a security as defined in section 2(a)(1) of the Securities Act.

142. "<u>Senior Secured Claims</u>" means, collectively:  (a) the Loan Claims; and (b) the Hedging Claims.

143. "<u>Senior Secured Party Equity Distribution</u>" means, solely with respect to the Reorganization Transaction, 95.75 percent of the New Holdings Interests, (a) subject to dilution by the Management Equity Consideration to the extent that the Consenting Interest Holders elect to receive the Management Equity Consideration in lieu of the Management Cash Consideration, (b) subject to adjustment if the Statewide Interest Equity Distribution is increased or decreased due to the principal amount of the New Loans or New Third-Party Financing, as applicable, being greater than or less than $2.75 billion as of the Effective Date, and (c) subject to increase if the Put Election is exercised (in which case the Senior Secured Party Equity Distribution shall be 100 percent of the New Holdings Interests subject to dilution and adjustment as set forth in subsections (a) and (b)), which New Holdings Interests shall be fully vested and, subject to applicable law and the Reorganized Holdings LLC Agreement, freely transferrable by the Holders thereof as of the Effective Date.

144. "<u>Senior Secured Party Sale Transaction Distribution</u>" means, solely upon closing the Sale Transaction (if any), the Net Sale Transaction Proceeds, subject to payment of the Statewide Interest Sale Transaction Distribution, as well as the proceeds of any remaining Cash, property, or other assets of the Debtors not otherwise used to fund obligations under the Plan, up to the Allowed amount of Senior Secured Claims.

145. "<u>Senior Secured Parties</u>" means, collectively:  (a) the Lenders; and (b) the Hedging Parties.

146.    "<u>Skyway Agreements</u>" means the various intercompany arrangements between the Concessionaire and the Skyway Concessionaire, including that certain Electronic Toll Collection Agreement, dated as of September 23, 2008, between the Concessionaire and the Skyway Concessionaire.

147.    "<u>Skyway Concessionaire</u>" means Skyway Concession Company LLC, a Delaware limited liability company.

148.    "<u>Special Committee</u>" means the special committee of the Board of Directors of Statewide appointed prior to the Petition Date for purposes of overseeing a sale of substantially all of the Debtors' assets.

149.    "<u>Statewide</u>" means Statewide Mobility Partners LLC, a Delaware limited liability company and a Debtor in the Chapter 11 Cases.

150.    "<u>Statewide Interest Equity Distribution</u>" means, solely with respect to the Reorganization Transaction, 4.25 percent of the New Holdings Interests, subject to adjustment if the Statewide Interest Equity Distribution is increased or decreased due to the principal amount of the New Loans or New Third-Party Financing, as applicable, being greater than or less than $2.75 billion as of the Effective Date, which New Holdings Interests shall be fully vested and, subject to applicable law and the Reorganized Holdings LLC Agreement, freely transferrable by the Holders thereof as of the Effective Date; *provided* that any dispute between Statewide and the Reorganized Debtors regarding the amount of any such adjustment shall be determined by an independent third-party valuation expert jointly selected by Statewide and the Required Consenting Secured Parties.

151.    "<u>Statewide Interest Sale Transaction Distribution</u>" means, solely with respect to the Sale Transaction, Cash in amount equal to the greater of:  (a) $80,000,000; and (b) $80,000,000 <u>plus</u> four percent of the Net Sale Transaction Proceeds in excess of $4,500,000,000, subject to an overall cap of $100,000,000; *provided* that notwithstanding anything to the contrary in this definition, Holders of Statewide Interests shall receive all Net Sale Transaction Proceeds in excess of the Allowed amount of Senior Secured Claims.  For the avoidance of doubt, the Statewide Interest Sale Transaction Distribution shall be payable in full in Cash upon consummation of any Sale Transaction.

152.    "<u>Statewide Interests</u>" means all existing Interests in Statewide.

153.    "<u>Successful Bid</u>" means the Qualified Bid, if any, selected by the Special Committee, subject to the terms and conditions set forth in Article IV.D of the Plan, as the highest or otherwise best proposal to acquire all or substantially all of the Debtors' assets.

154.    "<u>Unexpired Lease</u>" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

155.    "<u>Unimpaired</u>" means, solely with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

156.    "<u>Unsecured Claim</u>" means any Claim that is not a Secured Claim.

157.    "<u>U.S. Trustee</u>" means the Office of the United States Trustee for the Northern District of Illinois.

158.    "<u>Wind Down</u>" means, following the closing of the Sale Transaction, the process to wind down, dissolve, and liquidate the Estates.

B.    *Rules of Interpretation*.

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form

or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented from time to time; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code (other than section 102(5) of the Bankruptcy Code) shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's Case Management and Electronic Case Filing system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended, modified, or supplemented from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (14) any immaterial effectuating provisions may be interpreted by the Debtors or Reorganized Holdings, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan, subject to the reasonable approval of the Required Consenting Secured Parties and the Consenting Interest Holders, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C.     *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.     *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.     *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.      *Administrative Claims*.

Unless otherwise agreed to by the holder of an Allowed Administrative Claim, the Debtors or Reorganized Holdings, as applicable, subject to the reasonable consent of the Required Consenting Secured Parties and the Consenting Interest Holders, such consent not to be unreasonably withheld, each holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either:  (1) on the Effective Date, or as soon as practicable thereafter, (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter, or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the holders of such Allowed Administrative Claims.

B.      *Professional Compensation*.

1.      Professional Fee Account.

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish the Professional Fee Account.  The Debtors shall fund the Professional Fee Account with Cash equal to the Professional Fee Amount.  The Professional Fee Account shall be funded on the Effective Date and maintained in trust for the Professionals and shall not be considered property of the Debtors' Estates or the Reorganized Debtors, as applicable; *provided*, *however*, that Reorganized Holdings shall have a reversionary interest in the excess, if any, of the amount of the Professional Fee Account over the aggregate Allowed Accrued Professional Compensation Claims to be paid from the Professional Fee Account.

2.      Final Fee Applications and Payment of Accrued Professional Compensation Claims.

All final requests for payment of Accrued Professional Compensation Claims incurred during the period from Petition Date through the Confirmation Date, shall be Filed no later than 45 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court.  The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Account when such Claims are Allowed by a Final Order.  To the extent that funds held in the Professional Fee Account are unable to satisfy the amount of Accrued Professional Compensation Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II of the Plan.  After all Accrued Professional Compensation Claims have been paid in full, the Final Order allowing such Accrued Professional Compensation Claims shall direct the escrow agent to return any excess amounts to Reorganized Holdings.

3.      Estimation of Fees and Expenses.

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals shall estimate their Accrued Professional Compensation Claims through and including the Confirmation Date and shall deliver such estimate to the Debtors by a date in advance of the Effective Date; *provided* that such estimate shall not be considered an admission or a cap with respect to the fees and expenses of such Professionals and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated shall comprise the Professional Fee Amount.

4.      Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or Reorganized Holdings, as applicable, shall, in the ordinary course of business and without any further notice to or

action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors or Reorganized Holdings, as applicable.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking compensation for services rendered after such date shall terminate, and the Debtors may pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.  A copy of each invoice submitted by a Professional for post-Confirmation Date fees and expenses shall be delivered to counsel to the Committee of Secured Parties, and such invoices shall include:  (a) the names of the attorneys and other individuals who performed services in the period covered by such invoice and, to the extent that such Professional maintains timekeeping records, the number of hours expended by each individual employed or engaged by such Professional; (b) a summary description of the services provided by individuals employed or engaged by such Professional; *provided* that any such invoice may be redacted to protect privileged, confidential, or proprietary information; and (c) each disbursement and expense incurred by such Professional in connection with services provided during the period covered by such invoice.  The Required Consenting Secured Parties shall have 10 days after receipt of the applicable invoice to submit (to the applicable Professional and the Debtors) a written objection to the reasonableness of the fees and expenses set forth in the applicable invoice.  To the extent that any objection is raised, the Debtors shall pay the undisputed portion, and the parties will work in good faith to resolve the objection. If no such resolution can be reached, the objection will be resolved by the Bankruptcy Court.

C.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

Claims and Interests, except for Administrative Claims, Priority Tax Claims, and Accrued Professional Compensation Claims, are classified in the Classes set forth in this Article III of the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.  Class Identification.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Senior Secured Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 5 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 6 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 7 | Statewide Interests | Impaired | Entitled to Vote |

B.     *Treatment of Claims and Interests*.

1.   <u>Class 1—Other Priority Claims</u>.

(a)     *Classification*:  Class 1 consists of all Other Priority Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Claim in Class 1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class 1, each such Holder shall receive payment in full in Cash.

(c)     *Voting*:   Class 1 is Unimpaired under the Plan.   Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.   <u>Class 2—Other Secured Claims</u>.

(a)     *Classification*:  Class 2 consists of all Other Secured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Claim in Class 2 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class 2, each such Holder shall receive, at the option of the Debtors, subject to the reasonable consent of the Required Consenting Secured Parties:

(i)     payment in full in Cash;

(ii)    delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

(iii)   Reinstatement of such Other Secured Claims; or

(iv)    other treatment rendering such Claim Unimpaired.

(c)     *Voting:*   Class 2 is Unimpaired under the Plan.   Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.   <u>Class 3—Senior Secured Claims</u>.

(a)     *Classification*:  Class 3 consists of all Senior Secured Claims.

(b)     *Allowance*:  The Senior Secured Claims shall be Allowed, and deemed to be Allowed, in the aggregate principal amount of $6,007,978,671.76 (which amount does not include any unpaid interest, whether or not such interest was accrued but unpaid as of the Petition Date), plus accrued interest through the Effective Date at the default rate, as well as any other fees, expenses, or other obligations owed to the Senior Secured Parties under the Loan Agreement, the Hedging Agreements, and any related documents.   The Plan shall constitute a settlement of the proper interest rate to be applied to the Hedging Claims.

Notwithstanding anything to the contrary contained in a Hedging Agreement, the interest rate applied to the Hedging Claims shall be 4.4% per annum inclusive of default rate interest. For the avoidance of doubt, Senior Secured Parties shall not be required to File Proofs of Claim.

(c)    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class 3 agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class 3, each such Holder thereof shall receive:

     (i)    **If the Sale Transaction occurs**: such Holder's Pro Rata share of the Senior Secured Party Sale Transaction Distribution.

     (ii)    **If the Sale Transaction does not occur**: (a) at the election of the Majority Secured Parties, such Holder's Pro Rata share of either (x) the New Loans and Second Lien Loan Purchase Proceeds, if any, or (y) New Third-Party Financing Proceeds and (b) Pro Rata share of the Senior Secured Party Equity Distribution.

(d)    *Voting*: Class 3 is Impaired under the Plan. Therefore, Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.   Class 4—General Unsecured Claims.

     (a)    *Classification*: Class 4 consists of all General Unsecured Claims.

     (b)    *Treatment*: Except to the extent that a Holder of an Allowed Class 4 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Class 4 Claim, each such Holder shall receive, at the option of the Debtors:

       (i)    payment in full in Cash;

       (ii)    Reinstatement of such General Unsecured Claims; or

       (iii)    other treatment rendering such Claim Unimpaired.

     (c)    *Voting*: Class 4 is Unimpaired under the Plan. Holders of Claims in Class 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

5.   Class 5—Intercompany Claims.

     (a)    *Classification*: Class 5 consists of all Intercompany Claims.

     (b)    *Treatment:* Holders of Intercompany Claims shall receive no distribution on account of such Intercompany Claims under the Plan, except that the Debtors and the Reorganized Debtors, as applicable, will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan and, from and after the Effective Date, Intercompany Claims may be settled, released or satisfied as determined by Reorganized Holdings in its sole discretion.

     (c)    *Voting*: Class 5 is Unimpaired under the Plan. Holders of Claims in Class 5 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the

Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

6.  <u>Class 6—Intercompany Interests</u>.

   (a)  *Classification:*  Class 6 consists of all Intercompany Interests.

   (b)  *Treatment*:  Except to the extent necessary to implement the Reorganization Transaction, on the Effective Date, or as soon thereafter as practicable, all Allowed Intercompany Interests shall be Reinstated, except that if a Sale Transaction does not occur, the Holder of Holdings Equity Interests (Statewide) shall receive the treatment set forth in Article III.B.7(b)(ii) of the Plan.

   (c)  *Voting*:  Class 6 is Unimpaired under the Plan.  Holders of Interests in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

7.  <u>Class 7—Statewide Interests</u>.

   (a)  *Classification*:  Class 7 consists of all Statewide Interests.

   (b)  *Treatment*:  Except to the extent necessary to implement the Reorganization Transaction, or that a Holder of an Allowed Class 7 Interest agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Class 7 Interest, each such Holder thereof shall, on the Effective Date:

      (i)  **If the Sale Transaction occurs on the Effective Date**:  receive such Holder's Pro Rata share of the Statewide Interest Sale Transaction Distribution.

      (ii)  **If the Sale Transaction does not occur on the Effective Date**:  retain its Statewide Interests, and Statewide shall, on the Effective Date, receive the Statewide Interest Equity Distribution, subject to the Put Election, it being understood that the Plan will not limit Statewide's right to transfer the Statewide Interest Equity Distribution provided that Statewide shall have at least two members for the entire six-month period beginning on the Effective Date.

   (c)  *Voting*:  Class 7 is Impaired under the Plan.  Therefore, Holders of Allowed Interests in Class 7 are entitled to vote to accept or reject the Plan.

C.    *Certain Sale Transaction Considerations*.

   Notwithstanding anything herein to the contrary, and notwithstanding how the Sale Transaction may be structured under the Sale Transaction Documents or otherwise, if the Sale Transaction occurs on the Effective Date, each Holder of Statewide Interests shall receive such Holder's Pro Rata share of the Statewide Interest Sale Transaction Distribution.

D.    *Special Provision Governing Unimpaired Claims*.

   Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

E.      *Acceptance or Rejection of the Plan*.

    1.  <u>Voting Classes</u>.

Classes 3 and 7 are Impaired under the Plan.  The Holders of Claims in Class 3 and Interests in Class 7 are entitled to vote to accept or reject the Plan.

    2.  <u>Presumed Acceptance of the Plan</u>.

Classes 1, 2, 4, 5, and 6 are Unimpaired under the Plan.  The Holders of Claims and Interests in such Classes are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

F.      *Elimination of Vacant Classes*.

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Confirmation Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*.

In the event that Class 3 votes to reject the Plan, the Debtors reserve the right to pursue Confirmation of an alternative plan of reorganization pursuant to section 1129(b) of the Bankruptcy Code.

H.      *Controversy Concerning Impairment*.

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims*.

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and Reorganized Holdings, as applicable, reserve the right to reclassify any Allowed Claim or Allowed Interest, other than the Senior Secured Claims and the Consenting Interest Holders' Interests (including, for the avoidance of doubt, the Consenting Interest Holders' Statewide Interests), in accordance with any contractual, legal, or equitable subordination relating thereto; *provided, however*, that any such reclassification must be approved by the Required Consenting Secured Parties.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *No Substantive Consolidation*.

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

B.      *Restructuring Transactions*.

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall enter into the Restructuring Transactions, and shall take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Debtors, to the extent provided in the Plan.   The Restructuring Transactions may include one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions as may be determined by either (x) the Debtors, in good-faith consultation with and subject to the reasonable consent of  both the Required Consenting Secured Parties and the Consenting Interest Holders, or (y) Reorganized Holdings, as applicable, to be necessary or appropriate.  The actions to implement the Restructuring Transactions may include (but shall not be limited to):  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) all actions that the Special Committee reasonably determines, in good-faith consultation with the Required Consenting Secured Parties, are necessary or appropriate to implement the Sale Transaction; and (5) making any filings or recordings that may be required by applicable law in connection with the Plan.

C.      *Sources of Consideration for Plan Distributions*.

On the Effective Date, the Debtors will consummate either the Sale Transaction or, if no bid is designated as the Successful Bid in accordance with the Plan, the Reorganization Transaction, in each case in accordance with the terms of the Plan and the Restructuring Support Agreement.

The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Sale Transaction using Cash on hand and the Sale Transaction Proceeds.

The Reorganized Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Reorganization Transaction with Cash on hand, including Cash from operations, any Cash provided pursuant to New Third-Party Financing,  the New Loans, and the New Holdings Interests.

D.      *Sale Transaction*.

1.   <u>Sale Process</u>.

Prior to the Effective Date, the Special Committee shall have the exclusive right to exercise the Debtors' authority to oversee and manage the sale process relating to any potential Sale Transaction in good-faith consultation with the Committee of Secured Parties Steering Group.  Any references to acts to be performed or determinations to be made by the Debtors with respect to the Sale Transaction shall be deemed to refer to the acts to be performed or determinations to be made by the Special Committee.  All insiders and members of the board of directors of Statewide (other than those directors serving on the Special Committee) shall recuse themselves from consideration or involvement in such sale process; *provided* that the foregoing shall not limit the right of any insider of any Debtor or member of the board of directors of Statewide from participating in the sale process as a bidder or prospective bidder.  The Committee of Secured Parties Steering Group and its advisors shall have the right to review all information, diligence, and materials provided by any the investment banker retained by the Special Committee to any bidder or prospective bidder with respect to the sale and to consult with such investment banker with respect to any potential Sale Transaction.  The Special Committee and the Committee of Secured Parties Steering Group shall consult in good faith regarding the sale process, including any diligence and other information requested by the Committee of Secured Parties Steering Group and its advisors with respect thereto.

2.   Termination of Sale Process.

The Special Committee shall have the right, in good-faith consultation with, and subject to the reasonable consent of, the Required Consenting Secured Parties, to terminate the sale process and either: (a) designate any bid as the Successful Bid and pursue the Sale Transaction, subject to the right of the Majority Secured Parties to issue the Reorganization Transaction Election Notice within five Business Days of any such designation; or (b) declare that there is no Successful Bid and pursue the Reorganization Transaction. Notwithstanding the prior sentence, if the Special Committee does not designate any Qualified Bid as the Successful Bid on or before 5:00 p.m., prevailing Eastern Time, on August 1, 2015, the sale process shall terminate and the Debtors shall consummate the Reorganization Transaction. Following termination of the sale process, the Debtors shall pursue and implement the Reorganization Transaction or the Sale Transaction, as applicable, and shall make all reasonable efforts to cause the Effective Date to occur as soon as practicable.

3.   Closing of Sale Transaction (If Any).

On the Effective Date, the Debtors shall be authorized to consummate the Sale Transaction contemplated by the Successful Bid and, among other things, the Debtors' assets (including Executory Contracts and Unexpired Leases assumed and assigned pursuant to Article V hereof) shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the Purchase Agreement and Confirmation Order; *provided* that the Debtors may request entry of any order supplementing the Confirmation Order that the Special Committee believes is necessary or appropriate to implement the terms and conditions of the Sale Transaction. On and after the Effective Date, except as otherwise provided in the Plan, the Debtors or the Purchaser, as applicable, may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.   Wind Down and Dissolution of the Debtors.

The Debtors will make distributions to Holders of Allowed Claims and Allowed Interests in accordance with the priorities set forth in the Plan and implement the Wind Down pursuant to the Plan. As soon as practicable after the Effective Date and only to the extent necessary and not otherwise resolved by the Debtors, the Debtors or an Entity selected by the Debtors shall: (a) file for the Debtors and their direct and indirect subsidiaries a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors and their respective direct and indirect subsidiaries under the applicable laws of their state of incorporation or formation (as applicable); (b) make distributions to Holders of Allowed Claims and Allowed Interests as provided by the Plan; (c) prosecute, settle, or compromise any Causes of Action; (d) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (e) take such other actions as the Debtors or the Entity selected by the Debtors to conduct the Wind Down may determine to be necessary or desirable to implement the Wind Down. The Debtors will, in an expeditious but orderly manner, make timely distributions pursuant to the Plan and the Confirmation Order.

The filing of the Debtors' and their respective direct and indirect subsidiaries' certificates of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of the Debtors.

E.   *Principal Means for Implementation of the Reorganization Transaction.*

If the sale process is terminated without the designation of a Successful Bid, the Debtors shall pursue and implement the Reorganization Transaction. The principal means for implementation of the Reorganization Transaction are set forth below.

1.  New Loans.

The Reorganized Concessionaire shall execute and deliver the New Debt Documents and all related documents to which the Reorganized Concessionaire is intended to be a party on the Effective Date. All such documents are incorporated herein by reference, and shall become effective in accordance with their terms and the Plan.

On the Effective Date, and without further notice to or order or other approval of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity (including the boards of directors of the Debtors), except for the Confirmation Order and as otherwise required by the New Debt Documents and the Restructuring Support Agreement, the Reorganized Concessionaire shall, and is authorized to, enter into the New Debt Documents and perform and receive the proceeds of the New Loans, and to execute and deliver the New Debt Documents and all related documents to which the Reorganized Concessionaire is intended to be a party on the Effective Date, in each case consistent with the terms of the Plan. Subject to the limitations and consent rights set forth herein and in the Restructuring Support Agreement, Confirmation of the Plan shall be deemed (x) approval of the New Loans and the New Debt Documents, and all transactions contemplated thereby, including any supplemental or additional syndication of the New Loans, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Concessionaire in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (y) authorization of the Reorganized Concessionaire to enter into and execute the New Debt Documents and such other documents as may be required to effectuate the treatment afforded by the New Credit Agreement.

The obligations under the New Debt Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Concessionaire, enforceable in accordance with the terms thereof. The financial accommodations to be extended pursuant to the New Debt Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to recharacterization for any purposes whatsoever, and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Security Documents shall be deemed to be approved, shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Security Documents and the New Debt Documents, shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Security Documents and the New Debt Documents, and shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law. The Reorganized Concessionaire and the persons and entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents (including all governmental approvals and consents reasonably requested by the counsel to the Committee of Secured Parties) necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. As of the Effective Date, the Liens and security interests securing the New Loans shall be governed by the terms of the New Security Documents and the relative Lien, payment, and enforcement priorities of the New Loans shall be governed by the terms of the New Intercreditor Agreement.

2.  New Third Party Financing.

If, prior to August 1, 2015, the Required Consenting Secured Parties alternatively elect to cause Holders of Senior Secured Claims to receive Cash in lieu of the New Loans on the Effective Date, the Reorganized Concessionaire shall not enter into the New Credit Agreement and shall instead execute and deliver the New Third-Party Financing Documents and all related documents to which the Reorganized Concessionaire is intended to be a party on the Effective Date. All such documents are incorporated herein by reference, and shall become effective in accordance with their terms and the Plan.  The Debtors may request entry of any Final Order supplementing the Confirmation Order that the Debtors, in good-faith consultation with the Required Consenting

Secured Parties, believe is necessary or appropriate to implement the terms and conditions of the Third-Party Financing.

On the Effective Date, and without further notice to or order or other approval of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity (including the boards of directors of the Debtors), except for the Confirmation Order and as otherwise required by the New Third-Party Financing Documents and the Restructuring Support Agreement, the Reorganized Concessionaire shall, and is authorized to, enter into the New Third-Party Financing Documents, if any, and perform and receive the New Third-Party Financing Proceeds, and to execute and deliver the New Third-Party Financing Documents and all related documents to which the Reorganized Concessionaire is intended to be a party on the Effective Date, in each case consistent with the terms of the Plan. Subject to the limitations and consent rights set forth herein and in the Restructuring Support Agreement, Confirmation of the Plan shall be deemed (x) approval of the New Third-Party Financing and the New Third-Party Financing Documents, and all transactions contemplated thereby, including any supplemental or additional syndication of the New Third-Party Financing, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Concessionaire in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (y) authorization of the Reorganized Concessionaire to enter into and execute the New Third-Party Financing Documents and such other documents as may be required to effectuate the treatment afforded by the New Third-Party Financing.

The obligations under the New Third-Party Financing Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Concessionaire, enforceable in accordance with the terms thereof. The financial accommodations to be extended pursuant to the New Third-Party Financing Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to recharacterization for any purposes whatsoever, and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Third-Party Financing Documents shall be deemed to be approved, shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Third-Party Financing Documents, shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Third-Party Financing Documents, and shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law. The Reorganized Concessionaire and the persons and entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents (including all governmental approvals and consents reasonably requested by the counsel to the Committee of Secured Parties) necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. As of the Effective Date, the Liens and security interests securing the New Third-Party Financing shall be governed by the terms of the New Security Documents and the relative Lien, payment, and enforcement priorities of the New Third-Party Financing shall be governed by the terms of the New Intercreditor Agreement.

3.    Second Lien Loan Purchase Election.

Each Consenting Interest Holder seeking to exercise a Second Lien Loan Purchase Election shall deliver an irrevocable written notice to the Debtors of its intent to make such purchase pursuant to the Second Lien Loan Purchase Election together with the purchase price in cash in United States dollars not later than three Business Days prior to the Effective Date. Upon the Effective Date, the Debtors shall deliver to each such Consenting Interest Holder the Second Lien Loans purchased pursuant to its Second Lien Loan Purchase Election. Any Second Lien Loans purchased pursuant to a Second Lien Loan Purchase Election shall reduce the amount of Second Lien Loans distributed to holders of Allowed Senior Secured Claims and all Second Lien Loan Purchase Proceeds shall be distributed to the holders of Allowed Senior Secured Claims in accordance with Article III.B.3(c)(ii). Nothing

herein shall in any way affect the rights of the Required Consenting Secured Parties under Article IV.E.1 and Article IV.E.2 and the New Debt Term Sheet.

    4.   <u>Treatment of Holders of Statewide Interests under a Reorganization Transaction</u>.

For the avoidance of doubt, Statewide in its capacity as a Holder of Holdings Interests shall receive the same treatment under the Plan regardless of whether a Reorganization Transaction is implemented either by (a) the entry into the New Credit Agreement or (b) the receipt of New Third-Party Financing.

    5.   <u>Issuance of the New Holdings Interests</u>.

The issuance of the New Holdings Interests by Reorganized Holdings is authorized without the need for any further corporate action or without any further action by the Holders of Claims or Interests. Reorganized Holdings shall be authorized to issue a certain number of shares of New Holdings Interests pursuant to the Reorganized Holdings LLC Agreement. On the Effective Date, the Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares of New Holdings Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The Holders of New Holdings Interests may be parties to the New Organizational Documents.

    6.   <u>Continued Corporate Existence</u>.

The Reorganized Debtors shall adopt the New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary or appropriate to consummate the Plan.

    7.   <u>Vesting of Assets in the Reorganized Debtors</u>.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action (unless otherwise released or discharged pursuant to the Plan), and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the New Credit Agreement and the Liens securing obligations on account of Other Secured Claims that are Reinstated pursuant to the Plan, if any). On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

    8.   <u>New Organizational Documents</u>.

Each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation or formation in accordance with the corporate laws of the respective state, province, or country of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of nonvoting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective state, province, or country of incorporation and their respective New Organizational Documents.

9.   Directors, Managers, and Officers of the Reorganized Debtors.

As of the Effective Date, the officers and members of the board of managers of the Reorganized Debtors shall be appointed in accordance with the respective New Organizational Documents.  To the extent any such director, manager, or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer.  Each such director, manager, and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

10.   Section 1145 Exemption.

Pursuant to section 1145 of the Bankruptcy Code, the issuance of the New Holdings Interests as contemplated by the Plan is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration prior to the offering, issuance, distribution, or sale of securities.  The New Holdings Interests are not "restricted securities" (as defined in rule 144(a)(3) under the Securities Act) and are freely tradable and transferable by any initial recipient thereof that (x) is not an "affiliate" of the Reorganized Debtors (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Holdings Interests through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Holdings Interests under applicable securities laws.  The DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Holdings Interests are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, the DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Loans or the New Holdings Interests are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

11.   Put Option.

Upon a Change In Control of Reorganized Holdings during the 18-month period following the Effective Date, in each case in accordance with Section 7.9 of the Reorganized Holdings LLC Agreement, (a) each Holder of Holdings Interests shall have the right to put its share of the Statewide Interest Equity Distribution to Reorganized Holdings for such Holder's share of $80,000,000 in Cash; and (b) Reorganized Holdings shall have the right to call the New Holdings Interests on account of the Statewide Interest Equity Distribution for $100,000,000 in Cash.

F.     General Settlement of Claims and Interests.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

G.     Corporate Existence.

Except as otherwise provided in the Plan, each Debtor, as reorganized pursuant to the Plan, shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other

formation documents) are amended under or in connection with the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

H.      *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including the Senior Secured Claims and the Holdings Interests (in the event no Sale Transaction takes place), shall be deemed cancelled and surrendered without any need for a Holder to take further action with respect thereto and the obligations of the Debtors or Reorganized Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full and discharged; *provided*, *however*, that notwithstanding Confirmation or Consummation, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan; *provided further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable.  Notwithstanding anything to the contrary in the Plan, including this section, the Liens of the Senior Secured Parties shall become liens under the New Security Documents and New Debt Documents, or the New Third-Party Financing Documents, to the extent applicable, and shall not be discharged hereby.

I.       *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including:  (1) adoption or assumption, as applicable, of the agreements with existing management to the extent provided in the Omnibus Services Agreement; (2) selection of the directors, managers, and officers for the Reorganized Debtors; (3) implementation of the Restructuring Transactions; (4) the Reorganized Concessionaire's entry into (a) the New Debt Documents or the New Third-Party Financing Documents, as applicable, and the New Security Documents, and (b) the Omnibus Services Agreement; (5) the issuance of the New Holdings Interests; and (6) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Debt Documents or the New Third-Party Financing Documents, as applicable, the New Security Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article IV.I of the Plan shall be effective notwithstanding any requirements under nonbankruptcy law.

J.       *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Debtors and the Reorganized Debtors and the officers and members of the boards of managers thereof, as applicable, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan in the name of and on behalf of the Debtors and the Reorganized Debtors, as applicable, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

K.      *Section 1146 Exemption.*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property or Interests pursuant to the Plan, including the recording of any amendments to such transfers, or any new mortgages or liens placed on the property in connection with such transfers, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

L.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Debtors and the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the rights of the Debtors and Reorganized Debtors, as applicable, to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the following Causes of Action, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date:  (1) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII; and (2) all Causes of Action that arise under (a) sections 544, 547, and 548 of the Bankruptcy Code and (b) state fraudulent conveyance law, in each case, solely related to payments made in the 90 days prior to the Petition Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled pursuant to the Plan or a Final Order, the Debtors and Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors and Reorganized Debtors, as applicable, reserve and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3)(B) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Debtors or Reorganized Debtors, as applicable.  The applicable Debtors or Reorganized Debtors through their respective authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  On or after the Effective Date, the Debtors and Reorganized Debtors, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

M.      *Payment of Certain Fees and Expenses.*

On the Effective Date, the Reorganized Debtors shall pay in Cash in full the Committee of Secured Parties Restructuring Fees to the extent not already paid.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.       *Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases (including, for the avoidance of doubt, the Restructuring Support Agreement) will be deemed assumed and, if the Sale Transaction occurs, assigned to the party(ies) set forth in the Sale Transaction Documents, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that:  (1) are identified on the Rejected Executory Contract and Unexpired Lease List; (2) previously were assumed, assumed and assigned, or rejected by the Debtors; (3) are the subject of a motion to assume, or to assume and assign, Executory Contracts or Unexpired Leases that is pending on the Effective Date; or (4) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such assumption is after the Effective Date; provided that no Insider Executory Contracts or Insider Unexpired Leases shall be assumed other than the Insider Executory Contracts and Insider Unexpired Leases identified on the Assumed Insider Executory Contract and Unexpired Lease List.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, subject to the occurrence of the Effective Date, of the assumption, pursuant to section 365(a) of the Bankruptcy Code, of the Executory Contracts and Unexpired Leases other than those identified in parts (1) through (4) of the preceding sentence, as well as any Insider Executory Contracts and Insider Unexpired Leases listed on the Assumed Insider Executory Contract and Unexpired Lease List, and shall constitute the Bankruptcy Court's approval of the rejection, on the Effective Date, of the Executory Contracts and Unexpired Leases identified on the Rejected Executory Contract and Unexpired Lease List, as well as any Insider Executory Contracts and Insider Unexpired Leases not listed on the Assumed Insider Executory Contract and Unexpired Lease List.  Any motions to assume or assume and assign Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  Each Executory Contract and Unexpired Lease assumed or assumed and assigned pursuant to Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Debtors or the Reorganized Debtors, as applicable, in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Notwithstanding anything herein to the contrary, the Confirmation Order will, and will be deemed to, approve the assumption of the Restructuring Support Agreement, effective as of the date of such order.

B.       *Claims Based on Rejection of Executory Contracts and Unexpired Leases.*

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be Filed with the Claims and Balloting Agent no later than the later of 30 days after the Confirmation Date or the effective date of rejection. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court no later than 30 days after the later of the Effective Date or the effective date of rejection. Any such objection will be scheduled to be heard by the Bankruptcy Court at the request of the Debtors or Reorganized Debtors, as applicable, as soon as practicable thereafter.   Claims arising from the rejection of any Executory Contract or Unexpired Lease other than any Hedging Agreement (which shall be treated exclusively in accordance with Article III.B.2 of the Plan) shall be classified as a General Unsecured Claim and shall be treated in accordance with Article III, as applicable.

C.       *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned, as applicable, pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.

No later than fifteen (15) Business Days prior to the Confirmation Hearing, the Debtors shall serve notices of proposed assumption or (if applicable) assumption and assignment and the proposed cure amounts to the applicable counterparties to Executory Contracts and Unexpired Leases, and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, proposed assumption and assignment, or related cure amount must be Filed, served, and actually received by the counsel to the Debtors, counsel to the Committee of Secured Parties, the clerk of the Bankruptcy Court, and the U.S. Trustee on or before the later of (1) the commencement of the Confirmation Hearing and (2) ten (10) Business Days following receipt of notice of such proposed assumption or assumption and assignment.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, and/or related cure amount will be deemed to have assented to such assumption or cure amount.  Any such objection will be scheduled to be heard by the Bankruptcy Court as soon as reasonably practicable after such objection is Filed.

In the event of a dispute regarding:  (1) the amount of any payments to cure a default in connection with a proposed assumption or assumption and assignment of an Executory Contract or Unexpired Lease; (2) the ability of the Debtors, the Reorganized Debtors, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or to be assumed and assigned; or (3) any other matter pertaining to assumption or assumption and assignment, as applicable, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or Final Orders resolving the dispute and approving the assumption or assumption and assignment, as applicable.

Assumption, rejection, or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assumed and assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any proofs of claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

D.      *Indemnification Obligations.*

Each Indemnification Obligation for the benefit of current and former directors, managers, officers, and employees of the Debtors who served in such capacity prior to, on, or after the Petition Date shall be assumed to the extent any such Indemnification Obligation is executory pursuant to sections 365 and 1123 of the Bankruptcy Code (or honored or reaffirmed, as the case may be) by the applicable Debtor, effective as of the Effective Date.  Each Indemnification Obligation that is assumed, deemed assumed, honored, or reaffirmed shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.  Furthermore, as of the Effective Date, the Debtors shall (if not already purchased) purchase and maintain directors, officers, managers, and employee liability tail coverage for the six-year period following the Effective Date on terms no less favorable than the Debtors' existing director, officer, and manager coverage and with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, and manager coverage upon placement.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*.

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned, as applicable, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Reservation of Rights*.

Nothing contained in the Plan, including identification in the Rejected Executory Contract and Unexpired Lease List, shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease subject to assumption or rejection pursuant to section 365(a) of the Bankruptcy Code, or that any of the Reorganized Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, if necessary.

H.      *Nonoccurrence of Effective Date*.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

I.      *Contracts and Leases Entered Into After the Petition Date*.

Contracts and leases entered into after the Petition Date by any Debtor shall be assumed or assumed and assigned by such Debtor in accordance with the Plan and/or the Purchase Agreement, as applicable.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Disbursing Agent*.

All distributions under the Plan shall be made by the Disbursing Agent on or after the Effective Date, except as otherwise provided in the Plan.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

B.      *Rights and Powers of Disbursing Agent*.

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:    (a) effect all actions and execute all agreements, instruments, and other documents necessary or appropriate to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant

to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

    2.   Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

C.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

    1.   Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the sole discretion of the Reorganized Debtors; *provided further*, *however*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in the Debtors' books and records as of the date of any such distribution.

    2.   Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

D.    *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary or appropriate to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

E.    *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

F.    *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan, including, for the avoidance of doubt, Article III.B.4 of the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not

accrue or be paid on any Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.

G.    *Setoffs and Recoupment.*

The Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the Holder of any such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors, as applicable, of any such Claim it may have against the Holder of such Claim.

H.    *Claims Paid or Payable by Third Parties.*

1.    <u>Claims Paid by Third Parties</u>.

The Debtors, the Reorganized Debtors, or the Purchaser, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or the Purchaser, as applicable. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or the Purchaser, as applicable, on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor or the Purchaser, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or Reorganized Debtor or the Purchaser annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.    <u>Claims Payable by Third Parties</u>.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.    *Disputed Claims.*

Except with respect to Holders of General Unsecured Claims equal to or greater than $25,000,000, Holders of Claims, Interests, and Administrative Claims need not file a Proof of Claim with the Bankruptcy Court and shall be subject to the Bankruptcy Court process only to the extent provided in the Plan. For the avoidance of doubt, Holders of General Unsecured Claims equal to or greater than $25,000,000 must File a Proof of Claim on account of

such General Unsecured Claim. On and after the Effective Date, except as otherwise provided in the Plan, all Allowed Claims, including Allowed General Unsecured Claims equal to or greater than $25,000,000 where the Holder of such Allowed General Unsecured Claim timely Filed a Proof of Claim, shall be paid pursuant to the Plan in the ordinary course of business of the Reorganized Debtors and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced. If the Debtors or the Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that if the Debtors dispute any Proof of Claim Filed by the Holder of a General Unsecured Claim equal to or greater than $25,000,000, the Debtors or Reorganized Debtors, as applicable, may elect, at their sole option, to object to any such Disputed Claim in the Bankruptcy Court and to seek to have the validity or amount of any such Disputed Claim adjudicated by the Bankruptcy Court. Nothing in this section shall in any way limit the Debtors' or Reorganized Debtors' rights to contest the validity, amount or enforceability of any Claim regardless of whether a Proof of Claim is required for such Claim.

B.       *Objections to Claims and Interests*.

Unless a different time is set by an order of the Bankruptcy Court or otherwise established pursuant to the Plan, all objections to Claims and Interests must be Filed within one year of the Effective Date ; *provided*, that no such objection may be Filed with respect to any Claim or Interest after a Final Order has been entered Allowing such Claim or Interest.

C.       *Compromises and Settlements*.

From and after the Effective Date, and without any further approval by the Bankruptcy Court, the Reorganized Debtors, as applicable, may compromise and settle all Claims and Causes of Action.

D.       *No Distributions Pending Allowance*.

If a Claim or Interest, or any portion of a Claim or Interest, is Disputed, no payment or distribution provided hereunder shall be made on account of such Disputed Claim, unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

E.       *Distributions After Allowance*.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.       *Discharge of Claims and Termination of Interests*.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or

non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. Notwithstanding anything to the contrary in the Plan, including this section, the Liens of the Senior Secured Parties shall be replaced by liens granted by the Reorganized Concessionaire under the New Security Documents and the New Debt Documents or the New Third-Party Financing Documents, as applicable, and the terms of the Plan and such replacement liens shall not be discharged under the Plan.

**B.      Release of Liens.**

**Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns in accordance with the Plan.**

**C.      Releases by the Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released by the Debtors, the Estates, and the Reorganized Debtors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors or the Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Estates, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence or any breach of the Restructuring Support Agreement by a Released Party.**

**D.      Releases by Holders of Claims and Interests.**

**As of the Effective Date, except as otherwise provided in the Plan, the Releasing Parties are deemed to have released the Debtors, the Estates, the Reorganized Debtors, and the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors or Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor**

and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion), upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence or any breach of the Restructuring Support Agreement by a Released Party.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

E.      *Exculpation.*

Except as otherwise specifically provided in the Plan, each Debtor, each Reorganized Debtor, each Estate, and each Released Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for any Exculpated Claim, except to the extent such claim, obligation, Cause of Action, or liability arises from the willful misconduct or gross negligence or the breach of the Restructuring Support Agreement (notwithstanding advice of counsel), but in all respects (other than with respect to any breach of the Restructuring Support Agreement) such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors, the Reorganized Debtors, the Estates, and the Released Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the restructuring of Claims and Interests in the Chapter 11 Cases and in connection with the Restructuring Transactions, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments, or other documents (including the New Debt Documents or New Third-Party Financing Documents, as applicable, and documents and instruments related thereto and any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) in connection with the Plan, and the solicitation and distribution of the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.      *Injunction.*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan (including any obligations under the Plan and the New Debt Documents or New Third-Party Financing Documents, as applicable, and documents and instruments related thereto), or Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released pursuant to Article VIII.C or Article VIII.D of the Plan, discharged pursuant to Article VIII.A of the Plan, or are subject to exculpation pursuant to Article VIII.E of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and

**(5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Setoffs.*

Except as otherwise expressly provided for in the Plan, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however,* that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.

I.      *Recoupment.*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless (1) such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date or (2) such Claim or Interest is Reinstated under the Plan.

J.      *Subordination Rights.*

The classification and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and any such rights shall be settled, compromised, and released pursuant to the Plan.

K.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

**ARTICLE IX.**
**EFFECT OF CONFIRMATION OF THE PLAN**

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, the Confirmation Order Findings of Fact and Conclusions of Law.   Upon entry of the Confirmation Order, the Confirmation Order Findings of Fact and Conclusions of Law shall constitute findings of fact even if they are stated

as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if they are stated as findings of fact.

# ARTICLE X.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.       *Conditions Precedent to the Effective Date*.

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.B of the Plan:

1.   the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance satisfactory to the Required Consenting Secured Parties and reasonably satisfactory to the Consenting Interest Holders, in full force and effect, and not be subject to any stay or injunction;

2.   no Other Secured Claim or General Unsecured Claim shall be Allowed in an amount in excess of $25,000,000 and the Debtors have objected to any General Unsecured Claim asserted in an amount in excess of $25,000,000;

3.   all actions, documents, Certificates, and agreements necessary or appropriate to implement the Plan, including documents contained in the Plan Supplement, shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws; and

4.   all authorizations, consents, regulatory approvals, rulings, or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received.

B.       *Waiver of Conditions*.

The conditions to Consummation set forth in this Article X of the Plan may be waived only by consent of the Debtors and the Required Consenting Secured Parties; <u>provided</u> that the conditions to Consummation set forth in Section X.A.1 and, with respect to any actions, documents, Certificates, and agreements that require the consent of the Consenting Interest Holders under the terms of the Plan, Section X.A.3, may only be waived by consent of the Debtors, the Required Consenting Secured Parties, and the Consenting Interest Holders.   Such waiver may be effectuated without notice to or entry of an order of the Bankruptcy Court and without notice to any other parties in interest.

C.       *Effect of Failure of Conditions*.

If Consummation does not occur on or prior to September 1, 2015, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by the Debtors, Holders of Claims, or Holders of Interests or any Causes of Action; (2) prejudice in any manner the rights of the Debtors, any Holders, the Consenting Secured Parties, the Consenting Interest Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, the Consenting Secured Parties, the Consenting Interest Holders, or any other Entity in any respect, including with respect to substantive consolidation and similar arguments.

# ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.       *Sale Transaction*.

The Plan contemplates the possibility of obtaining a proposal for the Sale Transaction.   If the Sale Transaction or the Reorganization Transaction occurs, the Debtors may File a modified Plan (including any necessary conforming and immaterial changes thereto), in form and substance reasonably acceptable to the Required

Consenting Secured Parties and the Consenting Interest Holders, evidencing the Sale Transaction or the Reorganization Transaction, as applicable, and shall not be required to make additional disclosures or resolicit votes for such modified Plan pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

B.    *Modification and Amendments*.

Except as otherwise provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each of the Debtors expressly reserves its respective rights to exercise its reasonable discretion to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary or appropriate may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary or appropriate to carry out the purposes and intent of the Plan.  Any such revocation, withdrawal, alteration, amendment, modification, or supplement contemplated by this section shall be in form and substance reasonably acceptable to the Required Consenting Secured Parties and the Consenting Interest Holders.  Additionally, any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XI of the Plan.

C.    *Effect of Confirmation on Modifications*.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof made in accordance with Article X of the Plan are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

D.    *Revocation or Withdrawal of Plan*.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims, Interests or Causes of Action; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity, including with respect to substantive consolidation and similar arguments.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code to the extent provided under applicable law, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.     ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.     enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement (including, for the avoidance of doubt, any good faith finding under section 363(m) of the Bankruptcy Code in connection with the Sale Transaction);

6.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

7.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

8.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

9.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

10.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

11.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

12.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and released granted in the Plan, including under Article VIII of the Plan, regardless of whether such termination occurred prior to or after the Effective Date;

13.     enforce all orders previously entered by the Bankruptcy Court; and

14.     hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Subject to Article X.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, as of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests, as applicable, have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Additional Documents*.

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents, which agreements and other documents shall be in form and substance reasonably acceptable to the Required Consenting Secured Parties and the Consenting Interest Holders, as may be necessary to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees*.

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment*.

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

E.      *Reservation of Rights*.

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns*.

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices*.

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.    if to the Debtors, to:

c/o ITR Concession Company LLC
205 North Michigan Avenue
Suite 2510
Chicago, Illinois 60601
Attn:  Garrett Phipps, General Counsel
Email:  gphipps@indianatollroad.org

with copies to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Facsimile: (312) 862-2200
Attn.: Marc Kieselstein, P.C., Chad J. Husnick, Jeffrey D. Pawlitz, and Gregory F. Pesce
Email: marc.kieselstein@kirkland.com, chad.husnick@kirkland.com,
jeffrey.pawlitz@kirkland.com, and gregory.pesce@kirkland.com

2.   if to the Administrative Agent, to:

The Royal Bank of Scotland plc
600 Washington Blvd
Stamford, Connecticut 06901
Facsimile: (646) 758-3987
Attn.: Neil Bivona
Email: neil.bivona@rbs.com

with copies to:

Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, New York 10019
Facsimile: (212) 506-5151
Attn: Raniero D'Aversa
Email: rdaversa@orrick.com

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606
Attn.: Craig Reimer
Email: CReimer@mayerbrown.com

3.   if to counsel to the Committee of Secured Parties, to:

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
Facsimile: (212) 530-5219
Attn.: Gerard Uzzi, Evan Fleck, and Nicholas Kamphaus,
Email: guzzi@milbank.com, efleck@milbank.com, nkamphaus@milbank.com

4.   if to Cintra, to:

Cintra ITR LLC
9600 Great Hills Trail #250e
Austin, Texas 78759
Attn.: Nicolas Rubio de Cardenas

with copies to:

Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166-0193

Attn.: Tomer Pinkusiewicz, David Feldman, and Matthew Kelsey
Email: tpinkusiewicz@gibsondunn.com; dfeldman@gibsondunn.com; mkelsey@gibsondunn.com

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.    *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.    *Entire Agreement.*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.    *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://www.kccllc.net/ITR or the Bankruptcy Court's website at http://www.ilnb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.    *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

L.    *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation

of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Conflicts.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

Dated:  September 11, 2014

Respectfully submitted,
ITR CONCESSION COMPANY LLC
ITR CONCESSION COMPANY HOLDINGS LLC
STATEWIDE MOBILITY PARTNERS LLC

By: /s/ Fernando Redondo
Name:  Fernando Redondo
Title:  Authorized Signatory

Prepared by:

James H.M. Sprayregen, P.C.
Marc Kieselstein, P.C.
Chad J. Husnick
Jeffrey D. Pawlitz
Gregory F. Pesce
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000

*Proposed Counsel to the*
*Debtors and Debtors in Possession*

## Exhibit 1

**New Debt Term Sheet**

ITR CONCESSION COMPANY LLC

Summary of Terms and Conditions of the First Lien Loans

*This Term Sheet (the "Term Sheet") sets forth the principal terms and conditions relating to a credit facility agreement (the "First Lien Financing Agreement") consisting of senior secured loans to be extended to OpCo (as defined below) in connection with its operation and maintenance of the Toll Road (as defined below). Common terms for the First Lien Loans and the Second Lien Loans (each as defined below) may be set forth in a collateral agency and intercreditor agreement (the "Collateral Agency Agreement", collectively with the First Lien Financing Agreement, the Second Lien Financing Agreement described below and the Financing Documents described below, the "Definitive Documents"). In the event of any discrepancy between this Term Sheet and the Definitive Documents, the Definitive Documents shall govern.*

| | |
|---|---|
| **OpCo:** | ITR Concession Company LLC, a Delaware limited liability company ("**OpCo**"), and Concessionaire under the Concession Agreement (each as defined below). |
| **HoldCo:** | ITR Concession Company Holdings LLC, a Delaware limited liability company, as reorganized as "Reorganized Holdings" prior to the Closing Date as defined and pursuant to and under the Plan described below ("**HoldCo**"). HoldCo directly owns 100% of the membership interests in OpCo. |
| **Toll Road:** | The toll road that runs across northern Indiana from the Illinois state line to the Ohio state line, together with all parcels of real property part of the toll road site or necessary for its operation and all buildings, structures, facilities, and other improvements now or hereafter erected on such real property, as described and defined in the Concession Agreement referred to below (the "**Toll Road**" or "**Project**"). |
| **Concession Agreement:** | The Indiana Finance Authority ("**IFA**") has leased the Toll Road to OpCo, in its capacity as concessionaire ("**Concessionaire**"), and granted Concessionaire a license and franchise to provide toll road services in connection with such lease, pursuant to the Indiana Toll Road Concession and Lease Agreement dated as of April 12, 2006 (as may be amended, modified or supplemented from time to time, the "**Concession Agreement**"). |
| **Management Agreement:** | OpCo will enter into a ten-year omnibus services agreement (the "**Management Agreement**") in accordance with the terms set forth in Appendix B. |
| **Material Project Documents:** | Concession Agreement, Management Agreement and any material project documents to which OpCo is or shall become a party. |
| **Plan:** | OpCo, HoldCo and Statewide Mobility Partners LLC, a Delaware limited liability company ("**Statewide**", together with OpCo and HoldCo, the "**ITR Parties**"), have proposed the Joint Prepackaged Plan of Reorganization of ITR Concession Company LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code, including the Plan Supplement (as defined in the Plan), for resolution of the outstanding claims against and interests in the ITR Parties (the "**Plan**"). |

| | |
|---|---|
| **Administrative Agent:** | Such person to be mutually agreed will act as administrative agent under the Financing Documents (together with its successors and permitted assigns, the "**Administrative Agent**"). |
| **Collateral Agent:** | Such person to be mutually agreed will act as collateral agent under the Financing Documents (together with its successors and permitted assigns, the "**Collateral Agent**"). |
| **Depositary Bank:** | Such person to be mutually agreed will act as depositary bank (together with its successors and permitted assigns, the "**Depositary Bank**"). |
| **First Lien Lenders:** | The lenders providing the First Lien Loans (as defined below) from time to time (collectively, the "**First Lien Lenders**"). |
| **Second Lien Lenders:** | The lenders providing the Second Lien Loans (as defined below) from time to time (collectively, the "**Second Lien Lenders**"). |
| **Lenders:** | The First Lien Lenders and the Second Lien Lenders from time to time (collectively, the "**Lenders**"). |
| **Secured Parties:** | The Lenders, and (to secure the agency fees, expenses and indemnities of the Administrative Agent, Collateral Agent and the Depositary Bank with respect to the Loans) the Administrative Agent, Collateral Agent and the Depositary Bank (the "**Secured Parties**"); provided that the priority of such Secured Parties shall be as set forth in the Collateral Agency Agreement. |
| **First Lien Loans:** | Senior secured floating rate loans (the "**First Lien Loans**") to be held by the relevant Senior Secured Parties (as defined in the Plan) pursuant to the Plan to satisfy claims under the Plan.  The principal amount of the First Lien Loans is contemplated to be approximately $2,000,000,000. |
| **Second Lien Loans:** | Subordinated secured floating rate loans (the "**Second Lien Loans**", together with the First Lien Loans, the "**Loans**") to be held by the relevant Senior Secured Parties and Consenting Interest Holders, if any, who exercise the Second Lien Loan Purchase Election (as such terms are defined in the Plan) pursuant to the Plan to satisfy claims under the Plan or otherwise in accordance with the Plan. The principal amount of the Second Lien Loans is contemplated to be approximately $750,000,000. The Second Lien Loans will be contractually subordinated in right of lien to the First Lien Loans.  The aggregate principal amount of the Loans is contemplated to be $2,750,000,000. |
| **Final Maturity Date:** | The final maturity date of the First Lien Loans will be five years after the Closing Date (the "**Final Maturity Date**"). |
| **Tenor:** | The First Lien Loans shall have a term of 5 years. |
| **Aspirational First Lien Loan Rating:** | BBB- |
| **Ranking:** | The First Lien Loans will be senior secured indebtedness of OpCo, will rank |

*pari passu* in right of payment, and will enjoy a *pari passu* first lien security interest in the Collateral (as defined below) with other senior obligations. The obligations in connection with the Second Lien Loans shall be secured by a second-lien security interest in the Collateral.

The lien priority, relative rights and other creditors' rights issues in respect of the First Lien Loans and the Second Lien Loans will be set forth in the Collateral Agency Agreement on terms substantially in accordance with Appendix C and as further supplemented by the Definitive Documents.

**Closing Date:**

The "Effective Date" under the Plan (the "**Closing Date**").

**Payment Dates:**

Quarterly on each March 31, June 30, September 30 and December 31 until the Final Maturity Date (each, a "**Payment Date**"), commencing on the first Payment Date to occur after the Closing Date (the "**Initial Payment Date**"), and any other date on which a payment in respect of the First Lien Loans is due (such as with respect to any voluntary or mandatory prepayment).

**Amortization:**

Principal of the First Lien Loans will be payable in accordance with an amortization schedule of quarterly installments commencing on the Initial Payment Date and ending on the Final Maturity Date, with a balloon payment of any remaining principal to be made on the Final Maturity Date. The amortization schedule will be set to yield a minimum annual historical debt service coverage ratio ("**DSCR**") of 1.60x, in respect of debt service payable on the First Lien Loans (but not the Second Lien Loans) on a current-interest basis based on the January 2013 traffic study (the "**Traffic Report**") prepared by the Traffic Adviser (as defined below) and including the final payment.

**Interest on First Lien Loans:**

Interest on the First Lien Loans will be computed on the basis of a 360-day year of twelve (12) thirty (30)-day months and will accrue at a floating rate of LIBOR plus an applicable margin of 250 basis points per annum, subject to a LIBOR floor of 1% per annum. Interest on the First Lien Loans will be paid quarterly.

If OpCo fails to make any payment on the applicable First Lien Loans when due, interest will accrue on such First Lien Loans and on any accrued and unpaid interest, including default interest, until such amounts are paid in full, such interest to be payable on demand, at a rate of 2% per annum above the interest rate applicable to such First Lien Loans.

**Currency:**

The Loans shall be provided by the Lenders in US dollars. All payments made under the Loans including principal, interest fees, breakage costs, indemnities and expense reimbursement shall be made to the Lenders in US dollars.

**Voluntary Prepayment:**

OpCo has the right to prepay the First Lien Loans, in whole or in part, at any time, upon at least five (5) days' prior written notice, and not more than ten (10) days' notice, to the Administrative Agent, without any premium or penalty, subject to payment of LIBOR breakage costs incurred in connection with a prepayment made on a date other than an interest payment date. Voluntary prepayments shall be applied so as to reduce the scheduled principal payments

- 3 -

of the First Lien Loans on a *pro rata* basis.

**Mandatory Prepayment:** OpCo shall be required to prepay the applicable First Lien Loans plus accrued and unpaid interest from the net cash proceeds received by OpCo from the following events to the extent set forth below:

(1) From insurance or condemnation net cash proceeds, to the extent permitted by the Concession Agreement and not otherwise applied to restoration, repairs, reimbursements, remediation or replacement in connection therewith (in accordance with restoration provisions to be mutually agreed, provided such restoration provisions are wholly consistent with and permitted by the Concession Agreement);

(2) From net cash proceeds of any payment received by the Concessionaire constituting Termination Damages (as defined in the Concession Agreement) or any other payment by IFA of the Toll Road Concession Value (as defined in the Concession Agreement); and

(3) Net cash proceeds of any payment received by the Concessionaire as Concession Compensation (other than as contemplated in paragraph (2) immediately above); <u>provided</u> that Concession Compensation paid in the following circumstances shall not be applied to such mandatory prepayment: (w) any Concession Compensation paid in respect of loss or damage to property of the Concessionaire to the extent necessary to repair, restore, replace or remediate the affected property (which amounts shall be applied to such repair, restoration, replacement or remediation), (x) Concession Compensation paid in respect of any event which is reasonably determined by the Concessionaire to have resulted or will reasonably be expected to result in ongoing loss of revenue of the Concessionaire during the following 18-month period or longer (which amounts shall be deposited in the Proceeds Account), (y) Concession Compensation paid in respect of past, current or identifiable future costs arising from the relevant Compensation Event (as defined in the Concession Agreement) (which amounts shall be applied to meet such costs) and (z) to the extent otherwise required to be applied pursuant to the terms of the Concession Agreement.

Mandatory prepayments shall be applied so as to reduce the scheduled principal payments of the First Lien Loans on a *pro rata* basis.

**Collateral Documentation:** The Collateral Agency Agreement and if necessary, a depositary agreement relating to the Accounts (as defined below), a security agreement executed by the Collateral Agent and OpCo, a pledge agreement executed by the Collateral Agent and HoldCo, a leasehold mortgage executed by OpCo in respect of its rights, title and interest in and to the Toll Road, any local account control agreement and the Third Party Consents (as defined below) (collectively, the "**Collateral Documentation**").

**Financing Documents:** The First Lien Financing Agreement, the second lien financing agreement in

- 4 -

respect of the Second Lien Notes (the "**Second Lien Financing Agreement**", together with the First Lien Financing Agreement, the "**Financing Agreements**"), any First Lien promissory notes, any Second Lien promissory notes, and the Collateral Documentation (collectively, the "**Financing Documents**").

| | |
|---|---|
| **Collateral:** | The First Lien Loans shall be secured by a first priority perfected security interest, for the benefit of the First Lien Lenders, (i) in substantially all assets (whether tangible or intangible) and rights of OpCo (subject to customary exceptions for excluded collateral), including, but not limited to, all its rights, title and interest in and to the Toll Road, the Accounts (as defined below), all revenue, all accounts receivables, the Material Project Documents and other Project documents, insurance policies and proceeds, condemnation proceeds, all governmental and other regulatory approvals and permits necessary for the operation and maintenance of the Toll Road (to the extent assignable as collateral), personal and real property of, and equity contributions made to OpCo through HoldCo, wherever located, now or hereafter owned, and all proceeds of the foregoing, and (ii) 100% of the membership interests of HoldCo in OpCo (collectively, the "**Collateral**"); provided that the Collateral will be subject to customary exceptions to be mutually agreed. |

The Service Providers (as defined in Appendix B) shall provide on or before the Closing Date a consent to assignment of the Management Agreement. OpCo shall procure on or before the Closing Date consents to assignments of the Concession Agreement from the IFA and shall use commercially reasonable efforts to procure such consents for any other material project documents (if any), other than the Management Agreement as provided above, as of the Closing Date (collectively, with the consent in respect of the Management Agreement, the "**Third Party Consents**").

| | |
|---|---|
| **Accounts:** | On or prior to the Closing Date, OpCo shall establish with the Depositary Bank the Accounts listed below (collectively, the "**Accounts**"). |

(1)    Proceeds Account
(2)    Operating Account
(3)    First Lien Debt Service Payment Account
(4)    Second Lien Debt Service Payment Account
(5)    Debt Service Reserve Account
(6)    Loss Proceeds Account
(7)    Distribution Account

| | |
|---|---|
| **Debt Service Reserve:** | On or prior to the Closing Date, OpCo will establish a debt service reserve account for the First Lien Loans and Second Lien Loans (the "**Debt Service Reserve Account**") with the Depositary Bank.  The Debt Service Reserve Account shall be funded in an amount equal to no more than one (1) year of the projected remaining mandatory scheduled interest and principal in respect of the First Lien Loans, excluding any balloon payments or excess cash sweeps, and after the First Lien Loans shall have been repaid in full (including any accrued and unpaid interest thereon), in an amount equal to one (1) year of the projected remaining mandatory scheduled interest and principal in respect of the Second Lien Loans, excluding any balloon payments or excess cash sweeps (the "**Debt** |

- 5 -

**Service Reserve Requirement**").  The Debt Service Reserve Account shall be funded with cash pursuant to the Cash Flow Waterfall described below.  Funds on deposit in the Debt Service Reserve Account will be used to pay debt service in respect of the First Lien Loans if funds are not available in the Proceeds Account and the First Lien Debt Service Payment Account to make such payments as and when due.  After the First Lien Loans shall have been repaid in full (including any accrued and unpaid interest thereon), funds on deposit in the Debt Service Reserve Account will be used to pay debt service in respect of the Second Lien Loans if funds are not available in the Proceeds Account and the Second Lien Debt Service Payment Account to make such payments as and when due.  For the avoidance of doubt, failure to fund the Debt Service Reserve Account up to the Debt Service Reserve Requirement shall not be an Event of Default (as defined below).

**Cash Sweep:**   The following percentages of Excess Cash (as defined below) will be applied on each Payment Date to prepay the outstanding First Lien Loans, together with unpaid interest:

(1)   if such Payment Date occurs during the period from the Closing Date to and including the second anniversary of the Closing Date, 25%; and

(2)   if such Payment Date occurs during the period from but excluding the second anniversary of the Closing Date until the Second Lien Loans have been paid in full, including accrued interest and fees, 50%

(such percentages, the "**Applicable Cash Sweep Percentages**").

 "**Excess Cash**" means, as of any Payment Date, amounts remaining, on deposit in the Proceeds Account after giving effect to the payment, in full, of the amounts, or establishment of reserves for payment of the amounts, described in clauses (1) through (5) of the Cash Flow Waterfall.

"**Cash Sweep**" means, as of any Payment Date, the Applicable Cash Sweep Percentages for such Payment Date multiplied by the applicable Excess Cash as of such Payment Date.

**Cash Flow Waterfall:**   All revenues and other amounts received by OpCo (other than casualty insurance and condemnation proceeds, certain equity and debt proceeds, and other payments which are required to prepay the First Lien Loans or the Second Lien Loans) from and after the Closing Date will be deposited in the Proceeds Account and disbursed as follows, to the extent funds are available:

(1)   *First*, once each month an amount sufficient to pay budgeted operating and maintenance fees, costs, expenses and permitted expenditures, if any, then due and payable or reasonably expected to be due within the next thirty (30) days (taking into account any permitted variances and other variances caused by certain emergencies, events of loss covered by insurance, compliance with laws and the Concession Agreement and costs that are passed through to the extent permitted under the Concession Agreement) will be transferred to the Operating Account;

- 6 -

(2)   *Second,* once each month an amount sufficient to pay (i) fees and expenses of the Administrative Agent, Collateral Agent, the Depositary Bank and any other relevant agents then due and payable or reasonably expected to become due and payable within the next thirty (30) days in connection with the First Lien Loans and the Second Lien Loans and (ii) scheduled payments of the Put Election Loans (as defined below), if any, then due and payable will be transferred to the applicable payees;

(3)   *Third,* if such month is a Payment Date, an amount equal to the amount of interest, principal and any other amounts then due and payable (less the balance then available in the First Lien Debt Service Payment Account) will be transferred to the First Lien Debt Service Payment Account and all funds in the First Lien Debt Service Payment Account shall then be applied to the payment of the First Lien Loans;

(4)   *Fourth,* if such month is a Payment Date, an amount equal to the amount of interest, principal and any other amounts then due and payable (less the balance then available in the Second Lien Debt Service Payment Account) will be transferred to the Second Lien Debt Service Payment Account and all funds in the Second Lien Debt Service Payment Account shall then be applied to the payment of the Second Lien Loans;

(5)   *Fifth,* on each Payment Date, an amount sufficient to fund the Debt Service Reserve Account, together with amounts already on deposit therein, up to the Debt Service Reserve Requirement will be transferred to the Debt Service Reserve Account;

(6)   *Sixth,* on each Payment Date, an amount equal to the Cash Sweep (after giving effect to the withdrawals and transfers specified in clauses (1) through (5) above) shall be applied to the prepayment of *first,* any interest, *second,* any principal on a *pro rata* basis and, *third,* any other amounts then outstanding under the First Lien Loans;

(7)   *Seventh,* on each Payment Date after the First Lien Loans have been repaid in full, an amount equal to the Cash Sweep (after giving effect to the withdrawals and transfers specified in clauses (1) through (6) above) shall be applied to the prepayment of *first,* any interest, *second,* any principal on a *pro rata* basis and, *third,* any other amounts then outstanding under the Second Lien Loans.

(8)   *Eighth,* on each Payment Date (or such later date after giving effect to all of the transfers required above), all remaining amounts, if any shall be transferred to the Distribution Account.

Funds maintained in the Distribution Account ("**Distributable Cash**") may be distributed within fifteen (15) business days after any Payment Date if (a) no Event of Default exists at the date of such Restricted Payment (as defined below) and no Event of Default shall occur as a consequence of making the Restricted Payment, (b) all amounts required to be funded or applied per the Cash Flow Waterfall have been funded or applied, including all amounts required to be on deposit in the Debt Service Reserve Account and all amounts required to be

- 7 -

applied in accordance with the Cash Sweep; (c) the historical DSCR, measured from the most recent financial statements of OpCo for the past twelve months, is equal to or greater than 1.5:1.0 at the date of such Restricted Payment; and (d) the Administrative Agent has received a certificate from OpCo certifying that each of the foregoing conditions has been satisfied as of the date of such Restricted Payment and setting forth the DSCR calculations (clauses (a) – (d), collectively, the "**Distribution Conditions**").

**Representations and Warranties:**

The Financing Documents in respect of the Transactions will contain customary representations and warranties of OpCo (subject to customary materiality limitations and qualifications to be mutually agreed in the Financing Documents).

**Affirmative Covenants:**

The Financing Documents will contain the following affirmative covenants of OpCo (which affirmative covenants shall be subject to materiality exceptions, thresholds and baskets):

(1)     payment of principal and interest;

(2)     use of proceeds from the Loans;

(3)     maintenance of organizational existence;

(4)     compliance with all applicable laws, including regulatory and environmental laws, and maintenance of permits;

(5)     conduct of business and maintenance of property and equipment;

(6)     maintenance of adequate insurance;

(7)     maintenance of books and records, inspection rights (subject to customary frequency and expense reimbursement limitations);

(8)     within thirty (30) days prior to the end of each fiscal year, delivery to the Lenders and the Technical Adviser of an operating budget for the Project for the succeeding fiscal year (the "**Annual Operating Budget**") in compliance with the Concession Agreement and which will be subject to the approval of the Required Lenders (in consultation with the Technical Adviser) if the operating costs (excluding expenses covered by insurance or paid with Distributable Cash or equity) in the prior fiscal year exceeded the total budgeted amount of such prior year by more than 15%;

(9)     compliance with the Annual Operating Budget (*provided that* the exceedance of the total budgeted amount by no more than 15%, excluding any expenses paid with Distributable Cash or equity, in the applicable year or any deviations caused by certain emergencies, events of loss covered by insurance, compliance with laws and the Concession Agreement and costs that are passed through shall be permitted to the extent permitted under the Concession Agreement);

(10)    operate and maintain the Project in accordance in all material respects

- 8 -

with, the terms of the Concession Agreement and applicable laws and permits;

(11) keeping in full force and effect each Material Project Document (other than the initial Management Agreement in the event the initial Management Agreement terminates in accordance with its terms and a replacement Operator (as defined in the Concession Agreement) is approved by IFA to the extent required in accordance with the Concession Agreement) except to the extent a Material Adverse Effect would not reasonably be expected to result;

(12) prompt delivery of (a) notices of default or events of default under the Financing Documents and the Material Project Documents, (b) notices of material litigation related to OpCo or the Project, (c) notices of other events related to OpCo or the Project that could reasonably be expected to result in a Material Adverse Effect (as defined below) (including, but not limited to, ERISA, eminent domain, environmental matters, casualty events and force majeure events), (d) notice of the occurrence of any IFA Default or Adverse Action, (e) notice of any event giving rise to a definitive prospective payment of any Concession Compensation or any payment of Toll Road Concession Value (each as defined in the Concession Agreement) by the IFA, promptly after OpCo has determined to make a claim for such payment, or notice of submission of any claims for any such payment, (f) notice of the receipt of payment of any Concession Compensation or any payment of Toll Road Concession Value (each as defined in the Concession Agreement) by the IFA, (g) notice of any IFA Directive (as defined in the Concession Agreement) issued by the IFA pursuant to the Concession Agreement, (h) copies of the annual operating plans provided to the IFA pursuant to the Concession Agreement, (i) notice of the occurrence of any Delay Events (as defined in the Concession Agreement) in the event the Concessionaire intends to delay or be relieved of performing its obligations under the Concession Agreement (together with a description thereof and an estimate of its expected duration), and (j) notice of adjustment to the Concessionaire's insurance coverage pursuant to Section 13.2(1) of the Concession Agreement;

(13) perform and observe the covenants and obligations under the Material Project Documents and other Project contracts, and enforce all of its material rights and remedies except in each case to the extent a Material Adverse Effect could not reasonably result;

(14) upon entry into any additional Material Project Documents, give notice of the security interest in such Material Project Documents to the other parties thereto and obtain consents to such security interest;

(15) no later than ninety (90) days after the end of each fiscal quarter of OpCo, delivery of an internal traffic and operating report showing (i) the operating data for the Toll Road for the previous quarter and for the year to date, including total revenues for the operation of the Toll Road, total operating expenses incurred, and total major maintenance costs incurred,

- 9 -

(ii) the variances for such periods between the actual revenues and the budgeted revenues and the actual operating expenses and major maintenance costs incurred and the budgeted operating expenses and major maintenance costs (as shown in the Annual Operating Budget), together with a brief narrative explanation of the reasons for any such variance of 15% or more, and (iii) if an Event of Default exists, such other operating and traffic information as the Required Lenders may reasonably request;

(16)    within one (1) year of the Closing Date, enter into interest rate hedging arrangements equal to at least 50% and no more than 100% of the notional amount of the First Lien Loans from the Closing Date through the date of the final scheduled amortization payment (any such agreements, "Hedging Agreements"); and

(17)    comply with separateness covenants set forth in the Concession Agreement.

**Negative Covenants:**    The Financing Documents will contain the following negative covenants (which negative covenants shall be subject to materiality exceptions, thresholds and baskets):

(1)    OpCo will not incur or guarantee any indebtedness and will not issue any disqualified stock, except for Permitted Debt.

"**Permitted Debt**" includes the following:

(a)  indebtedness incurred under the Financing Documents and any replacement, refinancing or extensions;

(b)  purchase money obligations and capitalized leases incurred to finance discrete items of equipment not comprising an integral part of the Project and secured only by Liens on the items financed that extend only to the equipment being financed in an aggregate amount of secured principal and capitalized lease obligations not exceeding payment of $40,000,000 in any year and not exceeding the purchase price paid for such equipment; *provided that* such indebtedness is incurred within two hundred seventy (270) days of the acquisition or construction of such equipment;

(c)  trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such trade accounts payable are payable within ninety (90) days of the date the respective goods are delivered or the respective services are rendered (unless subject to contest);

(d)  (i) obligations in respect of surety bonds or similar instruments required to be maintained under the Material Project Documents, (ii) indebtedness for financing working capital and (iii) other indebtedness , in the case of clause (iii) an aggregate amount not exceeding $40,000,000 at any one time outstanding;

(e)    additional indebtedness approved by the Required Lenders,

- 10 -

subject to intercreditor terms set forth in the Collateral Agency Agreement;

(f)   the issuance of senior unsecured floating rate loans to Statewide or a designated third party to satisfy the terms of or to fund the Put Election, as defined under and in accordance with the Plan (the "**Put Election Loans**"), which shall mature within one year and shall bear interest at a fixed rate of 10% per annum;

(g)   Permitted Investments;

(h)   intercompany indebtedness;

(i)   indebtedness with any permitted sale leasebacks;

(j)   unsecured debt incurred to finance capital expenditures or contributions in respect to the IFA Directives under Section 5.5(c) of the Concession Agreement so long as on a pro forma basis the DSCR is equal to or greater than 1.6:1.0;

(k)   amounts payable to the IFA under the Concession Agreement and the Toll Road Contracts to the extent constituting indebtedness;

(l)   hedging obligations incurred for non-speculative reasons as permitted under the Financing Documents;

(m)   the Second Lien Loans and debt incurred under the second lien loan documents.

(2)   OpCo will not create or permit any liens on such OpCo's assets, other than Permitted Liens.

"**Permitted Liens"** will include:

(a)   liens created or contemplated by the Financing Documents or secured in full by a bond;

(b)   Liens for taxes that either are not yet due or are being diligently contested in good faith in accordance with the provisions of the Financing Documents;

(c)   statutory liens, materialmen's, mechanics', workers', repairmen's, employees', carriers', warehousemen's and other like liens relating to the construction of the improvements or in connection with any modifications or arising in the ordinary course of business for amounts that are either (i) not more than forty-five (45) days past due or (ii) being diligently contested in good faith in accordance with the provisions of the Financing Documents and for which adequate reserves have been established or which have been bonded for not less than the full amount in dispute (or as to which other security arrangements satisfactory to the Collateral Agent have

- 11 -

been made), which bonding (or arrangements) shall comply with applicable law;

(d)  liens arising out of judgments or awards that have been adequately bonded or with respect to which appeals or other proceedings for review are being diligently contested and no final judgment has been entered or which do not otherwise constitute an event of default;

(e)  any exceptions to title described on the title insurance policy delivered with respect to the Project;

(f)  such minor defects, easements and rights of way, restrictions incurred in the ordinary course of business, irregularities, encumbrances, clouds on title and statutory liens, zoning restrictions, servitudes, permits, reservations, encroachments, exceptions, conditions, covenants and any other restrictions on the use of real property, any obligations or duties affecting any of the property of any Person to any municipality or public authority with respect to any franchise, grant, license or permit, none of which materially impairs the use of such property for the purposes for which it is held or the operation of the Project and the ability of the Secured Parties to realize on the Collateral;

(g)  inchoate liens arising under ERISA for amounts which are not yet due;

(h)  (i) liens created by capitalized leases *provided that* the liens created by any such capitalized lease attach only to the property leased (and any attachments, accessions or proceeds thereof) and *provided further that* such capital lease obligations are Permitted Debt, (ii) purchase money liens securing Permitted Debt (including such Liens securing Permitted Debt incurred within nine (9) months of the date on which such property was acquired) and (iii) any liens created to secure Permitted Debt as approved in clause (e) of the definition thereof; *provided that*, for purposes of this clause (f), Permitted Debt shall not include any Permitted Debt described in clause (g) of the definition thereof;

(i) second priority liens in respect of the Collateral in accordance with the terms of the Second Lien Loans and the Collateral Agency Agreement;

(j)  permitted title exceptions;

(k) Permitted Concessionaire Encumbrances and Permitted IFA Encumbrances (each as defined in the Concession Agreement);

(l) liens securing debt described in clauses (d)(ii) and (m) in "Permitted Debt";

(m)  refinancing, replacement and extensions of the permitted liens; and

FIRST LIEN LOAN TERM SHEET
(ITR)

(n)  liens created with the consent of the Required Lenders.

(3)  OpCo will not (i) pay any dividend or distribution on account of its equity interests or similar payment to the direct or indirect holders of its equity interests in their capacity as such, other than payments in equity interests (other than disqualified stock) of OpCo, (ii) purchase or redeem any equity interests of OpCo, (iii) make any payment on, redeem, repurchase or defease any subordinated indebtedness of OpCo except at its stated maturity, or (iv) make investments not otherwise permitted by the Financing Documents (clauses (i) – (iv), collectively, "**Restricted Payments**") other than Restricted Payments made with Distributable Cash so long as the Distribution Conditions have been met;

(4)  OpCo and HoldCo will not (i) merge or consolidate, change its form of organization, or liquidate, wind up or dissolve itself, or suffer any liquidation or dissolution; (ii) convey, sell, lease, assign, transfer or otherwise dispose of all or substantially all of its property, assets or business, whether now owned or hereafter acquired, other than in accordance with the Concession Agreement and the Agreements; (iii) purchase, lease or acquire any assets other than assets required or advisable in connection with the operation and maintenance of the Toll Road; (iv) acquire any equity interest in any other Person; or (v) convey, sell, lease, transfer, assign or otherwise dispose of, in one transaction or a series of related transactions, any of its properties or assets in excess of $5,000,000 per year in the aggregate except for (A) sales or other dispositions of obsolete, worn out, surplus or defective equipment, (B) sales or other dispositions of equipment or other property in the ordinary course of business of OpCo in accordance with the Material Project Documents, and (C) sales, transfers or other dispositions of Permitted Investments or Permitted Liens;

(5)  OpCo will not enter into any transactions with any affiliates other than (a) those on terms (taken as a whole) that are not materially less favorable than what would be obtained in an arm's-length transaction with a non-affiliate; (b) Restricted Payments and Permitted Investments permitted by the Financing Documents; (c) transactions between OpCo and HoldCo; and (d) transactions contemplated with the Operator;

(6)  OpCo will not enter into or engage in any business other than the operation, maintenance and administration of the Toll Road and ancillary corollary and incidental activities related thereto;

(7)  OpCo will not, subject to exceptions to be mutually agreed upon, (i) enter into new project documents or amend or otherwise modify, or grant any waiver or consent under, replace or supplement, any Material Project Document if taking any such actions could reasonably be expected to result in a Material Adverse Effect; provided, that, other than as contemplated in the Management Agreement, OpCo will not enter into any new project documents with an affiliate or amend or otherwise modify, or grant any waiver or consent under, replace or supplement, any

- 13 -

Material Project Document with an affiliate, without the consent of the Board of Directors or (ii) amend or modify the Annual Operating Budget;

(8)   OpCo will comply with and will not amend or modify any of its organizational documents if any such amendment or modification materially and adversely affects any material rights or remedies of any of the parties under any Collateral Documentation.

(9)   OpCo will not make any investments other than:

(i) permitted investments to be mutually agreed upon ("**Permitted Investments**");

(ii) expenditures permitted by the Annual Operating Budget; and

(iii) investments permitted under the Concession Agreement.

(10)  OpCo will not maintain any accounts other than a local bank account for the payment of operating expenses (which will be subject to a cap to be mutually agreed) and the Accounts, which Accounts shall be maintained with the Depositary Bank subject to the lien of the Collateral Documentation, and will take all commercially reasonable actions to cause all revenues received from the Project to be deposited into the Proceeds Account;

(11)  OpCo will not create or acquire any subsidiary other than an Operator under the Concession Agreement (if necessary); provided that all of the membership interests and assets of the Operator is pledged to the First Lien Lenders and the Operator has no debt outstanding or any liens encumbering it, its membership interests or any of its material assets;

(12)  OpCo will not make any payments to procure consents from any Lender, unless the same consideration is offered to all such Lenders, as applicable, and paid to all such Lenders, as applicable, that so consent.

(13)  Without the consent of the Required Lenders (not to be unreasonably withheld, conditioned or delayed), OpCo will not enter into any hedging arrangements or other speculative transactions, except as otherwise required or permitted hereunder.

(14)  OpCo will not terminate or assign the Concession Agreement, unless OpCo receives and applies a termination payment sufficient to prepay the Loans in full plus accrued and unpaid interest pursuant to the mandatory prepayment provisions in the Financing Agreements.

(15)  OpCo will not cause any releases of hazardous materials at, on or under the Toll Road, except in compliance in all material respects with all Governmental Rules and required insurance policies, except to the extent that any failure to comply with any of the above cannot reasonably be expected to result in a Material Adverse Effect.

- 14 -

(16) OpCo will not at any time following the Closing Date appoint a replacement Operator except in accordance with Section 3.3 of the Concession Agreement.

**Reports:**

OpCo will be required to deliver the following items in accordance with the time periods set forth below:

(a) no later than sixty (60) days after the end of each of the first three quarterly periods of each fiscal year of OpCo (commencing in respect of the fiscal quarter ending after the Closing Date) unaudited quarterly financial statements of OpCo,

(b) no later than 120 days after the end of each fiscal year of OpCo (commencing in respect of the fiscal year ending after the Closing Date), audited annual financial statements of OpCo, together with an opinion of a recognized independent auditor,

(c) customary officer's compliance certificates related to the foregoing, and

(d) copies of any material notices received by OpCo or Operator under the Material Project Documents and such other information as the Lenders or the Administrative Agent may reasonably request.

**Events of Default:**

The Financing Documents will contain the following events of default (collectively, "**Events of Default**", and each, an "**Event of Default**") (which Events of Default shall be subject to materiality exceptions, thresholds and baskets):

(1)   non-payment of principal of any First Lien Loan on the date due, whether by scheduled maturity, acceleration or otherwise, or failure to pay any interest or other amount due in respect of any First Lien Loan in each case within five (5) business days of when due;

(2)   violation of any negative covenants under the Financing Documents, unless any violation of a negative covenant specified in clause (1) or (2) thereof is remedied within fifteen (15) days or any violation of a negative covenant specified in clause (7), (9), (10), (12) or (13) thereof is remedied within thirty (30) days;

(3)   violation of any affirmative covenants under the Financing Documents subject to a thirty (30)-day grace period from notice by the Administrative Agent which may be extended for an additional ninety (90) days so long as OpCo diligently pursues a cure for such violation and such violation is capable of being cured within such additional period;

(4)   any representation or warranty made by OpCo in any Financing Documents (or in any certificate or document delivered in connection therewith) is incorrect or untrue in any material respect when made, unless the adverse effect of such misrepresentation is remedied within thirty (30) days after

- 15 -

notice from the Administrative Agent;

(5)    (a) the commencement by OpCo of any case or other proceeding (i) under any existing or future law of jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (ii) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or seeking to make a general assignment for the benefit of its creditors; or (b) commencement against OpCo of any case or other proceeding of a nature referred to in clause (a) above which (i) results in the entry of an order for relief or any such adjudication or appointment or (ii) remains undismissed, undischarged or unbonded for a period of sixty (60) consecutive days; or (c) commencement against OpCo of any case or other proceeding seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) consecutive days from the entry thereof; or (d) OpCo shall take any corporate action to effectuate any of the acts set forth in clause (a), (b) or (c) above; or (e) OpCo shall admit in writing its inability to pay its debts as they become due;

(7)    cross-default with respect to payment defaults under OpCo's indebtedness for borrowed money (other than with respect to the Second Lien Loans) and cross-acceleration with respect to all other defaults under OpCo's indebtedness for borrowed money other than with respect to the Second Lien Loans), if the principal amount of such indebtedness individually or in the aggregate exceeds $40,000,000;

(8)    a "Concessionaire Default" shall have occurred under, and as defined in, the Concession Agreement, unless a termination payment to OpCo sufficient to prepay the Loans in full plus accrued and unpaid interest is applied pursuant to the mandatory prepayment provisions in the Financing Agreements;

(9)    one or more judgments or orders for the payment of money which is reasonably likely to result in a Material Adverse Effect shall be rendered against OpCo and the same is not paid, discharged or stayed, or for which no bond is posted, for a period of sixty (60) consecutive days after its entry;

(10)    certain ERISA events with respect to OpCo and its ERISA affiliates which would reasonably be expected to result in a Material Adverse Effect;

(11)    any material portion of the Secured Parties' interest in the Collateral shall be void or terminated, or shall not have the required perfection and priority, in each case except in accordance with the Collateral

- 16 -

Documentation or as a result of the action or inaction of the Collateral Agent or First Lien Lenders;

(12) OpCo abandons all or a material part of the Toll Road or its activities to operate or maintain the Toll Road, which abandonment shall be deemed to have occurred if OpCo fails, without reasonable cause, to operate the Toll Road for ninety (90) consecutive days;

(13) (i) any Material Project Document shall terminate or cease to be valid and binding on any party thereto prior to its scheduled expiry or as otherwise permitted (subject to a cure period to be mutually agreed), and (ii) any permit necessary to operate the Project in accordance with the Project contracts shall have been revoked or withdrawn and such failure, termination or non-compliance can reasonably be expected to have a Material Adverse Effect; unless such failure is remedied within 30 days after the earlier of the Administrative Agent giving written notice to OpCo obtaining actual knowledge, or such longer period, not exceeding 180 days, as is reasonably necessary under the circumstances to remedy such failure;

(14) any of the Financing Documents shall cease to be in full force and effect (other than in accordance with their respective terms) or shall be declared void by a governmental authority;

(15)  any funds on deposit in any Account are used or withdrawn other than for the purposes specified or as expressly permitted in the Financing Documents, unless such is caused by an administrative error and is remedied within fifteen (15) business days;

(16) a casualty, loss or damage event or a condemnation or nationalization event, in each case, with respect to all or substantially all of the Toll Road shall have occurred (other than insured amounts); and

(17) the Concession Agreement is terminated for any reason unless a termination payment to OpCo sufficient to prepay the Loans in full plus accrued and unpaid interest is applied pursuant to the mandatory prepayment provisions in the Financing Agreements.

| | |
|---|---|
| **Material Adverse Effect:** | A material adverse change in or effect on (a) the business, financial condition, operations, performance or property of OpCo and the Project (taken as a whole), (b) the ability of OpCo to perform their payments obligations under the Financing Documents or the Concession Agreement, (c) the legality, validity, binding effect or enforceability of the Financing Documents or the Concession Agreement or (d) the rights and remedies of the Lenders or any agent under the Financing Documents. |
| **Materiality Generally** | To the extent not specified herein, the representations and warranties, covenants and events of default described above will contain customary exceptions, materiality standards, dollar thresholds, baskets, knowledge qualifiers, replacement rights and grace and cure periods to be mutually agreed upon in the Definitive Documents. |

- 17 -

| | |
|---|---|
| **Indemnity and Expenses**: | The Financing Documents will provide customary and appropriate provisions relating to indemnity, expense reimbursement and related matters. |
| **Waivers and Amendments:** | Required Lenders must consent to any extensions or increase of the First Lien Loan amounts, extension of any scheduled payment or mandatory payment of principal, interest, fees or other amounts, reduction of principal of, or rate of interest, specified in the First Lien Loans, alter the pro rata sharing of payments, change the definition of "Required Lenders", release any material portion of the Collateral or any material Collateral, and amend the provisions in respect of "waiver" and "amendment". |
| **Required Lenders:** | "**Required Lenders**" shall have the meaning set forth in <u>Appendix C</u>. |
| **Assignment:** | Usual and customary assignment provisions for the Financing Documents. |
| **Governing Law and Jurisdiction:** | Law of the State of New York shall govern the Financing Documents (other than the leasehold mortgage, and certain Third Party Consents and the Concession Agreement which shall be governed by law of the State of Indiana). |
| | The Financing Documents will provide that OpCo and HoldCo will submit to the non-exclusive jurisdiction and venue of the federal and state courts of the State of New York, in the Borough of Manhattan, and shall waive any right to trial by jury. |
| **Traffic Adviser:** | The Halcrow Group. |
| **Model Auditor:** | To be determined by the Required Lenders in consultation with OpCo. |
| **Technical Adviser:** | To be determined by the Required Lenders in consultation with OpCo. |
| **Insurance Consultant:** | To be determined by the Required Lenders in consultation with OpCo. |

*The foregoing is intended to summarize certain basic terms and conditions of the First Lien Loans.  It is not intended to be a definitive list of all of the terms of the First Lien Loans.  The Definitive Documents need to be acceptable to the Consenting Lenders in all respects.*

- 18 -

Appendix A

Organizational Chart[1]



---

[1] NOTE: Post-Chapter 11 structure to be confirmed.

<u>Appendix B</u>

[Omnibus Services Agreement Term Sheet]

**Omnibus Services Agreement Term Sheet**[1]

| Term | Summary |
|---|---|
| **New Management Structure** | Pursuant to the terms of an amended LLC Agreement of Reorganized Holdings, the Cintra or Macquarie Member (as each are defined in the Reorganized Holdings LLC Agreement), directly or indirectly, shall be entitled, during the Term (as defined below), to appoint the manager (the "Manager") of the Reorganized Concessionaire. The Manager will manage the day-to-day operations of the Reorganized Concessionaire in accordance with the terms of the Concession Agreement and past practices and will have the right, with the approval of the Board of Directors of Reorganized Holdings, to (i) appoint all of the Reorganized Concessionaire's personnel (provided that no consent of the Board of Directors will be required in respect of replacement of such personnel in order to fill vacancies with similarly qualified personnel) and/or (ii) retain, in accordance with the Omnibus Services Agreement (as defined below), the services of personnel currently employed by any Service Provider (as defined herein) and providing services to ITRCC pursuant to one or more Material Operator Agreements described in **Exhibit A** and attached hereto (including, without limitation, employed by the Skyway Concessionaire and providing such services pursuant to the Cost Sharing Agreement (as defined herein)), in each case on substantially the same terms as existing as of the Petition Date except as otherwise set forth herein (including to the extent modified in accordance with the Omnibus Services Agreement). |
| | As of the Petition Date, the services contemplated in the Material Operator Agreements attached hereto constitute all of the services being provided by Macquarie and Cintra to ITRCC (collectively, the "Services").  As of the Petition Date, the personnel set forth in **Exhibit C-II** as personnel being provided to ITRCC pursuant to the Cost Sharing Agreement referred to herein constitutes all of such personnel as of such date.  The personnel of ITRCC as of the Petition Date has remained substantially the same since July 1, 2014 and consists of approximately two hundred and fifty (250) employees, none of which overlap with any personnel set forth in **Exhibit C-II** (except for those employees listed in part (b) thereof), and each such employee has the requisites skills and is required for the continuing operation of the Reorganized Concessionaire in accordance with the Concession Agreement and past practices. As of the Petition Date, no other services or personnel are required or contemplated for the continuing operation of Reorganized Concessionaire in accordance with the Concession Agreement and past practices. |
| | The Manager, all personnel (both employed by ITRCC or who provide services to ITRCC pursuant to any Material Operator Agreement), and any other Service Providers under any Material Operator Agreement will provide the Reorganized Concessionaire with day-to-day operational services in a manner consistent with past historical practices as of the Petition Date, as adjusted in accordance with the Omnibus Services Agreement, in exchange for either the Management Cash Consideration or the Management Equity Consideration (as each is described below). Subject to the Definitive Documentation, including the negative |

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Joint Prepackaged Plan of Reorganization of ITR Concession Company LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code* (as the same may be amended, modified, or supplemented from time to time, the "Plan").

| | |
|---|---|
| | covenants set forth in the Financing Agreements (each as defined in the New Loans Term Sheet), any other services may be mutually agreed upon between the Reorganized Concessionaire and any Service Provider under any Material Operator Agreement or any service provider under any other relevant agreement. For the avoidance of doubt, the new management structure will not be implemented to the extent that a sale of the Reorganized Concessionaire and/or the other Reorganized Debtors is effected. |
| **Remuneration/Management Fee** | The Cintra or Macquarie Member (as each are defined in the Reorganized Holdings LLC Agreement) of Reorganized Holdings shall be entitled to elect, in exchange for all of the services provided under the Material Operator Agreements (including those provided pursuant to the Cost Sharing Agreement and any secondment agreements) as shall be set forth in the Omnibus Services Agreement, and as payment for all amounts (including Compensation Costs of all Service Providers) payable pursuant to the Material Operator Agreements, the Management Cash Consideration <u>or</u> the Management Equity Consideration, which election shall be made at or prior to the Effective Date. The costs and expenses (and related remuneration) associated with any personnel of the Reorganized Concessionaire shall be paid by the Reorganized Concessionaire (other than any amounts (including Compensation Costs of any Service Provider) payable pursuant to the Material Operator Agreements). The Reorganized Concessionaire shall be responsible for all other operation, maintenance and capital expenditures of the Reorganized Concessionaire (other than any amounts payable pursuant to the Material Operator Agreements). <br><br> "<u>Management Cash Consideration</u>" shall mean the cash compensation payable pursuant to the Omnibus Services Agreement in an amount, payable by the Reorganized Concessionaire to each Service Provider in immediately available funds monthly in arrears during the Term, consistent with the current amounts payable to each Service Provider as set forth in each of their respective Material Operator Agreement, at an aggregate amount of approximately $2.3 million annually (as may be adjusted in accordance to and consistent with the CPI). <br><br> "<u>Management Equity Consideration</u>" shall mean compensation payable pursuant to the Omnibus Services Agreement for all services provided thereunder of, in the aggregate, New Holdings Interests representing 3% of the aggregate New Holdings Interests, on a fully diluted basis, which equity shall vest and be payable over a period of ten (10) years on a straight line and pro rata basis (issuable on a monthly basis). For the avoidance of doubt, any further vesting thereof shall cease upon the termination of the Omnibus Services Agreement in accordance with the terms thereof. |
| **Omnibus Services Agreement** | The Reorganized Concessionaire and/or Reorganized Holdings and each of the Service Providers shall enter into an omnibus services agreement (the "<u>Omnibus Services Agreement</u>") pursuant to which (i) the Reorganized Concessionaire shall assume any and all rights and obligations of ITRCC under and pursuant to the Material Operator Agreements described in **<u>Exhibit A</u>** hereto and (ii) the Service Providers shall agree to provide the personnel and/or other services currently provided pursuant to the terms of the respective Material Operator Agreements (x) for the duration of the Term (and without giving effect to (I) any right of the parties under such Material Operator Agreements to terminate any such Material Operator Agreements with notice of a shorter duration than the Termination Right described below or (II) any |

| | |
|---|---|
| | termination thereof which would otherwise occur as the result of the Petition) and (y) collectively, for either the Management Cash Consideration or the Management Equity Consideration (notwithstanding any alternative consideration for such services otherwise contemplated in such Material Operator Agreements); <u>provided</u> that the Omnibus Services Agreement shall, for the avoidance of doubt, be subject to the Termination Right and Events of Default, each as described below.<br><br>For the avoidance of doubt, the Reorganized Concessionaire and the Skyway Concessionaire shall, pursuant to the Omnibus Services Agreement, ratify and confirm the cost sharing allocations in respect of:<br><br>    (a) the sharing of personnel, in respect of which the Compensation Costs (as defined below) are shared in accordance with the percentages and amounts set forth opposite the respective names of the relevant personnel as set forth in **<u>Exhibit C-II</u>** hereto (subject to the replacement of any such personnel in the ordinary course in accordance with the Cost Sharing Agreement and the Omnibus Services Agreement); and<br><br>    (b) among other similar expenses, overhead, in respect of which ITRCC currently is responsible for the payment of fifty percent (50%) of the rent, telephone, e-mail, telecopier, utilities, repairs and maintenance, office supplies, and other costs of maintaining and operating the Skyway Concessionaire's offices;<br><br>in each case as set forth in Exhibit A.2 to the Second Adjustment.<br><br>"<u>Compensation Costs</u>" shall mean all salary, incentive compensation, if any, the employer portion of employment taxes, workers' compensation insurance, unemployment insurance contributions, benefit costs and any other related costs. |
| **Service Providers** | "<u>Service Providers</u>" shall include Skyway Concessionaire, Cintra, Cintra Spain, ITRP and such personnel set forth in **<u>Exhibit C-II</u>**. |
| **Standard of Performance** | The Manager shall cause the Reorganized Concessionaire to: (a) comply with all safety rules and regulations issued by IFA pursuant to the Concession Agreement, if any, (b) comply, in all material respects, with all provisions of the Concession Agreement applicable to the Reorganized Concessionaire, including the Operating Standards, and all applicable laws, regulations, codes permits and licenses, Material Operator Agreements and Financing Agreements (as defined in the New Loans Term Sheet, (c) maintain all authorizations required to operate the Toll Road, (d) perform the portion of the Services undertaken by the Manager (or at its direction) to enable the Toll Road to operate as a business and to the standards required of it under the Concession Agreement and in a good and workmanlike manner with due skill and care and in accordance with current standards of care and diligence reasonably expected of a skilled and experienced operator performing services of a similar nature on projects of a similar size and nature.<br><br>The Manager shall cause the Service Providers to perform their respective services under the relevant Material Operator Agreements in a manner that shall result in compliance with the Standard of Performance (to the extent applicable to the services being provided thereunder) and shall not cause the Reorganized Concessionaire to breach its obligations under the Concession Agreement, any applicable laws and the Definitive Documents (as defined in the New Loans Term Sheet). |
| **Term** | The Omnibus Services Agreement shall be effective for a term of 10 |

| | years following the Effective Date, subject to the Termination Right and an early termination due to an Event of Default as contemplated herein. |
|---|---|
| **Termination** | Either the Reorganized Concessionaire or the Service Providers may, pursuant to the Omnibus Services Agreement, terminate the Omnibus Services Agreement and the management arrangements contemplated therein at any time (including any and all Services and the Material Operator Agreements), in each case on six-months' prior written notice to the other parties to the Omnibus Services Agreement and the other members of Reorganized Holdings (such termination right, the "<u>Termination Right</u>"); provided that either the Reorganized Concessionaire or the Service Providers may terminate the Omnibus Master Agreement together with all Material Operator Agreements pursuant to an Event of Default; provided, further, that the Service Providers shall be entitled to exercise such Termination Right solely with the consent of each Service Provider under the Omnibus Services Agreement. |
| | For the avoidance of doubt, the Termination Right shall replace and supersede any existing discretionary termination right in each of the Material Operator Agreements to the extent such right provides for termination by either party thereto upon notice of shorter duration than the Termination Right. |
| | Any termination of the Omnibus Services Agreement shall automatically result in the concurrent termination of all Material Operator Agreements. |
| | The Service Providers and the Manager shall at no additional cost to Reorganized Concessionaire provide all reasonable and necessary transition assistance to any replacement service providers to ensure Services and the operation and maintenance of the Toll Road continue uninterrupted and in accordance with the Operating Standards (as defined in the Concession Agreement) and all safety and performance standards as set forth in the Concession Agreement and transfer to such replacement operator all reports, records and documents related to the operation, maintenance and performance of the Toll Road. |

| | |
|---|---|
| **Indemnity** | To the extent the Service Providers or any their respective current or former affiliates, directors, officers, partners, managers, agents, representatives, or employees (collectively, the "<u>Indemnified Persons</u>") become involved in any capacity in any actual or threatened action, claim, suit, investigation, or proceeding (an "<u>Action</u>") arising out of, related to or in connection with the Omnibus Services Agreement, the Material Operator Agreements or any of the transactions or management arrangements contemplated herein or any other matter referred to herein, the Reorganized Concessionaire will reimburse such Indemnified Person for the reasonable and documented out-of-pocket costs and expenses of investigating, preparing for, and responding to such Action as they are incurred to the extent that such Action is not due to the gross negligence or willful misconduct of such Indemnified Persons. The Reorganized Concessionaire will also indemnify and hold harmless any Indemnified Person from and against, and the Reorganized Concessionaire each agrees that no Indemnified Person shall have any liability to the Reorganized Concessionaire or its Affiliates, or their respective owners, directors, officers, employees, security holders, or creditors for, any losses, claims, damages or liabilities (collectively, "<u>Losses</u>") (A) related to or arising out of the Reorganized Concessionaire's actions or failures to act or (B) otherwise arising out of, related to or in connection with the management arrangements contemplated herein (other than Losses incurred due to the gross negligence or willful misconduct of such Indemnified Persons). |
| **Limitation on Liability** | The Reorganized Debtors shall have absolutely no recourse to, and the Service Providers and their respective Affiliates shall have absolutely no liability for, any claims, causes of action, liabilities, or other obligations relating to the services contemplated herein (other than the express obligations of any such parties under the Omnibus Services Agreement and the relevant Material Operator Agreements). |
| **Events of Default** | A "Service Provider Event of Default" shall occur if one or more of the events or conditions below arise or exist as to any Service Provider or Manager, as applicable (subject to cure periods, to be agreed): <br><br>(i)     a Service Provider or the Manager fails to perform any of its material obligations under the Omnibus Services Agreement or if a Service Provider or the Manager violates any material terms or material conditions of the Omnibus Services Agreement; <br><br>(ii)     a Service Provider (A) fails to pay its debts as they become due; (B) admits in writing its inability to pay its debts as they mature; (C) makes a general assignment for the benefit of creditors; or (D) commences, voluntarily or otherwise, any case, proceeding, or other action seeking reorganization, arrangement, adjustment, liquidation, dissolution, or composition of its debts under any law relating to bankruptcy, insolvency, or reorganization, or relief of debtors, or seeking appointment of a receiver, trustee, custodian, or other similar official for it or for all or any substantial part of its property; <br><br>(iii)     any of the Service Provider's representations or warranties under the Omnibus Services Agreement are false or breached in any material respect at the time made; <br><br>(iv)     there is an unauthorized change in control of any Service Provider (to the extent applicable); <br><br>(v)     any assignment of a Service Provider's rights and obligations under the Omnibus Services Agreement to a third party which is not an affiliate of such Service Provider unless approved by the Manager (in |

| | |
|---|---|
| | consultation with the Board of Directors); |
| | (vi)      any Service Provider or the Manager abandons the provision of the Services or the performance of its obligations under the Omnibus Services Agreement; |
| | (vii)      any Material Operator Agreement is or becomes unenforceable, invalidated, terminated or illegal or for any reason ceases to be in full force and effect; or |
| | (viii)    the Manager or any Service Provider shall cause the Reorganized Concessionaire to fail to comply with the relevant obligations set forth under the heading "Standard of Performance". |
| | A "Reorganized Concessionaire Event of Default" shall occur if Reorganized Concessionaire fails to make a payment when due under the Omnibus Services Agreement within sixty (30) days' notice from Manager of such payment default. |
| | An Event of Default shall mean either a Service Provider Event of Default or a Reorganized Concessionaire Event of Default, as applicable. |

\*      \*      \*      \*      \*

**Exhibit A**

**Material Operator Agreements**

(a)     That certain Amended and Restated Cost Sharing Agreement, dated as of July 13, 2010 (as modified by the First Adjustment and the Second Adjustment, the "Cost Sharing Agreement"), between ITRCC and the Skyway Concessionaire, as modified by (i) the First Adjustment to Amended and Restated Cost Sharing Agreement, dated as of November 1, 2012 (the "First Adjustment"), by and between the Skyway Concessionaire and ITRCC and (ii) the Second Adjustment to Amended and Restated Cost Sharing Agreement, dated as of December 2, 2013 (the "Second Adjustment"), by and between the Skyway Concessionaire and ITRCC, in each case set forth in **Annex I** hereto;

(b)     That certain Agreement for the Maintenance of Back Office System, dated as of July 12, 2011 (the "BOS Contract"), between ITRCC and Cintra Infraestructuras, S.A. ("Cintra"), as modified by the Extension Agreement – BOS Contract with respect to the BOS Contract executed by the ITRCC and Cintra, in each case set forth in **Annex II** hereto;

(c)     That certain Technical Services Agreement & Financial Services Agreement, dated as of April 24, 2014, between ITRCC and Cintra Servicios de Infraestructuras, S.L. ("Cintra Spain"), as modified by that certain Termination of Financial Services Agreement, dated as of April 23, 2014, effective January 1, 2014, between ITRCC and Cintra Spain, in each case set forth in **Annex III** hereto;

(d)     That certain Agreement for the Provision of Economical and Financial IT Systems Services, dated as of April 17, 2012, between ITRCC and Cintra Spain, set forth in **Annex IV** hereto;

(e)     That certain Technical Services Agreement & Financial Services Agreement, dated as of April 24, 2014, between ITRCC and the Indiana Toll Road Partnership ("ITRP), set forth in **Annex V** hereto; and

(f)     That certain Secondment Agreement, dated as of January 19, 2006, between ITRCC and Cintra Spain, set forth in **Annex VI** hereto.

**Exhibit C-II**

(a)      Skyway Concessionaire personnel for whom ITRCC pays the percentage set forth opposite such personnel's name:

| Name | Title | Percentage paid by ITRCC |
|---|---|---|
| Fernando Redondo* | Manager | 50% |
| Iñaki Alonso | Reporting Manager | 50% |
| Garrett Phipps | General Counsel | 50% |
| Tamiko Casteel | Procurement Manager | 50% |
| Lindsey Heys | Executive Assistant | 50% |
| Kristina Thorsten | Quality Coordinator | 50% |
| Ilia Kay | Finance Director | 50% |
| Inger Robertson | Treasurer | 50% |
| Sylvia Cedeno | Accounting Manager | 50% |
| Stephanie Donlan | Staff Accountant | 50% |
| Michael Lowrey | Director of Operations** | 50% |
| Vacant | Financial Analyst | 50% |

\*      Seconded to Skyway Concessionaire from Cintra or Cintra Spain.

\*\*      Serves as Director of Operations of Skyway Concessionaire and Operations Manager of Sections 1 & 2 of ITRCC.


(b)      ITRCC personnel for whom Skyway Concessionaire pays the remaining percentage set forth opposite such personnel's name:

| Name | Title | Percentage paid by ITRCC |
|---|---|---|
| Richard Fedder | Director of Human Resources | 80% |
| Rob Ladson | Infrastructure Manager | 80% |
| Juan Ignacio Gómez-Lobo | IT Manager | 80% |
| Tanya Zent | Buyer | 80% |
| Amber Kettring | Public Relations Manager | 95% |
| Ray Hoover | Safety Manager | 80% |
| Joyce Cieleilski | Audit Manager | 80% |
| Toll Audit Department Personnel | Audit Personnel | As needed |

**<u>Annex I</u>**

Cost Sharing Agreement, First Adjustment and Second Adjustment

[HIGHLY CONFIDENTIAL—REDACTED]

**<u>Annex II</u>**

BOS Contract and Extension Agreement

# AGREEMENT FOR THE MAINTENANCE OF BACK OFFICE SYSTEM

## ITR Concession Company LLC

- and -

## Cintra Infraestructuras, S.A.

July 12, 2011

Table of Contents

ARTICLE I General ............................................................................. 5

ARTICLE II Commencement and Term ................................................. 5

ARTICLE III Performance of Services ................................................. 6

ARTICLE IV Representations, Warranties, and Covenants ..................... 6

ARTICLE V Charges and Payment ....................................................... 9

ARTICLE VI ITRCC Obligations ........................................................ 11

ARTICLE VII Confidentiality ............................................................. 14

ARTICLE VIII Intellectual Property .................................................... 16

ARTICLE IX Liability ........................................................................ 17

ARTICLE X Termination .................................................................... 19

ARTICLE XII Force Majeure .............................................................. 21

ARTICLE XII Miscellaneous .............................................................. 21

1.      Definitions ............................................................................ 28

2.      Rules of Interpretation ........................................................... 32

**Schedules**

Schedule 1                          Definitions and Rules of Construction

Schedule 2                          Statement of Work (Ferrovial & CGI
                                    Contract No. 664/10 and Annex No. 87).

Schedule 3                          Service Charges

THIS AGREEMENT FOR THE MAINTENANCE OF BACK OFFICE SYSTEMS (this "**Agreement**"), dated as of July 12, 2011, effective as of May 9, 2011 (the "**Effective Date**"), between ITR Concession Company LLC ("**ITRCC**") and Cintra Infraestructuras, S.A. ("**Cintra**," together with ITRCC, the "Parties" and each individually, a "**Party**").

### W I T N E S S E T H:

WHEREAS, ITRCC is a party to that certain Indiana Toll Road Concession and Lease Agreement, entered into between the Indiana Finance Authority ("IFA") and the ITRCC dated April 12, 2006, as amended, supplemented and/or modified from time to time ("**Concession Agreement**"), pursuant to which ITRCC is to operate, manage, and maintain the Indiana Toll Road ("**ITR**");

WHEREAS, ITRCC seeks to enter into contract for maintenance services for its Back Office System ("**BOS**");

WHEREAS, Ferrovial S.A. ("**Ferrovial**") is party to that certain Contract for the Provision of Services between Ferrovial S.A. and CGI Information Systems and Management Consultantes España S.A. ("**CGI**") dated July 1, 2010, pursuant to which CGI provides certain BOS maintenance support services to certain toll roads indirectly owned by Ferrovial ("**CGI Contract No. 664/10**");

WHEREAS, Ferrovial and CGI have executed Annex No. 87 to the CGI Contract, pursuant to which CGI is to provide BOS maintenance support services to ITRCC; (Annex No. 87 and CGI Contract No. 664/10, collectively the "**CGI Contract**");

WHEREAS, Cintra is party to that certain contract with Ferrovial, by which it has contracted for the provision of certain BOS maintenance services to be provided to ITRCC pursuant to the terms and conditions of the CGI Contract;

WHEREAS, ITRCC has procured that Cintra, and Cintra has agreed, to provide or cause to be provided through its Affiliates and Subcontractors certain services subject to the terms of this Agreement; and

NOW THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

# ARTICLE I

## General

1.1    Scope of the Agreement

This Agreement governs the processes and procedures for the ongoing maintenance and operation of back office services in support of ITRCC's BOS.

1.2    Definitions and Construction

The definitions and the construction set forth in **Schedule 1** (Definitions and Rules of Construction) shall apply to the interpretation and construction of this Agreement.

# ARTICLE II

## Commencement and Term

2.1    Commencement

This Agreement shall come into force and effect on the Effective Date as defined in the preamble.

2.2    Duration

Unless terminated earlier in accordance with Article XI, this Agreement shall continue in force from its Commencement in accordance with Section 2.1 for a period of twelve (12) months. The Agreement may be renewed for successive one year periods, upon written, mutual agreement of the Parties.

2.3    The **"Term"** of this Agreement shall be the period between (i) the Agreement's commencement pursuant to Section 2.1 and (ii) expiration pursuant to this Section 2.2 or earlier termination pursuant to Article XI.

## ARTICLE III

### Performance of Services

3.1     General

3.1.1   Cintra covenants that as of the Effective Date, Cintra directly or through its Affiliates and Subcontractors, including CGI will provide BOS maintenance services to ITRCC, as more particularly described in the CGI Contract attached hereto as **Schedule 2** (Statement of Work) (the "**Services**").

3.2     Third Party Beneficiary

ITRCC shall become a third party beneficiary to the CGI Contract with respect to BOS maintenance services for the Indiana Toll Road.

3.3     Enforcement of Third Party Beneficiary Rights

As set forth in Article III of this Agreement, Cintra shall enforce ITRCC's third party beneficiary rights.

3.4     Service Levels

In performing its obligations under this Agreement, Cintra shall cause the Services to be provided in accordance with the Service Levels set forth in **Schedule 2** (specifically, Section 6 of Annex No. 87) and, where such Service Levels are not defined, in a workmanlike and professional manner.

3.5     Service Level Failures & Penalties

If there is a Deficiency, then upon being notified of the Deficiency in writing by ITRCC, Cintra shall take commercially reasonable steps necessary to enforce the provisions of the CGI Contract, including but not limited to the application of the applicable penalty provisions, as set forth in **Schedule 2** (specifically, Section 6 of Annex No. 87).

## ARTICLE IV

### Representations, Warranties, and Covenants

4.1     General

Cintra hereby represents and warrants that:

4.1.1   There is no hindrance, legal, contractual or otherwise, to Cintra entering into this Agreement and performing its obligations hereunder and Cintra has the full power and authority to execute, deliver, and perform under this Agreement.

4.1.2   This Agreement is the legal, valid, and binding obligation of Cintra, enforceable against Cintra in accordance with its terms, subject, however, to applicable bankruptcy, insolvency, reorganization, or other similar Laws relating to creditors' rights generally.

4.1.3   (a) It is duly organized, validly existing and in good standing under the laws of Spain and (b) it has, directly or through its Affiliates and Subcontractors, all necessary expertise, qualifications, competence, skills and know-how to perform or cause the Services and Deliverables to be provided in accordance with this Agreement.

4.1.4   To the extent that the Deliverables embody any third party off-the-shelf software ("**Third Party Software**") or that Third Party Software is provided for the purpose of aiding in the provision of the Services, that Third Party Software shall be licensed in accordance with the standard commercial terms given by the third party software supplier.

4.2   Deliverables

Cintra represents and warrants that:

4.2.1   The Deliverables will be free from defects, in compliance with the applicable requirements set forth in **Schedule 2** (Statement of Work) and operating in accordance with such requirements.

4.2.2   The use of the Deliverables in accordance with their requirements and intended application shall not infringe, violate, misappropriate, or misuse the Intellectual Property rights of third parties and Cintra is not otherwise aware of the Deliverables' infringement upon or misappropriation of any Intellectual Property rights of any third party. No claim of such infringement has been threatened or asserted, and no such claim is pending against Cintra.

4.2.3   None of the Deliverables will contain any virus, worm, time bomb, trap door, disabling device, automatic restraint, Trojan horse, or other code designed to: (i) delay or discontinue ITRCC's effective use of the Back Office System; (ii) erase, destroy, corrupt or modify any data of ITRCC or ITRCC's customers, contractors, or subcontractors without the express written consent of ITRCC; (iii) bypass any internal or external software security measure to obtain access to any hardware or software of ITRCC or ITRCC's customers, contractors, or subcontractors without the prior express written consent of ITRCC; or (iv) hinder or prevent the quiet enjoyment of the Back Office System.

7

4.2.4   The Deliverables will not violate the Laws or regulations of any governmental or judicial authority.

4.2.5   All Services to be provided hereunder shall be performed in a high quality, professional manner by qualified and reasonably skilled personnel in accordance with Best Industry Practice subject to the terms and conditions of **Schedule 2** (Statement of Work) .

4.2.6   All work furnished hereunder will be performed by or under the supervision of persons who hold all necessary, valid licenses or certifications to practice in the location where such work is performed, by personnel who are skilled, experienced and competent in their respective trades or professions, who are professionally qualified to perform such work in accordance with this Agreement and the Concession Agreement and who shall assume professional responsibility for the accuracy and completeness of the Services provided by them.   Cintra, its Affiliates or Subcontractors shall be responsible for any costs or fees associated with the acquisition and maintenance of any such licenses or certifications.

4.3   Covenants

Cintra hereby covenants, in the course of performing its obligations under this Agreement, to abide by the obligations and restrictions set forth in this Section 4.3. Cintra further covenants to cause its Affiliates, Subcontractors, or any person acting within Cintra's control or on Cintra's behalf in the provision of the Services, to abide by such covenants.

4.3.1   Security

Cintra shall abide by, and cause its Affiliates and Subcontractors involved in the provision of the Services, to abide by, all security policies and other rules governing the use of, or access to, the computer systems and premises of ITRCC. Cintra shall use, and cause its Affiliates and Subcontractors to use, in the provision of the Services, reasonable diligence to avoid the introduction of any virus, lockup program, spyware, Trojan horse or other similar malware or other software device to the information technology systems of ITRCC.

4.3.2   Confidentiality

Cintra shall ensure, and cause its Affiliates and Subcontractors, to ensure, that all subcontractors and personnel who have access to Confidential Information shall be bound confidentiality restrictions at least as stringent as those set forth in this Agreement.

8

### 4.3.3 Compliance with Laws

Cintra shall comply or shall direct its Affiliates and Subcontractors to comply with all applicable Laws to the extent affecting the performance of its obligations under this Agreement, including worker's compensation laws and licensing laws and regulations. To the extent applicable, Cintra covenants that at all times throughout this Agreement it shall comply or shall direct its Affiliates and Subcontractors to comply with requirements of the Concession Agreement in respect of non-discrimination, ethics and conflict of interest requirements, minority and women business enterprises, and the buy Indiana presumption, in each case, as they relate to the performance of the Agreement.

### 4.3.4 No Liability

Cintra does not represent or warrant that rights, relief or remedies set forth or described in Section 4.3.5 will be available in any particular circumstance, nor that Cintra will, where such rights, relief and remedies are available, be successful in enforcing such rights, relief or remedies.

### 4.3.5 Enforcement of Rights Under the CGI Contract

Subject to the principles, terms and conditions set out herein, including, without limitation, those set forth in Section 4.3.5, ITRCC shall be entitled to demand that Cintra use its commercially reasonable efforts to enforce its rights or its Affiliates' rights under the CGI Contract. Regarding such rights, ITRCC shall in no event be entitled to any recovery from Cintra that exceeds the recovery actually obtained by Cintra from CGI pursuant to the CGI Contract and solely to the extent that ITRCC is entitled to such recovery pursuant to this Agreement. In connection with any such enforcement of rights, Cintra shall cooperate and collaborate to the maximum extent possible with ITRCC in enforcing such rights vis-à-vis CGI for the benefit of ITRCC or by bringing any claim forward against CGI for ITRCC's own benefit at ITRCC's sole cost and expense.

## ARTICLE V

## Charges and Payment

### 5.1 Price

5.1.1 The Service Charge for the Services is €411,000, as set forth in **Schedule 3** and shall only

be subject to increase in response to documented increases as a result of a mutually agreed upon change request.

5.2    Invoices

5.2.1    Invoicing will be made on a monthly basis for the percentage of Services provided for the prior billing period.

5.2.2    Each invoice will include supporting information for the line items which are charged.

5.2.3    Upon receipt of payments by ITRCC described in this Article V, Cintra shall be responsible for paying its Affiliates and Subcontractors involved in the provision of the Services.

5.3    Tax

The Services Charges invoiced by Cintra will set forth any taxes, sales or otherwise, applicable to the use or transfer of hardware and equipment, and ITRCC shall reimburse Cintra for its payment of such taxes or any reimbursement made by Cintra to its Affiliates and Subcontractors for such taxes.

5.4    Payments

All payments will be due within thirty (30) calendar days after the date of receipt of the invoice by ITRCC and will be made free of bank charges or other deductions (e.g., deductions for prompt payment) by wire transfer in immediately available funds to an account which Cintra specifies in writing to ITRCC reasonably in advance of the delivery of an invoice or on the face of the invoice.

5.5    Interest on Late Payments

Any amount properly due to Cintra pursuant to this Agreement and remaining unpaid after the date when payment was due shall bear interest, to accrue from day to day at a rate equal to the lesser of (a) the prime rate of interest announced publicly by the Wall Street Journal plus one and one half percent (1.5%) per month from (and including) the date such amount is due until (but excluding) the day upon which the amount due is actually received, and (b) the maximum amount permissible under applicable Law.

5.6    Disputed Items

5.6.1    ITRCC must notify Cintra of any dispute in relation to an invoice delivered under this Agreement within seven (7) days after receipt of that invoice. If ITRCC fails to notify Cintra of that dispute within that time, ITRCC shall be deemed irrevocably to have

agreed to the amount stated in that invoice.

5.6.2  If the amount or part of the amount in an invoice rendered by Cintra under this Agreement is reasonably and in good faith disputed or subject to question by ITRCC, the Parties shall refer that matter to the Disputes Resolution Procedure for resolution, and, subject to Section 7.3.4, Cintra shall continue all Services without any pause or delay and ITRCC shall not be entitled to withhold payment of the disputed amount on those grounds.

5.6.3  If an undisputed amount as set forth in Section 5.6.2 above remains unpaid for ninety (90) calendar days, Cintra may suspend work under this Agreement upon thirty (30) calendar days prior written notice.


# ARTICLE VI

## ITRCC Representations, Warranties and Covenants

6.1  General

ITRCC hereby represents and warrants that:

6.1.1  ITRCC is duly organized, validly existing and in good standing under the laws of the state of Delaware;

6.1.2  ITRCC has the full power and authority to execute, deliver, and perform under this Agreement;

6.1.3  This Agreement is the legal, valid, and binding obligation of ITRCC, enforceable against ITRCC in accordance with its terms, subject, however, to applicable bankruptcy, insolvency, reorganization, or other similar Laws relating to creditors' rights generally;

6.1.4  ITRCC is the exclusive owner of or has the right to license and use all right, title and interest in and to the BOS and to any hardware or software that ITRCC will make available to Cintra for the provision of the Services.

6.2  General Obligations

ITRCC shall comply with all of its obligations and responsibilities set forth in this Agreement. ITRCC shall make commercially reasonable efforts to provide Cintra and its

11

subcontractors with all cooperation and assistance reasonably required to perform the Services, including by:

(a)    promptly making all decisions reasonably requested of it by Cintra;

(b)    providing in a timely manner all information that Cintra reasonably requests;

(c)    as Cintra its Affiliates and Subcontractors may reasonably request assistance, making staff resources available at locations where work within the scope of the Services is being conducted in order to provide such assistance in a timely manner; and

(d)    providing Cintra its Affiliates and Subcontractors with access to any location where equipment required for or dedicated to the performance of the Services is located.

6.3    Consents, permits and authorizations.

ITRCC shall ensure that it has or procures all relevant consents, permissions or licenses to enable Cintra to provide the Services that Cintra is required to provide under this Agreement.

6.4    Security measures.

ITRCC shall (a) ensure that reasonable security measures are maintained to protect the BOS, and (b) ensure that there are no security breaches, including unauthorized access or damage, in respect of any (i) computer systems hosting the Deliverables, or (ii) any computer systems owned or used by ITRCC.

6.5    Confidentiality

ITRCC shall ensure that all subcontractors and personnel who have access to Confidential Information shall be bound by non-disclosure agreements containing confidentiality restrictions at least as stringent as those set forth in this Agreement.

6.6    Non-Solicitation

ITRCC shall not, whether directly or by means of third parties, solicit any of the employees of Cintra's Subcontractors who have actively participated in the performance of the Services under this Agreement. This covenant is valid throughout the entire duration of this Agreement and up to one (1) year from its termination

12

# ARTICLE VII

## Governance

7.1    <u>Relationship Managers</u>

Cintra and ITRCC will each appoint a Relationship Manager to act as the primary interface with regard to all matters and communications arising under or in connection with this Agreement. Each Relationship Manager is entitled to make all decisions and issue all declarations on behalf of its principal with regard to any aspect of this Agreement. Neither Cintra nor ITRCC has any responsibility for monitoring whether the other side's Relationship Manager has actually complied with any applicable internal approval procedures for binding the respective Party. One Party's Relationship Manager can delegate authority for a specific matter or for categories of matters to another person by informing the other Party's Relationship Manager in writing reasonably in advance of such delegation; the delegation of authority may only be cancelled by written notification to the other Relationship Manager.

7.2    <u>Meetings</u>

The Relationship Managers shall meet in person or via teleconference as needed.

7.3    <u>Dispute Resolution Procedure</u>

7.3.1    Any Dispute between the Parties shall be dealt with in accordance with the dispute resolution procedures set forth in this Section 7.3.

7.3.2    Each Party must notify the Relationship Manager of the other Party of a Dispute, without undue delay after becoming aware of it, in a written report which at a minimum contains sufficient information to enable the receiving Party to reasonably evaluate the Dispute.

7.3.3    If the Parties resolve a Dispute, the Parties will record the resolution in writing. If the Relationship Managers cannot resolve a Dispute within five (5) Business Days after a Dispute Report has been submitted to either of them in accordance with this Section 7.3, each Party may proceed to mediation and, if necessary, arbitration as set forth in Section 13.13.

7.3.4    Pending resolution of a Dispute under this Section 7.3 or as referred to the Arbitration Procedures in Section 16.13, Cintra must continue to provide the Services and meet all applicable Service Levels without limitation and otherwise perform in accordance with the terms of this Agreement, provided that ITRCC shall continue to pay all Services Charges applicable to such Services.

7.3.5 Compliance with the dispute resolution procedure set forth in this Section 7.3 does not constitute a waiver of any substantive rights or remedies of either Party under this Agreement.

7.3.6 All discussions, negotiations and the dispute resolution procedures set forth in this Section 7.3 between the Parties to resolve a Dispute, and all documents and other written materials furnished by a Party or exchanged between the Parties during any such discussions, negotiations or Dispute Resolution Procedures, shall be considered confidential and not subject to disclosure by either Party.

## ARTICLE VIII

### Confidentiality

8.1    Confidential Information

The Parties acknowledge that they have received and will receive Confidential Information in connection with this Agreement. Confidential Information does not include any information: (i) which becomes generally available to the public other than as a result of a breach of this ARTICLE VIII (ii) which is received from a third party provided that the third party is not bound by an obligation of confidentiality with respect to such information, (iii) which was legally in a Party's possession without obligations of confidentiality prior to such information being furnished as Confidential Information, or (iv) which is developed by either Party independently without access to Confidential Information of the other Party.

8.2    Use of Confidential Information

The Parties agree that all Confidential Information will be used only for the purpose of exercising any rights or complying with any obligations under this Agreement and the receiving Party will ensure that only such staff to whom disclosure of the Confidential Information is required for the performance of the receiving Party's obligations under this Agreement will have access to Confidential Information and only to the extent necessary to perform these obligations. The receiving Party of each item of Confidential Information will use all reasonable efforts, taking into account the materiality and proprietary nature of the particular Confidential Information, to protect such Confidential Information from unauthorized use or disclosure (intentional, inadvertent or otherwise) and, in any event, will exercise at least the same reasonable level of care to avoid any such unauthorized use or disclosure as it uses to protect its own information of a like nature.

8.3    Permitted Disclosure

14

Notwithstanding the foregoing, a Party may disclose Confidential Information to third parties with the prior written consent of the other Party, and each Party will be free to disclose Confidential Information without the consent of the other Party:

(a)     to any regulatory authority in accordance with applicable Laws;

(b)     as otherwise required by applicable Laws, and only to the extent required by applicable Laws; and

(c)     to their and their Affiliates' directors, staff, subcontractors, attorneys, consultants, insurers and agents on a strict need-to-know basis in connection with their respective duties, as long as such persons are advised of the confidential nature of such information and their obligation to protect it as confidential and are bound by confidentiality undertakings consistent with this ARTICLE VIII.

provided that, with respect to (a) and (b) above (in either case, a "Confidential Information Request"), such Party shall: (i) provide the disclosing Party with prompt, prior written notice of such Confidential Information Request so that the disclosing Party may seek an appropriate protective order or waive the receiving Party's compliance with the provisions of this Agreement; and (ii) cooperate with any attempts by disclosing Party as allowed by law to resist such Confidential Information Requests. If, in the absence of a protective order or the receipt of a waiver hereunder, the receiving Party is nonetheless compelled to disclose Confidential Information or else stand liable for contempt or suffer other liability, the receiving Party may disclose only that portion of the Confidential Information, which the receiving Party deems necessary to fulfill the applicable legal requirements.

8.4     Return and Destruction

If this Agreement terminates or expires for any reason, the receiving Party of each item of Confidential Information, including documents, contracts, records or properties, will return it to the disclosing Party or, as reasonably requested in the disclosing Party's discretion, destroy it and provide a certification to the disclosing Party that all such Confidential Information has been returned or destroyed except to the extent that retention of any Confidential Information is required by applicable Law or expressly permitted under this Agreement.

8.5     Breach of Confidentiality

Each Party acknowledges that a breach of this Article may result in serious and irreparable harm to the Party who disclosed the Confidential Information subject to such breach, for which there is no adequate remedy at law. Therefore, in addition to any other

remedies available to the disclosing Party at law or in equity, the disclosing Party shall be entitled to injunctive relief for any such breach without the posting of bond or other security and without proof of actual damages. Such remedy shall not be deemed to be the exclusive remedy to the disclosing Party for any such breach but shall be in addition to all other remedies available at law or equity.

## ARTICLE IX

### Intellectual Property

9.1    Ownership and Restrictions

ITRCC shall have exclusive title and ownership rights, including all Intellectual Property rights, throughout the world in all Work Product. To the extent that exclusive title and/or ownership rights may not originally vest in ITRCC as contemplated herein, Cintra shall irrevocably assign all right, title and interest, including Intellectual Property and ownership rights, in the Work Product to ITRCC. Any use of the Work Product by ITRCC, its assigns, or any person, firm or corporation acting on behalf of ITRCC, shall be without additional compensation to Cintra.

9.1.1   Cintra shall not at any time do anything or cause anything to be done that would prejudice ITRCC's right, title and interest in any of ITRCC's Intellectual Property rights in the Work Product.

9.2    Disclosure

Cintra agrees to disclose, and shall cause its Affiliates and Subcontractors to disclose, promptly in writing to ITRCC any and all Intellectual Property made, conceived, developed, acquired or reduced to practice by Cintra, its Affiliates and Subcontractors, alone or jointly with others, during or in connection with the performance of the Services.

9.2    Further Assurances

Cintra will give ITRCC or ITRCC's designee all reasonable assistance and execute all documents necessary to assist with enabling ITRCC to prosecute, perfect, register or record its rights in any Work Product.

9.3    Termination

Upon the expiration or termination of this Agreement, each Party must cease to use any

16

Intellectual Property provided by the other under this Agreement except as otherwise provided in the this Agreement or the CGI Contract and must return to the other Party all materials (including records in electronic or digital form) which embody such Intellectual Property or, at such other Party's direction, destroy the same (and certify to the other Party in writing signed by a director that such destruction has taken place).

9.4    Infringement and Misappropriation

Each Party shall notify the other Party promptly if it becomes aware of any unauthorized access to, use or copying of any part of the Back Office System, Services or the Intellectual Property in the Work Product. Each Party shall fully cooperate in any factual investigation of such infringement or misappropriation, including by providing any relevant documents, proffering any employees with relevant knowledge or technical expertise, and executing any documents or written affidavits necessary for such investigation or any subsequent enforcement action.]

## ARTICLE X

### Liability

10.1    Exclusions

10.1.1    Cintra shall have no liability to ITRCC under or in connection with this Agreement or the provision of the Services, whether in contract (including under any indemnity), in tort (including negligence), in property, under a warranty, under statute, in law, in equity, or otherwise to the extent that such liability is principally caused by or is a result of: (a) the failure by ITRCC to perform any of its obligations under this Agreement; (b) errors in programs, coding information, data preparation or operating instructions, in each case if supplied by ITRCC or its subcontractors; (c) defects in any systems within the control or under the operation of ITRCC or any subcontractors; (d) any act or omission of ITRCC or any other subcontractors which delays or prevents Cintra from providing the Services where Cintra has notified ITRCC of such act or omission and where ITRCC has not rectified such act or omission within a reasonable period of time from such notification; or (e) any failure of ITRCC to operate the BOS in accordance with Best Industry Practice or directions given by Cintra, its Affiliates or Subcontractors (to the extent to which they are not inconsistent with this Agreement); or (f) a Force Majeure Event.

10.1.1    Each of the items set out in Section 10.1 shall be construed separately and without limitation to each other.

17

10.2   Exclusion of Specific Forms of Loss

Neither Party shall have liability to the other under or in connection with this Agreement or the provision of the Services, whether in contract (including under any indemnity), in tort (including negligence), in property, under a warranty, under statute, in law, in equity, or otherwise, whether or not foreseeable or noticed by a Party, for any indirect, consequential, punitive, special or exemplary damages, or loss of profits.  For the avoidance of doubt, nothing in this Section 10.2 shall preclude either Party from recovering direct damages for breach of this Agreement.

10.3   Limitation of Liabilities

To the extent permitted by Law, Cintra's aggregate liability for all claims arising under the Agreement, during the Term and thereafter, whether in contract (including under any indemnity), in tort (including negligence), in property, under a warranty, under statute, in law, in equity or otherwise for or in respect of any loss or damage suffered by ITRCC in connection with the Services, shall be limited to fifty percent (50%) of the Contract Value as of the date when any such liability arises; provided, that, for any liability related to or in connection with the Termination of this Agreement, the foregoing limitation of liability shall not apply to such liability and Cintra's aggregate liability, for both liability arising in connection with Termination and otherwise, shall be limited to one hundred percent (100%) of the Contract Value.  The limitation of this Section 10.3 shall not apply to any recoveries for the following: (1) physical injury to persons (including death) or damage to property for which Cintra is responsible under this Agreement; (2) the allegation of facts, which if true, would result in a violation of Section 4.2.2; and (3) acts or omissions of Cintra that constitute gross negligence or willful misconduct.. The amounts of such recoveries as set forth in the preceding sentence shall not apply toward the monetary limitation set forth herein.

10.4   Insurance

Cintra agrees to procure and maintain, at its own expense, appropriate insurance covering its obligations hereunder in accordance with the provisions in the CGI Contract. In the event that any of the Services are provided by employees of Cintra, its Affiliates or Subcontractors in the United States, Cintra shall maintain, or cause its Affiliate or Subcontractors to maintain, Employers' Liability and Workers' Compensation insurance in an amount of not less than $500,000 (or the minimum statutory amount) per occurrence.

10.5   Notification of Claims

If either Party becomes aware of any matter that may give rise to a claim under this

18

Agreement, notice of that fact (together with all details of the matter in question as are available) shall be given to the other Party as soon as is reasonably possible. Without prejudice to its obligations at Law, each Party shall take all reasonable steps to mitigate any loss it may suffer in connection with such claims.

10.6    Remedies in the Event of Breach of Warranty

In the event of a breach of the warranties set forth in Section 4.2.2, Cintra, at its sole expense, shall have the option promptly to: (a) modify the Deliverables to make them non-infringing so long as the Deliverables as modified complies with the requirements of this Agreement and provides ITRCC with the same functionality and benefit; (b) obtain for ITRCC the right to continue using the Deliverables; or (c) substitute services or deliverables acceptable to ITRCC which do not so infringe or misappropriate in place of the respective infringing or misappropriated Deliverables so long as the substitute complies with the requirements of this Agreement and provides ITRCC with the same functionality and benefit.

10.7    Recovery from Third Parties

10.7.1 If Cintra pays an amount in discharge of any claim under this Agreement and ITRCC or any of its Affiliates previously or subsequently recovers (whether by payment, discount, credit, relief, set-off or otherwise) from a third party (including an insurer) a sum for which it has already been reimbursed by Cintra, ITRCC shall forthwith pay, or shall procure that the relevant Affiliate forthwith pays, to Cintra an amount equal to the lesser of:

(a)    the net sum recovered from the third party; and

(b)    the amount previously paid by Cintra to ITRCC on account of the relevant claim.

10.7.2 Where ITRCC has or may have a claim against a third party, ITRCC shall use reasonable efforts, and shall procure that all reasonable efforts are used, to recover any amounts due from any such third party against whom ITRCC has or may have such claim.

**ARTICLE XI**

**Termination**

11.1    Termination by Either Party

Either Party may terminate this Agreement immediately by written notice to the other Party if that other Party is the subject of a bankruptcy order, or becomes insolvent, or makes any arrangement or composition with or assignment for the benefit of its creditors,

19

or goes into voluntary (otherwise than for reconstruction or amalgamation) or compulsory liquidation, or a receiver or administrator is appointed over its assets, or if the equivalent of any of those events occurs under the Laws of any of the relevant jurisdictions to the other Party.

11.2    Termination by ITRCC

11.2.1    ITRCC may terminate this Agreement:

(a)    in part or in whole, by written notice to Cintra if Cintra commits a material breach of its obligations under this Agreement and that breach has not been remedied within sixty (60) days (or such longer period as may be specified in the notice) after ITRCC gives Cintra such written notice indicating: (i) the nature and basis of such breach with reference to the applicable provisions of this Agreement; and (ii) ITRCC intention to terminate this Agreement if the breach is not cured; or

(b)    any time upon sixty (60) days prior written notice subject to payment of the Termination Charges to Cintra.

11.3    Termination by Cintra

11.3.1    Cintra may terminate this Agreement immediately by written notice to ITRCC if ITRCC commits a material breach of its obligations under this Agreement and that breach has not been remedied within sixty (60) days (or such longer period as may be specified in the notice) after Cintra gives ITRCC such written notice indicating: (i) the nature and basis of such breach with reference to the applicable provisions of this Agreement; and (ii) Cintra's intention to terminate this Agreement if the breach is not cured.

11.3.2    Cintra may suspend provision of the Services immediately by written notice to ITRCC if ITRCC does not pay any undisputed amounts due pursuant to this Agreement and such amounts (including interest thereon) remain unpaid for more than sixty (60) days.

11.4    Survival of Rights on Termination or Expiration

Termination or expiration of this Agreement shall not affect any rights or obligations which may have accrued prior to termination or expiration. Any provisions of this Agreement that can reasonably be interpreted as being intended to survive the termination or expiration of this Agreement, including all payment obligations will survive the termination or expiration of this Agreement.

11.5   Effect of Termination

Subject to Section 11.6, on termination or expiration of this Agreement for any reason:

(a)     Cintra and its Affiliates and Subcontractors shall be discharged from any further obligation to provide the Services and other resources to ITRCC as set forth in this Agreement;

(b)     except as otherwise expressly set forth herein, any right granted to ITRCC pursuant to this Agreement shall cease to exist; and

(c)     the Parties shall fulfill their respective obligations pursuant to Section 9.3.

11.6   Termination Assistance

Due to the specialized nature of the Services, if this Agreement is terminated for any reason (other than pursuant to Section 11.3.1), the Parties shall negotiate a reasonable period, of no more than two (2) months, for an effective transition, during which time the Agreement will be in full force and effect. During the transition period, Cintra shall reasonably assist in transitioning the Services to a replacement provider selected by ITRCC.

## ARTICLE XII

### Force Majeure

12.1   Relief for Force Majeure

A Party shall not be liable for any failure to perform or delay in performing any of its obligations under this Agreement to the extent caused by a Force Majeure Event, and shall be deemed not to be in breach of this Agreement to the extent that such breach is caused by such Force Majeure Event; provided, that each Party uses reasonable diligence to ensure the continuation of Services, the timely delivery of Deliverables, and any other actions that are required to continue the operation of the Back Office Systems.

12.2   Exceptions

Notwithstanding Section 12.1, the obligation of a Party under this Agreement to pay money shall not be excused due to any Force Majeure Event.

## ARTICLE XIII

### Miscellaneous

21

13.1    Notices

13.1.1    Notices under this Agreement shall be in writing and: (a) delivered personally; (b) sent by
certified mail, return receipt requested; (c) sent by a recognized overnight mail or courier
service, with delivery receipt requested, or (d) sent by facsimile or email communication
followed by a hard copy and with receipt confirmed by telephone, to the following
addresses (or to such other address as may from time to time be specified in writing by
the relevant Party):

13.1.2    All notices, correspondence and other communications to ITRCC shall be delivered to
the following address or as otherwise directed by ITRCC's Relationship Manager:

ITR Concession Company LLC
52551 Ash Road
Granger, Indiana 46530-7226
Attn: IT Manager
Tel. (574) 651-2474
Fax. (574) 651-2562
E-mail: jigomezlobo@indianatollroad.org

In addition, copies of all notices to precede, notices regarding Disputes, and suspension,
termination and default notices shall be delivered to the following persons:

ITR Concession Company LLC
52551 Ash Road
Granger, Indiana 46530-7226
Attn: General Counsel
Tel. (312) 552-7102
Fax. (312) 552-7130
E-mail: gphipps@indianatollroad.org

13.1.3    All notices, correspondence and other communications to Cintra shall be delivered to the
following address or as otherwise directed by Cintra's Relationship Manager:

Cintra Infraestructuras S.A.
Plaza Manuel Gómez Moreno 2,
Edificio Alfredo Mahou
E28020 Madrid, Spain
Attn: Jose Maria Rivas
Tel.: +34 914 185 644
Fax: +34 915 563 262
E-mail: jose.rivas@cintra.es
and
Attn: Maria Isabel Navarro
Tel.: +34 914 185 685

Fax: +34 915 551 701
E-mail: inavarro@cintra.es

In addition, copies of all notices regarding Disputes, and termination and default notices shall be delivered to the following person:

Cintra US, LLC
7700 Chevy Chase Dr.
Suite 500
Austin, Texas 78752
Attn: General Counsel
Phone: (512) 371-4811
Fax: (512)

13.1.4 Notices shall be deemed received when actually received in the office of the addressee (or by the addressee if personally delivered) or when delivery is refused, as shown on the receipt of the U. S. Postal Service, private carrier or other person making the delivery. Notwithstanding the foregoing, notices sent by facsimile after 4:00 p.m. Central Standard or Daylight Time (as applicable) and all other notices received after 5:00 p.m. shall be deemed received on the first business day following delivery (that is, in order for a fax to be deemed received on the same day, at least the first page of the fax must have been received before 4:00 p.m.).  Any technical or other communications pertaining to the Services shall be conducted by the Parties' Relationship Managers.

13.2    Entire Agreement

This Agreement constitutes the entire agreement between the Parties with respect to its subject matter and (to the extent permissible by Law) supersedes all prior representations, writings, negotiations or understandings with respect to that subject matter, provided that neither Party is attempting to exclude any liability for fraudulent statements (including fraudulent pre-contractual misrepresentations on which the other Party can be shown to have relied). All terms, conditions and warranties not stated expressly in this Agreement, and which would in the absence of this provision be implied into this Agreement by statute, common law, equity, trade, custom or usage or otherwise, are excluded to the extent permitted by Law.

13.3    Assignment

13.3.1 ITRCC shall not be entitled to and shall not assign, novate or otherwise transfer this Agreement, in whole or in part, without Cintra's prior written consent; provided that ITRCC may assign this Agreement to the IFA or its successors, as provided in the Concession Agreement.

13.3.2 Cintra may assign, novate or otherwise transfer this Agreement in whole or in part to (i) a

23

Cintra Affiliate, provided that if at any time following such a transfer, assignment or novation, the relevant entity ceases to be a Cintra Affiliate, Cintra shall procure that such entity shall re-transfer, re-assign or re-novate this Agreement, or the relevant part of it to Cintra or another Cintra Affiliate at that time, or (ii) a subcontractor of Cintra performing the work in connection with the Services or another entity of comparable standing that is fully capable of performing the work required hereunder.

13.4    Waiver

13.4.1   No waiver of any term, covenant or condition of this Agreement shall be valid unless in writing and signed by the obliged Party.

13.4.2   No waiver by any Party of any right or remedy under this Agreement shall be deemed to be a waiver of any other or subsequent right or remedy under this Agreement. The consent by one Party to any act by the other Party requiring such consent shall not be deemed to render unnecessary the obtaining of consent to any subsequent act for which consent is required, regardless of whether similar to the act for which consent is given.

13.4.3   No act, delay or omission done, suffered or permitted by one Party or its agents shall be deemed to waive, exhaust or impair any right, remedy or power of such Party hereunder, or to relieve the other Party from the full performance of its obligations under this Agreement.

13.4.4   Either Party's waiver of any breach or failure to enforce any of the terms, covenants, conditions or other provisions of this Agreement at any time shall not in any way limit or waive that Party's right thereafter to enforce or compel strict compliance with every term, covenant, condition or other provision, any course of dealing or custom of the trade notwithstanding. Furthermore, if the Parties make and implement any interpretation of this Agreement without documenting such interpretation by an instrument in writing signed by both Parties, such interpretation and implementation thereof will not be binding in the event of any future Disputes.

13.4.5   Except as otherwise expressly set forth in this Agreement, the acceptance of any payment or reimbursement by a Party shall not waive any preceding or then-existing breach or default by the other Party of any term, covenant or condition of this Agreement, other than the other Party's prior failure to pay the particular amount or part thereof so accepted, regardless of the paid party's knowledge of such preceding or then-existing breach or default at the time of acceptance of such payment or reimbursement. Nor shall such acceptance continue, extend or affect:  (a) the service of any notice, any Dispute Resolution Procedures or final judgment; (b) any time within which the other Party is required to perform any obligation; or (c) any other notice or demand.

13.5   Amendment and Variation

No amendment, deletion, supplementation, or other variation of this Agreement (or of any of the documents referred to in this Agreement) shall be valid unless it is in writing and signed by or on behalf of each of the Parties.

13.6   Independent Contractor

This Agreement does not set up or create an employer/employee relationship, partnership of any kind, an association or trust between the Parties, each Party being individually responsible only for its obligations as set out in this Agreement and in addition the Parties agree that their relationship is one of independent contractors.  Except to the extent to which a Party is specifically authorized in writing in advance by the other Party, neither Party is authorized or empowered to act as agent for the other for any purpose and neither Party must on behalf of the other enter into any contract, warranty or representation as to any matter.  Neither Party will be bound by the acts or conduct of the other, except for acts or conduct which the first Party specifically authorizes in writing in advance.

13.7   Counterparts

This Agreement may be executed in any number of counterparts and by the Parties to it on separate counterparts, each of which is an original but all of which together constitute one and the same instrument.

13.8   Invalidity

If any provision in or any part of this Agreement shall be found to be illegal or unenforceable under any enactment or rule of law then that provision or part shall to that extent be deemed not to form part of this Agreement and the remaining provisions shall continue in full force and effect.

13.9   Costs and Duties

Each Party must bear its own costs and expenses arising out of the negotiation, preparation and execution of this Agreement.

13.10  Further Assurances

Each Party agrees to do all things and execute all documents as may be necessary or desirable to give full effect to the provisions of this Agreement and the transactions contemplated by it.

13.11  Remedies Cumulative

25

Except where this Agreement provides otherwise, the rights, powers and remedies provided to the Parties in this Agreement are in addition to, and do not exclude or limit, any right, power or remedy provided by law or equity or by any agreement between the Parties.

### 13.12  Governing Law

The construction and validity and performance of this Agreement and the transactions contemplated by it shall be governed by the Laws of Indiana as applied to contracts executed and performed entirely within such state.

### 13.13  Arbitration Procedure

13.13.1    Except with regard to actions seeking temporary or permanent injunctive relief, any Dispute, having exhausted all procedures under Section 7.3, will be initially referred to mediation in accordance with the rules of the American Arbitration Association.

13.13.2    If the Dispute is not successfully resolved through such mediation, it shall be finally settled by arbitration in accordance with the rules of the American Arbitration Association. Prior to commencing arbitration, the Parties must have complied with the Dispute Resolution Procedures as set forth in Section 7.3 and the mediation described in Section 13.13.1.

13.13.3    The arbitration shall be conducted by three (3) arbitrators.

13.13.4    The place of both mediation and arbitration shall be in Elkhart County, Indiana. The proceedings shall be conducted in the English language exclusively and all costs apart from the Parties' own representation shall be divided evenly.

### 13.14  Injunctive Relief

Each Party hereby acknowledges that a breach of the intellectual property, confidentiality, and data protection provisions of this Agreement would lead to irreparable harm that could not be remedied by damages and other monetary remedies alone. In such event, the non-breaching Party may seek injunctive or other equitable relief in any court of competent jurisdiction, and the Parties waive any requirement of special proof or bond in such actions.

[Signature page follows]
[Remainder of page intentionally left blank]

26

**ITR Concession Company LLC**

By: ~~FERNANDO REDONDO~~

Title: CEO

Date: Aug. 31, 2011

**Cintra S.A.**

By: CRISTOBAL MARTINEZ

Title: CONCESSIONAL SERVICES DPT. DIRECTOR

Date: AUG 31, 2011

## Schedule 1
## Definitions and Construction

**1.    Definitions**

In this Agreement, the following terms shall have the following meanings unless the context otherwise requires:

| | |
|---|---|
| **"Affiliate"** | means, in relation to a Party, any company, partnership or other entity which from time to time Controls, is Controlled by or is under the common Control with that Party (provided that neither Cintra or ITRCC shall be regarded as an Affiliate of the other for the purposes of this Agreement). For these purposes **"Control"** means the beneficial ownership of more than 50% of the issued share capital or the legal power to direct or cause the direction of the general management of the company, partnership or other entity in question. |
| **"Agreement"** | means this Agreement. |
| **"Back Office System"** | is defined in Section 1.1 and further described in the Statement of Work. |
| **"Business Days"** | means any day other than Saturdays, Sundays and official government holidays in Indiana and Spain. |
| **"Concession Agreement"** | means the Indiana Toll Road Concession and Lease Agreement, entered into between the Indiana Finance Authority and the ITR Concession Company LLC, dated April 12, 2006, as amended, supplemented and/or modified from time to time. |

| | |
|---|---|
| **"Confidential Information"** | means the proprietary and confidential information of one Party that is disclosed to the other in connection with this Agreement, or other Work Product included in the Deliverables that derives value from its confidentiality, where such information may include, without limitation, all Work Product and all other information, know-how, marketing and development plans, techniques and materials, customer names and other information related to customers, price lists, pricing policies and financial information, and methods of production, use, operation and application, and all samples, prototypes or other materials disclosed by ITRCC, as well as all analyses, compilations, results, studies, or other documents prepared by Cintra: (i) which are not generally known to the public; and (ii) in which such Party or its suppliers or customers has rights. Confidential Information shall include all Background Materials and Third Party Software made available by Cintra, an Affiliate of Cintra or a subcontractor of Cintra. |
| **"Contract Value"** | means the amount of the Services for a one year period, including any additional work requested by ITRCC pursuant to Section 8 of Annex No. 87. |
| **"Deficiency"** | means a failure to provide any of the Services (and to meet the Service Levels) in accordance with this Agreement. |
| **"Deliverable(s)"** | means any work product produced by Cintra and provided to ITRCC as part of the Services or in support of the maintenance or operation of the Back Office System. |
| **"Dispute"** | means any dispute between the Parties arising out of or in connection with this Agreement. |
| **"Dispute Resolution Procedure"** | means the dispute resolution procedure set out in Section 7.3. |
| **"Effective Date"** | is defined in the Preamble. |

| | |
|---|---|
| **"Force Majeure Event"** | means, in relation to a Party, events or circumstances beyond such Party's reasonable control, including by fire, flood, earthquake, elements of nature or acts of God, acts of war, terrorism, riots, sabotage, civil disorders, rebellions or revolutions, strikes or lock-outs, acts or omissions of utilities or of government entities and major ongoing power outages. |
| **"Best Industry Practice"** | means, in relation to any particular circumstances, the degree of skill, diligence, prudence, foresight and operating practice which would reasonably and ordinarily be expected from a reasonably skilled and experienced person performing a similar type of obligations under the same or similar circumstances. |
| **"Governmental Entity"** | means any federal, State of Indiana, or local government and any political subdivision or any governmental, quasi-governmental, judicial, public or statutory instrumentality, administrative agency, authority, or body. |
| **"IFA"** | means the Indiana Finance Authority |
| **"Intellectual Property"** | means rights in patents, trademarks, signs and service marks, designs, trade or business names, copyrights (including rights in computer software), database rights and topography rights (whether or not any of these is registered and including applications for registrations of any such thing) and all trade secrets and all rights or forms of protection of a similar nature or having equivalent or similar effect to any of those which may subsist anywhere in the world. |

| | |
|---|---|
| **"Law(s)"** | means any statute, law, code, regulation, ordinance, rule, common law, judgment, judicial or administrative order, decree, directive, guideline, policy requirement or other governmental restriction (including those resulting from the initiative or referendum process) or any similar form of decision of or determination by, or any interpretation or administration of any of the foregoing by, any Governmental Entity, which is applicable to or has an impact on the Facility or the Services, whether taking effect before or after the Effective Date, including environmental laws. "Laws", however, excludes governmental approvals, permits, or consents. |
| **"Parties"** or **"Party"** | is defined in the Preamble. |
| **"Regulatory Requirements"** | means all federal and state legal and regulatory requirements in the State of Indiana that are applicable in relation to the Services. |
| **"Related Parties"** | means a Party's Affiliates, employees, subcontractors, officers, directors, agents, successors and assigns. |
| **"Relationship Manager"** | means the person appointed by each Party to act as such in accordance with Section 7.1. |
| **"Service Levels"** | means the service levels as set out in **Schedule 2** (specifically, Section 6 of Annex No. 87). |
| **"Services"** | is defined in Section 3.1. |
| **"Statement of Work"** | means the statement of work set out in **Schedule 2** (Statement of Work). |
| **"Subcontractors"** | means any third party subcontracted by Cintra or any of its Affiliates for the purpose of providing the Services under the Agreement |

| | |
|---|---|
| **"Taxes"** | means any kind of taxes including federal, state or local taxes, levies, imposts or other fees or duties of any kind whatsoever imposed by any governmental authority in any other jurisdiction, or any subdivision thereof, including any interest, penalties or additions thereon. |
| **"Term"** | is defined in Section 2.3 |
| **"Termination Charges"** | means the early termination charges. |
| **"Work Product"** | means any embodiment of the instruments of service that is unique and developed specifically in connection with performing the obligations under this Agreement or any other contract or agreement of any nature or kind between the Parties, which may include: information, data, material, discoveries, ideas (whether or not patentable or reduced to practice), concepts, software in various stages of development, designs, drawings, specifications, techniques, models, data, algorithms, documentation, diagrams, flow charts, methods, techniques, research, processes, procedures, know-how, marketing and development plans, techniques and materials, and all tangible embodiments of each of the foregoing (in whatever form and media) and all Intellectual Property rights appurtenant to or inherent in the same. |

## 2. Rules of Interpretation

The following rules apply unless the context requires otherwise.

(a) Headings shall be ignored in construing this Agreement.

(b) If a word or phrase is defined, its other grammatical forms have a corresponding meaning.

(c) References to this Agreement include its Schedules and this Agreement as from time to time amended and references to Recitals, Sections, Schedules and Appendices are to recitals and Sections of, and schedules and appendices to, this Agreement. In the event of a conflict between the terms in the main body of this Agreement and those contained in a Schedule or an Appendix, as the case may be, the terms set out in the Schedule shall prevail.

(d) A reference in a Schedule to an Article or Section of this Agreement is a reference to such an

32

Article or Section contained in the main body of this Agreement.

(e) The words "include", "includes", "including", "e.g." and "in particular" and any words following them shall be construed without limitation to the generality of any preceding words or concepts and vice versa.

(f) References to times of day are to Granger, Indiana local time unless otherwise stated. References to indemnifying any person against any circumstance include indemnifying that person, on an after tax basis in respect of that consequence.

(g) A reference to the holder of any office or position of responsibility includes references to such person as is from time to time appointed to exercise the functions of the holder.

(h) A reference to an agreement or document (including a reference to this Agreement) is to the agreement or document as amended, varied, supplemented, or restated, except to the extent prohibited by this Agreement or that other agreement or document.

33

**Schedule 2**

**Statement of Work**

**Annex 1**      Contract No. 664/10 for the Provision of Services between Ferrovial S.A. and
CGI Information Systems and Management Consultantes España S.A., dated July
1, 2010 ("CGI Contract"). Signed Spanish and translated versions included.

**Annex 2**      Annex No. 87 to the CGI Contract, dated March 10, 2011. Signed Spanish and
translated versions included.

34

**Schedule 3**

**Service Charges**

Pursuant to the terms and conditions set forth in Article 5 of this Agreement, the Service Charges for the Services are set forth below and shall only be subject to increase in response to documented increases as a result of a mutually agreed upon change request.

| | | |
|---|---|---|
| 1. | CGI Fee (including margin): | €300,000 |
| 2. | 3rd Party, Independent Testing: | €56,000 |
| 3. | Project Management: | €55,000 |
| | **Total:** | **€411,000** |

For the avoidance of doubt, the Service Charges include any and all travel expenses, previously agreed between the parties, incurred by Cintra or its Affiliate or Subcontractors in the execution of the Services.

**ANNEX 1**

Contract Number: 664/10

# CONTRACT
## FOR THE
## PROVISION OF SERVICES

Between

### FERROVIAL, S.A.

### AND

### CGI INFORMATION SYSTEMS AND MANAGEMENT CONSULTANTS ESPAÑA S.A

In Madrid, on 1 July 2010

1

Madrid, 1 July 2010

## BETWEEN

**Of the one part:** Ms María Pilar Rodríguez Tapia resident for these purposes at Calle Príncipe de Vergara, 135, Madrid, and having Spanish ID card no. 2.525.747-W.

**II** **And for the other part:** Ms Pilar Montón Millán, resident for these purposes at Alcobendas, Avda. de Europa 24,
Edificio Torona B, parque empresarial la Moraleja, and having Spanish ID card no. 25.428.797-C

## REPRESENTING

I.    The former on behalf of the entity FERROVIAL, S.A. established in Madrid, registered address at Príncipe de Vergara, 135 and tax ID no. A-81939209, (hereinafter **"Ferrovial").** Acting under the authority granted to her by deed witnessed by Mr Carlos del Moral Carro, Notary in Madrid, on 9 December 2009, original notarial document number 4716.

II.    And the second on behalf of the entity CGI INFORMATION SYSTEMS MANAGEMENT CONSULTANTS AND SPAIN, SA, having its registered offices at Avenida de Europa 24, Torona Building B, parque empresarial la Moraleja, Alcobendas, tax ID no. A-81154197 (hereinafter the **"Supplier").** Acting under the power of attorney granted to her by deed witnessed by Mr Madrid Ignacio Ramos Covarrubias, Notary in Madrid, on 17 April 2006, original notarial document number 1807.

Hereinafter Ferrovial and the Supplier shall be referred individually as a **"Party"** and collectively as **"Parties."**

## WITNESSING

I.    Whereas Ferrovial intends to engage the Information Technology Consulting services defined in the Annexes to this contract.

II.    Whereas the Supplier declares that it has the technical capacity and expertise, and owns the material resources necessary to provide these services to Ferrovial, and is willing to assist Ferrovial in this regard.

In consideration whereof, the Parties have agreed to enter into this contract for the provision of services (hereinafter the "Agreement"), which shall be governed by the following clauses.

2

**CLAUSES**

### 1. PURPOSE

#### 1.1. Provision of Services

The purpose of this Agreement is the provision to Ferrovial by the Supplier of the services listed in the service definition documents annexed hereto (hereinafter, the "Services").

These services shall be provided during the lifetime of the Agreement. The Parties, by express mutual agreement in writing, may agree to extend or modify the services under the conditions they see fit and all such modifications shall be incorporated as addenda to this Agreement.

#### 1.2. Activities

In particular, the Supplier agrees to diligently perform all activities necessary for the completion and implementation of the Services described in clause 1.1 and Annexes.

### 2. TERMS OF THE PERFORMANCE OF THE SERVICE

#### Independent execution

In the performance of the Services under this Agreement, the Supplier shall have full autonomy and independence regarding its staff, without being subject to working hours or instructions regarding the performance of the services.

Notwithstanding, Ferrovial reserves the right to carry out the necessary internal or external audits on the Services performed to ensure proper compliance.

#### 2.2. Interlocutors and Communications

Ferrovial shall appoint a person responsible for overseeing the provision of Services by the Supplier and this person shall be Ferrovial's interlocutor for the purposes of the monitoring of the Services.

The Supplier shall likewise appoint a person as the contact for the purposes of communication with Ferrovial and the monitoring of the services provided.

Communications between the Parties shall take place through these interlocutors.

#### 2.3. Expenses and resources

For the provision of the Services, the Supplier shall provide all the necessary technical expertise, as well as all means, machinery, production facilities and equipment necessary for this purpose, assuming responsibility for its own business management and organisation.

The Supplier shall meet any expenses it may incur in the proper performance of the Services.

### 3. GUARANTEE OF PERFORMANCE OF THE WORK

The Supplier shall guarantee to Ferrovial that the Services will be performed in a diligent manner, in accordance with best market practice and the level and quality of service described in the Annexes defining the services under this Agreement.

3

Supplier shall guarantee to Ferrovial the correct operation of all the work/outputs implemented for a period of six (6) months from the date of acceptance of work/project by Ferrovial. While this warranty is in effect, the Supplier agrees to rectify any errors identified in the Work/Project, at no additional cost to Ferrovial.

**4.    NO SUBCONTRACTING**

The Supplier may not subcontract the Services under this Agreement.

**5.    DURATION**

This Agreement shall come into force on 1 July 2010 and shall remain in effect for six months as of that date. The termination of this Agreement shall not affect the duty of confidentiality contained in clause [21], which shall remain in force for a period of 5 years from the date of termination.

This Agreement may be renewed for successive one year periods upon prior notice in writing by Ferrovial and acceptance by the Supplier not less than one (1) month before the end of the term hereof or any of its extensions.

**6.    PRICE 6.1. Price**

The Price of the services under this Agreement are set forth in the Annexes defining the service, Financial Conditions section, which forms an integral part of this Agreement for all purposes.

All project-related expenses incurred by Supplier are included, without exception, in the prices for the service stated in the Service definition Annex - Financial Conditions.

At the request of Ferrovial and by mutual agreement between the parties, Ferrovial reserves the right to delay compliance with any of the deadlines, without thereby incurring any penalty vis-à-vis the Supplier. In such cases, the Supplier shall also be exempted from the penalties that apply insofar as non-compliance is attributable to the delay imposed by Ferrovial.

The failure to meet deadlines/requirements for the provision of the service and/or breach of quality standards required by Ferrovial, may lead to the application of the penalties described in the relevant clause or, if applicable, the resolution as established in the COMPENSATION OR PENALTY clause (7) and RESCISSION OF CONTRACT clause (8), along with the cancellation of any outstanding orders.

**6.2. Method of payment**

All quantities indicated to be payable by Ferrovial in this Agreement shall be settled following acceptance of the corresponding monthly invoice issued by the Supplier, in the form of a personal cheque payable after 60 days, or by any other means established by the Parties by mutual agreement. These amounts shall include VAT as appropriate under the law applicable at the time. Invoices issued by the Supplier shall specify the taxable amount and the VAT, all other taxes, fees, taxes, etc. arising from this Agreement and the provision of the Services being borne by the Supplier.

4

**7.    COMPENSATION OR PENALTY**

If Supplier does not comply with the conditions or levels of service set out in the service definition Annex – Levels of Service – Ferrovial may impose the penalties described in that Annex, by the application of its Bonus/Malus scheme.

**8.    TERMINATION OF CONTRACT**

(i)    Unilateral rescission: Ferrovial may unilaterally terminate this Agreement at any time. To this end, Ferrovial must send written notice to the Supplier with a minimum of 15 days and shall be required to pay the Supplier for Services effectively performed by the latter up until the date of early termination.

(ii)    Unilateral cancellation: The service model has its limitations and risks and in order for both parties to be able to mitigate this risk, both parties agree to review the state of the service every 3 months in order to determine whether it is in their interest to maintain or terminate the service. Both parties agree to respect the decision of the other party independently of whether this means the termination of the service. In the case either party decides to terminate the service, they will communicate this in writing to the affected party and a period of 2 months will be established from the date of the communication during which a period of reverse transition will be executed. This will provide both parties time to reorganise the service and resources and ensure that neither party is adversely affected by the termination.

(iii)    Rescission for breach: Ferrovial may terminate this Agreement early in the following cases:

a)    if the Supplier fails to comply with any its obligations under this Agreement;

b)    if the Supplier fails to meet the service levels set out in the service definition Annexes, service level agreements section, attached to this Agreement.

In this case, Ferrovial shall notify the Supplier of the breach in writing, setting out the details of the breach that has occurred. The Supplier shall remedy the breach within 15 days of receipt of notification from Ferrovial. If the Supplier fails to remedy the breach within 15 days of receipt of notification, Ferrovial shall be entitled to terminate this Agreement or to keep it in force, but in either case, to be compensated for damages caused by said breach, including the cost of providing an alternative service to substitute for the service affected by the breach. Any potential damages will be limited to the amount specified in the Limitation of Liability clauses (Clause 15).

c)    In the event that within 15 days from the signing of this Agreement, the Supplier fails to deliver a copy of the third party liability policy to Ferrovial.

d)    The cessation of the Supplier's existence as a legal entity, except in those cases where its legal identity is taken over by another entity belonging to the same group, acting as successor to the dissolved entity and taking on all the latter's rights and obligations.

e)    Interruption or suspension of the contracted services, whatever the cause thereof.

In the event of termination for any of the reasons mentioned in the preceding paragraphs, the Supplier shall also be obliged to indemnify Ferrovial for any damages that the breach may have caused it.

In the event of termination of the Agreement, the Supplier shall, upon request by Ferrovial, immediately cease providing the service entrusted to it. It also shall make the final settlement for the services performed up to that time which are considered usable by Ferrovial, paying for the services actually provided valued in accordance with the table of contracted prices.

In any event, the amount resulting from the settlement of penalties,

5

compensation and other items as appropriate will be deducted from this amount.

### 9.    MODIFICATION OF THE CONTRACT

Any amendments, renewals, addenda, amendments or annexes affecting the Agreement shall be valid only when set out in writing and signed on behalf of both parties by persons duly authorised for this purpose.

The Supplier shall not, without prior written authorisation from Ferrovial, make any modifications, additions or deletions of any kind to the Agreement or its terms and conditions. Possible variations of the characteristics of the contracted services, and any variants or additions to the economic conditions applicable to each of the services under this Agreement must be agreed and notice given to the other party and shall not enter into force without prior agreement between the parties formalised in writing and attached to this Agreement.

### 10.    PROPERTY RIGHTS

The Vendor expressly acknowledges that the product of the services provided by the Supplier under this Agreement shall be the sole property of Ferrovial. The signing of this Agreement does not confer rights or impose obligations upon the Supplier other than those expressly referred to herein, and in particular, does not imply the granting of any license to exploit intellectual property or other rights.

### 11.    THIRD PARTY INSURANCE.

The Supplier has taken out a third party liability insurance policy with ZURICH and AIG guaranteeing the payment of any amount deriving from any third-party liability that may arise, as a result of personal injury and/or damage caused to Ferrovial, its employees, or third parties during the implementation of its activity and the damage caused by the work done and services rendered by the Supplier after its delivery.

At the time of signing the Agreement the Supplier shall deliver a certificate issued by the aforementioned insurance company, stating that the Supplier has taken out the policy, that it is in force and that the Supplier is up-to-date with payment of the premiums.

### 12.    UNDERTAKING NOT TO USE FERROVIAL'S NAME

The Supplier agrees not to use this Agreement for advertising purposes in any form or channel, specifically including, but not limited to, any disclosure to the public in general or to specific third parties, and not to make any use of the name, trademarks or logos representing Ferrovial in the media, on websites, corporate presentations, representations to clients or through any other system of information or publicity, and in general, not to publish or disclose information to third parties about the contractual relationship between the parties, without the prior express written consent of Ferrovial.

### 13.    RELATIONS BETWEEN THE PARTIES

Ferrovial shall be authorised to request the replacement of team members who are to act as interlocutors with Ferrovial, and this request must be complied with within not more than fifteen days.

The obligations the Supplier must comply with include:

- Guaranteeing the availability to Ferrovial at all times of the staff agreed and that they have the defined professional skills. This must ensure that in the event that the supplier decides to replace any staff the services offered to Ferrovial in the tender shall not be affected.

6

- In relation to the foregoing obligation, the Supplier undertakes that the rotation of staff providing the contracted services under the tender may in no case exceed 20% per annum or 10% per quarter. Rotation is understood here to mean the change or replacement of a resource assigned to the service for reasons not attributable to *force majeure* such as leave, illness or other legally established reasons.

- The Supplier shall notify Ferrovial no less than 2 weeks in advance in the event of the substitution of any of the staff members assigned to the contracted services under the Supplier's tender, except in the cases already listed as *force majeure*.

Also, in connection with the above obligation, the Supplier undertakes to establish an overlap period of 15 working days, at no cost to Ferrovial, between the person leaving the service and their substitute.

### 14. LIABILITY FOR DAMAGES

The Supplier shall be directly liable for all damages and administrative sanctions resulting from any accident involving its own staff members assigned to the contracted services during the term of this Agreement. Also, the Supplier undertakes to take out the relevant accident insurance to cover staff assigned to the contracted services.

### 15. LIMITATION OF LIABILITY

The Supplier's total liability for any loss or damages that may occur as a result of the breach, defective performance or negligence of its obligations, or due to any other cause, is limited to the maximum value of each of the services contracted by Ferrovial and set out in Service definition Annexes, economic conditions.

The limit under this clause shall not apply to:

1. physical injury to persons (including death) or damage to property for which the Supplier is legally responsible;

2. those arising from claims for infringement of third parties relating to the infringement of "Patents and Copyrights," as a result of the work and services provided by the Supplier.

3. actions in which malice, fraud or gross negligence have played a part.

### 16. OBLIGATIONS REGARDING THE PREVENTION OF OCCUPATIONAL HAZARDS

The Supplier, as the employer of all the staff providing the Services under this Agreement, shall be responsible to the employment authorities and courts for the correct implementation of all legislation in force on the prevention of occupational hazards and that the Supplier's staff perform their activities in accordance with the measures envisaged in the relevant occupational risk assessment and prevention plan. To this end, the Supplier declares in this Agreement that it has undertaken the relevant occupational risk assessment of each of the jobs to be performed by the personnel assigned to the services under this Agreement, and has prepared the occupational hazard prevention plan.

7

All machinery, equipment, components and production equipment used by the Supplier for the performance of the contracted services shall comply with all requirements of the applicable regulations.

## 17. AUTHORITY

This Agreement does not imply Ferrovial's granting the Supplier or any of its employees any authority or representation, such that neither the Supplier nor its employees shall in any case act on behalf of Ferrovial, or in any way bind Ferrovial in agreements with third parties.

## 18. MUTUAL AGREEMENT NOT TO RECRUIT THE OTHER PARTY'S STAFF

Neither party may offer employment to or recruit, directly or indirectly, the staff of the other party, or in any way encourage them to be hired by third parties while the Agreement is in force. This obligation shall remain in force for a period of 1 year from the completion of the Agreement unless there is a written agreement between the Supplier and Ferrovial otherwise.

## 19. ASSIGNMENT

The Supplier may not assign this Agreement to a third party, in whole or in part.

## 20. DATA PROTECTION

**20.1** For the purposes of Law 15/1999 on the Protection of Personal Data ("Data Protection Act") and its implementing regulations, the parties report that the personal information of the parties signing this Agreement are obligatory for the contracting of the services requested and will be included in a file owned by the Supplier and another owned by Ferrovial for the proper management of these services.

The signing of this Agreement implies that the signatories give their consent for their data to be stored and processed by the parties to the extent that this is necessary for the performance of this Agreement. It is also specifically mentioned that the undersigned may exercise, before the Supplier and Ferrovial, their rights of access, rectification, cancellation and opposition laid down in the legislation, by writing to the corresponding address stated in the header, for the attention of the Human Resources Department, with the reference "Data Protection".

**20.2** In order to comply with its obligations under this Agreement, in accordance with Article 12 of the Data Protection Act and other applicable regulations, Ferrovial authorises the Supplier to access certain personal data held in files registered with the Spanish Data Protection Agency necessary for the provision of Services under this Agreement.

In accordance with the Data Protection Act and Royal Decree 1720/2007 of 21 December 2007 ("Data Protection Act Regulation"), under this Agreement:

(i)     Ferrovial is the party responsible for the files or their processing in accordance with Article 3 d) of the Act, as it needs to process this personal data and will decide on the purpose, content and use of such processing.

(ii)    The Supplier acts as a processor in accordance with Article 3 g) of the Data Protection Act, since it must process personal data on behalf of Ferrovial.

8

(iii)    Access by the Supplier to Ferrovial's data held within the framework of the provision of the Services under this Agreement, being necessary for the performance of the services shall not be considered, therefore, a communication of those data, but access to them under the provisions of Article 12 of that Act.

(iv)    The Supplier shall only process the data provided by Ferrovial in accordance with the latter's instructions, and shall not apply or use them for purposes other than as provided for in this Agreement, or disclose or transfer the data to other persons, even for their storage.

(v)    In the event that the Supplier uses the data provided by Ferrovial for another purposes, discloses it or uses it any way that breaches the agreements set forth in this Agreement, the Supplier shall also be deemed responsible for processing of the data and shall be personally liable for all infringements that may have incurred.

(vi)    The Supplier shall apply the security measures referred to in Article 9 of the Data Protection Act (LOPD), Article 82 of the Data Protection Act Regulation and all other applicable regulations under the applicable legislation in force at all times to all personal data processed on behalf of Ferrovial. Specifically, according to the type of data processed, the Supplier shall apply basic measures to all files containing basic personal information, intermediate level measures to files containing intermediate level personal data and high level measures to files containing high level personal data.

(vii)    After the performance of the Services under this Agreement has ended, all personal data shall be destroyed or returned to Ferrovial by the Supplier, along with any media or documents which include any personal data subject to processing.

(viii)    The Supplier shall comply with the duty of professional secrecy with regard to personal data as stipulated in Article 10 of the Data Protection Act and other applicable regulations at all times, even after its contractual relations with Ferrovial have ended.

**20.3** Any use of the data that does not conform to the provisions of this Agreement, shall be the sole responsibility of the Supplier, and it shall indemnify Ferrovial for any damage caused and hold it harmless for any liability for damages that may have been caused to third parties.

## 21. CONFIDENTIALITY

### 21.1. Definition of Confidential Information

All information and documentation (including, without limitation, data, contracts, reports, forecasts, analysis, statistics, studies or other materials) to which the Supplier or its employees, or companies controlled by the Supplier, directly or indirectly, and its external advisors, may have access to, whether orally or in writing, during the course of the provision of services, shall be considered confidential (hereinafter "Confidential Information"). The term "Confidential Information" shall not include that part of such information which has become public knowledge in any way (provided that this disclosure did not result from any acts or omissions by the Supplier or its representatives as defined in paragraph 19.2.3).

### 21.2. Obligations regarding Confidential Information

21.2.1 The Supplier undertakes to Ferrovial that both it and its staff shall:

(i)    (i) handle and keep the Confidential Information such that it remains secret and confidential and not disclose or communicate in any way, in whole or

9

in part, without prior written approval from Ferrovial, except (i) to those staff members participating actively and directly in the provision of the services and (ii) insofar as they are compelled to do so by the competent authorities, pursuant to paragraph 19.2.7 below. They also undertake that such information will not be disclosed to third parties, for any reason attributable to them;

(ii)    it is understood that the risk of theft, loss or loss of Confidential Information is assumed by the Supplier, such that the fact of the receipt of Confidential Information by third parties due to any of these causes will be understood to be the result of negligence attributable to the Supplier;

(iii)   refrain from using Confidential Information for any purpose other than those directly related to the subject matter hereof;

(iv)   limit to the essential minimum the number of people having access to the Confidential Information.

(v)   take all necessary precautions to ensure the non-disclosure of the Confidential Information.

21.2.2 The Supplier shall not communicate the following to any person unless it has the prior consent of Ferrovial: (i) the fact that the Confidential Information has been made available to it; (ii) the existence of the work entrusted to it; (iii) the existence of negotiations on the provision services to which the Confidential Information relates directly or indirectly, or any of its terms or conditions, including the status thereof, and/or (iv) that information sensitive for Ferrovial has been made available to the Supplier in non-confidential manner by any person other than Ferrovial.

21.2.3 The Supplier shall not disclose Confidential Information to its employees, directors, affiliates or advisors (the "Representatives") except as is strictly necessary for the performance of the services, and provided that, prior to receiving such Confidential Information these persons agree in writing to be subject to confidentiality obligations contained in this Agreement (under the same terms as those contained herein). In any event, the Supplier shall be liable, whatever the circumstances, for any breach of the obligations under this clause, including the case where that failure is attributable to one or more members of its Representatives.

21.2.4 The Supplier shall keep an archive of the Confidential Information. Ferrovial may at any time require the Supplier to return all or part of this information and the latter must deliver it within 7 business days. Additionally, the Supplier must keep a register of persons within and outside its organisation to whom the information has become known, indicating the date from which these persons know of the Confidential Information and what part thereof has been delivered to them. This register shall be updated immediately as new people in the organisation access the Confidential Information, and it will be available to Ferrovial at all times.

21.2.5 Ferrovial shall be authorised to require that all documentation prepared by the Supplier in connection with the examination of the Confidential Information be destroyed, and if this is not possible, that it be delivered to Ferrovial. Notwithstanding the foregoing, the Supplier may keep a copy of the aforementioned documentation if it has been given prior written authorisation to do so by Ferrovial.

21.2.6 In any event, once the Agreement has ended, the Contractor shall, within five (5) days of such termination:

(i)    return to Ferrovial all documents and other media suitable for transmitting information they contain or reflect any Confidential Information and all copies that it has made of this Confidential Information;

(ii)    destroy all analysis, compilations, studies and other documents prepared by the Supplier which contain or otherwise reflect Confidential Information, or have been prepared from the same, and all copies of such analysis, compilations, and studies, and

(iii)    remove from all computers, word processors or other media all Confidential Information or other information containing or reflecting the Confidential Information.

21.2.7 In the event that the Supplier or any person to whom it has transmitted, with the written permission of Ferrovial, all or part of the Confidential Information is legally obliged to disclose some or all or of it, Ferrovial must be informed of this fact as soon as possible, so that it can take measures to avoid or reduce the harm so caused. In the event that such damage cannot be avoided or reduced, the Supplier shall publish only that Confidential Information, which in the opinion of independent legal counsel, is sufficient to comply with the legal requirements.

21.2.8 In addition, the Supplier shall make every effort to ensure that the Confidential Information thus communicated by legal mandate is treated confidentially.

21.2.9 Ferrovial does not guarantee the accuracy or completeness of the Confidential Information. As a consequence, Ferrovial shall not be liable to the Supplier for the content thereof.

21.2.10 The Supplier warrants that, in the treatment and custody of the Confidential Information, it will meet the applicable standards in force at all times in terms of data protection.

21.2.11 The Supplier acknowledges and agrees that, given the special nature of the Confidential Information provided, and the harm that its improper use might cause to Ferrovial, is not sufficient to set a sum of money to remedy any breach on its part or that of its representatives. Thus Ferrovial shall be entitled to seek specific performance of the obligations agreed herein, in conjunction with any other action deemed appropriate, to remedy the damage caused as a result of such failure.

21.2.12 All obligations under this confidentiality clause shall remain in force for five (5) years after the date of the completion of the service under this Agreement.

### 21.3 Duty of professional secrecy of employees, outside consultants and third parties

Both parties shall make their members of staff, external consultants or other third parties who have access to the Confidential Information accept in writing their responsibility for confidentiality under the same terms as established in this clause.

Also, the Supplier shall use all the means at its disposal to ensure that staff with access to the Confidential Information comply with the terms of the confidentiality agreements entered into.

11

In any event, the parties shall be liable in all cases for any breach of the obligations arising from this clause, even assuming that such failure is attributable to one or more members of staff, external consultants or other third parties.

### 21.4 Obligations relating to the Confidential Information once the Agreement has ended

The Supplier shall, on the day following the completion of the Project:

(i)     return to Ferrovial all documents and other media suitable for transmitting information that contain or reflect any Confidential Information and all copies that have been made of this Confidential Information;

(ii)    destroy all analysis, compilations, studies and other documents prepared by the Supplier which contain or otherwise reflect Confidential Information, or have been prepared from the same, and all copies of such analysis, compilations, and studies, and

(iii)   remove from all computers, word processors or other media all Confidential Information or other information containing or reflecting the Confidential Information.

## 22.   SEVERABILITY

In the event that any of the provisions of this Agreement, or any part thereof, proves, becomes, or is declared invalid, illegal, void or unenforceable in the present or future, it is hereby agreed that it shall not entail the invalidity of the Agreement as a whole, nor shall it affect, insofar as is possible, the remainder of the contents of this Agreement, whose binding nature is expressly recognised. In this case, the parties shall make their best efforts to reach the agreement they would have intended at the time of signing the Agreement if they had considered the issue at that time

## 23.   COMMUNICATIONS

All communication between the parties relating to the Agreement shall be in writing, either by mail, fax or e-mail sent to the addresses indicated below.

Ferrovial

(a)   Address: C/ Príncipe de Vergara, 135
(b)   For the attention of: Javier Lázaro Pascual
(c)   Fax: 91 586 63 53
(d)   E-mail: javier.lazaro@ferrovial.es

The Supplier

(a)   Address: Avda. de Europa 24, Edificio Torona B
(b)   For the attention of: Brian McCarthy
(c)   Fax: 91 657 81 51
(d)   E-mail: brian.mccarthy@cgi.com

12

**24.   APPLICABLE LAW**

This Agreement shall be governed by Spanish law.

**25.   JURISDICTION**

The parties hereby waive any privilege that may apply, and agree that any disputes, disagreements, issues or claims arising from the implementation or interpretation of this Agreement or otherwise related to it, directly or indirectly, shall be settled by arbitration in accordance with the Spanish Arbitration Act (Law 60/2003 of 23 December 2003). The administration and management of the arbitration shall correspond to the Tribunal of Civil and Commercial Arbitration (Corte Civil y Mercantil de Arbitraje, CIMA), Madrid.

The Parties agree to be subject to the Regulations and Rules of Procedure of the Tribunal of Civil and Commercial Arbitration (CIMA), which they declare they know and accept, and agree to act in good faith in such procedures and comply with its decisions and orders, without prejudice to any legitimate legal appeals.

Disputes shall by heard and resolved upon by a single arbitrator appointed from among the members of the Tribunal of Civil and Commercial Arbitration by its President, in accordance with the Statutes thereof.

The arbitration shall be conducted in Madrid and the language shall be Spanish.

In witness whereof, the parties have hereby signed the [TWO] identical copies of this Agreement, at the date and place indicated in the heading.

Ferrovial                                          The Supplier

Ms María Pilar Rodríguez Tapia                     Ms Pilar Montón Millán

13

Madrid, March 10, 2011

**Appendix number: 87/**

**APPENDIX 9: TO THE SERVICE PROVISION CONTRACT UNDERTAKEN BETWEEN FERROVIAL AND CGI INFORMATION SYSTEMS AND MANAGEMENT CONSULTANTS ESPAÑA S.A.**

## RECITALS

I.    Between Ferrovial S.A., (hereinafter Ferrovial) and CGI Information Systems and Management Consultants España, S.A. (hereinafter the Supplier), jointly termed as "the parties", there is an IT consultancy service agreement signed on July 1, 2010.

II.   Said Contract has been renewed for the period from 1 January 2011 to 31 December 2011, by means of appendix 87/370 (644/10-A7), dated 1 December 2010.

## CLAUSES

**ONE:** The parties agree that this Appendix forms part of contract 644/10, signed on 1 July 2010.

**TWO:** The object of this Appendix is to contract "Maintenance and Secondary Level Support for Back Office systems at the Indiana highways", under the conditions stipulated in clause three of this contract.

**THREE:** Scope, planning, service levels and financial terms of the service:

1.  Purpose.
The contracted service is the provision of support and maintenance for back-office applications at Ferrovial's ITRCC. This includes preventative, correctional and support maintenance, as well as the implementation of improvements recognized and expressly requested by Ferrovial.

The service will be provided based on the number of resources contracted by Ferrovial, working chiefly from offices in Madrid.

The applications and components subject to this service are:
* BOS (Back Office Application)
* Getizoom (website)
* ITRCC Client (application construction motor)
* Batch processing (Java-based)
* Different interfaces with BOS (components related to the BOS and not previously considered): ftp, DTS, IAG, IVR, Web, Izoom.

The following diagram shows the applications and components that are included in the coverage and scope of this service:



## 2.   Scope

The services considered within the scope of the service are as follows:

- Monitoring and support of batch processes: checking of registries, time checking processes, problem detection and resolution. In the latter case, resolution will come as a support response from the Supplier's offices in Madrid.
- Resolution of incidents: Resolution of problems related to applications maintained by the Supplier and that have been scaled by Ferrovial or ITRCC.
- Production support: Support for production applications. This includes assessment and recommendations for measures to be taken after a problem is detected and upon request from Ferrovial.
- Data Recovery Support: Support for components based at ITRCC's DR site. Any action taken in production environments must also be applied and verified in the DR environment.
- Response to business queries: As part of the service, ITRCC may require business logic information. These tasks will be carried out by the supplier's support team and upon authorization from Ferrovial.
- Optimization of current processes: Checking of current processes and identifying improvements to be implemented. This task will generate an optimization opportunity (improvement), which will be sent to Ferrovial for assessment and authorization to proceed. The delivery date and implementation of said optimization will be agreed between the Parties. Any incident will have priority over optimization tasks unless the parties agree otherwise.
- Documentation: Deliverable documents included within the scope of this service are as follows: proposals and change logs. Any existing document subject to change, update or improvement must be updated as part of the scope of this Appendix. This request will be coordinated and agreed between the parties.
- Testing: each incident and improvement implemented will have passed prior testing. This testing will be documented in the Change Log. For each change, the Supplier will deliver, at the very least, a test plan to Ferrovial, which must be validated by Ferrovial prior to the plan being implemented. Details of testing results will be delivered to Ferrovial and validated by the same, prior to being implemented.

- Support to production deployment: The production deployment stage of any change will be Ferrovial's responsibility, although the supplier will provide Ferrovial with support should it require consultation or encounter any problem. The Supplier must be available throughout this process. Ferrovial will provide the Supplier with at least 48 hours notice ahead of the task being undertaken. Critical implementations must be coordinated and agreed between Ferrovial and the Supplier prior to execution.
- As part of any change, update or improvement, the supplier will provide a detailed step by step service recovery plan.
- Included in the service are planning reports for any severity 1 or 2 incidents, including status, action taken, responsibilities and the impact of each incident.
- Testing of interfaces with all components included within the service scope and that have been transferred to the back office.
- Monthly reports with details of all implementations, incidents, action taken by the Supplier, critical elements or requirements, etc.
- Secondary level support for the Getizoom website in case of incidents that might be detected.

The following are excluded from the service scope governed by this Appendix:
- DTS packages (1)
- FTP Connections (2)
- Rita Connections (2)
- Implementation solutions (3)
- Support for DWH
- Sw. Rita
- DRP site and systems (4)
- Back-up tasks
- OS support
- Any kind of hardware or network support
- Application Server Support

(1) For DTS maintenance, any BOS component associated with this interface will be considered within the scope of service and will be implemented by the Supplier.
(2) Regarding interfaces, such as Rita, FTP, etc., the Supplier will assist and support Ferrovial in developing an appropriate testing environment if none is available (FTO, Rita):
- As part of the transfer of know-how from previous suppliers, the delivery of this documentation must be planned so as to ensure that the supplier is able to understand the various interfaces.
- Ferrovial will supply the development environment in partnership with and with the assistance of the Supplier.
- Ferrovial will guarantee on-site and remote access to the production environment in order to replicate it and allow the supplier to become familiar with current interfaces.
(3) The Supplier will provide coordinated support during the implementation of any solution, patch or improvement.
(4) BOS components at the ITRCC DR site will be supported and be included in the scope of service. Any solution, patch or improvement must also be applied and verified for DR components. Any other components making up part of the ITRCC DR site should not be included in the scope of service.

3.  Services contracted

The following list of services will be included in the scope of service of this Appendix: The level of service support is defined based on the resources allocated to the service, meaning that

should Ferrovial require greater support the Supplier will provide more resources as agreed between the parties.

### 3.1. Incident management

An incident is defined as an unplanned interruption of service or a reduction in the quality of said service. The aim of incident management is to restore normal levels of operations as quickly as possible, with the least possible impact on the business or end user.

Ferrovial and the supplier agree that the incident management tool employed will be Jira, with Ferrovial providing the appropriate access and configuration to allow the Supplier to access the same.

The criteria for classifying the severity of incidents are as follows:

**Level 1: System blocking**
The incident prevents system functionality, due to failure or malfunction rendering it unusable to users, and/or preventing the continuance of program testing stages or the continuance of other developments.
Included in this category are installation incidents that prevent the system from becoming operational.

- **Level 2: Critical**
The incident prevents use of functions due to failure, malfunction or incomplete functioning preventing user operations.
Likewise, defects that partially and significantly obstruct testing and other activities carried out by Ferrovial or third parties will also be considered Critical.
Testing will be understood to have experienced significant obstruction when more than 10% of test cases, as defined by Ferrovial, cannot be executed due to loss of functionality, or in the event of a resolution requiring the test case to be run again.

- **Level 3: Serious**
The incident does not impede functional use, but does impose limitations and has significant effects on operations, partially or totally preventing use of the program, not blocking more than 10% of the test cases run by Ferrovial.

- **Level 4: Minor**
A minor loss of functionality, without impeding functional use, or affecting user operations and/or the continuance of testing phases.

- **Level 5: Formal Error**
Cosmetic defects that do not negatively affect user operations, nor have any impact on any functionality.

Once an incident has been reported, the supplier's production resources will confirm receipt of incident notification and begin assessment. In the event of any discrepancy against the information provided by Ferrovial, the person responsible for the Supplier's service will get in touch with their contact person at Ferrovial, while the Supplier will only be able to reclassify the severity of the incident with Ferrovial's consent.

Defects will be classified jointly by the parties. Should no agreement be reached after 7 days, during which time the proper meetings have been held, Ferrovial's judgment will prevail.

In the event of further information being required in order to continue the task of resolving the incident, the case will again be presented to Ferrovial with a request for further information. Depending on the level of complexity, a telephone call may be enough for the incident to be assessed more thoroughly. If no further information is required, the agent

assigned to the case by the Supplier will work on service resumption based on the severity level and SLA.

Once development and testing has come to an end, the case will be considered resolved. Ferrovial will validate the solution implemented and upon confirmation of the problem's resolution, the case will be classified as closed.

A resolution will be considered accepted in any of the following cases:
The end user changes the status to "closed"
Depending on the severity level and time spent on testing, if the Supplier receives no response from the end user the solution will be considered accepted and the case will be classified as closed.

| SEVERITY | PERIOD |
|---|---|
| Severity 1 | 5 working days |
| Severity 2 | 5 working days |
| Severity 3 | 10 working days |
| Severity 4 | 10 working days |
| Severity 5 | 10 working days |

The above table indicates the time, following the resolution of a case, after which a case will be considered accepted should no response be received from Ferrovial, except when the nature of the correction means longer testing periods need to be planned.

Once the incident has been resolved, or at least a temporary solution has been found to the problem, the Supplier will inform Ferrovial of the corrections implemented by the Madrid maintenance team.

The Madrid maintenance team may implement permanent changes to code for the purposes of resolving the root causes of the incident and providing a permanent solution in the next version. Tracking of the incident / problem will be carried out using JIRA, to which Ferrovial will have access in order to allow it to monitor the progress of problem resolution.

3.2. Improvements

The Supplier's maintenance team will provide off-shore preventative maintenance, considered "minor improvements", which will be included in the scope of maintenance services described in this Appendix. Minor improvements are considered to be changes or sets of changes to functionality in an existing application, which will provide additional functionalities, characteristics or allow an application to remain operational during the implementation of a change or change of environment, and which will require at least 10 working days to implement. The figure of 10 working days is for orientation purposes only and represents no limitation, as the figure may vary depending on Ferrovial's needs and existing workloads at any given time.

Jira will be used to manage these minor improvements as required. Requests received from Ferrovial will be assessed, with the implementation of minor improvements ordered and planned based on Ferrovial's needs and the Supplier's availability at a given time.

All improvements will be planned according to the Supplier's workload in order to coordinate and plan service priorities. Any incident will have priority over improvement work, unless the Parties agree otherwise. This will mean that planning and estimated delivery dates for improvements will be reconsidered according to the number of incidents handled at that given time by the Supplier.

Ferrovial will have 10 working days to carry out the necessary verifications, prior to accepting the work carried out by the Supplier and classifying it as closed. This period of

time will not be included in the Service Levels calculation. If the Supplier receives no response after this time the improvement will be considered accepted, except when the correction type requires more extensive testing. In this case, the testing and acceptance period will be formally agreed between the Parties.

All other improvements and "minor improvements" requested by Ferrovial will be implemented by the Supplier using additional resources to those assigned to the standard service, with these improvements, charged as established in section 8.2 of this Appendix, up to the stipulated limit.

### 3.3. Configuration management

All Configuration management will be centrally managed by the Supplier using Ferrovial infrastructure. The Supplier will provide the service using Ferrovial's Subversion. Ferrovial will be responsible for delivering to the supplier the current production version prior to service commencing. The supplier will use this version as a base for services and will not be held responsible for any possible differences that may exist between the delivered version and the version in production.

The objective of Software Configuration Management is to establish and maintain the integrity of products generated or modified as part of the services contracted under this Appendix. Configuration management includes identification of software configurations, systematically controlling changes to configurations and maintaining integrity and traceability throughout the software's life cycle.

It will be the supplier's responsibility to control and update the various files and software, always providing Ferrovial with the most recent versions. Any version of the software will be delivered to Ferrovial with documentation detailing specifications of changes made to each particular version.

### 3.4. Change Management

All change management will be centrally managed by the Supplier. The latter will provide this service using Subversion.

Change management will control versions and the transfer of software and other components from development environments to the testing and production environments.

Subversion will represent the database used to store documentation and the source code. All updates will be digitally delivered to Ferrovial by e-mail or any other method agreed between the Parties.

The change logs will contain:
- Changes made
- Testing Plan
- Test Cases
- Test results
- Executables: .class, .pbd, scripts, etc.
- Step by step implementation procedures
- Recovery procedures

### 3.5. Change logs and tracking

This process will ensure the traceability of all changes made to applications maintained by the Supplier, as well as databases. All changes or code updates derived from stable solutions or modifications will be documented in the source code and the change log.

Furthermore, any other process that may be created or updated as part of the service described in this Appendix will also be maintained and changes will be appropriately monitored.

The Supplier will use documentation existing at the time of service commencement as a starting point for any new documentation or modifications of existing documents.

### 3.6. Database consulting

Ferrovial will be responsible for maintaining databases. Nonetheless, the supplier may evaluate code and inform Ferrovial on how the applications use databases (optimization of queries, timeouts, logs, etc.).

Any change to databases will be reported by Ferrovial and coordinated with the Supplier, particularly if said change is deemed to have a possible impact on the performance of the application or the interface with the database.

## 4.  Organization of the work team

The diagram below shows how work will be organized and the staff profiles that the Supplier will use to provide the standard service referred to in this Appendix:



There will be two channels of communication for reporting incidents between Ferrovial and the Supplier:

- In the case of level 1 and 2 incidents, as defined in section 3.1 of this appendix, and given their particular importance, these will be directly reported by the ITRCC highway concessionaire to the Supplier via the service telephone number that the Supplier will provide, within the hours established for this purpose and detailed below.
- In the case of level 3 and 4 incidents, as defined in section 3.1 of this appendix, these will be reported by Ferrovial to the Supplier once their technical implications have been assessed.

All incidents must be managed using the system established by Ferrovial, which in this case is Jira.

The Supplier's work team will be located at their Madrid offices.

Service hours will be as follows:
- From Monday to Thursday, from 09:00 to 21:00 (Madrid time).
- Friday from 08:00 to 19:00 (Madrid time)
- The Supplier will provide support outside of these hours for all local and national holidays, as well as weekends. This will be provided as telephone support from 15:00 to 23:00 (Madrid time) to respond to severity level 1 and 2 incidents.

5. Transition Phase

The following diagram details the different phases and tasks to be implemented, with particular details on the initial phase of service control being handed over to the Supplier.



- Delivery of relevant Ferrovial documentation.
  The Supplier will specify a minimum time required for the receipt and assessment of existing documentation related to the service governed by this Appendix. In this phase, Ferrovial will make available to the Supplier information on the incidents registered in the reporting system at the time of service commencing. The Supplier will also be informed of the status and progress of said incidents at the time of service commencing.

- Supplier Training.
  Ferrovial will provide training at the US concessionaire, ITRCC, over the period of one week, in order to demonstrate the functioning of technical and business operations in BOS systems used at said concessionary. The supplier will send the resources it deems necessary to ensure the proper transfer of knowledge.

- Availability of infrastructure and connectivity.
  Following on-site training at Ferrovial's concessionaire, the Supplier will check the required modes of access to the environment and application in order to ensure that the service can be provided in the proper manner. Access to Jira will also be checked in this phase. Staff assigned to the service by the Supplier will also need to be granted access rights and permits to access Ferrovial's facilities in Madrid and Indiana. Access protocols and mechanisms will be mutually established between the parties.

- Start-up phase.
  After a month has passed from service commencement, the Start-up phase will begin, in which the Supplier will assume responsibility for the entire service. This stage will last for three months, during which the Service Levels will be measured and recorded. During this phase Service Level compliance intervals will be agreed transitorily and by mutual agreement between the Parties.

  As a result of this Start-up phase, Ferrovial and the Supplier will define the management processes and procedures required to implement and provide definitive Service Levels, as well as defining service reports. During this stage the Supplier will update and generate documentation as agreed on existing systems, up to the capacity limit of the team made available for this purpose (not including corrective and "minor improvements").

  This phase is estimated to last three months, which may be increased or decreased by mutual consent between the Parties.

- Production phase
  Once the period established for the Start-up phase as come to an end, the Service Levels agreed for this phase will begin to be implemented and measured. The Supplier will provide the services described in this Appendix for the rest of the contract duration.

- Service handover phase
  In this phase the Supplier will transfer knowledge regarding the service should Ferrovial decide to contract a third party to take over the service referred to in this appendix, in substitution of the Supplier.

  In this inverse transition stage, the Supplier will provide the necessary support to complete the service transition and handover to the third party. This support will represent up to a maximum of 10% of the current team's resources, in order to ensure that service quality provided during this period, still the responsibility of the Supplier, does not suffer.

  Ferrovial must inform the Supplier that this phase will be implemented providing at least 30 days notice. This notification must come accompanied with a transition plan detailing the level of support required and all necessary planning for action to be taken. The inverse transition phase will last a maximum of two months and will end on the final day of the contract.

- Reporting phase
  The Supplier will adopt Ferrovial's tracking and quality model and formats, with the possibility of generating additional documentation as it deems appropriate using its own methodology.

  All documentation will be delivered to the Ferrovial contact person for said service.

## 5.1. Documentation

The following table describes the documentation related to the project. In the case of new developments and improvements, the Supplier will be responsible for providing Ferrovial with appropriate documentation, adapting its methods to Ferrovial's needs. The principal language for documentation will be English.

| Documentation | |
|---|---|
| Phase | Deliverables / tasks |
| Requirements collection | Requirements document |
| Detailed analysis | Detailed analysis document<br>Architecture document<br>Prototype (only for GUI SW) |
| Development and unit tests | Software tested and ready to be deployed.<br>Testing plan.<br>User's manual<br>Help-desk manual<br>Run book<br>Installation and configuration manual |
| Testing | Testing document (separate GUI and integration testing) |
| On each installation | Installation detailed plan |
| On each customer deployment | Customer deployment plan (breakdown)<br>Configuration, conversion and parallel running. |

Furthermore, the supplier will do its utmost to generate the documentation required by Ferrovial for those applications or processes that do not have prior existing documentation or that have prior documentation that requires updating. Incident resolution and system maintenance will take priority over the preparation of the documentation detailed above, in order to ensure proper service provision.

5.2. Maintenance and procedural improvements
This section details the working procedures established between Ferrovial and the Supplier for corrective maintenance services and improvement requests within the scope of this Appendix.

The following graph shows the procedure that will be followed for improvements or new functionalities, which will be applied to the systems included within the scope of this Appendix.



1. Ferrovial will submit a request for each new improvement.
   Should said improvement require a workload in excess of 42 hours, these requests will be processed individually, analyzing their scope and implications, and proposing a viability study to Ferrovial based on which the Supplier will assess the best way to resolve said requests.
2. They must be accompanied by specifications. If specifications are insufficient or non-existing, then the process status will change to pending specifications.
3. Specifications of the improvement requested by Ferrovial will be assessed by the Supplier, which may request additional specifications from Ferrovial should it be deemed necessary. If these additional specifications are sufficient, they will be assessed for implementation.
4. The evaluation document with the final assessment will be delivered to Ferrovial, which will then approve or reject the same.
5. If the assessment is accepted by Ferrovial, the Supplier will begin managing the software life cycle.

The following diagram lays out the software life cycle and procedures to follow, both for improvements and incidents.



Once the Supplier has assessed the request sent by Ferrovial, and the latter has accepted said assessment, the case will be allocated the status of "in progress", the phase in which the Supplier carries out implementation, unitary testing and system testing.

Once the implementation and unitary and system testing has been carried out, the Supplier will send Ferrovial a request to deploy production, in accordance with the following procedure.

The Supplier will create a new status in order to request migration permission from Ferrovial. Next, the Ferrovial testing and production phase teams will test the solution and implement the necessary installations.



6. Service Levels

The following table establishes the Service Levels that will govern the service provision. These Service Levels will be applied during the transition and start-up phases, which will last no longer than 4 months from service commencement.

At this time, and based on the service history accumulated over the period, Ferrovial and the Supplier will revise the following SLAs to adapt them to actual service conditions, needs and scaling.

During this initial phase, lasting a maximum of 4 months, the SLAs described below will not be applied to calculate any possible penalties, as these must be considered initial estimates for service management requirements.

| ACUERDO DE NIVEL DE SERVICIO (ANS) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Servicio | Descripción | Nivel Malo | Nivel Bonus | Unidad | Bonus (%) | Malus (%) | Base de Aplicación | Notas |
| Indicadores de Seguimiento y Control | | | | | | | | |
| KPI-REP-01 | Informe de Cumplimiento SLA | 0 | N/A | días laborables | N/A | 0.10% | Importe Servicio | Días de retraso frente al Nivel Malus |
| KPI-REP-02 | Informe de Seguimiento de Servicio | 0 | N/A | días laborables | N/A | 0.05% | Importe Servicio | Días de retraso frente al Nivel Malus |
| Indicadores de Calidad de Software | | | | | | | | |
| KPI-CAL-01 | Calidad del Software | 15 | 30 | unidad | 0.05% | 0.10% | Importe Servicio | Indicador Calidad: valor ponderado de incidencias, severidad y esfuerzo. Actualmente en fase de estudio en Irlanda y España |
| KPI-CAL-03 | Rendimiento de Operaciones On-line | 1 | N/A | unidades | N/A | 0.20% | Importe Servicio | Tiempo máximo: 2 segundos |
| KPI-CAL-05 | Rendimiento de Operaciones Batch | 1 | N/A | unidades | N/A | 0.20% | Importe Servicio | Tiempo máximo: 4 horas |
| Indicadores del Tiempo de Resolución | | | | | | | | |
| KPI-TRE-02a | Tiempo Resolución de Defectos en PRODUCCIÓN (Defectos Nivel 1) | 2 | N/A | horas naturales | N/A | 0.50% | Importe Servicio | |
| KPI-TRE-02b | Tiempo Resolución de Defectos en PRODUCCIÓN (Defectos Nivel 2) | 8 | 2 | horas naturales | 0.25% | 0.50% | Importe Servicio | |
| KPI-TRE-03c | Tiempo Resolución de Defectos en PRODUCCIÓN (Defectos Nivel 3) | 3 | 2 | días laborables | 0.10% | 0.25% | Importe Servicio | |
| KPI-TRE-04d | Tiempo Resolución de Defectos en PRODUCCIÓN (Defectos Nivel 4) | 4 | 3 | días laborables | 0.01% | 0.10% | Importe Servicio | |
| KPI-TRE-05e | Tiempo Resolución de Defectos en PRODUCCIÓN (Defectos Nivel 5) | N/A | 5 | días laborables | 0.01% | N/A | Importe Servicio | |

Once Service Levels have been agreed following the initial period of a maximum of 4 months, these Service Levels will be subject to metrics and associated penalties, which can be implemented according to the stipulations of the Master Service Provision Contract, clause 7.

7. Other terms and conditions
• Ferrovial will provide the concessionaire's preproduction environments and required testing environments, as well as access and permits, to ensure that personnel allocated by the Supplier have remote access to said environments, for the purpose of carrying out the tasks referred to in this service. The Supplier will have access to the necessary environments to properly implement the service.
• Operation and maintenance of the production environment is the responsibility of Ferrovial's team.
• Implementation and Maintenance:
   o Development, implementation, support and UAT maintenance all require connectivity between the Supplier and Ferrovial. Ferrovial will provide technical support and resources to establish this connection within the scope of its responsibilities under this Appendix, which include:
      ▪ Security server configuration
      ▪ Networks
      ▪ Hardware installation and configurations

- Ferrovial's SCM team (Software Configuration Management) will be responsible for migrating the various updates developed by the Supplier.
- For each software delivery made by the Supplier, within the scope of this Appendix, the Supplier will request written consent and acceptance from Ferrovial. If no express acceptance has been received from Ferrovial after five days following software delivery, the software will be considered approved and accepted by Ferrovial.
- Ferrovial will be invoiced separately for any travel or time spent outside of Madrid, which Ferrovial will approve in writing in advance. The Supplier will follow Ferrovial's travel policy.
- In order to ensure compatibility between software versions, the Supplier will make available, where possible, the same versions of Oracle within its testing and development environments as exist at the ITRCC concessionaire, which is currently version 8.

8.  Financial Conditions

8.1. Baseline
A fixed baseline will be used, with a flat rate for the maintenance service. This baseline is of €209,700, VAT not included.

The service will have a duration of 12 months, starting on 1 April 2011 and ending on 31 March 2011.

The Supplier will invoice monthly for the sum proportional to the total service cost, i.e. €17,490 per month, VAT not included.

8.2. Additional work capacity
The parties agree to establish a price of €41.25/hour, which will be charged for additional improvements or services as required by Ferrovial.

In order to establish a maximum availability limit for this additional working capacity, the parties agree to a limit of 1,058 hours for the duration of this Appendix, estimated at a cost of €43,640.

The Supplier will provide Ferrovial with an evaluation or viability plan for Ferrovial to assess and expressly approve, if it deems fit.

Once Ferrovial has notified that it approves the viability study proposed by the Supplier, the latter will begin to implement the tasks using the number of hours stipulated in this section.

The Supplier will invoice on a monthly basis for the number hours used in each month, at a unitary price of €41.25/hour, providing details on how the hours were used, based on Ferrovial's requirements.

8.3. Travel expenses
The costs of travel to the USA that the Supplier may incur in the course of the services provided under this Appendix are detailed in the following table, which shows an initial estimate of travel costs for training and the attendance of quarterly meetings at the Ferrovial concessionaire in the USA:

|  | Cost € VAT not included |
| --- | --- |
| Travel costs for Training | €12,600 |
| Travel cost for quarterly meetings | €3,350 |

The fixed service cost includes the cost of travel for initial training up to a maximum of €12,600.

Ferrovial will be provided with sufficient prior notice of these costs before they are incurred, with prior express approval from Ferrovial and the submission of corresponding receipts required for them to be charged.

The Supplier will follow Ferrovial's travel policy.

**FOUR:** All remaining terms and conditions of the contract and master Appendix remain valid.

In witness whereof, the Parties sign the TWO copies of this contract in the place and on the date set forth ut supra.

Ferrovial                                     The Supplier

_____              _____
Ms. Mª Pilar Rodríguez Tapia              Ms. Pilar Montón Millán

Contrato número: 664/10

CONTRATO

DE

PRESTACIÓN DE SERVICIOS

Entre

FERROVIAL S.A.

Y

CGI INFORMATION SYSTEMS AND MANAGEMENT CONSULTANTS ESPAÑA S.A

En Madrid, a 1 de julio de 2010

1

Information Systems and
Management Consultants España, S.A.

En Madrid a 1 de julio de 2010

## COMPARECEN

I.   <u>De una parte:</u> Dª. María Pilar Rodríguez Tapia con domicilio en Madrid, calle Príncipe de Vergara,135 y con Documento Nacional de Identidad 2.525.747-W.

II.  <u>De otra parte:</u> Dª Pilar Montón Millán con domicilio en Alcobendas, Avda. de Europa 24, Edificio Torona B, parque empresarial la Moraleja, y con Documento Nacional de Identidad 25.428.797-C

## INTERVIENEN

I.   El primero en nombre y representación de la entidad FERROVIAL, S.A. con domicilio en Madrid, Príncipe de Vergara, 135  y con C.I.F. A-81939209, (en adelante "**Ferrovial**"). Actúa en virtud del poder otorgado a su favor mediante escritura autorizada por el Notario de Madrid D. Carlos del Moral Carro el día  9 de diciembre de 2009 con el número 4.716 de su protocolo.

II.  Y el segundo en nombre y representación de la entidad CGI INFORMATION SYSTEMS AND MANAGEMENT CONSULTANTS ESPAÑA, S.A. con domicilio en Alcobendas, Avda. de Europa 24, Edificio Torona B, parque empresarial la Moraleja, y con C.I.F A-81154197 (en adelante el "**Proveedor**"). Actúa en virtud del poder otorgado a su favor mediante escritura autorizada por el Notario de Madrid Ignacio Ramos Covarrubias el día 17 de abril de 2006 con el número 1.807 de su protocolo.

En adelante a Ferrovial y al Proveedor se les denominará individualmente como una "**Parte**" y conjuntamente como las "**Partes**".

## EXPONEN

I.   Que Ferrovial tiene intención de contratar los servicios de consultoría de Tecnologías de la Información definidos mediante anexos al presente contrato.

II.  El Proveedor manifiesta que tiene la capacidad técnica y experiencia necesaria así como los medios materiales propios para prestar dichos servicios a Ferrovial, hallándose dispuesto a ofrecer a Ferrovial su colaboración en este sentido.



En consideración a lo anteriormente expuesto, las Partes han convenido celebrar el presente contrato de prestación de servicios (en adelante, el "Contrato"), que se regirá por las siguientes cláusulas.

2

## CLÁUSULAS

### 1. OBJETO

#### 1.1. Prestación de servicios

El objeto del presente Contrato es la prestación por el Proveedor a favor de Ferrovial de los servicios indicados en los documentos de definición de servicio anexo al presente Contrato (en adelante, los "Servicios").

Dichos Servicios se prestarán durante la vigencia del Contrato. Las partes de común acuerdo, y expresamente por escrito, podrán acordar la ampliación o modificación de dichos servicios conforme a las condiciones que estimen por convenientes para la prestación de los mismos y se incorporen mediante addendas al presente Contrato.

#### 1.2. Actividades

En concreto, el Proveedor se obliga a efectuar todas aquellas actividades necesarias para la realización y ejecución de los Servicios descritos en la cláusula 1.1 y Anexos de manera diligente.

### 2. TERMINOS DE LA EJECUCIÓN DEL SERVICIO

#### 2.1. Independencia en la ejecución

El Proveedor tendrá, para el desarrollo de los Servicios objeto del presente Contrato, plena autonomía e independencia, sobre el personal a su cargo, sin que esté sujeto a horario ni instrucciones en el desempeño de los mismos.

No obstante esto, Ferrovial se reserva el derecho de llevar a cabo las auditorías necesarias, internas o externas, de los Servicios realizados a fin de garantizar su adecuado cumplimiento.

#### 2.2. Interlocutores y Comunicación

Ferrovial nombrará un responsable que supervisará la prestación de los Servicios por el Proveedor y será el interlocutor de Ferrovial con el Proveedor a efectos de seguimiento de los Servicios.

El Proveedor, a su vez, designará un responsable para llevar a cabo la comunicación con Ferrovial y realizar un seguimiento de los Servicios prestados.

Las comunicaciones entre las Partes se realizarán a través de dichos interlocutores.

#### 2.3. Gastos y medios

Para la prestación de los Servicios, el Proveedor aportará todo el personal técnico especializado requerido, así como todos los medios, maquinaria, instalaciones y equipos de producción necesarios para tal fin, asumiendo su propia dirección y organización empresarial.

Correrán a cargo del Proveedor cualesquiera gastos en que deba incurrir para la debida ejecución de los Servicios.

### 3. GARANTÍA DE EJECUCIÓN DE LOS TRABAJOS

El Proveedor garantiza a Ferrovial que los Servicios serán prestados de una manera diligente, de acuerdo con las mejores prácticas del mercado y con el nivel y calidad de servicio descrita en los Anexos correspondientes a la definición de los servicios objeto del presente Contrato.

3

El Proveedor otorga a Ferrovial una garantía del correcto funcionamiento de todos los trabajos/productos ejecutados por un período de seis (6) meses a partir de la fecha de la aceptación del trabajo/proyecto por parte de Ferrovial. Durante la vigencia de esta garantía, el Proveedor se compromete a subsanar cualquier error localizado en el Trabajo/Proyecto, sin coste adicional alguno para Ferrovial.

## 4.   PROHIBICIÓN DE SUBCONTRATACIÓN

El Proveedor no podrá subcontratar los Servicios objeto del presente Contrato.

## 5.   DURACIÓN

El presente Contrato entrará en vigor con efectos de 1 de julio de 2010 y tendrá una duración de 6 meses desde su entrada en vigor. La finalización del presente Contrato no afectará a la obligación de confidencialidad contenida en la cláusula [21] que seguirá en vigor por un plazo de 5 años desde la fecha de terminación.

El contrato se podrá renovar por períodos sucesivos de un año previa comunicación por escrito de Ferrovial y aceptación por parte del Proveedor con una antelación mínima de un (1) mes a la finalización de la vigencia del mismo o de cualquiera de sus prórrogas.

## 6.   PRECIO

### 6.1.  Precio

Los precios de los servicios objeto del Contrato son los que se contienen en los Anexos de definición de servicio, apartado de Condiciones Económicas, los cuales formarán parte integrante del Contrato a todos los efectos.

Los gastos asociados al proyecto a incurrir por El Proveedor se encuentran incluidos, sin excepciones, en los precios del Anexo de definición de servicio – Condiciones Económicas.

A petición de Ferrovial y de mutuo acuerdo entre las partes, Ferrovial se reserva la facultad de retrasar el cumplimiento de alguno de los plazos señalados, sin que por ello incurra en penalización de cualquier tipo frente al Proveedor. También en este caso, El Proveedor quedará exonerado de las penalizaciones que correspondan en la parte atribuible a Ferrovial por el retraso impuesto.

El incumplimiento de los plazos/requisitos en la prestación del servicio y/o el incumplimiento de los estándares de calidad solicitados por Ferrovial, podrá dar lugar a la aplicación de las penalizaciones descritas en la cláusula correspondiente o en su caso a la resolución total según lo establecido en las cláusulas de INDEMNIZACIÓN O PENALIZACIÓN(7) y RESOLUCIÓN DEL CONTRATO (8), y a la cancelación de los pedidos en curso.

### 6.2.  Forma de pago

Todas las cantidades que se señalan a cargo de Ferrovial en este Contrato se abonarán, contra la aceptación de la correspondiente factura emitida mensualmente por el Proveedor, mediante talón nominativo a 60 días, o mediante cualquier otro medio que las Partes establezcan de mutuo acuerdo. Dichas cantidades incluirán el IVA que corresponda según la legislación vigente en cada momento. Las facturas emitidas por el Proveedor especificarán las cantidades correspondientes a la base imponible, IVA, siendo por cuenta del Proveedor los demás impuestos, tasas, arbitrios, contribuciones, etc. que se deriven del presente Contrato y de la prestación de los Servicios.





CCI
Information Systems and
Management Consulting España, S.
C.I.F. A-80751017

4

7. **INDEMNIZACIÓN O PENALIZACIÓN**

En caso de que El Proveedor no cumpliera con las condiciones o niveles de servicio establecidas en el Anexo de definición de servicio – Niveles de Servicio - Ferrovial podrá imponer las penalizaciones descritas en el citado Anexo, a través de su esquema de Bonus / Malus.

8. **RESOLUCIÓN DEL CONTRATO**

(i)   Desistimiento Unilateral: Ferrovial podrá dar por terminado de manera unilateral el presente Contrato en cualquier momento.  A estos efectos, Ferrovial deberá enviar una comunicación por escrito al Proveedor con una antelación mínima de 15 días y estará obligado a abonar al Proveedor los Servicios efectivamente ejecutados por éste hasta la fecha de la terminación anticipada.

(ii)  Resolución por Incumplimiento: Ferrovial podrá resolver anticipadamente el presente Contrato en los siguientes supuestos:

a) en el caso de que el Proveedor incumpla alguna de las obligaciones del presente Contrato;

b) en el caso de que el Proveedor incumpla los niveles de servicio establecidos en los Anexos de definición de servicio, apartado de Acuerdos de Niveles de Servicio, adjuntos al presente Contrato.

En este caso, Ferrovial notificará el incumplimiento al Proveedor por escrito y con indicación detallada del incumplimiento producido. El Proveedor deberá subsanar el incumplimiento en el plazo máximo de 15 días desde la recepción de la notificación de Ferrovial. Si el Proveedor no subsanara dicho incumplimiento en el plazo de 15 días desde la recepción de la notificación, Ferrovial tendrá derecho a resolver el presente Contrato o a mantener su vigencia y, en todo caso, a ser indemnizado por los daños y perjuicios causados por tal incumplimiento, incluyendo el coste de la prestación sustitutoria del servicio incumplido

c) En el caso de que en plazo de 15 días desde la firma del presente Contrato, el Proveedor no entregue a Ferrovial copia de la póliza de responsabilidad civil.

d) La extinción de la personalidad jurídica del Proveedor con excepción de aquellos supuestos de extinción en los que otra entidad con personalidad jurídica del mismo grupo asuma, como sucesora de la extinta, los derechos y obligaciones de esta última.

e) La interrupción o suspensión de los Servicios contratados, cualquiera que sea la causa de las mismas.

En el caso de que se produzca la terminación del Contrato por alguna de las causas mencionadas en los apartados anteriores, el Proveedor estará obligado, asimismo, a indemnizar a Ferrovial por los daños y perjuicios que el incumplimiento le haya podido causar.

En caso de resolución del Contrato, El Proveedor deberá, a petición de Ferrovial, cesar de inmediato en todo servicio encargado. Asimismo se procederá a efectuar la liquidación definitiva de los servicios realizados hasta la fecha que se consideren aprovechables para Ferrovial pagando los servicios realmente prestados valorados de acuerdo con el cuadro de precios contractual.

En todo caso, se deducirá de la cantidad que resulte de la liquidación el importe correspondiente a penalizaciones, indemnizaciones y demás conceptos que procedan.

Information Systems Group
Management Consultants España, S.
C.I.F.: A-81184127

9. **MODIFICACIÓN DEL CONTRATO**

Cualquier modificación, novación, addenda, enmienda o anexo que afecten al Contrato, serán formulados por escrito y tendrán validez siempre y cuando estén firmados por ambas partes mediante personas debidamente apoderadas al efecto.

El Proveedor no podrá, sin autorización previa y por escrito realizada por Ferrovial, aportar al objeto del Contrato o a los términos en el mismo contenidos, modificaciones, adiciones o supresiones de cualquier naturaleza y entidad. Las posibles variaciones a las características objeto, así como las posibles variantes o adiciones a las Condiciones Económicas de cada unos de los servicios objeto del presente Contrato, deberán acordarse con preaviso de una de las partes y no podrán entrar en vigor si no existe acuerdo previo formalizado por escrito entre ambas partes e incorporado al presente Contrato.

10. **DERECHOS DE PROPIEDAD**

El Proveedor reconoce expresamente que el resultado de los Servicios prestados por el Proveedor bajo este Contrato será propiedad exclusiva de Ferrovial. La firma de este Contrato no confiere al Proveedor más derechos ni impone más obligaciones que los expresamente contemplados en el mismo, y, en particular, no supone la concesión de ninguna licencia de explotación de derechos de propiedad intelectual u otros.

11. **SEGURO DE RESPONSABILIDAD CIVIL.**

El Proveedor tiene suscrita una póliza de Responsabilidad civil con ZURICH y AIG que garantiza al Proveedor el pago de cualquier importe derivado de la responsabilidad civil que pueda corresponderle, en razón de daños personales y/o materiales causados a Ferrovial, sus empleados, o terceros durante la ejecución de su actividad, así como los daños producidos por los trabajos realizados y Servicios prestados por el Proveedor después de su entrega.

El Proveedor entrega en el momento de la firma del Contrato, un certificado emitido por la citada compañía aseguradora, en el que se indica que el Proveedor tiene contratada dicha póliza, que ésta se encuentra en vigor y que el Proveedor se encuentra al corriente de pago de la prima.

12. **COMPROMISO DE NO USO DEL NOMBRE FERROVIAL**

El Proveedor se obliga a no efectuar uso publicitario del presente Contrato por ningún medio o cauce, incluidos expresamente y sin limitación cualquier forma de divulgación al público en general o a terceros concretos, a no efectuar uso alguno del nombre, marcas o signos representativos de Ferrovial en medios de comunicación, página Web, presentaciones corporativas, a clientes o cualquier otro sistema de información o publicidad, y en general a no publicar ni facilitar información a terceros de la relación contractual existente entre las Partes, sin previo y expreso consentimiento escrito de Ferrovial.

13. **RELACIONES ENTRE LAS PARTES**

Ferrovial tiene la potestad de solicitar la sustitución de los miembros del equipo que son interlocutores con Ferrovial, y este se debe atender en un plazo no superior a quince días.

Entre las obligaciones a garantizar por el proveedor están:

- Garantizar a Ferrovial en todo momento, la disponibilidad del personal acordado, con la cualificación profesional definida. De tal forma que no se vean afectados, en el caso de que el proveedor, decidiera sustituir a aquel personal, los servicios encomendados por Ferrovial en virtud de la oferta presentada.




Information Systems and
Management Consulting España
C.I.F. B83153

5

- En relación con la obligación arriba mencionada, el proveedor se compromete a que la rotación del personal para la prestación de los servicios contratados al amparo de la oferta presentada, no superará en ningún caso el 20% anual o el 10% trimestral. Entendiendo por rotación, el cambio o sustitución de un recurso asignado al servicio por motivos no imputables a una causa de fuerza mayor como vacaciones, enfermedad o demás causas legalmente establecidas.

- Comunicar a Ferrovial en un plazo no inferior a 2 semanas la sustitución, en caso de producirse, de alguno de los miembros del equipo de trabajo asignado para los servicios contratados al amparo de la oferta presentada por el proveedor, excepto en los supuestos antes contemplados como de fuerza mayor.

Así mismo, en relación con la obligación arriba mencionada el proveedor se compromete a establecer un periodo de solape, sin cargo para Ferrovial, entre la persona que abandona el servicio y la persona que le sustituirá, de 15 días laborables.

## 14.  RESPONSABILIDAD POR DAÑOS

El Proveedor responderá directamente de los daños y sanciones administrativas derivados de cualquier accidente sufrido por el personal propio adscrito a los Servicios contratados durante la vigencia del presente Contrato. Asimismo, el Proveedor se obliga a la concertación de la correspondiente póliza de accidentes para la cobertura del personal destinado a la ejecución de los Servicios contratados.

## 15.  LIMITACIÓN DE RESPONSABILIDAD

La responsabilidad total del Proveedor por cualesquiera daños y perjuicios así como las pérdidas que pudieran producirse como consecuencia del incumplimiento, cumplimiento defectuoso o abandono de sus obligaciones, o debidas a cualquier otra causa, está limitada al valor máximo de cada uno de los servicios contratados por Ferrovial y establecido en los Anexos de definición de Servicio, Condiciones Económicas.

El límite establecido en esta cláusula no será aplicable a:

1.- daños físicos a las personas (incluyendo la muerte) o a las propiedades, que sean jurídicamente imputables al Proveedor;

2.- los derivados de las reclamaciones por la infracción de terceros relativas a la vulneración de "Patentes y Derechos de Autor" que fuera consecuencia de los trabajos y servicios prestados por el Proveedor.

3.- actuaciones en las que haya mediado dolo, fraude o negligencia grave.

## 16.  OBLIGACIONES EN MATERIA DE PREVENCIÓN DE RIESGOS LABORALES

El Proveedor, como empresario de todo el personal que utilice para la prestación de los Servicios objeto del presente Contrato, responderá ante la Administración Laboral y Jurisdicción social de la correcta aplicación de la legislación vigente en materia de prevención de riesgos laborales y de la adecuada adaptación de su actuación al contenido de las medidas previstas en la correspondiente evaluación de riesgos laborales y de plan de prevención. A tales efectos, el Proveedor manifiesta mediante el presente Contrato haber efectuado la pertinente evaluación de riesgos laborales de cada uno de los puestos de trabajo relativos al personal adscrito a los Servicios objeto de contratación, así como la elaboración del plan de prevención de riesgos laborales.



Information Systems and
Management Consultants España, S.
C.I.F: A-83154192

7

Toda la maquinaria, instalaciones, elementos y equipos de producción utilizados por el Proveedor para el desarrollo de los Servicios contratados cumplirán con todas las prescripciones exigidas por la normativa de aplicación.

## 17.  APODERAMIENTO

El presente Contrato no supone apoderamiento de Ferrovial en favor del Proveedor ni de ninguno de sus empleados, por lo que el Proveedor ni ninguno de sus empleados en ningún caso podrán actuar en nombre de Ferrovial, ni vincular al Ferrovial frente a terceros en modo alguno.

## 18.  ACUERDO DE NO CONTRATACIÓN MUTUA DE PERSONAL

Ninguna de las partes podrá ofrecer empleo o contratar, directa o indirectamente, a personal de la otra, o a propiciar por ningún medio que éstos sean contratados por terceros durante la duración del contrato y durante un plazo de 1 año a partir de la finalización del Contrato, salvo que exista un acuerdo escrito entre el Proveedor y Ferrovial a tal efecto.

## 19.  CESIÓN

El Proveedor no podrá ceder, parcial o totalmente, el presente Contrato a un tercero.

## 20.  PROTECCIÓN DE DATOS

**20.1**   A los efectos de la Ley Orgánica 15/1999 sobre Protección de Datos de Carácter Personal ("LOPD") y de su normativa de desarrollo, las partes informan de que los datos de carácter personal de los firmantes incluidos en el presente Contrato son de carácter obligatorio para la contratación de los Servicios solicitados y se integrarán en un fichero titularidad del Proveedor y otro titularidad de Ferrovial para la gestión adecuada de dichos Servicios.

La firma del presente Contrato supondrá la prestación del consentimiento por parte de los firmantes para que sus datos aquí contenidos sean custodiados y tratados por las partes en la medida en que ello sea necesario para dar cumplimiento al presente Contrato. Asimismo, se hace expresa mención de que los firmantes podrán ejercitar, ante el Proveedor y Ferrovial, sus derechos de acceso, rectificación, cancelación y oposición en los términos legales, mediante carta a la correspondiente dirección indicada en el encabezamiento, a la atención del Departamento de Recursos Humanos con la referencia "Protección de Datos".

**20.2**   Al objeto de cumplir con las obligaciones de este Contrato, de conformidad con lo dispuesto en el artículo 12 de la LOPD y demás normativa aplicable, Ferrovial autoriza al Proveedor a que tenga acceso a ciertos datos de carácter personal incluidos en ficheros registrados en la Agencia Española de Protección de Datos necesarios para la prestación de Servicios objeto del presente Contrato.

Conforme a lo dispuesto en la LOPD y el Real Decreto 1720/2007 de 21 de diciembre ("Reglamento LOPD"), en el marco del presente Contrato:

(i)    Ferrovial actúa en calidad de Responsable de los ficheros o tratamientos según lo dispuesto en el artículo 3 d) de la citada Ley, puesto que necesita tratar datos de carácter personal y es quien decide sobre la finalidad, contenido y uso de los tratamientos.

(ii)   El Proveedor actúa en calidad de Encargado del tratamiento según lo dispuesto en el artículo 3 g) de la LOPD, puesto que debe tratar datos personales por cuenta de Ferrovial 




(iii)   El acceso por parte del Proveedor a los datos de Ferrovial se realizará en el marco de la prestación de los Servicios objeto del presente Contrato, siendo necesario para la ejecución de los mismos y no considerándose, por lo tanto, comunicación de datos sino acceso a los mismos en virtud de lo dispuesto en el artículo 12 de la citada Ley.

(iv)   El Proveedor únicamente tratará los datos facilitados por Ferrovial conforme a sus instrucciones, y no los aplicará o utilizará con fines distintos al previsto en el presente Contrato, ni los comunicará o cederá a otras personas, ni siquiera para su conservación.

(v)   En el caso de que el Proveedor destine los datos facilitados por Ferrovial a otra finalidad, los comunique o los utilice incumpliendo los acuerdos establecidos en el presente Contrato, será considerado, también, Responsable del tratamiento, respondiendo personalmente de las infracciones en que hubiera podido incurrir.

(vi)   El Proveedor aplicará a los datos personales que trate por cuenta de Ferrovial las medidas de seguridad a las que se refiere el artículo 9 de la LOPD, artículo 82 del Reglamento LOPD y demás normativa aplicable, siempre conforme a la legislación aplicable vigente en cada momento. En concreto, y en función del tipo de datos tratados, aplicará las medidas del nivel básico a los ficheros de datos de carácter personal de tipo básico, las medidas del nivel medio a los ficheros de datos de carácter personal de tipo medio y las medidas del nivel alto a los ficheros de datos de carácter personal de tipo alto.

(vii)   Una vez cumplida la prestación contractual, los datos de carácter personal serán destruidos o devueltos a Ferrovial por parte del Proveedor, al igual que cualquier soporte o documentos en que conste algún dato de carácter personal objeto del tratamiento.

(viii)   El Proveedor cumplirá con el deber de secreto profesional respecto a los datos de carácter personal, tal y como expresa el artículo 10 de la LOPD y demás normativa aplicable en cada momento, aun después de finalizar sus relaciones contractuales con Ferrovial.

**20.3**   Cualquier uso de los Datos que no se ajuste a lo dispuesto en el presente Contrato, será responsabilidad exclusiva del Proveedor frente a terceros y frente a Ferrovial ante la que responderá por los daños y perjuicios que le hubiere podido causar.

## 21.   CONFIDENCIALIDAD

### 21.1. Concepto de Información Confidencial

Toda la información y documentación (incluyendo, a título meramente enunciativo y no limitativo, los datos, contratos, informes, previsiones, análisis, estadísticas, estudios u otros materiales) a la que tenga acceso el Proveedor, sus empleados, empresas controladas directa o indirectamente por el Proveedor y sus asesores externos, ya sea de forma oral o escrita, en la prestación de los servicios contratados será considerada información confidencial (en adelante, la "Información Confidencial"). La expresión "Información Confidencial" no incluirá aquella parte de la misma que haya pasado a ser de conocimiento público por cualquier medio (siempre que no haya mediado acción u omisión del Proveedor ni de sus Representantes según se definen en el apartado 19.2.3).

### 21.2. Obligaciones relativas a la Información Confidencial

21.2.1   El Proveedor se compromete frente a Ferrovial a que, tanto él como su personal:




   tratarán y conservarán en todo momento la Información Confidencial como secreta y confidencial, y no la comunicarán ni la revelarán, en forma alguna, parcial o

Information Systems and
Management Consultants España, S.A.
C.I.F.: A-81154197

totalmente, sin que medie previa aprobación por escrito de Ferrovial, excepto (i) a aquéllos miembros de su personal que participen activa y directamente en la ejecución de los servicios y (ii) en la medida en que se vean compelidos a ello por las autoridades competentes, conforme al apartado 19.2.7 siguiente. Se comprometen asimismo a que dicha información no llegará a ser conocida por terceros, por ninguna causa que les sea imputable;

(ii) se entenderá que el riesgo de robo, extravío o pérdida de la Información Confidencial es asumido por el Proveedor, de tal modo que el hecho de que la recepción de la Información Confidencial por terceros se deba a cualquiera de dichas causas será entendido como producto de una negligencia imputable al Proveedor;

(iii) se abstendrán de utilizar la Información Confidencial para cualquier otro propósito distinto de aquéllos relacionados directamente con el objeto del presente Contrato;

(iv) limitarán al mínimo imprescindible el número de personas que tendrán acceso a la Información Confidencial.

(v) tomarán cuantas precauciones sean necesarias a fin de garantizar la confidencialidad de la Información Confidencial.

21.2.2 Sin el previo consentimiento de Ferrovial, el Proveedor no podrá comunicar a persona alguna: (i) la puesta a su disposición de la Información Confidencial; (ii) la existencia del encargo; (iii) la existencia de negociaciones sobre la prestación de los servicios a que la Información Confidencial se refiera directa o indirectamente, o sobre cualquiera de sus términos o condiciones, incluyendo el estado o condiciones de los mismos, y/o (iv) aquella información sensible para Ferrovial que haya sido puesta a disposición del Proveedor de forma no confidencial por cualquier persona distinta de Ferrovial.

21.2.3 El Proveedor no revelará la Información Confidencial a sus empleados, directivos, empresas filiales o asesores (en adelante "Representantes"), salvo que sea estrictamente necesario para la ejecución de los servicios y siempre que, previamente a recibir la Información Confidencial, estas personas asuman por escrito estar sujetas a las obligaciones de confidencialidad incluidas en el presente Contrato (en los mismos términos que los aquí contenidos). En todo caso, el Proveedor responderá, en cualquier situación y circunstancia, de cualquier incumplimiento de las obligaciones que se deriven de esta cláusula, incluyendo el supuesto de que dicho incumplimiento sea imputable a uno o varios miembros de sus Representantes.

21.2.4 El Proveedor se compromete a mantener un archivo de la Información Confidencial. Ferrovial podrá, en cualquier momento, requerir al Proveedor la restitución de toda o parte de dicha Información quien deberá entregarla en un plazo de 7 días hábiles. Además, el Proveedor deberá llevar un registro de personas iniciadas dentro y fuera de su organización, que indicará la fecha desde que las personas iniciadas conocen la Información Confidencial y qué parte de la misma les ha sido entregada. Dicho registro se actualizará de inmediato según vayan accediendo a la Información Confidencial nuevas personas de la organización, y estará permanentemente a disposición de Ferrovial.

21.2.5 Ferrovial queda también facultado para requerir que toda la documentación elaborada por el Proveedor en relación con el examen de la Información Confidencial, sea destruida, y de no ser ello posible, entregada a Ferrovial. No obstante lo anterior, éste podrá conservar un ejemplar de la citada documentación si así lo autoriza previamente y por escrito Ferrovial.

21.2.6 En todo caso, una vez terminado el Contrato, El Proveedor deberá en el plazo de cinco (5) días desde dicha terminación:




Information Systems and
Management Consultants España, S.
C.I.F.: A-83154197

10

(i)     devolver a Ferrovial todos los documentos y demás soportes aptos para transmitir información que contengan o reflejen alguna Información Confidencial y todas las copias de dicha Información Confidencial que haya hecho;

(ii)     destruir todos los análisis, recopilaciones, estudios y otros documentos preparados por el Proveedor que contengan o de alguna manera reflejen Información Confidencial, o hayan sido elaborados en base a la misma, así como todas las copias de dichos análisis, recopilaciones, estudios, y

(iii)     borrar de todos los ordenadores, procesadores de textos u otros soportes la Información Confidencial que contengan o cualquier otra información que contenga o refleje Información Confidencial.

21.2.7   En el caso de que el Proveedor o cualquier persona a quien éste haya transmitido, previa autorización escrita de Ferrovial, todo o parte de la Información Confidencial, resulte legalmente obligado a hacer público toda o parte de la misma, pondrá tal circunstancia en conocimiento de Ferrovial con la mayor brevedad posible, de forma tal que ésta pueda adoptar medidas tendentes a eliminar o reducir el daño. En caso de que tal daño no pueda ser evitado o reducido, el Proveedor hará pública únicamente aquella Información Confidencial que, en opinión de un asesor legal independiente, sea suficiente para dar cumplimiento al requerimiento legal.

21.2.8   Adicionalmente, el Proveedor hará todo lo posible para asegurarse de que la Información Confidencial comunicada por imperativo legal es tratada de forma confidencial.

21.2.9   Ferrovial no garantiza la veracidad o el grado de compleción de la Información Confidencial. En consecuencia, no responderá frente al Proveedor del contenido de la misma.

21.2.10   El Proveedor garantiza que, en el tratamiento y custodia de la Información Confidencial, cumplirá la normativa aplicable, y en cada momento vigente, en materia de protección de datos.

21.2.11   El Proveedor reconoce y acepta que, dada la especial naturaleza de la Información Confidencial suministrada, y el daño que de su uso incorrecto podría derivarse para Ferrovial, no es suficiente la fijación de una cantidad económica para remediar un posible incumplimiento por su parte o el de sus Representantes, por lo que Ferrovial tendrá derecho a solicitar el cumplimiento específico de las obligaciones aquí pactadas, conjuntamente con cualquier otra medida que se estime apropiada para remediar el daño causado como consecuencia de tal incumplimiento.

21.2.12   Todas las obligaciones derivadas de la presente cláusula de confidencialidad seguirán vigentes durante los cinco (5) años siguientes a la finalización de la prestación del servicio objeto del presente Contrato.

### 21.3 Deber de secreto profesional de sus trabajadores, asesores externos y terceros

Ambas partes harán que los miembros de su personal, asesores externos u otros terceros, que tengan acceso a la Información Confidencial asuman por escrito compromisos de confidencialidad en términos acordes con la presente cláusula.

Asimismo, el Proveedor deberá poner todos los medios que estén a su alcance, para asegurarse de que los miembros del personal con acceso a la Información Confidencial cumplen con los términos de los compromisos de confidencialidad asumidos.

CGI

Information Systems and
Management Consultants España, S.
C.I.F.: A-81134197

11

En todo caso, ambas partes responderán, en cualquier situación y circunstancia, de cualquier incumplimiento de las obligaciones que se deriven de esta cláusula, incluso en el supuesto de que dicho incumplimiento sea imputable a uno o varios miembros de su personal, asesores externos u otros terceros.

### 21.4 Obligaciones relativas a la Información Confidencial una vez terminado el Contrato

El Proveedor deberá, al día siguiente de la finalización del Proyecto:

(i)  devolver a Ferrovial todos los documentos y demás soportes aptos para transmitir información que contengan o reflejen alguna Información Confidencial y todas las copias de dicha Información Confidencial que haya hecho;

(ii)  destruir todos los análisis, recopilaciones, estudios y otros documentos preparados por el Proveedor que contengan o de alguna manera reflejen Información Confidencial, o hayan sido elaborados en base a la misma, así como todas las copias de dichos análisis, recopilaciones, estudios, y

(iii)  borrar de todos los ordenadores, procesadores de textos u otros soportes la Información Confidencial que contengan o cualquier otra información que contenga o refleje Información Confidencial.

## 22.  VALIDEZ

En el supuesto de que alguna de las estipulaciones o extremos del presente Contrato, o parte de los mismos, resultare, deviniere, o fuere declarado inválido, ilegal, nulo o inaplicable en el presente o en el futuro, se acuerda que ésta no supondrá la invalidez del Contrato en su totalidad ni afectará, en la medida de lo posible, al resto del contenido del presente Contrato, cuya obligatoriedad expresamente se reconoce. Las partes en este caso llevarán a cabo sus mejores esfuerzos para alcanzar el acuerdo que hubiesen pretendido en el momento de la perfección del Contrato si hubiesen considerado la cuestión en ese momento

## 23.  COMUNICACIONES

Toda comunicación entre las Partes relativa al Contrato deberá hacerse por escrito, sea por correo, telefax o correo electrónico enviados a las direcciones indicadas en el siguiente apartado.

Ferrovial

(a)  Domicilio: c/ Príncipe de Vergara, 135
(b)  Atención: Javier Lázaro Pascual
(c)  Fax: 91 586 63 53
(d)  Correo Electrónico: javier.lazaro@ferrovial.es

El Proveedor

(a)  Domicilio Avda. de Europa 24, Edificio Torona B
(b)  Atención: Brian McCarthy
(c)  Fax: 91 657 81 51
(d)  Correo Electrónico: brian.mccarthy@cgi.com






Information Systems and
Management Consultants España, :
C.I.F. A-30153xxx

12

24. **LEGISLACIÓN APLICABLE**

El presente Contrato se regirá por las leyes españolas.

25. **JURISDICCIÓN**

Las partes, renunciando expresamente a cualquier fuero que pudiera corresponderles, aceptan que todo litigio, discrepancia, cuestión o reclamación resultantes de la ejecución o interpretación del presente Acuerdo o relacionados con él, directa o indirectamente, se resolverán definitivamente mediante arbitraje de derecho de conformidad con la Ley Española de Arbitraje (Ley 60/2003, de 23 de diciembre). La administración y gestión del arbitraje corresponderán a la Corte Civil y Mercantil de Arbitraje (CIMA) de Madrid.

Las Partes se someten a los Estatutos y Reglamentos de Procedimiento de dicha Corte Civil y Mercantil de Arbitraje (CIMA), que declaran conocer y aceptar, y se comprometen a actuar de buena fe en dichos procedimientos y cumplir con sus laudos y órdenes, sin perjuicio de las apelaciones legales a las que pudieran estar legitimados.

El conocimiento y la decisión de las cuestiones litigiosas incumbirán a un árbitro único, que será designado de entre los miembros de la Corte Civil y Mercantil de Arbitraje por su Presidente, de acuerdo con los Estatutos de la misma.

El arbitraje se realizará en Madrid y el idioma del arbitraje será el español.

Como expresión de su consentimiento, las Partes firman los [DOS] ejemplares en que se formaliza el presente Contrato, en el lugar y la fecha indicadas en el encabezamiento.

Ferrovial                                              El Proveedor

Dª. María Pilar Rodríguez Tapia                        Dª. Pilar Montón Millán

Information Systems and
Management Consultants España, S.
C.I.F.: A-84154197

13

**ANNEX 2**

Madrid, March 10, 2011

Appendix number: 87/

**APPENDIX 9**: TO THE SERVICE PROVISION CONTRACT UNDERTAKEN BETWEEN FERROVIAL AND CGI INFORMATION SYSTEMS AND MANAGEMENT CONSULTANTS ESPAÑA S.A.

## RECITALS

I.  Between Ferrovial S.A., (hereinafter Ferrovial) and CGI Information Systems and Management Consultants España, S.A. (hereinafter the Supplier), jointly termed as "the parties", there is an IT consultancy service agreement signed on July 1, 2010.

II.  Said Contract has been renewed for the period from 1 January 2011 to 31 December 2011, by means of appendix 87/370 (644/10-A7), dated 1 December 2010.

## CLAUSES

**ONE:** The parties agree that this Appendix forms part of contract 644/10, signed on 1 July 2010.

**TWO:** The object of this Appendix is to contract "Maintenance and Secondary Level Support for Back Office systems at the Indiana highways", under the conditions stipulated in clause three of this contract.

**THREE:** Scope, planning, service levels and financial terms of the service:

1. Purpose.
The contracted service is the provision of support and maintenance for back-office applications at Ferrovial's ITRCC. This includes preventative, correctional and support maintenance, as well as the implementation of improvements recognized and expressly requested by Ferrovial.

The service will be provided based on the number of resources contracted by Ferrovial, working chiefly from offices in Madrid.

The applications and components subject to this service are:
- BOS (Back Office Application)
- GetIzoom (website)
- ITRCC Client (application construction motor)
- Batch processing (Java-based)
- Different interfaces with BOS (components related to the BOS and not previously considered): ftp, DTS, IAG, IVR, Web, Izoom.

The following diagram shows the applications and components that are included in the coverage and scope of this service:

1



## 2.  Scope

The services considered within the scope of the service are as follows:

- Monitoring and support of batch processes: checking of registries, time checking processes, problem detection and resolution. In the latter case, resolution will come as a support response from the Supplier's offices in Madrid.
- Resolution of incidents: Resolution of problems related to applications maintained by the Supplier and that have been scaled by Ferrovial or ITRCC.
- Production support: Support for production applications. This includes assessment and recommendations for measures to be taken after a problem is detected and upon request from Ferrovial.
- Data Recovery Support: Support for components based at ITRCC's DR site. Any action taken in production environments must also be applied and verified in the DR environment.
- Response to business queries: As part of the service, ITRCC may require business logic information. These tasks will be carried out by the supplier's support team and upon authorization from Ferrovial.
- Optimization of current processes: Checking of current processes and identifying improvements to be implemented. This task will generate an optimization opportunity (improvement), which will be sent to Ferrovial for assessment and authorization to proceed. The delivery date and implementation of said optimization will be agreed between the Parties. Any incident will have priority over optimization tasks unless the parties agree otherwise.
- Documentation: Deliverable documents included within the scope of this service are as follows: proposals and change logs. Any existing document subject to change, update or improvement must be updated as part of the scope of this Appendix. This request will be coordinated and agreed between the parties.
- Testing: each incident and improvement implemented will have passed prior testing. This testing will be documented in the Change Log. For each change, the Supplier will deliver, at the very least, a test plan to Ferrovial, which must be validated by Ferrovial prior to the plan being implemented. Details of testing results will be delivered to Ferrovial and validated by the same, prior to being implemented.

2

- Support to production deployment: The production deployment stage of any change will be Ferrovial's responsibility, although the supplier will provide Ferrovial with support should it require consultation or encounter any problem. The Supplier must be available throughout this process. Ferrovial will provide the Supplier with at least 48 hours notice ahead of the task being undertaken. Critical implementations must be coordinated and agreed between Ferrovial and the Supplier prior to execution.
- As part of any change, update or improvement, the supplier will provide a detailed step by step service recovery plan.
- Included in the service are planning reports for any severity 1 or 2 incidents, including status, action taken, responsibilities and the impact of each incident.
- Testing of interfaces with all components included within the service scope and that have been transferred to the back office.
- Monthly reports with details of all implementations, incidents, action taken by the Supplier, critical elements or requirements, etc.
- Secondary level support for the Getizoom website in case of incidents that might be detected.

The following are excluded from the service scope governed by this Appendix:
- DTS packages (1)
- FTP Connections (2)
- Rita Connections (2)
- Implementation solutions (3)
- Support for DWH
- Sw. Rita
- DRP site and systems (4)
- Back-up tasks
- OS support
- Any kind of hardware or network support
- Application Server Support

(1) For DTS maintenance, any BOS component associated with this interface will be considered within the scope of service and will be implemented by the Supplier.
(2) Regarding interfaces, such as Rita, FTP, etc., the Supplier will assist and support Ferrovial in developing an appropriate testing environment if none is available (FTO, Rita):
- As part of the transfer of know-how from previous suppliers, the delivery of this documentation must be planned so as to ensure that the supplier is able to understand the various interfaces.
- Ferrovial will supply the development environment in partnership with and with the assistance of the Supplier.
- Ferrovial will guarantee on-site and remote access to the production environment in order to replicate it and allow the supplier to become familiar with current interfaces.
(3) The Supplier will provide coordinated support during the implementation of any solution, patch or improvement.
(4) BOS components at the ITRCC DR site will be supported and be included in the scope of service. Any solution, patch or improvement must also be applied and verified for DR components. Any other components making up part of the ITRCC DR site should not be included in the scope of service.

3.  Services contracted

The following list of services will be included in the scope of service of this Appendix: The level of service support is defined based on the resources allocated to the service, meaning that

should Ferrovial require greater support the Supplier will provide more resources as agreed between the parties.

## 3.1.  Incident management

An incident is defined as an unplanned interruption of service or a reduction in the quality of said service. The aim of incident management is to restore normal levels of operations as quickly as possible, with the least possible impact on the business or end user.

Ferrovial and the supplier agree that the incident management tool employed will be Jira, with Ferrovial providing the appropriate access and configuration to allow the Supplier to access the same.

The criteria for classifying the severity of incidents are as follows:
### Level 1: System blocking
The incident prevents system functionality, due to failure or malfunction rendering it unusable to users, and/or preventing the continuance of program testing stages or the continuance of other developments.
Included in this category are installation incidents that prevent the system from becoming operational.

- ### Level 2: Critical
The incident prevents use of functions due to failure, malfunction or incomplete functioning preventing user operations.
Likewise, defects that partially and significantly obstruct testing and other activities carried out by Ferrovial or third parties will also be considered Critical.
Testing will be understood to have experienced significant obstruction when more than 10% of test cases, as defined by Ferrovial, cannot be executed due to loss of functionality, or in the event of a resolution requiring the test case to be run again.

- ### Level 3: Serious
The incident does not impede functional use, but does impose limitations and has significant effects on operations, partially or totally preventing use of the program, not blocking more than 10% of the test cases run by Ferrovial.

- ### Level 4:  Minor
A minor loss of functionality, without impeding functional use, or affecting user operations and/or the continuance of testing phases.

- ### Level 5: Formal Error
Cosmetic defects that do not negatively affect user operations, nor have any impact on any functionality.

Once an incident has been reported, the supplier's production resources will confirm receipt of incident notification and begin assessment. In the event of any discrepancy against the information provided by Ferrovial, the person responsible for the Supplier's service will get in touch with their contact person at Ferrovial, while the Supplier will only be able to reclassify the severity of the incident with Ferrovial's consent.

Defects will be classified jointly by the parties. Should no agreement be reached after 7 days, during which time the proper meetings have been held, Ferrovial's judgment will prevail.

In the event of further information being required in order to continue the task of resolving the incident, the case will again be presented to Ferrovial with a request for further information. Depending on the level of complexity, a telephone call may be enough for the incident to be assessed more thoroughly. If no further information is required, the agent

4

assigned to the case by the Supplier will work on service resumption based on the severity level and SLA.

Once development and testing has come to an end, the case will be considered resolved. Ferrovial will validate the solution implemented and upon confirmation of the problem's resolution, the case will be classified as closed.

A resolution will be considered accepted in any of the following cases:
The end user changes the status to "closed"
Depending on the severity level and time spent on testing, if the Supplier receives no response from the end user the solution will be considered accepted and the case will be classified as closed.

| SEVERITY | PERIOD |
|---|---|
| Severity 1 | 5 working days |
| Severity 2 | 5 working days |
| Severity 3 | 10 working days |
| Severity 4 | 10 working days |
| Severity 5 | 10 working days |

The above table indicates the time, following the resolution of a case, after which a case will be considered accepted should no response be received from the end user, except when the nature of the correction means longer testing periods need to be planned.

Once the incident has been resolved, or at least a temporary solution has been found to the problem, the Supplier will inform Ferrovial of the corrections implemented by the Madrid maintenance team.
The Madrid maintenance team may implement permanent changes to code for the purposes of resolving the root causes of the incident and providing a permanent solution in the next version. Tracking of the incident / problem will be carried out using JIRA, to which Ferrovial will have access in order to allow it to monitor the progress of problem resolution.

3.2. Improvements

The Supplier's maintenance team will provide off-shore preventative maintenance, considered "minor improvements", which will be included in the scope of maintenance services described in this Appendix. Minor improvements are considered to be changes or sets of changes to functionality in an existing application, which will provide additional functionalities, characteristics or allow an application to remain operational during the implementation of a change or change of environment, and which will require at least 10 working days to implement. The figure of 10 working days is for orientation purposes only and represents no limitation, as the figure may vary depending on Ferrovial's needs and existing workloads at any given time.

Jira will be used to manage these minor improvements as required. Requests received from Ferrovial will be assessed, with the implementation of minor improvements ordered and planned based on Ferrovial's needs and the Supplier's availability at a given time.

All improvements will be planned according to the Supplier's workload in order to coordinate and plan service priorities. Any incident will have priority over improvement work, unless the Parties agree otherwise. This will mean that planning and estimated delivery dates for improvements will be reconsidered according to the number of incidents handled at that given time by the Supplier.

Ferrovial will have 10 working days to carry out the necessary verifications, prior to accepting the work carried out by the Supplier and classifying it as closed. This period of time will not be included in the Service Levels calculation. If the Supplier receives no

5

response after this time the improvement will be considered accepted, except when the correction type requires more extensive testing. In this case, the testing and acceptance period will be formally agreed between the Parties.

All other improvements and "minor improvements" requested by Ferrovial will be implemented by the Supplier using additional resources to those assigned to the standard service, with these improvements, charged as established in section 8.2 of this Appendix, up to the stipulated limit.

### 3.3. Configuration management

All Configuration management will be centrally managed by the Supplier using Ferrovial infrastructure. The Supplier will provide the service using Ferrovial's Subversion. Ferrovial will be responsible for delivering to the supplier the current production version prior to service commencing. The supplier will use this version as a base for services and will not be held responsible for any possible differences that may exist between the delivered version and the version in production.

The objective of Software Configuration Management is to establish and maintain the integrity of products generated or modified as part of the services contracted under this Appendix. Configuration management includes identification of software configurations, systematically controlling changes to configurations and maintaining integrity and traceability throughout the software's life cycle.

It will be the supplier's responsibility to control and update the various files and software, always providing Ferrovial with the most recent versions. Any version of the software will be delivered to Ferrovial with documentation detailing specifications of changes made to each particular version.

### 3.4. Change Management

All change management will be centrally managed by the Supplier. The latter will provide this service using Subversion.

Change management will control versions and the transfer of software and other components from development environments to the testing and production environments.

Subversion will represent the database used to store documentation and the source code. All updates will be digitally delivered to Ferrovial by e-mail or any other method agreed between the Parties.

The change logs will contain:
- Changes made
- Testing Plan
- Test Cases
- Test results
- Executables: .class, .pbd, scripts, etc.
- Step by step implementation procedures
- Recovery procedures

### 3.5. Change logs and tracking

This process will ensure the traceability of all changes made to applications maintained by the Supplier, as well as databases. All changes or code updates derived from stable solutions or modifications will be documented in the source code and the change log.

6

Furthermore, any other process that may be created or updated as part of the service described in this Appendix will also be maintained and changes will be appropriately monitored.

The Supplier will use documentation existing at the time of service commencement as a starting point for any new documentation or modifications of existing documents.

### 3.6. Database consulting

Ferrovial will be responsible for maintaining databases. Nonetheless, the supplier may evaluate code and inform Ferrovial on how the applications use databases (optimization of queries, timeouts, logs, etc.).

Any change to databases will be reported by Ferrovial and coordinated with the Supplier, particularly if said change is deemed to have a possible impact on the performance of the application or the interface with the database.

### 4. Organization of the work team

The diagram below shows how work will be organized and the staff profiles that the Supplier will use to provide the standard service referred to in this Appendix:



There will be two channels of communication for reporting incidents between Ferrovial and the Supplier:

- In the case of level 1 and 2 incidents, as defined in section 3.1 of this appendix, and given their particular importance, these will be directly reported by the ITRCC highway concessionaire to the Supplier via the service telephone number that the Supplier will provide, within the hours established for this purpose and detailed below.
- In the case of level 3 and 4 incidents, as defined in section 3.1 of this appendix, these will be reported by Ferrovial to the Supplier once their technical implications have been assessed.

All incidents must be managed using the system established by Ferrovial, which in this case is Jira.

7

The Supplier's work team will be located at their Madrid offices.

Service hours will be as follows:
- From Monday to Thursday, from 09:00 to 21:00 (Madrid time).
- Friday from 08:00 to 19:00 (Madrid time)
- The Supplier will provide support outside of these hours for all local and national holidays, as well as weekends. This will be provided as telephone support from 15:00 to 23:00 (Madrid time) to respond to severity level 1 and 2 incidents.

5. Transition Phase

The following diagram details the different phases and tasks to be implemented, with particular details on the initial phase of service control being handed over to the Supplier.



- Delivery of relevant Ferrovial documentation.
  The Supplier will specify a minimum time required for the receipt and assessment of existing documentation related to the service governed by this Appendix. In this phase, Ferrovial will make available to the Supplier information on the incidents registered in the reporting system at the time of service commencing. The Supplier will also be informed of the status and progress of said incidents at the time of service commencing.

- Supplier Training.
  Ferrovial will provide training at the US concessionaire, ITRCC, over the period of one week, in order to demonstrate the functioning of technical and business operations in BOS systems used at said concessionary. The supplier will send the resources it deems necessary to ensure the proper transfer of knowledge.

- Availability of infrastructure and connectivity.
  Following on-site training at Ferrovial's concessionaire, the Supplier will check the required modes of access to the environment and application in order to ensure that the service can be provided in the proper manner. Access to Jira will also be checked in this phase. Staff assigned to the service by the Supplier will also need to be granted access rights and permits to access Ferrovial's facilities in Madrid and Indiana. Access protocols and mechanisms will be mutually established between the parties.

8

- Start-up phase.
  After a month has passed from service commencement, the Start-up phase will begin, in which the Supplier will assume responsibility for the entire service. This stage will last for three months, during which the Service Levels will be measured and recorded. During this phase Service Level compliance intervals will be agreed transitorily and by mutual agreement between the Parties.

  As a result of this Start-up phase, Ferrovial and the Supplier will define the management processes and procedures required to implement and provide definitive Service Levels, as well as defining service reports. During this stage the Supplier will update and generate documentation as agreed on existing systems, up to the capacity limit of the team made available for this purpose (not including corrective and "minor improvements").

  This phase is estimated to last three months, which may be increased or decreased by mutual consent between the Parties.

- Production phase
  Once the period established for the Start-up phase as come to an end, the Service Levels agreed for this phase will begin to be implemented and measured. The Supplier will provide the services described in this Appendix for the rest of the contract duration.

- Service handover phase
  In this phase the Supplier will transfer knowledge regarding the service should Ferrovial decide to contract a third party to take over the service referred to in this appendix, in substitution of the Supplier.

  In this inverse transition stage, the Supplier will provide the necessary support to complete the service transition and handover to the third party. This support will represent up to a maximum of 10% of current team's resources, in order to ensure that service quality provided during this period, still the responsibility of the Supplier, does not suffer.

  Ferrovial must inform the Supplier that this phase will be implemented providing at least 30 days notice. This notification must come accompanied with a transition plan detailing the level of support required and all necessary planning for action to be taken. The inverse transition phase will last a maximum of two months and will end on the final day of the contract.

- Reporting phase
  The Supplier will adopt Ferrovial's tracking and quality model and formats, with the possibility of generating additional documentation as it deems appropriate using its own methodology.

  All documentation will be delivered to the Ferrovial contact person for said service.

## 5.1. Documentation

The following table describes the documentation related to the project. In the case of new developments and improvements, the Supplier will be responsible for providing Ferrovial with appropriate documentation, adapting its methods to Ferrovial's needs. The principal language for documentation will be English.

| Documentation | |
|---|---|
| Phase | Deliverables / tasks |
| Requirements collection | Requirements document |
| Detailed analysis | Detailed analysis document |
| | Architecture document |
| | Prototype (only for GUI SW) |
| Development and unit tests | Software tested and ready to be deployed. |
| | Testing plan. |
| | User's manual |
| | Help-desk manual |
| | Run book |
| | Installation and configuration manual |
| Testing | Testing document (separate GUI and integration testing) |
| On each installation | Installation detailed plan |
| On each customer deployment | Customer deployment plan (breakdown) |
| | Configuration, conversion and parallel running. |

Furthermore, the supplier will do its utmost to generate the documentation required by Ferrovial for those applications or processes that do not have prior existing documentation or that have prior documentation that requires updating. Incident resolution and system maintenance will take priority over the preparation of the documentation detailed above, in order to ensure proper service provision.

5.2. Maintenance and procedural improvements
This section details the working procedures established between Ferrovial and the Supplier for corrective maintenance services and improvement requests within the scope of this Appendix.

The following graph shows the procedure that will be followed for improvements or new functionalities, which will be applied to the systems included within the scope of this Appendix.



1. Ferrovial will submit a request for each new improvement.
   Should said improvement require a workload in excess of 42 hours, these requests will be processed individually, analyzing their scope and implications, and proposing a viability study to Ferrovial based on which the Supplier will assess the best way to resolve said requests.
2. They must be accompanied by specifications. If specifications are insufficient or non-existing, then the process status will change to pending specifications.
3. Specifications of the improvement requested by Ferrovial will be assessed by the Supplier, which may request additional specifications from Ferrovial should it be deemed necessary. If these additional specifications are sufficient, they will be assessed for implementation.
4. The evaluation document with the final assessment will be delivered to Ferrovial, which will then approve or reject the same.
5. If the assessment is accepted by Ferrovial, the Supplier will begin managing the software life cycle.

The following diagram lays out the software life cycle and procedures to follow, both for improvements and incidents.



Once the Supplier has assessed the request sent by Ferrovial, and the latter has accepted said assessment, the case will be allocated the status of "in progress", the phase in which the Supplier carries out implementation, unitary testing and system testing.

Once the implementation and unitary and system testing has been carried out, the Supplier will send Ferrovial a request to deploy production, in accordance with the following procedure.

The Supplier will create a new status in order to request migration permission from Ferrovial. Next, the Ferrovial testing and production phase teams will test the solution and implement the necessary installations.



12