**ITR Concession Company LLC**
**205 North Michigan Avenue**
**Suite 2510**
**Chicago, Illinois 60601**

September 11, 2014

**To:    Holders of Senior Secured Claims against ITR Concession Company LLC**
**Holders of Interests in Statewide Mobility Partners LLC**

We deliver to you herewith the attached *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of ITR Concession Company LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Disclosure Statement**")[1] and ballots so that you may vote to accept or reject the proposed *Joint Prepackaged Plan of Reorganization of ITR Concession Company LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Plan**") with respect to Statewide Mobility Partners LLC, ITR Concession Company Holdings LLC, and ITR Concession Company LLC (collectively, the "**Company**" or the "**Debtors**"), according to the ballot applicable to your respective Class 3 Claims or Class 7 Interests. The Company intends to use those votes that are returned to its proposed claims and balloting agent, Kurtzman Carson Consultants LLC (the "**Claims and Balloting Agent**"), or Wilmington Trust, N.A., the administrative agent under the Company's outstanding secured loan facility (the "**Administrative Agent**"), as applicable, by 4:00 p.m., prevailing Pacific Time / 6:00 p.m., prevailing Central Time, on September 17, 2014 (the "**Voting Deadline**"), to seek approval of the Plan in cases under chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") that the Company intends to commence soon after that date. To count the votes of Holders of Class 3 Claims to accept or reject the Plan, the Company intends to use a master ballot identifying the individual votes of all Holders of Class 3 Claims (the "**Class 3 Master Ballot**"), which must be submitted by the Administrative Agent to the Claims and Balloting Agent by 4:00 p.m., prevailing Pacific Time / 6:00 p.m., prevailing Central Time, on September 19, 2014 (the "**Class 3 Master Ballot Deadline**").[2]

The Plan is the product of more than two years of arm's-length, good-faith negotiations among the Company and its creditors and equity sponsors. The Company, its existing equity sponsors, and the holders of at least two-thirds in amount of the senior secured claims against the Company have agreed to a global settlement memorialized in a restructuring support agreement (the "**Restructuring Support Agreement**"), which describes the restructuring transactions that will be consummated if the Plan is confirmed.

The Plan provides for a comprehensive restructuring of the Company's pre-bankruptcy obligations and maximizes recoveries available to all constituents. Specifically, the Plan contemplates that the Company, with the support of a committee of its senior secured creditors

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement.

[2]   In order for the Administrative Agent to compile and submit the Class 3 Master Ballot prior to the Class 3 Master Ballot Deadline, the Administrative Agent <u>must receive</u> the Ballots of each individual Holder of Class 3 Claims by no later than the Voting Deadline.

(the "**Committee of Secured Parties**") and its existing equity sponsors, will seek to confirm a chapter 11 plan contemplating either (x) a sale of substantially all of the Company's assets following a competitive sale process (the "**Sale Transaction**") or (y) a comprehensive balance-sheet restructuring (the "**Reorganization Transaction**").  It is contemplated that the Plan will be confirmed while the Company works toward a potential Sale Transaction.  As described in further detail below and in the Plan, following confirmation of the Plan, under certain circumstances, the Company may terminate the sale process and work toward the Reorganization Transaction.  The general terms of the Sale Transaction and the Reorganization Transaction are set forth below.

The Plan, if confirmed, would effectuate a substantial compromise and settlement of competing claims among the Company, its existing equity sponsors, and its creditors (including the senior secured creditors).  If the Plan is confirmed, the ultimate result following the sale process described in this Disclosure Statement would be either the Sale Transaction or the Reorganization Transaction, depending on which transaction a special committee of independent directors (the "**Special Committee**"), whose members were selected by the Company and the Committee of Secured Parties, determines to be in the best interests of all stakeholders.  If the Plan is not confirmed, however, and no other consensual path can be identified, the Company reserves the right to pursue an alternative, nonconsensual restructuring.

**Sale Transaction**

- Sale Process to Maximize Value.  The Special Committee plans to conduct a competitive sale process for substantially all of the Company's assets following confirmation of the Plan, which could extend through, at the latest, August 1, 2015.

- Sale Procedures.  The Plan authorizes the Special Committee, in good-faith consultation with a steering group of the Committee of Secured Parties (the "**Committee of Secured Parties Steering Group**"), to adopt and implement procedures that the Special Committee determines will facilitate the solicitation and evaluation of potential sale proposals without further notice to or approval by the Bankruptcy Court.

- Evaluation of Bids.  Following the sale process and no later than the August 1, 2015 outside date, the Special Committee,  in good-faith consultation with and subject to the reasonable consent of the holders of a majority of senior secured claims that became party to the Restructuring Support Agreement on the effective date thereof (the "**Required Consenting Secured Parties**"), will determine whether any asset sale proposals provide greater value to the Company and its stakeholders than the Reorganization Transaction described below or are otherwise in the best interests of all stakeholders.  If the Company does not consummate the Sale Transaction following the sale process, the Company will consummate the Reorganization Transaction described below.

- Consummation of the Sale Transaction.  If the Special Committee, in good-faith consultation with and subject to the reasonable consent of the Required Consenting Secured Parties, determines to pursue and implement the Sale Transaction, the Sale Transaction shall be consummated on the effective date of the Plan.  A majority of the Company's senior secured creditors, however, may elect to pursue the Reorganization Transaction notwithstanding the Special Committee's selection of a successful bid.  Following consummation of the Sale

Transaction, the Company shall make distributions to holders of claims and interests on the effective date of the Plan in accordance with the Bankruptcy Code and the Plan, and the Debtors shall be wound down and dissolved in accordance with applicable law to the extent that their equity interests are not acquired in connection with the Sale Transaction.

### Reorganization Transaction

- New Financing.  If no Sale Transaction is consummated, the Company either will (a) enter into a $2.75 billion loan facility comprising $2.0 billion in first-lien loans and $750 million in second-lien loans (collectively, the "**New Loans**"), which loans will be distributed *pro rata* to the Company's prepetition senior secured creditors, or (b) obtain new third-party financing on terms no less favorable than the New Loans, the cash proceeds of which will be distributed *pro rata* to the Company's prepetition senior secured creditors.  The Required Consenting Secured Parties shall determine whether the Company issues New Loans or obtains new third-party financing.

- Distribution of Reorganized Equity Interests.  The Company's prepetition senior secured creditors will receive 95.75 percent of the equity interests in reorganized ITR Concession Company Holdings LLC ("**Reorganized Holdings**"), reorganized Statewide Mobility Partners LLC ("**Reorganized Statewide**") will receive the remaining 4.25 percent of the equity interests in Reorganized Holdings, and the Company's existing equity sponsors will retain their equity interests in Reorganized Statewide.  Prior to the effective date of the Plan and subject to certain other conditions, the Company's existing equity sponsors may elect to receive some or all of $80 million in cash in lieu of the distribution of Reorganized Holdings interests to Reorganized Statewide.  The amount of equity interests distributed to the Company's senior secured creditors and Reorganized Statewide is subject to adjustment if the principal amount of new debt or the new third-party financing is less than or greater than $2.75 billion.  Additionally, the amount of the equity interests to be distributed to the Company's senior secured creditors is subject to dilution by an equity award to the new operator described below and increase if the Company's existing equity sponsors elect to receive cash in lieu of some or all of the distribution of Reorganized Holdings interests, as described above.

- New Manager.  The Company's existing equity sponsors will have the right to operate and manage the Toll Road for an initial term of 10 years in exchange for consideration in the form of either cash reimbursement for the cost of services provided or up to three percent of the equity interests in Reorganized Holdings as elected by the equity sponsors, which equity interests shall vest on a straight line and *pro rata* basis over 10 years after the effective date of the Plan, commencing on the effective date of the Plan and ceasing upon termination of the management agreement pursuant to which the operator shall operate the Toll Road.

- Post-Reorganization Put and Call Rights.  In the event of a change of control of, or sale of substantially all of the assets of, the reorganized Company during the 18-month period after consummation of the Plan, the Company's existing equity sponsors and/or Reorganized Statewide, as applicable, shall have the right to cause the Company to purchase their share of the Reorganized Holdings interests for their share of $80 million, and the Company shall have the right to purchase the equity interests held by Statewide for $100 million.

iii

Under both the Sale Transaction and the Reorganization Transaction, all outstanding and undisputed general unsecured claims against the Company will be unimpaired and unaffected by the restructuring and will be paid in full in cash on the effective date of the Plan or in the ordinary course of business when such claims become due and owing.

**The Sale Transaction or the Reorganization Transaction, as applicable, will be consummated pursuant to the Plan.  The Debtors and their advisors believe that the Company has substantial value—well in excess of the face amount of the promissory notes contemplated to be distributed in the potential Reorganization Transaction described herein.  It is unclear and unknown whether the sale process described in this Disclosure Statement and adopted by the Special Committee will result in bids reflecting the fair market value of the Debtors.  The Special Committee will have discretion on determining whether to accept or reject a bid based in part on whether or not the bids received reflect the fair market value of the Company.**

The Company does not have the resources to pay all of its existing funded debt obligations in full and in cash on their current maturity date.  If the Plan is confirmed, through the transactions contemplated by the Plan, the Company will maximize stakeholder value through consummation of either a sale of substantially all of the Company's assets or a comprehensive reorganization.

The Company is seeking your vote on the Plan prior to the commencement of its "prepackaged" chapter 11 cases.  By utilizing this joint prepackaged chapter 11 reorganization process, the Company anticipates that its day-to-day business operations will not be affected, the duration of its chapter 11 cases will be significantly shortened, and the administration of its chapter 11 cases will be simplified and less costly.  The Company also anticipates that its secured and unsecured creditors will obtain a better result if the Plan is approved and confirmed than they would otherwise receive following a contested reorganization process.

Please review the attached Disclosure Statement carefully for details about voting, recoveries, the proposed restructuring, the Company's financial performance, and other relevant matters.  The Company has established the following date for determining who is entitled to vote on the Plan (the "**Voting Record Date**") and deadline for its Claims and Balloting Agent to receive votes (the "**Voting Deadline**"):

|  |  |
|---|---|
| **RECORD DATE**: | September 10, 2014 |
| **VOTING DEADLINE**: | September 17, 2014, 4:00 p.m., prevailing Pacific Time / 6:00 p.m., prevailing Central Time |

Sincerely,

Statewide Mobility Partners LLC
ITR Concession Company Holdings LLC
ITR Concession Company LLC

*/s/ Fernando Redondo*
Fernando Redondo
Authorized Signatory

iv

KE 32728595

THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE DEBTORS' PROPOSED JOINT PREPACKAGED PLAN OF REORGANIZATION *BEFORE* THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532 (AS AMENDED, THE "BANKRUPTCY CODE").  BECAUSE THE DEBTORS' CHAPTER 11 CASES HAVE NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY A BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE OR AS BEING IN COMPLIANCE WITH SECTION 1126(b) OF THE BANKRUPTCY CODE. FOLLOWING COMMENCEMENT OF THEIR CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK ENTRY OF AN ORDER OF THE BANKRUPTCY COURT (I) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(a) OF THE BANKRUPTCY CODE, (II) APPROVING THE SOLICITATION OF VOTES ON THE PLAN AS HAVING BEEN IN COMPLIANCE WITH SECTION 1126(b) OF THE BANKRUPTCY CODE, AND (III) CONFIRMING THE PLAN.

## DISCLOSURE STATEMENT, DATED SEPTEMBER 11, 2014

SOLICITATION OF VOTES TO ACCEPT OR REJECT THE
JOINT PREPACKAGED PLAN OF REORGANIZATION
OF ITR CONCESSION COMPANY LLC, *ET AL.*,
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

---

### RECOMMENDATION BY THE DEBTORS

THE BOARD OF MANAGERS OR THE SOLE MEMBER OF EACH OF THE DEBTORS, AS APPLICABLE, HAVE UNANIMOUSLY APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT AND RECOMMEND THAT ALL HOLDERS OF CLAIMS AND INTERESTS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.

---

**DELIVERY OF BALLOTS**

IF YOU ARE A HOLDER OF A CLAIM IN <u>CLASS 3</u>, YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE ADMINISTRATIVE AGENT BY THE VOTING DEADLINE, WHICH IS 4:00 P.M., PREVAILING PACIFIC TIME / 6:00 P.M., PREVAILING CENTRAL TIME, ON SEPTEMBER 17, 2014, AS FOLLOWS:

**IF VIA ELECTRONIC MAIL:**

jjames@wilmingtontrust.com <u>and</u> rkuhl@wilmingtontrust.com

**IF VIA FACSIMILE:**

+1 (612) 217-5651 (Attn.: Josh James <u>and</u> Renee Kuhl)

IF YOU ARE A HOLDER OF AN INTEREST IN <u>CLASS 7</u>, YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE CLAIMS AND BALLOTING AGENT BY THE VOTING DEADLINE, WHICH IS 4:00 P.M., PREVAILING PACIFIC TIME / 6:00 P.M., PREVAILING CENTRAL TIME, ON SEPTEMBER 17, 2014,  AT THE FOLLOWING ELECTRONIC MAIL ADDRESS:

ITRinfo@kccllc.com

IF YOU ARE THE <u>ADMINISTRATIVE AGENT</u>, YOUR CLASS 3 MASTER BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE CLAIMS AND BALLOTING AGENT BY 4:00 P.M., PREVAILING PACIFIC TIME / 6:00 P.M., PREVAILING CENTRAL TIME, ON SEPTEMBER 19, 2014,  AT THE FOLLOWING ELECTRONIC MAIL ADDRESS:

ITRinfo@kccllc.com

If you have any questions on the procedure for voting on the Plan, please call the Debtors' restructuring hotline at:

(877) 634-7181 (if calling from the United States or Canada), or
+1 (424) 236-7226 (if calling from outside the United States or Canada)

PLEASE NOTE THAT THE DESCRIPTION OF THE PLAN PROVIDED THROUGHOUT THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY PROVIDED FOR CONVENIENCE PURPOSES. IN THE CASE OF ANY INCONSISTENCY BETWEEN THE SUMMARY IN THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF, THE PLAN WILL GOVERN.

A COPY OF THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES IS ATTACHED HERETO AS <u>EXHIBIT A</u>.

READERS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE PLAN AND THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR THE PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.

KE 32728595

**NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.**

**ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL IN THIS DISCLOSURE STATEMENT.**

<u>**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**</u>

**Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "<u>SEC</u>") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.**

**This Disclosure Statement has been prepared pursuant to sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 3016(b). The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), or any securities regulatory authority of any state under applicable state securities laws ("<u>Blue Sky Laws</u>"). The Debtors intend to rely on section 1145(a) of the Bankruptcy Code and equivalent state law registration exemptions to exempt the issuance of new securities of the Debtors in connection with the Plan from registration under the Securities Act and Blue Sky Laws. The solicitation of votes on the Plan is being made in reliance on the exemptions from registration provided by the Securities Act, including section 4(a)(2) thereof.**

**Pursuant to section 1145 of the Bankruptcy Code, the securities to be issued on or after the Effective Date (a) will not be "restricted securities" as defined in rule 144(a)(3) under the Securities Act and (b) will be freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the issuer (e.g., the Debtors) as defined in rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.**

**Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the securities through the facilities of The Depository Trust Company (the "<u>DTC</u>"), the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the securities under applicable securities laws. The DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the securities are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no entity (including, including, for the avoidance of doubt, the DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the securities are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.**

**This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Readers are cautioned that any forward-looking statements in this Disclosure Statement are based on assumptions that are believed to be reasonable, but are subject to a wide range of risks, including risks associated with the following: (a) future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (b) the relationships with and payment terms provided by trade creditors; (c) additional financing requirements post-restructuring; (d) future dispositions and acquisitions; (e) the effect of competition; (f) changes to the costs of commodities and raw materials; (g) the proposed restructuring and costs associated therewith; (h) the effect of conditions in the local, national, and global economy on the Debtors; (i) the ability to obtain relief from the Bankruptcy Court to facilitate the smooth operation of the Debtors' businesses under chapter 11; (j) the Confirmation and consummation of the Plan; (k) the terms and conditions of the New Loans to be entered into pursuant to the Plan; and (l) each of the other risks identified in this Disclosure Statement. Due to these uncertainties, readers cannot be assured that any forward-looking statements will prove to be correct. The Debtors are**

KE 32728595

under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.

You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referenced in such forward-looking statements. The liquidation analysis, financial projections, and other projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Interests, among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

**TABLE OF CONTENTS**

Page

I.    Executive Summary ...................................................................................................................1
    A.    Purpose of the Disclosure Statement and Plan ...................................................................1
    B.    Overview of the Transactions Contemplated by the Plan ...................................................1
    C.    Summary of Treatment of Claims and Interests and Description of Recoveries under the
         Plan ...................................................................................................................................3
    D.    Voting on the Plan ...............................................................................................................4
    E.    Confirmation and Consummation of the Plan .....................................................................6
        1.    Combined Hearing ..................................................................................................6
        2.    Effect of Confirmation and Consummation of the Plan .........................................6
    F.    Additional Plan-Related Documents ....................................................................................6
        1.    The Plan Supplement ..............................................................................................6
        2.    The Sale Transaction ..............................................................................................7
        3.    The Initial Board .....................................................................................................7

II.    Debtors' Business Operations and Capital Structure...............................................................8
    A.    The Debtors' Prepetition Corporate Structure.....................................................................8
    B.    The Debtors' Entry into the Concession Agreement.............................................................8
        1.    History of the Private Toll Road Business...............................................................8
        2.    The Major Moves Initiative and the Debtors' Entry into the Concession
             Agreement ...............................................................................................................8
    C.    The Debtors' Operations .....................................................................................................9
        1.    The Debtors' Operation of the Toll Road ...............................................................9
        2.    The Debtors' Capital Expenditure Program............................................................9
        3.    The Debtors' Employees .......................................................................................10
        4.    The Toll Road's Relationship with the Equity Sponsors and the Chicago
             Skyway ..................................................................................................................10
    D.    The Debtors' Prepetition Capital Structure .......................................................................11
        1.    The Loans ..............................................................................................................12
        2.    The Swaps..............................................................................................................12
        3.    Collateral Arrangements .......................................................................................12

III.    Events Leading to the Debtors' Financial Difficulties and Commencement of the Chapter 11 Cases..........13
    A.    The Global Recession Arises Shortly after the Debtors Enter Into the Concession
         Agreement.............................................................................................................................13
    B.    The Debtors' Negotiations with Cintra, Macquarie, the Steering Committee, and the
         Committee of Secured Parties ............................................................................................13
    C.    The Restructuring Support Agreement ..............................................................................14
    D.    The Debtors' Proposed Disclosure Statement and Solicitation Process.............................14
    E.    The Debtors' First-Day Motions and Certain Related Relief..............................................15
    F.    Other Requested First-Day Relief and Retention Applications...........................................16
    G.    Interaction with the IFA .....................................................................................................16

IV.    Summary of the Plan ..............................................................................................................17
    A.    Treatment of Unclassified Claims .....................................................................................17
        1.    Administrative Claims ...........................................................................................17
        2.    Professional Compensation ...................................................................................17
        3.    Priority Tax Claims................................................................................................18
    B.    Classification and Treatment of Claims and Interests........................................................18
        1.    Classification of Claims and Interests...................................................................18
        2.    Treatment of Claims and Interests ........................................................................19
        3.    Certain Sale Transaction Considerations ..............................................................22
        4.    Special Provision Governing Unimpaired Claims .................................................22

|        | 5.  | Acceptance or Rejection of the Plan | 22 |
|        | 6.  | Elimination of Vacant Classes | 22 |
|        | 7.  | Controversy Concerning Impairment | 23 |
|        | 8.  | Subordinated Claims | 23 |
| C.     |     | Means for Implementation of the Plan | 23 |
|        | 1.  | No Substantive Consolidation | 23 |
|        | 2.  | Restructuring Transactions | 23 |
|        | 3.  | Sources of Consideration for Plan Distributions | 23 |
|        | 4.  | Sale Transaction | 24 |
|        | 5.  | Principal Means for Implementation of the Reorganization Transaction | 25 |
|        | 6.  | General Settlement of Claims and Interests | 29 |
|        | 7.  | Corporate Existence | 29 |
|        | 8.  | Cancellation of Existing Securities and Agreements | 30 |
|        | 9.  | Corporate Action | 30 |
|        | 10. | Effectuating Documents; Further Transactions | 30 |
|        | 11. | Section 1146 Exemption | 30 |
|        | 12. | Preservation of Causes of Action | 31 |
|        | 13. | Payment of Certain Fees and Expenses | 31 |
| D.     |     | Treatment of Executory Contracts and Unexpired Leases | 31 |
|        | 1.  | Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases | 31 |
|        | 2.  | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 32 |
|        | 3.  | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 32 |
|        | 4.  | Indemnification Obligations | 33 |
|        | 5.  | Insurance Policies | 33 |
|        | 6.  | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 33 |
|        | 7.  | Reservation of Rights | 33 |
|        | 8.  | Nonoccurrence of Effective Date | 34 |
|        | 9.  | Contracts and Leases Entered Into After the Petition Date | 34 |
| E.     |     | Provisions Governing Distributions | 34 |
|        | 1.  | Disbursing Agent | 34 |
|        | 2.  | Rights and Powers of Disbursing Agent | 34 |
|        | 3.  | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 34 |
|        | 4.  | Compliance with Tax Requirements | 35 |
|        | 5.  | Allocations | 35 |
|        | 6.  | No Postpetition Interest on Claims | 35 |
|        | 7.  | Setoffs and Recoupment | 35 |
|        | 8.  | Claims Paid or Payable by Third Parties | 35 |
| F.     |     | Settlement, Release, Injunction, and Related Provisions | 36 |
|        | 1.  | Discharge of Claims and Termination of Interests | 36 |
|        | 2.  | Release of Liens | 36 |
|        | 3.  | Releases by the Debtors | 36 |
|        | 4.  | Releases by Holders of Claims and Interests | 37 |
|        | 5.  | Exculpation | 37 |
|        | 6.  | Injunction | 38 |
|        | 7.  | Protections Against Discriminatory Treatment | 38 |
|        | 8.  | Setoffs | 38 |
|        | 9.  | Recoupment | 38 |
|        | 10. | Subordination Rights | 39 |
|        | 11. | Document Retention | 39 |
| G.     |     | Conditions Precedent to Consummation of the Plan | 39 |
|        | 1.  | Conditions Precedent to the Effective Date | 39 |
|        | 2.  | Waiver of Conditions | 39 |
|        | 3.  | Effect of Failure of Conditions | 39 |
| V.     |     | Confirmation of the Plan | 40 |

| | | | |
|---|---|---|---|
| | A. | The Combined Hearing | 40 |
| | B. | Deadline to Object to Approval of the Disclosure Statement and Confirmation of the Plan | 40 |
| | C. | Requirements for Approval of the Disclosure Statement | 40 |
| | D. | Requirements for Confirmation | 40 |
| | | 1. Requirements of Section 1129(a) of the Bankruptcy Code | 40 |
| | | 2. Best Interests of Creditors/Liquidation Analysis | 41 |
| | | 3. Feasibility/Financial Projections | 42 |
| | | 4. Acceptance by Impaired Classes | 42 |
| | | 5. Confirmation without Acceptance by All Impaired Classes/Fair and Equitable Test | 42 |
| VI. | | Voting Instructions | 44 |
| | A. | Overview | 44 |
| | B. | Solicitation Procedures | 44 |
| | | 1. Claims and Balloting Agent | 44 |
| | | 2. Solicitation of Holders of Class 3 Claims through the Administrative Agent | 44 |
| | | 3. Claim and Interest Holder Solicitation Package | 44 |
| | | 4. Distribution of the Solicitation Package and Plan Supplement | 44 |
| | C. | Voting Procedures | 45 |
| | | 1. Holders of Claims and Interests Entitled to Vote to Accept or Reject the Plan | 45 |
| | | 2. Voting on a Plan | 45 |
| VII. | | Risk Factors | 47 |
| | A. | Risks Related to the Restructuring | 47 |
| | | 1. The Restructuring Could Involve Either the Sale Transaction or the Reorganization Transaction | 47 |
| | | 2. Voting on and Confirmation of the Plan Will Occur Prior to the Conclusion of the Sale Process | 47 |
| | | 3. The Sale Process Will Take Place over Several Months, and the Sale Transaction May Not Occur | 47 |
| | | 4. The Majority Secured Parties May Elect to Pursue the Reorganization Transaction Even if the Special Committee Designates a Successful Bid | 47 |
| | | 5. The Debtors Will Consider All Available Restructuring Alternatives If the Restructuring Is Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors | 48 |
| | | 6. Even if the Restructuring is Successful, the Debtors Will Continue to Face Risks | 48 |
| | | 7. The Consideration under the Plan Does Not Reflect any Independent Valuation of the Plan | 48 |
| | | 8. Risks Related to the New Loans That May Be Entered into and the New Third-Party Financing That May Be Obtained in the Reorganization Transaction | 48 |
| | | 9. Risks Related to the Offer and Issuance of the New Holdings Interests under the Reorganization Transaction | 50 |
| | | 10. Risks Related to Confirmation and Consummation of the Plan | 51 |
| | B. | Risks Related to Recoveries under the Plan | 53 |
| | | 1. The Form and Amount of Recoveries under the Plan May Vary | 53 |
| | | 2. Under the Reorganization Transaction, the New Holdings Interests Distributed to Reorganized Statewide Are Subject to Certain Forced Purchase and Sale Provisions | 53 |
| | | 3. Under the Reorganization Transaction, the Senior Secured Party Equity Distribution May Be Affected by the Management Equity Consideration or by an Change in the Principal Amount of the New Loans or the New Third-Party Financing Above or Below $2.75 Billion | 54 |
| | | 4. Under the Reorganization Transaction, the Debtors May Not Be Able to Achieve Their Projected Financial Results or Meet Their Post-Restructuring Debt Obligations | 54 |

KE 32728595

5.      Estimated Valuations of the Debtors, the New Loans, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values............................................................................54

6.      Under the Reorganization Transaction, Certain Holders of Claims That Acquire the New Holdings Interests May Assert Significant Control over the Reorganized Debtors ...........................................................................55

7.      Under the Reorganization Transaction, Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors ...................................................................55

C.      Risks Related to the Business Operations of the Debtors and Reorganized Debtors .................55

1.      The Debtors Plan to File Voluntary Petitions for Relief under Chapter 11 of the Bankruptcy Code and Will Be Subject to the Risks and Uncertainties Associated with Any Chapter 11 Restructuring ...........................................55

2.      New Omnibus Services Agreement ...................................................................56

3.      Potential for the Loss of Key Members of the Executive Management Team .................56

4.      Arrangements with the Skyway Concessionaire ..................................................56

5.      Economic Conditions That Are Beyond the Debtors' Control .................................56

6.      Traffic Risk ...................................................................................................56

7.      Concentration of Geographic Risk ....................................................................57

8.      Labor Risks ...................................................................................................57

9.      Catastrophic Events ........................................................................................57

10.     Extreme Weather Events ..................................................................................57

D.      Miscellaneous Risk Factors and Disclaimers ...................................................................57

1.      The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed ...........................................57

2.      No Legal or Tax Advice Is Provided by This Disclosure Statement ..........................57

3.      No Admissions Made .......................................................................................58

4.      Failure to Identify Litigation Claims or Projected Objections.................................58

5.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors .......................................................................................................58

6.      No Representations outside This Disclosure Statement Are Authorized........................58

VIII.   Important Securities Laws Disclosures ...........................................................................59

IX.     Certain U.S. Federal Tax Consequences of the Plan ...........................................................60

A.      Introduction..............................................................................................................60

B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Holders of Allowed Class 7 Interests..........................................................................................60

1.      COD Income .................................................................................................61

2.      Gain on Sale Transaction or Reorganization Transaction.......................................61

3.      Receipt of New Holdings Interests ....................................................................61

C.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 3 Claims.......................................................................................................62

1.      Consequences of Exchanges Pursuant to the Plan to Holders of Class 3 Loan Claims...........................................................................................................62

2.      Consequences of Exchanges Pursuant to the Plan of Class 3 Hedging Claims .............64

3.      Ownership and Disposition of the New Holdings Interests .....................................65

4.      Ownership and Disposition of the New Loans .....................................................67

D.      Withholding and Reporting .........................................................................................68

X.      Recommendation of the Debtors ...................................................................................69

KE 32728595

### EXHIBITS

EXHIBIT A       Plan of Reorganization

EXHIBIT B       Corporate Structure of the Debtors

EXHIBIT C       Financial Projections

EXHIBIT D       Liquidation Analysis

EXHIBIT E       Consolidated Financial Statements for the Preceding Three Fiscal Years

EXHIBIT F       Restructuring Support Agreement

## I.    Executive Summary

**A.      Purpose of the Disclosure Statement and Plan**.

Statewide Mobility Partners LLC ("**Statewide**"), ITR Concession Company Holdings LLC ("**Holdings**"), and ITR Concession Company LLC (the "**Concessionaire**"), as debtors and debtors in possession (each, a "**Debtor**" and, collectively, the "**Debtors**"), submit this disclosure statement (the "**Disclosure Statement**") pursuant to sections 1125 and 1126 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Joint Prepackaged Plan of Reorganization of ITR Concession Company LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, modified, or supplemented from time to time, the "**Plan**"). A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.[3] The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO HOLDERS OF CLAIMS AND INTERESTS. AT THIS TIME, THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR MAXIMIZING STAKEHOLDER VALUE (INCLUDING LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE). THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

**B.      Overview of the Transactions Contemplated by the Plan**.

As described below, the Debtors constitute a privately held business enterprise that operates a 157-mile toll road in northern Indiana commonly referred to as the Indiana Toll Road, pursuant to the Concession Agreement between the Concessionaire and the Indiana Finance Authority. The Toll Road, which extends from the Ohio state line to the Illinois state line and comprises portions of U.S. Interstates 80 and 90, provides fast and convenient access to and from communities in northern Illinois and northern Indiana. Traffic on the Toll Road currently averages over 30,000 vehicle trips per day. The Debtors have approximately 283 employees and maintain headquarters in Chicago, Illinois, and Granger, Indiana. For the fiscal year ending December 31, 2013, the Debtors had total revenues of approximately $206 million.

In an effort to effect the restructuring contemplated by the Plan (the "**Restructuring**"), each of the Debtors plans to commence a chapter 11 case in the United States Bankruptcy Court for the Northern District of Illinois (the "**Bankruptcy Court**") following the completion of the solicitation process. The Debtors intend to seek joint administration of the Chapter 11 Cases for procedural purposes, and, upon commencement of the Chapter 11 Cases, intend to file the Plan, this Disclosure Statement, and a motion seeking to approve the Disclosure Statement and proposed solicitation process and confirm the Plan.

The Plan provides for a comprehensive restructuring of the Debtors' pre-bankruptcy obligations and maximizes recoveries available to all constituents. Specifically, the Plan contemplates that the Debtors, with the support of the Committee of Secured Parties and its existing equity sponsors, will seek to confirm a chapter 11 plan contemplating either (x) a sale of substantially all of the Debtors' assets following a competitive sale process (the "**Sale Transaction**") or (y) a comprehensive balance-sheet restructuring (the "**Reorganization Transaction**"). The general terms of the Sale Transaction and the Reorganization Transaction are set forth below.

---

[3]   Capitalized terms used but not otherwise defined in this Disclosure Statement have the meaning ascribed to such terms in the Plan. Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan. **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan, the exhibits and other materials referenced in the Plan, the Plan Supplement, and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement, the Restructuring Support Agreement, and/or the Plan, the Plan shall govern.**

## Sale Transaction

- Sale Process to Maximize Value.  The Special Committee, composed of three independent directors selected by the Debtors and the Committee of Secured Parties, plans to conduct a competitive sale process for substantially all of the Debtors' assets following Confirmation of the Plan, which could extend through, at the latest, August 1, 2015.

- Sale Procedures.  The Plan authorizes the Special Committee, in good-faith consultation with the Committee of Secured Parties Steering Group, to adopt and implement procedures that the Special Committee determines will facilitate the solicitation and evaluation of potential sale proposals without further notice to or approval by the Bankruptcy Court.

- Evaluation of Bids.  Following the sale process and no later than the August 1, 2015 outside date, the Special Committee, in good-faith consultation with and subject to the reasonable consent of the Required Consenting Secured Parties, shall determine whether any asset sale proposals provide greater value to the Debtors and their stakeholders than the Reorganization Transaction.  If the Debtors do not consummate the Sale Transaction following the sale process, the Debtors shall consummate the Reorganization Transaction described below.

- Consummation of the Sale Transaction.  If the Special Committee, in good-faith consultation with and subject to the reasonable consent of the Required Consenting Secured Parties, determines to pursue and implement the Sale Transaction, the Sale Transaction shall be consummated on the Effective Date.  The Majority Secured Parties, however, may elect to pursue the Reorganization Transaction notwithstanding the Special Committee's selection of a successful bid.  Following consummation of the Sale Transaction, the Debtors shall make distributions to Holders of Allowed Claims and Allowed Interests in accordance with the Bankruptcy Code on the Effective Date and the Plan, and the Debtors shall be wound down and dissolved in accordance with applicable law to the extent their Interests are not acquired in connection with the Sale Transaction.

## Reorganization Transaction

- New Financing.  If no Sale Transaction is consummated, the Debtors either shall (a) enter into $2.75 billion in New Loans comprising $2.0 billion in first-lien loans and $750 million in second-lien loans, which debt shall be distributed *pro rata* to the Holders of Allowed Senior Secured Claims, or (b) obtain New Third-Party Financing on terms no less favorable than the New Loans, the cash proceeds of which shall be distributed *pro rata* to the Holders of Allowed Senior Secured Claims.  The Required Consenting Secured Parties shall determine whether the Debtors issue New Loans or obtain New Third-Party Financing.

- Distribution of Reorganized Equity Interests.  The Holders of Allowed Senior Secured Claims shall receive their *pro rata* share of the Senior Secured Party Equity Distribution (comprising 95.75 percent of the New Holdings Interests), Reorganized Statewide shall receive the remaining 4.25 percent of the equity interests in Reorganized Holdings, and the Holders of Allowed Statewide Interests will retain their equity interests in Reorganized Statewide.  Prior to the Effective Date and subject to certain other conditions, the Holders of Allowed Statewide Interests may elect to receive some or all of $80 million in Cash in lieu of some or all of the Statewide Interest Equity Distribution to Reorganized Statewide.[4]  The amount of equity interests to be distributed to the Holders of Allowed Senior Secured Claims and Reorganized Statewide is subject to adjustment if the principal amount of New Loans or the New Third-Party Financing is less than or greater than $2.75 billion.  Additionally, the amount of the equity interests to be distributed to the Holders of Allowed Senior Secured Claims is subject to dilution by an equity award to the equity sponsors described below and increase if the Holders of Allowed Statewide Interests elect to receive cash in lieu of some or all of the Statewide Interest Equity Distribution to Reorganized Statewide, as described above.

- New Manager.  The Debtors' existing equity sponsors shall have the right to operate and manage the Toll Road for an initial term of 10 years in exchange for consideration in the form of either cash reimbursement for the

---

[4]   The mechanics of such election by the Holders of Allowed Statewide Interests are described in greater detail in Section I.A.115 of the Plan.

KE 32728595

cost of services provided or up to three percent of the equity interests in Reorganized Holdings as elected by the equity sponsors, which equity interests shall vest on a straight line and *pro rata* basis over 10 years after the Effective Date, commencing on the Effective Date and ceasing upon termination of the Omnibus Services Agreement pursuant to which the manager shall operate the Toll Road.

- Post-Reorganization Put and Call Rights. In the event of a change of control of, or sale of substantially all of the assets of, the Reorganized Debtors during the 18-month period after consummation of the Plan, the Debtors' existing equity sponsors and/or Reorganized Statewide, as applicable, shall have the right to cause Reorganized Debtors to purchase their share of the New Holdings Interests for their share of $80 million, and Reorganized Holdings shall have the right to purchase the New Holdings Interests held by Reorganized Statewide for $100 million.

Under both the Sale Transaction and the Reorganization Transaction, except as specifically provided in the Plan, all outstanding and undisputed general unsecured claims against the Debtors will be Unimpaired and unaffected by the Restructuring and will be paid in full in cash on the Effective Date of the Plan or in the ordinary course of business when such claims become due and owing.

**The Sale Transaction or the Reorganization Transaction, as applicable, will be consummated pursuant to the Plan.**

The Plan, if confirmed, would effectuate a substantial compromise and settlement of competing claims among the Debtors, their existing equity sponsors, and the Debtors' creditors (including the Senior Secured Parties). If the Plan is confirmed, the ultimate result following the competitive sale process described in this Disclosure Statement would be either the Sale Transaction or the Reorganization Transaction, depending on which transaction the Special Committee determines to be in the best interests of all stakeholders. If the Plan is not confirmed, however, and no other consensual path can be identified, the Debtors are prepared to maximize the value of their business enterprise, including on a nonconsensual basis under section 1129(b) of the Bankruptcy Code if necessary.

The Sale Transaction or the Reorganization Transaction, as applicable, will be consummated pursuant to the Plan. The Debtors and their advisors believe that the Debtors have substantial value—well in excess of the face amount of the New Loans contemplated to be distributed in the potential Reorganization Transaction described herein. It is unclear and unknown whether the sale process described in this Disclosure Statement and adopted by the Special Committee will result in bids reflecting the fair market value of the Debtors. The Special Committee, in good-faith consultation with and subject to the reasonable consent of the Required Consenting Secured Parties, shall determine whether to accept or reject a bid, or instead to pursue the Reorganization Transaction, based in part on whether or not the bids received reflect the fair market value of the Debtors. The Majority Secured Parties, however, may elect to pursue the Reorganization Transaction notwithstanding the Special Committee's selection of a successful bid.

As described below, you are receiving this Disclosure Statement because you are a Holder of a Claim or Interest entitled to vote to accept or reject the Plan. **Prior to voting on the Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure Statement in their entirety. As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. Certain of these risks, uncertainties, and factors are described in Section VII of this Disclosure Statement, entitled "Risk Factors."**

C.      **Summary of Treatment of Claims and Interests and Description of Recoveries under the Plan**.

The Plan organizes the Debtors' creditor and equity constituencies into groups called "Classes." For each Class, the Plan describes: (1) the underlying Claim or Interest; (2) the recovery available to the Holders of Claims or Interests in that Class under the Plan; (3) whether the Class is Impaired or Unimpaired under the Plan; (4) the form of consideration, if any, that such Holders will receive on account of their respective Claims or Interests, and (5) whether each Class is entitled to vote to accept or reject the Plan.

The table below provides a summary of the classification, description, and treatment of Claims and Interests under the Plan. This information is provided in summary form below for illustrative purposes only and is

qualified in its entirety by reference to the provisions of the Plan.  For a more detailed description of the treatment of Claims and Interests under the Plan and the sources of satisfaction for Claims and Interests, see Section IV of this Disclosure Statement, entitled "Summary of the Plan."

| Class | Claims and Interests | Status | Voting Rights | Estimated Amount of Claims[5] | Estimated Recovery Under Plan[6] |
|-------|---------------------|--------|---------------|---------------------------|------------------------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $0 | 100% |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $0 | 100% |
| Class 3 | Senior Secured Claims | Impaired | Entitled to Vote | $6.3 billion | 43.5%–100%[7] |
| Class 4 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $8.0 million | 100% |
| Class 5 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $0 | 0%–100% |
| Class 6 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) | N/A | N/A |
| Class 7 | Statewide Interests | Impaired | Entitled to Vote | N/A | N/A |

**D.        Voting on the Plan**.

Certain procedures will be used to collect and tabulate votes on the Plan (the "**Voting Instructions**"), as set forth on each ballot (a "**Ballot**") or master ballot identifying the votes of Holders of Class 3 Claims (a "**Class 3 Master Ballot**"), as applicable, and as summarized in Section VI of this Disclosure Statement, entitled "Voting Instructions."  Readers should carefully read the Voting Instructions on each Ballot as well as the summary in Section VI.

Only Holders of Senior Secured Claims and Statewide Interests, which are classified in Classes 3 and 7 of the Plan, respectively (together, the "**Voting Classes**"), are entitled to vote on the Plan.  Holders of all other Classes of Claims and Interests are conclusively presumed to accept the Plan because they are Unimpaired.

---

[5]     The estimated amount of the Class 3 Senior Secured Claims includes, for illustrative purposes only, estimated accrued interest as of an assumed Effective Date of September 1, 2015.

[6]     Estimated recoveries are included for illustrative purposes only and assume that the Reorganization Transaction is consummated.  As described in this Disclosure Statement, the Plan also contemplates that the Special Committee will conduct a sale process to solicit bids for a possible Sale Transaction.  Although the amounts of such bids, if any, are not yet known, the mechanics of distributions under a Sale Transaction are described in greater detail in Section IV.C.4 of this Disclosure Statement.

[7]     The low end of the estimated range of recoveries to Holders of Class 3 Senior Secured Claims is based solely on the amount of the New Loans and does not accord any value to the New Holdings Interests.  The value of the New Holdings Interests may be significant.

**The Voting Deadline is 4:00 p.m., prevailing Pacific Time / 6:00 p.m., prevailing Central Time, on September 17, 2014**.  To be counted as votes to accept or reject the Plan, each Ballot must be properly executed, completed, and delivered such that it is **actually received** on or before the Voting Deadline by Kurtzman Carson Consultants LLC (the "**Claims and Balloting Agent**") or the Wilmington Trust, N.A. (the "**Administrative Agent**") as follows:

---

### DELIVERY OF BALLOTS

**IF YOU ARE A HOLDER OF A CLAIM IN CLASS 3, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE ADMINISTRATIVE AGENT BY THE VOTING DEADLINE, WHICH IS 4:00 P.M., PREVAILING PACIFIC TIME / 6:00 P.M., PREVAILING CENTRAL TIME, ON SEPTEMBER 17, 2014,  AS FOLLOWS:**

**IF VIA ELECTRONIC MAIL:**

**jjames@wilmingtontrust.com and rkuhl@wilmingtontrust.com**

**IF VIA FACSIMILE:**

**+1 (612) 217-5651 (Attn.:  Josh James and Renee Kuhl)**

**IF YOU ARE A HOLDER OF AN INTEREST IN CLASS 7, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND BALLOTING AGENT BY THE VOTING DEADLINE, WHICH IS 4:00 P.M., PREVAILING PACIFIC TIME / 6:00 P.M., PREVAILING CENTRAL TIME, ON SEPTEMBER 17, 2014,  AT THE FOLLOWING ELECTRONIC MAIL ADDRESS:**

**ITRinfo@kccllc.com**

**IF YOU ARE THE ADMINISTRATIVE AGENT, YOUR CLASS 3 MASTER BALLOT MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND BALLOTING AGENT BY 4:00 P.M., PREVAILING PACIFIC TIME / 6:00 P.M., PREVAILING CENTRAL TIME, ON SEPTEMBER 19, 2014,  AT THE FOLLOWING ELECTRONIC MAIL ADDRESS:**

**ITRinfo@kccllc.com**

**If you have any questions on the procedure for voting on the Plan, please call the Debtors' restructuring hotline at:**

**(877) 634-7181 (if calling from the United States or Canada), or
+1 (424) 236-7226 (if calling from outside the United States or Canada)**

---

**PLEASE CONTACT THE CLAIMS AND BALLOTING AGENT REGARDING ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS.  IF YOU ARE THE HOLDER OF A CLAIM IN CLASS 3, YOU MAY ALSO CONTACT THE ADMINISTRATIVE AGENT (AT THE ELECTRONIC MAIL ADDRESSES PROVIDED ABOVE) REGARDING ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS**

**SUBJECT TO THE REASONABLE CONSENT OF THE REQUIRED CONSENTING SECURED PARTIES, ANY BALLOT RECEIVED AFTER THE VOTING DEADLINES DETAILED HEREIN WILL NOT BE COUNTED EXCEPT IN THE DEBTORS' DISCRETION**

**ANY BALLOT RECEIVED BY THE APPLICABLE VOTING DEADLINE BUT OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT IN THE DEBTORS' SOLE DISCRETION**

---

KE 32728595

E.      **Confirmation and Consummation of the Plan**.

Under section 1128(a) of the Bankruptcy Code, a bankruptcy court, after notice, may hold a hearing to confirm a plan of reorganization. If the Debtors file the Chapter 11 Cases, they intend to file a motion on the Petition Date requesting that the Bankruptcy Court set a date and time as soon as is reasonably practicable after the Petition Date for the Bankruptcy Court to determine whether the Disclosure Statement complies with section 1126(b) of the Bankruptcy Code (including whether the Disclosure Statement contains adequate information as defined in section 1125(a) of the Bankruptcy Code) and whether the Plan should be Confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed (such hearing, the "**Combined Hearing**"), as permitted by section 105(d)(2)(B)(2)(v) of the Bankruptcy Code. The Combined Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Combined Hearing, may put in place additional procedures governing the Combined Hearing. Subject to section 1127 of the Bankruptcy Code and the Restructuring Support Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Combined Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for the Combined Hearing, intend to request that the Bankruptcy Court set a date and time for parties in interest to file objections to the adequacy of the Disclosure Statement, the Debtors' prepetition solicitation of acceptances in support of the Plan, and Confirmation of the Plan. All such objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received on or before the deadline to file such objections.

1.      *Combined Hearing*.

At the Combined Hearing, the Bankruptcy Court will determine whether the Disclosure Statement complies with section 1126(b) of the Bankruptcy Code (including whether the Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code) and whether the Plan should be Confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed. For a more detailed discussion of the Combined Hearing, see Section V of this Disclosure Statement, entitled "Confirmation of the Plan."

2.      *Effect of Confirmation and Consummation of the Plan*.

Following Confirmation, and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan, the Plan will be consummated on the Effective Date. Among other things, on the Effective Date, certain release, injunction, exculpation, and discharge provisions set forth in Article VIII of the Plan will become effective. **As such, it is important to read the provisions contained in Article VIII of the Plan very carefully so that you understand how Confirmation and Consummation—which effectuates such provisions—will affect you and any Claim or Interest with respect to the Debtors so that you cast your vote accordingly. The releases are described in Section IV.F of this Disclosure Statement.**

F.      **Additional Plan-Related Documents**.

1.      *The Plan Supplement*.

The Debtors will file certain documents that provide more details about implementation of the Plan in the Plan Supplement, which will be filed with the Bankruptcy Court no later than five Business Days before the Combined Hearing (or such later date as may be approved by the Bankruptcy Court). The Debtors will serve a notice that will inform all parties that the Plan Supplement was filed, list the information included therein, and explain how copies of the Plan Supplement may be obtained. The Plan Supplement will be subject to the consent of the Required Consenting Secured Parties and the Consenting Interest Holders. Eligible Holders of Claims or Interests entitled to vote to accept or reject the Plan shall not be entitled to change their vote based on the contents of the Plan Supplement after the Voting Deadline. The Plan Supplement will include:

- the form of the New Organizational Documents (to the extent not attached to the Plan);

- to the extent identified, a list of retained Causes of Action;

- the form of the New Debt Documents;

- to the extent known, the identity of the directors, managers, officers, and other management for the Reorganized Debtors;

- the form of the Omnibus Services Agreement;

- the form of the New Holdings Interests;

- to the extent available, the form of any Sale Transaction Documents distributed by the Special Committee to potentially interested parties;

- to the extent available, the form of the New Third-Party Financing Documents;

- the New Security Documents;

- the Confirmation Order Findings of Fact and Conclusions of Law; and

- the Reorganization Transaction Steps Memorandum.

**2.      *The Sale Transaction*.**

As noted above, the Plan contemplates that the Special Committee will conduct a sale process under which a potentially interested party may purchase substantially all of the Debtors' assets in the Sale Transaction. The Debtors may file a modified Plan in accordance with the terms of the Sale Transaction. Because such modified Plan will not impair the treatment of Claims against or Interests in the Debtors relative to the treatment of such Claims and Interests contemplated under the Reorganization Transaction contained in the current Plan, the Debtors do not believe that they will be required to make additional disclosures or resolicit votes for such modified Plan under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

**3.      *The Initial Board*.**

As noted above, the identity of the initial directors or managers for the Reorganized Debtors shall be determined in a manner set forth in the Reorganized Holdings LLC Agreement. The initial board of Reorganized Holdings shall consist of six directors selected by the Committee of Secured Parties with the consent of the Required Consenting Secured Parties, as well as one director selected by such six directors, in a manner consistent with the New Organizational Documents. The term of any current members of the board of managers shall expire on the Effective Date.

> ***THE FOREGOING EXECUTIVE SUMMARY IS ONLY A GENERAL OVERVIEW
> OF THIS DISCLOSURE STATEMENT AND THE MATERIAL TERMS OF, AND
> TRANSACTIONS PROPOSED BY, THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY
> BY REFERENCE TO, AND SHOULD BE READ IN CONJUNCTION WITH, THE MORE
> DETAILED DISCUSSIONS APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT
> AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN.***

KE 32728595

## II.    Debtors' Business Operations and Capital Structure

**A.    The Debtors' Prepetition Corporate Structure.**

The Concessionaire was formed in January 2006 in connection with the Debtors' entry into the Concession Agreement and their assumption of control over the Toll Road.  The Concessionaire is a wholly owned subsidiary of Holdings, which is, in turn, a wholly owned subsidiary of Statewide.  Each Debtor is a limited liability company formed under the laws of Delaware.  A diagram illustrating the current corporate structure of the Debtors is attached hereto as **Exhibit B**.

The Debtors are indirectly owned by affiliates of Cintra Infraestructuras, S.A. ("**Cintra**") and Macquarie Atlas Roads and Macquarie Infrastructure Partners (collectively, "**Macquarie**," and together with Cintra, the "**Equity Sponsors**").  The Equity Sponsors are among the world's leading developers and operators of critical public infrastructure assets.  Based in Madrid, Spain, Cintra is one of the largest private developers of transportation infrastructure assets in the world and holds interests in numerous critical real estate and public infrastructure assets, including over 1,340 miles of highways in the United States, Canada, Spain, Greece, Ireland, the United Kingdom, and Portugal.  Together with various partners, Macquarie, which is based in Sydney, holds interests in and/or operates multiple notable public infrastructure assets such as: (a) the Dulles Greenway, a toll road that links Leesburg, Virginia, and Washington, D.C.; (b) the Warnow Tunnel, a two-kilometer toll road located in Rostock, Germany; (c) the M6 toll road in the United Kingdom; and (d) the APRR motorway network in France.  Cintra and Macquarie also own interests in and operate the Chicago Skyway Toll Bridge, which, as described below, engages in intercompany cost-savings measures with the Debtors.

**B.    The Debtors' Entry into the Concession Agreement.**

**1.    *History of the Private Toll Road Business.***

Over the past 40 years, governments in various countries, including Australia, Canada, Ireland, Portugal, Spain, the United Kingdom, and the United States, faced with fiscal pressures and growing needs for new public infrastructure assets, have privatized the operation of existing toll roads and the right to develop new toll roads.  Privatization of critical infrastructure assets results in the transfer of certain risks and costs from governments to the private sector, including development risk, construction delay and cost overrun risks, reduced traffic usage, increased maintenance costs, and risks arising from regulations and taxes.  In exchange, private firms receive the right to capture the economic upside from operating, maintaining, collecting tolls on, and, in some cases, constructing, toll road assets.

**2.    *The Major Moves Initiative and the Debtors' Entry into the Concession Agreement.***

In 2005, faced with a multibillion-dollar gap between statewide transportation project needs and projected revenues and the significant financial costs to maintain the Toll Road, former Indiana Governor Mitch Daniels launched the Major Moves initiative, which tasked the IFA with exploring the feasibility of leasing the Toll Road.[8] Thereafter, the IFA engaged various advisors to prepare traffic and revenue forecasts and an investment banker, Goldman Sachs & Co., to provide financial advice and solicit bids from potentially interested parties.

In connection with these efforts, on September 28, 2005, the IFA released its *Request for Toll Road Concessionaire Proposals*, pursuant to which the IFA proposed to auction the right to operate and collect toll revenues on the Toll Road.  Four entities, including the Debtors, submitted proposals by the October 26, 2005, bid deadline.  Following the competitive bidding process, the IFA selected the Debtors' $3.8 billion bid to manage the Toll Road for an initial term of 75 years as the highest and best bid received.  The Debtors' bid was contingent on, among other things, the passage of appropriate authorizing legislation, which former Governor Daniels signed into

---

[8]    The Major Moves initiative also proposed to auction the right to develop, manage, and collect toll revenues on the proposed Southern Indiana Toll Road.  Due to a lack of interest from potential developers, however, the State of Indiana subsequently determined to abandon plans for the Southern Indiana Toll Road and to instead develop a toll-free expressway along Indiana State Route 69, which extends from Indianapolis to Evansville.

KE 32728595

law on March 22, 2006.  On April 26, 2006, the Debtors and the IFA executed the Concession Agreement, pursuant to which the Debtors acquired the exclusive right to operate, repair, and collect tolls on the Toll Road through 2081.

## C.    The Debtors' Operations.

### 1.    *The Debtors' Operation of the Toll Road*.

The Debtors formally assumed operational responsibility for the Toll Road on June 29, 2006.  Pursuant to the Concession Agreement, the Debtors have the exclusive right to establish and collect tolls on the Toll Road through 2081.  The Debtors have established appropriate toll levels to satisfy operational and maintenance costs over the 75-year term of the Concession Agreement.  Toll amounts vary based on, among other factors, how far and in which direction a vehicle is travelling, the vehicle's number of axles, and whether the toll is paid in cash or electronically.

In 2013, the Toll Road generated toll receipts of approximately $206 million, of which approximately 73 percent, or approximately $151 million, were paid electronically through the interoperability system managed by the E-ZPass Interagency Group ("**E-ZPass**").  The E-ZPass system consists of a small electronic device that is mounted on a vehicle's windshield.  Transponders work together with electronic readers installed at certain points along the Toll Road.  When travelling in an E-ZPass-equipped lane, an overhead antenna and a lane level reader detect the data stored in the E-ZPass transponder and the toll is automatically deducted from the account owner's prepaid E-ZPass account or documented in a customer's postpaid account.[9]  E-ZPass transponders also can be used on other toll roads managed by toll road operators that are parties to E-ZPass interoperability agreements.  E-ZPass is the largest interoperability network in the world, with over 23 million members and generating over $6 billion in toll receipts in 2013 alone.

Since Debtors assumed control over the Toll Road, the Debtors have distributed more than 238,000 E-ZPass transponders to their customers.[10]  Upon opening a customer's E-ZPass account, the Debtors charge or debit a customer's credit or debit card, as applicable, as a prepayment of tolls.  The Debtors deduct toll charges as the customer uses the Toll Road.  Once the prepaid balance dips below a minimum threshold, the account is replenished automatically with cash debited from the customer's credit or debit card.

### 2.    *The Debtors' Capital Expenditure Program*.

The Debtors have made substantial investments in the Toll Road since their assumption of control over the Toll Road.  From 2006 through 2081, the Debtors have committed to invest approximately $4 billion in improvements to the Toll Road.  The Debtors already have invested approximately $458 million in capital expenditures to improve the Toll Road, including:

- approximately $250 million to expand the Toll Road to relieve traffic and construct a third lane in certain high-traffic segments;

---

[9]    Approximately 400 significant commercial and governmental Toll Road customers participate in a post-payment program.  This program enables participating customers, which typically are government agencies or engaged in the freight, manufacturing, food and beverage, and fuel industries, to utilize their Debtor-issued E-ZPass electronic transponders to make toll payments in arrears based on the amount of actual usage during predefined usage periods.  To participate in the post-payment program, participants must post cash collateral or a surety bond to secure their obligations to the Debtors.  In 2013, participating customers paid approximately $3.9 million to the Debtors pursuant to the post-payment program.

[10]    Between 2007 and 2012, the Debtors administered an electronic transponder system known as "iZoom."  iZoom electronic transponders utilized E-ZPass interoperability technology; however, the iZoom program was targeted exclusively at Indiana residents.  In 2012, the Debtors suspended the iZoom program and now exclusively provide E-ZPass-branded electronic transponders to their customers.  Each iZoom and E-ZPass electronic transponder is fully interoperable on infrastructure assets operated by other toll road operators that utilize E-ZPass.

- approximately $74 million to fund resurfacing projects designed to maintain the Toll Road for years to come;

- approximately $40 million to expand the E-ZPass transponder system and existing cash-pay tolling system;

- approximately $39 million in capital improvements to repair and rehabilitate certain outdated bridges and other structures on the Toll Road;

- approximately $9 million to expand the Westpoint, Portage, and Eastpoint toll plazas;

- approximately $5 million to construct an Indiana State Police post that serves as the hub for a multi-agency public safety facility; and

- approximately $3.5 million to construct state-of-the-art salt storage facilities located near the Toll Road and related critical maintenance facilities.

In addition, the Debtors have made substantial investments in services that benefit the Toll Road as well as nearby communities.  More specifically, since 2006, the Debtors have purchased more than $7 million in new snowplows and maintenance vehicles to replace the Debtors' aging fleet of snowplows and maintenance vehicles.  In addition, the Debtors are slated to pay in excess of $150,000 per year for the foreseeable future in license plate renewal fees and wheel taxes that state and local governments otherwise would not have collected under the Indiana Department of Transportation's management.  Finally, each year, the Debtors pay approximately $7 million to the Indiana State Police to patrol and maintain the Toll Road to ensure public safety and minimize the risk of accidents.

### 3.    *The Debtors' Employees*.

The Debtors employ approximately 283 employees; 223 full time and 60 part time.  Approximately 34 employees are salaried; approximately 249 employees are paid on an hourly basis.  In addition, and as discussed below, the Debtors complement their dedicated employee workforce with: one Cintra employee temporarily assigned, or "seconded," to the Debtors; approximately twelve employees from their non-Debtor affiliate, the Skyway Concessionaire (as defined below); and approximately thirty temporary employees through a third-party staffing agency.[11]

The Debtors' employees perform a variety of critical functions, including management, engineering, accounting, business administration, finance, human resources, information technology, marketing, facilities maintenance, security, and other key functions, and they are essential to the preservation of value and the administration of the Debtors' estates during the Debtors' ongoing restructuring process.

### 4.    *The Toll Road's Relationship with the Equity Sponsors and the Chicago Skyway*.

A key component of the Debtors' operations is the financial, operational, and managerial support that the Equity Sponsors and the Debtors' non-Debtor affiliate, Skyway Concession Company LLC (the "**Skyway Concessionaire**"), historically have provided to the Debtors.  Specifically, the Debtors and the Skyway Concessionaire, the operator of the Chicago Skyway Toll Bridge, a neighboring toll road that is linked to the Toll Road and that serves as the source of a significant amount of eastbound traffic from Illinois on the Toll Road, are parties to various cost-sharing and related intercompany agreements pursuant to which the Debtors have been able to take advantage of operational synergies.  In addition, Cintra periodically seconds its personnel to the Debtors.  Finally, the Equity Sponsors, which own and operate infrastructure concessions across the globe, regularly advise the Debtors on their operations and utilize the Equity Sponsors' institutional relationships with financial institutions, vendors, and other contract counterparties.  As a result of these synergies and other factors, the Debtors have to date successfully operated the Toll Road at 27 percent lower costs than the prior operator.  The support

---

[11]    Approximately 44 percent of the Debtors' employees are represented by labor unions that are parties to collective bargaining agreements with the Concessionaire.

KE 32728595

provided to the Debtors by the Equity Sponsors and the Skyway Concessionaire generates substantial value for the Debtors and their stakeholders.

(a)     **The Skyway Toll Collection Agreement**.

Pursuant to that certain Electronic Toll Collection Agreement, effective as of June 10, 2008 (as amended, modified, or supplemented from time to time, the "**Skyway Toll Collection Agreement**"), between the Concessionaire and the Skyway Concessionaire, the Debtors process E-ZPass payments on behalf of the Skyway Concessionaire in exchange for a service fee.  The Skyway Toll Collection Agreement ensures that any customers with an E-ZPass transponder can access the Chicago Skyway Toll Bridge and pay with their transponder, which relies exclusively on the Skyway Toll Collection Agreement to process E-ZPass toll payments.  This inures to the benefit of the Debtors and their stakeholders because the Chicago Skyway Toll Bridge is the origination point for significant eastbound Toll Road traffic from Illinois.  As of the Petition Date, the Debtors transfer approximately $5 million each month to the Skyway Concessionaire on account of electronic toll payments processed by the Debtors on behalf of the Skyway Concessionaire in accordance with the terms of the Skyway Toll Collection Agreement.

(b)     **The Cost Sharing and Secondment Arrangements**.

The Debtors supplement their workforce with certain individuals that are seconded to the Debtors by Cintra or whose salaries are split on a *pro rata* basis among the Debtors and the Skyway Concessionaire.  More specifically, one individual, the Debtors' chief operating officer (the "**COO**"), is seconded to the Debtors pursuant to that certain secondment arrangement between the Debtors and Cintra.  Pursuant to the terms of the chief operating officer's secondment arrangement, the Debtors reimburse Cintra for the COO's salary and also provide the COO with a local salary to cover the expenses of living overseas

In addition, pursuant to the terms of a cost-sharing arrangement, the Concessionaire and the Skyway Concessionaire share office space as well as the services of approximately twenty employees, approximately twelve of which are employed by the Skyway Concessionaire and approximately eight of which are employed by the Debtors.  Under the cost-sharing arrangement, the Debtors typically pay a portion of the costs of maintaining the Debtors' and the Skyway Concessionaire's office as well as each shared employee's salary and annual incentive compensation, if any.  From time to time, the Debtors and the Skyway Concessionaire also incur on behalf of each other joint expenses and provide each other with miscellaneous goods and services.  The costs of such miscellaneous goods and services and the amounts of such expenses are generally shared among the Debtors and the Skyway Concessionaire on a *pro rata* basis.  Net of amounts owed to the Debtors by the Skyway Concessionaire, the Debtors have historically paid the Skyway Concessionaire approximately $78,000 each month on account of their cost-sharing structure.

(c)     **The Equity Sponsors' Other Support to the Debtors**.

In addition to the foregoing, the Equity Sponsors provide various forms of ad hoc operational and managerial support to the Debtors.  For example, the Equity Sponsors allow the Debtors to participate in group insurance policies that the Equity Sponsors obtain for certain of their affiliates, allowing the Debtors obtain certain types of insurance at a discount.  In addition, Cintra and Macquarie and their respective personnel (including their respective representatives on the Statewide board of directors) regularly advise the Debtors and the Debtors' management regarding Toll Road operations and harness the Equity Sponsors' extensive institutional knowledge and existing relationships with vendors, financial institutions, and other critical contract counterparties on behalf of the Debtors.  As a result, the Debtors are able to generate substantial value for their stakeholders in the form of reduced operating costs and greater Toll Road revenues.

**D.     The Debtors' Prepetition Capital Structure**.

The Debtors have outstanding funded debt of approximately $6.0 billion in principal amount comprised of approximately $3.86 billion in first-priority syndicated bank debt obligations under the Loan Agreement and approximately $2.15 billion in *pari passu* first-lien obligations under the Hedging Agreements.

1.      *The Loans*.

As of June 26, 2006, the Concessionaire, the Administrative Agent, and the Lenders entered into the Loan Agreement.  Pursuant to the Loan Agreement, the Concessionaire became the obligor with respect to three tranches of debt:  (a) a $3.25 billion acquisition facility, due June 29, 2015 (the "**Series A Facility**"); (b) a $150 million liquidity facility, due June 15, 2015, to fund certain early period interest payments (the "**Series B Facility**"); and (c) a $665 million liquidity facility to fund certain capital improvements required under the Concession Agreement (the "**Series C Facility**," and, collectively with the Series A Facility and the Series B Facility, the "**Loans**").  The Administrative Agent syndicated interests in the Loans to the Lenders, each of which is a lender of record under the Loan Agreement.  The outstanding principal amount of the Loans is approximately $3.86 billion and the interest rate per annum is equal to LIBOR plus 1.25 percent.

The Debtors have no additional borrowing capacity under the Series A Facility or the Series B Facility.  The Debtors' remaining $67 million in borrowing capacity under the Series C Facility was terminated as of July 25, 2014.

2.      *The Swaps*.

To hedge the interest rate risk associated with the floating interest rates on the Loans and as required under the Loan Agreement, the Concessionaire and the Hedging Parties entered into the Hedging Agreements.  Pursuant to the Hedging Agreements, the Concessionaire entered into interest rate swaps (the "**Swaps**").  Under the Swaps, the Concessionaire agreed to pay the Hedging Parties a fixed rate of interest in exchange for receiving from such Hedging Parties a floating interest rate.  At their inception, the Swaps were "at the money," meaning that the total value of the fixed interest payments to be paid by the Concessionaire to the applicable Hedging Party was essentially equal to the expected total value of the floating interest payments to be paid by the Hedging Party to the Concessionaire.  As interest rates precipitously declined to historic lows following the Debtors' entry into the Loan Agreement, however, the Swaps have turned into a net liability of the Debtors valued at approximately $2.15 billion.  This liability became due and payable following the early termination of the Swaps due to the Debtors' failure to make an interest payment of approximately $102 million that became payable on June 30, 2014.[12]

3.      *Collateral Arrangements*.

In connection with the Debtors' entry into the Loan Agreement, certain Debtors entered into various collateral arrangements, including the Collateral Agency Agreement, Security Agreement, and Pledge Agreement, as each is defined and described in greater detail below.

(a)      **The Collateral Agreement**.

Pursuant to the Collateral Agreement between the Concessionaire, the Administrative Agent, and the Collateral Agent, the Concessionaire agreed to maintain certain bank accounts from which the Collateral Agent may make withdrawals, transfers, and payments from revenues from the Concessionaire's business operations and borrowings under the Loan Agreement to make payments of payable operating, debt service, and capital expenditure obligations.

(b)      **The Security Agreement**.

As of June 26, 2006, the Concessionaire entered into that certain Security Agreement (as amended, modified, or supplemented from time to time, the "**Security Agreement**"), with the Collateral Agent, pursuant to which the Concessionaire pledged all of its interests under the Concession Agreement and interests and rights otherwise related to the Toll Road to the Collateral Agent as collateral for its secured obligations under the Loan Agreement, including the Loans and the Swaps.

---

[12]     There is significant overlap between the Lenders and the Hedging Parties, which, as noted above, share collateral and are *pari passu*.

KE 32728595

        (c)      **The Pledge Agreement**.

Finally, Holdings entered into that certain Pledge Agreement, dated as of June 26, 2006 (as amended, modified, or supplemented from time to time, the "**Pledge Agreement**"), with the Collateral Agent, pursuant to which Holdings pledged to the Collateral Agent, in support of the Concessionaire's secured obligations with respect to the Loans and Swaps, all of Holdings' membership interests in the Concessionaire, any indebtedness owed to Holdings owed the Concessionaire, and all proceeds, products, and accession of and to any and all of the foregoing.

**III.    Events Leading to the Debtors' Financial Difficulties and Commencement of the Chapter 11 Cases**

**A.    The Global Recession Arises Shortly after the Debtors Enter Into the Concession Agreement**.

As discussed above, the Debtors assumed control of the Toll Road shortly before the collapse of the capital markets in 2007.  The resulting global economic recession fundamentally affected interstate trucking activity, tourism, and economic development.  More specifically, interstate trucking activity declined by 6.1 percent between 2007 and 2008 and a further 14.6 percent between 2008 and 2009.  The national economic decline, in turn, had a cascade effect, dragging down economic growth in the State of Indiana by 6.01 percent and the neighboring Chicago, Illinois region by 4.12 percent between 2008 and 2009.  These national and regional economic forces, in turn, reduced overall traffic on the Toll Road, which declined by more than 10.5 percent between 2007 and 2013, negatively affecting the Debtors' cash flows and forcing the Debtors to commit a greater share of their operating income to honor their financing obligations.

The steady-but-slow recovery of Toll Road traffic has affected the Debtors' ability to satisfy their financial obligations on a go-forward basis.  For example, during 2013, the Debtors paid approximately $193 million in debt servicing obligations, while generating approximately $158 million in EBITDA.[13]  The Debtors' 2014 debt service obligations also are projected to exceed the Debtors' EBITDA and, without any remaining availability under the Series B Facility, the Debtors lacked sufficient liquidity to make the required payments under the Loans and Swaps at the end of June 2014.

In addition to the global economic recession's effect on traffic on the Toll Road, the actions undertaken by the United States government in response thereto drove interest rates down to historic lows, creating a substantial net obligation under the Swaps and leaving the Debtors with a substantially greater debt burden than anticipated.

**B.    The Debtors' Negotiations with Cintra, Macquarie, the Steering Committee, and the Committee of Secured Parties**.

Recognizing that their current and projected debt service profiles were not sustainable given the weakened business performance brought on by the global economic recession, the Debtors determined that a restructuring of their balance sheet was necessary to ensure that the Debtors could satisfy their financial obligations going forward.

Accordingly, the Debtors retained Kirkland & Ellis LLP as legal counsel and Moelis & Co. LLC ("**Moelis**") and Morgan Stanley & Co. LLC as financial co-advisors to assess potential restructuring alternatives, including a potential chapter 11 filing.  Throughout 2013, the Debtors engaged in discussions with a steering committee of comprising certain Lenders and Hedging Parties (the "**Steering Committee**") regarding a potential consensual resolution.  These discussions culminated in an agreement in principle among the Debtors, the Equity Sponsors, and the Steering Committee in December 2013 regarding the terms of a balance sheet restructuring.  The parties agreed to negotiate and document the final terms of the proposed restructuring in early 2014.  This agreement in principle cleared the way for the Debtors to make approximately $104.5 million in debt service payments on December 30, 2013, that, if not made, would have enabled the Debtors' creditors and to exercise remedies against the Debtors' assets, to the detriment of the Debtors' stakeholders.

In early 2014, the Debtors, the Equity Sponsors, and the Steering Committee finalized the terms of their restructuring proposal.  Thereafter, the parties began to seek support for a comprehensive restructuring proposal to

---

[13]   The Debtors funded the shortfall through draws on the Series B Facility which was exhausted in December 2013.

be implemented through a prepackaged chapter 11 process from other lenders and swap counterparties, a group primarily comprised of financial institutions based in Spain, Italy, the United Kingdom, Germany, Greece, and Portugal that regularly invest in long-term infrastructure assets such as toll road concessions. The parties' efforts to solicit support for the proposal included convening back-to-back in-person lender meetings in Madrid, Spain and New York, New York, engaging in extensive telephonic and in person discussions with the Debtors' lenders and their respective advisors, and providing additional diligence information to potentially interested parties. And, in an effort to garner additional support for the proposal, the Debtors, in consultation with their advisors and potentially interested parties, assessed potential modifications to the proposal.

Unfortunately, the Steering Committee's proposal did not achieve sufficient creditor support. Specifically, regulatory changes negatively affected the level of support for the proposed transaction. Numerous lenders and swap counterparties (including multiple Steering Committee members) entered into participation agreements with members of the Committee of Secured Parties that favored alternative restructuring strategies, including a potential liquidation of substantially all of the Debtors' assets.

In an effort to forge a consensual resolution, the Debtors, the Equity Sponsors, and the Committee of Secured Parties engaged in discussions regarding potential reorganization and sale alternatives. These extensive, arm's-length discussions, which occurred over several months and resulted in the parties exchanging multiple proposals, were productive and paved the way for a 90-day forbearance following the Debtors' failure to make an interest payment of approximately $102 million that became payable on June 30, 2014. The Debtors, the Equity Sponsors, and the Committee of Secured Parties utilized the forbearance period to finalize the terms of the global settlement memorialized in the Restructuring Support Agreement, which describes the restructuring transactions that will be consummated if the Plan is confirmed.

**C.    The Restructuring Support Agreement.**

On September 4, 2014, the Initial Consenting Secured Parties, the Debtors, Cintra, and Macquarie entered into the Restructuring Support Agreement, a copy of which is attached hereto as **Exhibit F**. The Restructuring Support Agreement serves as the foundation for the Debtors' proposed restructuring. Specifically, the Restructuring Support Agreement provides for the two alternative transactions memorialized in the Plan: the Sale Transaction and the Reorganization Transaction. Pursuant to the Restructuring Support Agreement, the parties thereto agreed, subject to certain terms and conditions, to pursue or support, as applicable, the Plan, the transactions contemplated therein, and certain related relief in the Chapter 11 Cases. As described in greater detail in section 10 of the Restructuring Support Agreement, the Restructuring Support Agreement may be terminated by the parties thereto under certain conditions, including the Debtors' failure to achieve certain milestones in the Chapter 11 Cases. The Plan provides that the Debtors will assume the RSA effective as of the Confirmation Date.

**D.    The Debtors' Proposed Disclosure Statement and Solicitation Process.**

Following the execution of the Restructuring Support Agreement, the Debtors commenced a prepackaged solicitation of the Plan beginning on September 11, 2014, by delivering a copy of the Plan and this Disclosure Statement (including Ballots or a Class 3 Master Ballot, as applicable) to the Administrative Agent (for subsequent distribution to Holders of Loan Claims and Hedging Claims) and to Holders of Statewide Interests, Holders of the only Claims or Interests entitled to vote to accept or reject the Plan. The Debtors have established September 17, 2014, at 4:00 p.m., prevailing Pacific Time / 6:00 p.m., prevailing Central Time, as the deadline for the receipt of votes to accept or reject the Plan (the "**Voting Deadline**"). The Company is soliciting the votes of Holders of Class 3 Claims through the Administrative Agent, which will submit the Class 3 Master Ballot identifying the votes of all such Holders. The Class 3 Master Ballot must be returned by the Administrative Agent to the Claims and Balloting Agent at or before 4:00 p.m., prevailing Pacific Time / 6:00 p.m., prevailing Central Time, on September 19, 2014 (the "**Class 3 Master Ballot Deadline**"). The Administrative Agent must receive Ballots completed by all Holders of Class 3 Claims by the Voting Deadline.

The Debtors will seek Bankruptcy Court approval of the Voting Deadline and the Class 3 Master Ballot Deadline at the Combined Hearing. On the Petition Date, the Claims and Balloting Agent will file a voting report (the "**Voting Report**") setting forth the voting results for Class 3 Claims and Class 7 Interests. The Debtors believe that the Voting Report will show that Holders of Claims and Interests entitled to vote have overwhelmingly (or

14

unanimously) voted to accept the Plan. Accordingly, on the Petition Date, the Debtors intend to file the Plan, this Disclosure Statement, and a motion to approve the Solicitation Procedures and schedule the Combined Hearing to consider approval of this Disclosure Statement and Confirmation of the Plan. The following table sets forth the timetable for the solicitation process and the anticipated Chapter 11 Cases, for which the Debtors will seek the Court's approval at the Combined Hearing.

| Proposed Solicitation and Confirmation Timeline | |
| --- | --- |
| Voting Record Date | September 10, 2014 |
| Start of Solicitation | September 11, 2014 |
| Voting Deadline | September 17, 2014, at 4:00 p.m., prevailing Pacific Time / 6:00 p.m., prevailing Central Time |
| Class 3 Master Ballot Deadline | September 19, 2014, at 4:00 p.m., prevailing Pacific Time / 6:00 p.m., prevailing Central Time |
| Anticipated Petition Date | September 22, 2014 |
| Distribution of Combined Hearing Notice | No later than two Business Days after entry of the order scheduling the Combined Hearing |
| Plan Supplement | No later than five days prior to the Combined Hearing |
| Objection Deadline | October 2, 2014, at 4:00 p.m., prevailing Central Time, or such other date as the Bankruptcy Court may direct |
| Deadline to File Reply Brief | The date that is two Business Days before the Combined Hearing |
| Combined Hearing | October 9, 2014, prevailing Central Time, or such date as the Court may direct |

E.      **The Debtors' First-Day Motions and Certain Related Relief**.

To minimize disruption to the Debtors' operations and effectuate the terms of the Plan, upon the commencement of the Chapter 11 Cases, the Debtors intend to file motions seeking various relief, including authority to: (1) use cash collateral and declaring the Holders of Senior Secured Claims adequately protected; (2) continue utilizing the Debtors' prepetition cash management system; (3) pay general unsecured claims in the ordinary course of business; (4) honor prepetition obligations related to their customer programs that come due and owing following the Petition Date and continue the customer programs in the ordinary course of business; (5) pay prepetition wages and certain administrative costs related to those wages; (6) pay certain taxes and fees that accrued or arose in the ordinary course of business before the Petition Date; (7) continue to perform under that certain agreement between the Debtors and the Skyway Concessionaire pursuant to which the Debtors perform certain administrative functions on behalf of the Skyway Concessionaire related to the Chicago Skyway Bridge in Chicago, Illinois; and (8) (a) approve the Debtors' proposed adequate assurance of payment for future service to the utility providers and procedures governing any requests for additional or different adequate treatment, (b) prohibit the utility providers from altering, refusing, or discontinuing utility services on account of any unpaid prepetition charges, and (c) approve an adequate assurance deposit in an amount that represents approximately two weeks of accounts payable on account of utilities services. All of the relief requested by the first-day relief and throughout the Chapter 11 Cases will be subject to any orders regarding the Debtors' use of cash collateral. Additionally, the Debtors intend to file a motion seeking entry of an order: (1) scheduling the Combined Hearing and approving the form of notices and procedures related thereto; (2) establishing the deadline for objections to the adequacy of the Disclosure Statement and Confirmation of the Plan and related procedures; (3) approving the procedures used in the Debtors' prepetition solicitation; (4) approving the form and manner of notice to Holders of Cure Claims; and (5) directing the U.S. Trustee not to schedule a meeting of creditors under section 341 of the Bankruptcy Code.

Finally, on the Petition Date, the Debtors intend to file a motion seeking to establish a bar date by which a Holder that individually holds a General Unsecured Claim against one or more of the Debtors arising out of a single transaction or occurrence equal to or greater than $25,000,000.00 must file a Proof of Claim (the "**Bar Date**").  The Debtors intend to seek an order setting the Bar Date after the Combined Hearing.  In connection therewith, on the Petition Date the Debtors also intend to file a motion extending the deadline by which the Debtors must file their schedules of assets and liabilities and statements of financial affairs to a date that is 45 days after the Petition Date and seeking to waive that requirement if a Plan is confirmed prior thereto.  On the Petition Date, the Debtors intend to file a Schedule F listing all General Unsecured Claims equal to or greater than $25,000,000.00 in amount.

**F.      Other Requested First-Day Relief and Retention Applications**.

In addition, the Debtors intend to file motions and/or applications seeking certain customary relief, including:  (a) an order directing the joint administration of the three Chapter 11 Cases under a single docket, and (b) orders approving the retention of the Debtors' bankruptcy advisors, including Kirkland & Ellis LLP as legal counsel, Moelis as financial co-advisor, UBS Securities, LLC as financial co-advisor, and Kurtzman Carson Consultants LLC as claims and balloting agent.

**G.      Interaction with the IFA**.

The Debtors and Committee of Secured Parties and/or their respective advisors have closely consulted with the IFA and/or its advisors with respect to the continuing operations of the Toll Road and the reorganization process. The Debtors and Committee of Secured Parties have shared drafts of material documents, held numerous update calls, provided access to UBS Securities, LLC, the proposed financial advisor to the Special Committee, and provided other relevant information with and to the IFA and its advisors.  Under the Concession Agreement, under certain circumstances, such as a change in control or replacement of the operator, the IFA is provided with certain approval rights.  The Debtors anticipate that any prospective purchaser in connection with a Sale Transaction will be able to meet the standards to obtain the IFA's approval, in accordance with the Concession Agreement. Nonetheless, there can be no assurances that the IFA will agree that a prospective purchaser will meet such standards.  Accordingly, the Debtors and the Committee of Secured Parties expect that the IFA will play an important role in the ultimate consummation of the Plan and look forward to maintaining a constructive dialogue with the IFA and its advisors.  Nothing in the Plan is intended to impair or alter the IFA's rights under the Concession Agreement, and all such rights are fully preserved.  To the extent necessary, the Debtors intend to include language in the Confirmation Order that confirms the IFA's rights under the Concession Agreement.

KE 32728595

## IV.    Summary of the Plan

> SECTION IV OF THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS TO THE PLAN.   ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL RELATED TERMS AND PROVISIONS, AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.  THE PLAN ITSELF (INCLUDING ATTACHMENTS) AND THE PLAN SUPPLEMENT WILL CONTROL THE TREATMENT OF HOLDERS OF CLAIMS AND INTERESTS UNDER THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION IV AND THE PLAN (INCLUDING ANY ATTACHMENTS TO THE PLAN) AND THE PLAN SUPPLEMENT, THE PLAN AND PLAN SUPPLEMENT, AS APPLICABLE, SHALL GOVERN.

A.    **Treatment of Unclassified Claims**.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.    *Administrative Claims*.

Unless otherwise agreed to by the holder of an Allowed Administrative Claim, the Debtors or Reorganized Holdings, as applicable, subject to the reasonable consent of the Required Consenting Secured Parties and the Consenting Interest Holders, such consent not to be unreasonably withheld, each holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either:  (1) on the Effective Date, or as soon as practicable thereafter, (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter, or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the holders of such Allowed Administrative Claims.

2.    *Professional Compensation*.

(a)    **Professional Fee Account**.

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish the Professional Fee Account.  The Debtors shall fund the Professional Fee Account with Cash equal to the Professional Fee Amount.  The Professional Fee Account shall be funded on the Effective Date and maintained in trust for the Professionals and shall not be considered property of the Debtors' Estates or the Reorganized Debtors, as applicable; *provided*, *however*, that Reorganized Holdings shall have a reversionary interest in the excess, if any, of the amount of the Professional Fee Account over the aggregate Allowed Accrued Professional Compensation Claims to be paid from the Professional Fee Account.

(b)    **Final Fee Applications and Payment of Accrued Professional Compensation Claims**.

All final requests for payment of Accrued Professional Compensation Claims incurred during the period from Petition Date through the Confirmation Date, shall be Filed no later than 45 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be

determined by the Bankruptcy Court.  The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Account when such Claims are Allowed by a Final Order.  To the extent that funds held in the Professional Fee Account are unable to satisfy the amount of Accrued Professional Compensation Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II of the Plan.  After all Accrued Professional Compensation Claims have been paid in full, the Final Order allowing such Accrued Professional Compensation Claims shall direct the escrow agent to return any excess amounts to Reorganized Holdings.

(c)        **Estimation of Fees and Expenses**.

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals shall estimate their Accrued Professional Compensation Claims through and including the Confirmation Date and shall deliver such estimate to the Debtors by a date in advance of the Effective Date; *provided* that such estimate shall not be considered an admission or a cap with respect to the fees and expenses of such Professionals and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated shall comprise the Professional Fee Amount.

(d)        **Post-Confirmation Fees and Expenses**.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or Reorganized Holdings, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors or Reorganized Holdings, as applicable.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking compensation for services rendered after such date shall terminate, and the Debtors may pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.  A copy of each invoice submitted by a Professional for post-Confirmation Date fees and expenses shall be delivered to counsel to the Committee of Secured Parties, and such invoices shall include:  (a) the names of the attorneys and other individuals who performed services in the period covered by such invoice and, to the extent that such Professional maintains timekeeping records, the number of hours expended by each individual employed or engaged by such Professional; (b) a summary description of the services provided by individuals employed or engaged by such Professional; *provided* that any such invoice may be redacted to protect privileged, confidential, or proprietary information; and (c) each disbursement and expense incurred by such Professional in connection with services provided during the period covered by such invoice.  The Required Consenting Secured Parties shall have 10 days after receipt of the applicable invoice to submit (to the applicable Professional and the Debtors) a written objection to the reasonableness of the fees and expenses set forth in the applicable invoice.  To the extent that any objection is raised, the Debtors shall pay the undisputed portion, and the parties will work in good faith to resolve the objection.  If no such resolution can be reached, the objection will be resolved by the Bankruptcy Court.

3.        *Priority Tax Claims*.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

B.        **Classification and Treatment of Claims and Interests**.

1.        *Classification of Claims and Interests*.

Claims and Interests, except for Administrative Claims, Priority Tax Claims, and Accrued Professional Compensation Claims, are classified in the Classes set forth in Article III of the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the

18

description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

(a)    **Class Identification**.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Senior Secured Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 5 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 6 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 7 | Statewide Interests | Impaired | Entitled to Vote |

2.    *Treatment of Claims and Interests*.

(a)    **Class 1—Other Priority Claims**.

(i)    *Classification*:  Class 1 consists of all Other Priority Claims.

(ii)    *Treatment*:  Except to the extent that a Holder of an Allowed Claim in Class 1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class 1, each such Holder shall receive payment in full in Cash.

(iii)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(b)    **Class 2—Other Secured Claims**.

(i)    *Classification*:  Class 2 consists of all Other Secured Claims.

(ii)    *Treatment*:  Except to the extent that a Holder of an Allowed Claim in Class 2 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class 2, each such Holder shall receive, at the option of the Debtors, subject to the reasonable consent of the Required Consenting Secured Parties:

19

     (A)     payment in full in Cash;

     (B)     delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

     (C)     Reinstatement of such Other Secured Claims; or

     (D)     other treatment rendering such Claim Unimpaired.

(iii)    *Voting:* Class 2 is Unimpaired under the Plan. Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(c)    **Class 3—Senior Secured Claims**.

(i)    *Classification*: Class 3 consists of all Senior Secured Claims.

(ii)    *Allowance*: The Senior Secured Claims shall be Allowed, and deemed to be Allowed, in the aggregate principal amount of $6,007,978,671.76 (which amount does not include any unpaid interest, whether or not such interest was accrued but unpaid as of the Petition Date), plus accrued interest through the Effective Date at the default rate, as well as any other fees, expenses, or other obligations owed to the Senior Secured Parties under the Loan Agreement, the Hedging Agreements, and any related documents. The Plan shall constitute a settlement of the proper interest rate to be applied to the Hedging Claims. Notwithstanding anything to the contrary contained in a Hedging Agreement, the interest rate applied to the Hedging Claims shall be 4.4% per annum inclusive of default rate interest. For the avoidance of doubt, Senior Secured Parties shall not be required to File Proofs of Claim.

(iii)    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class 3 agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class 3, each such Holder thereof shall receive:

     (A)     **If the Sale Transaction occurs**: such Holder's Pro Rata share of the Senior Secured Party Sale Transaction Distribution.

     (B)     **If the Sale Transaction does not occur**: (a) at the election of the Majority Secured Parties, such Holder's Pro Rata share of either (x) the New Loans and Second Lien Loan Purchase Proceeds, if any, or (y) New Third-Party Financing Proceeds and (b) Pro Rata share of the Senior Secured Party Equity Distribution.

(iv)    *Voting*: Class 3 is Impaired under the Plan. Therefore, Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan.

(d)    **Class 4—General Unsecured Claims**.

(i)    *Classification*: Class 4 consists of all General Unsecured Claims.

(ii)    *Treatment*:  Except to the extent that a Holder of an Allowed Class 4 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Class 4 Claim, each such Holder shall receive, at the option of the Debtors:

(A)    payment in full in Cash;

(B)    Reinstatement of such General Unsecured Claims; or

(C)    other treatment rendering such Claim Unimpaired.

(iii)    *Voting*:  Class 4 is Unimpaired under the Plan.  Holders of Claims in Class 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(e)**    **Class 5—Intercompany Claims**.

(i)    *Classification*:  Class 5 consists of all Intercompany Claims.

(ii)    *Treatment:*  Holders of Intercompany Claims shall receive no distribution on account of such Intercompany Claims under the Plan, except that the Debtors and the Reorganized Debtors, as applicable, will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan and, from and after the Effective Date, Intercompany Claims may be settled, released or satisfied as determined by Reorganized Holdings in its sole discretion.

(iii)    *Voting*:  Class 5 is Unimpaired under the Plan.  Holders of Claims in Class 5 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(f)**    **Class 6—Intercompany Interests**.

(i)    *Classification:*  Class 6 consists of all Intercompany Interests.

(ii)    *Treatment*:  Except to the extent necessary to implement the Reorganization Transaction, on the Effective Date, or as soon thereafter as practicable, all Allowed Intercompany Interests shall be Reinstated, except that if a Sale Transaction does not occur, the Holder of Holdings Equity Interests (Statewide) shall receive the treatment set forth in Article III.B.7(b)(ii) of the Plan.

(iii)    *Voting*:  Class 6 is Unimpaired under the Plan.  Holders of Interests in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(g)**    **Class 7—Statewide Interests**.

(i)    *Classification*:  Class 7 consists of all Statewide Interests.

(ii)    *Treatment*:  Except to the extent necessary to implement the Reorganization Transaction, or that a Holder of an Allowed Class 7 Interest agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and

KE 32728595

discharge of and in exchange for each Allowed Class 7 Interest, each such Holder thereof shall, on the Effective Date:

(A)     **If the Sale Transaction occurs on the Effective Date**: receive such Holder's Pro Rata share of the Statewide Interest Sale Transaction Distribution.

(B)     **If the Sale Transaction does not occur on the Effective Date**: retain its Statewide Interests, and Statewide shall, on the Effective Date, receive the Statewide Interest Equity Distribution, subject to the Put Election, it being understood that the Plan will not limit Statewide's right to transfer the Statewide Interest Equity Distribution provided that Statewide shall have at least two members for the entire six-month period beginning on the Effective Date.

(iii)     *Voting*:  Class 7 is Impaired under the Plan.  Therefore, Holders of Allowed Interests in Class 7 are entitled to vote to accept or reject the Plan.

3.     *Certain Sale Transaction Considerations*.

Notwithstanding anything herein to the contrary, and notwithstanding how the Sale Transaction may be structured under the Sale Transaction Documents or otherwise, if the Sale Transaction occurs on the Effective Date, each Holder of Statewide Interests shall receive such Holder's Pro Rata share of the Statewide Interest Sale Transaction Distribution.

4.     *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

5.     *Acceptance or Rejection of the Plan*.

(a)     **Voting Classes**.

Classes 3 and 7 are Impaired under the Plan.  The Holders of Claims in Class 3 and Interests in Class 7 are entitled to vote to accept or reject the Plan.

(b)     **Presumed Acceptance of the Plan**.

Classes 1, 2, 4, 5, and 6 are Unimpaired under the Plan.  The Holders of Claims and Interests in such Classes are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

6.     *Elimination of Vacant Classes*.

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Confirmation Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

KE 32728595

7.      *Controversy Concerning Impairment*.

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

8.      *Subordinated Claims*.

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and Reorganized Holdings, as applicable, reserve the right to reclassify any Allowed Claim or Allowed Interest, other than the Senior Secured Claims and the Consenting Interest Holders' Interests (including, for the avoidance of doubt, the Consenting Interest Holders' Statewide Interests), in accordance with any contractual, legal, or equitable subordination relating thereto; *provided*, *however*, that any such reclassification must be approved by the Required Consenting Secured Parties.

C.      **Means for Implementation of the Plan**.

1.      *No Substantive Consolidation*.

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

2.      *Restructuring Transactions*.

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall enter into the Restructuring Transactions, and shall take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Debtors, to the extent provided in the Plan. The Restructuring Transactions may include one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions as may be determined by either (x) the Debtors, in good-faith consultation with and subject to the reasonable consent of both the Required Consenting Secured Parties and the Consenting Interest Holders, or (y) Reorganized Holdings, as applicable, to be necessary or appropriate. The actions to implement the Restructuring Transactions may include (but shall not be limited to): (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) all actions that the Special Committee reasonably determines, in good-faith consultation with the Required Consenting Secured Parties, are necessary or appropriate to implement the Sale Transaction; and (5) making any filings or recordings that may be required by applicable law in connection with the Plan.

3.      *Sources of Consideration for Plan Distributions*.

On the Effective Date, the Debtors will consummate either the Sale Transaction or, if no bid is designated as the Successful Bid in accordance with the Plan, the Reorganization Transaction, in each case in accordance with the terms of the Plan and the Restructuring Support Agreement.

KE 32728595

The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Sale Transaction using Cash on hand and the Sale Transaction Proceeds.

The Reorganized Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Reorganization Transaction with Cash on hand, including Cash from operations, any Cash provided pursuant to New Third-Party Financing, the New Loans, and the New Holdings Interests.

4.  *Sale Transaction*.

(a)  **Sale Process**.

Prior to the Effective Date, the Special Committee shall have the exclusive right to exercise the Debtors' authority to oversee and manage the sale process relating to any potential Sale Transaction in good-faith consultation with the Committee of Secured Parties Steering Group. Any references to acts to be performed or determinations to be made by the Debtors with respect to the Sale Transaction shall be deemed to refer to the acts to be performed or determinations to be made by the Special Committee. All insiders and members of the board of directors of Statewide (other than those directors serving on the Special Committee) shall recuse themselves from consideration or involvement in such sale process; *provided* that the foregoing shall not limit the right of any insider of any Debtor or member of the board of directors of Statewide from participating in the sale process as a bidder or prospective bidder. The Committee of Secured Parties Steering Group and its advisors shall have the right to review all information, diligence, and materials provided by any the investment banker retained by the Special Committee to any bidder or prospective bidder with respect to the sale and to consult with such investment banker with respect to any potential Sale Transaction. The Special Committee and the Committee of Secured Parties Steering Group shall consult in good faith regarding the sale process, including any diligence and other information requested by the Committee of Secured Parties Steering Group and its advisors with respect thereto.

(b)  **Termination of Sale Process**.

The Special Committee shall have the right, in good-faith consultation with, and subject to the reasonable consent of, the Required Consenting Secured Parties, to terminate the sale process and either: (a) designate any bid as the Successful Bid and pursue the Sale Transaction, subject to the right of the Majority Secured Parties to issue the Reorganization Transaction Election Notice within five Business Days of any such designation; or (b) declare that there is no Successful Bid and pursue the Reorganization Transaction. Notwithstanding the prior sentence, if the Special Committee does not designate any Qualified Bid as the Successful Bid on or before 5:00 p.m., prevailing Eastern Time, on August 1, 2015, the sale process shall terminate and the Debtors shall consummate the Reorganization Transaction. Following termination of the sale process, the Debtors shall pursue and implement the Reorganization Transaction or the Sale Transaction, as applicable, and shall make all reasonable efforts to cause the Effective Date to occur as soon as practicable.

(c)  **Closing of Sale Transaction (If Any)**.

On the Effective Date, the Debtors shall be authorized to consummate the Sale Transaction contemplated by the Successful Bid and, among other things, the Debtors' assets (including Executory Contracts and Unexpired Leases assumed and assigned pursuant to Article V hereof) shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the Purchase Agreement and Confirmation Order; *provided* that the Debtors may request entry of any order supplementing the Confirmation Order that the Special Committee believes is necessary or appropriate to implement the terms and conditions of the Sale Transaction. On and after the Effective Date, except as otherwise provided in the Plan, the Debtors or the Purchaser, as applicable, may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(d)  **Wind Down and Dissolution of the Debtors**.

The Debtors will make distributions to Holders of Allowed Claims and Allowed Interests in accordance with the priorities set forth in the Plan and implement the Wind Down pursuant to the Plan. As soon as practicable

after the Effective Date and only to the extent necessary and not otherwise resolved by the Debtors, the Debtors or an Entity selected by the Debtors shall:  (a) file for the Debtors and their direct and indirect subsidiaries a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors and their respective direct and indirect subsidiaries under the applicable laws of their state of incorporation or formation (as applicable); (b) make distributions to Holders of Allowed Claims and Allowed Interests as provided by the Plan; (c) prosecute, settle, or compromise any Causes of Action; (d) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (e) take such other actions as the Debtors or the Entity selected by the Debtors to conduct the Wind Down may determine to be necessary or desirable to implement the Wind Down.  The Debtors will, in an expeditious but orderly manner, make timely distributions pursuant to the Plan and the Confirmation Order.

The filing of the Debtors' and their respective direct and indirect subsidiaries' certificates of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of the Debtors.

**5.**        *Principal Means for Implementation of the Reorganization Transaction*.

If the sale process is terminated without the designation of a Successful Bid, the Debtors shall pursue and implement the Reorganization Transaction.  The principal means for implementation of the Reorganization Transaction are set forth below.

**(a)**        **New Loans**.

The Reorganized Concessionaire shall execute and deliver the New Debt Documents and all related documents to which the Reorganized Concessionaire is intended to be a party on the Effective Date. All such documents are incorporated herein by reference, and shall become effective in accordance with their terms and the Plan.

On the Effective Date, and without further notice to or order or other approval of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity (including the boards of directors of the Debtors), except for the Confirmation Order and as otherwise required by the New Debt Documents and the Restructuring Support Agreement, the Reorganized Concessionaire shall, and is authorized to, enter into the New Debt Documents and perform and receive the proceeds of the New Loans, and to execute and deliver the New Debt Documents and all related documents to which the Reorganized Concessionaire is intended to be a party on the Effective Date, in each case consistent with the terms of the Plan. Subject to the limitations and consent rights set forth herein and in the Restructuring Support Agreement, Confirmation of the Plan shall be deemed (x) approval of the New Loans and the New Debt Documents, and all transactions contemplated thereby, including any supplemental or additional syndication of the New Loans, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Concessionaire in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (y) authorization of the Reorganized Concessionaire to enter into and execute the New Debt Documents and such other documents as may be required to effectuate the treatment afforded by the New Credit Agreement.

The obligations under the New Debt Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Concessionaire, enforceable in accordance with the terms thereof. The financial accommodations to be extended pursuant to the New Debt Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to recharacterization for any purposes whatsoever, and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Security Documents shall be deemed to be approved, shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Security Documents and the New Debt Documents, shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Security Documents and the New Debt Documents, and shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent

conveyances under the Bankruptcy Code or any applicable nonbankruptcy law. The Reorganized Concessionaire and the persons and entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents (including all governmental approvals and consents reasonably requested by the counsel to the Committee of Secured Parties) necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. As of the Effective Date, the Liens and security interests securing the New Loans shall be governed by the terms of the New Security Documents and the relative Lien, payment, and enforcement priorities of the New Loans shall be governed by the terms of the New Intercreditor Agreement.

(b)        **New Third-Party Financing**.

If, prior to August 1, 2015, the Required Consenting Secured Parties alternatively elect to cause Holders of Senior Secured Claims to receive Cash in lieu of the New Loans on the Effective Date, the Reorganized Concessionaire shall not enter into the New Credit Agreement and shall instead execute and deliver the New Third-Party Financing Documents and all related documents to which the Reorganized Concessionaire is intended to be a party on the Effective Date. All such documents are incorporated herein by reference, and shall become effective in accordance with their terms and the Plan.  The Debtors may request entry of any Final Order supplementing the Confirmation Order that the Debtors, in good-faith consultation with the Required Consenting Secured Parties, believe is necessary or appropriate to implement the terms and conditions of the Third-Party Financing.

On the Effective Date, and without further notice to or order or other approval of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity (including the boards of directors of the Debtors), except for the Confirmation Order and as otherwise required by the New Third-Party Financing Documents and the Restructuring Support Agreement, the Reorganized Concessionaire shall, and is authorized to, enter into the New Third-Party Financing Documents, if any, and perform and receive the New Third-Party Financing Proceeds, and to execute and deliver the New Third-Party Financing Documents and all related documents to which the Reorganized Concessionaire is intended to be a party on the Effective Date, in each case consistent with the terms of the Plan. Subject to the limitations and consent rights set forth herein and in the Restructuring Support Agreement, Confirmation of the Plan shall be deemed (x) approval of the New Third-Party Financing and the New Third-Party Financing Documents, and all transactions contemplated thereby, including any supplemental or additional syndication of the New Third-Party Financing, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Concessionaire in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (y) authorization of the Reorganized Concessionaire to enter into and execute the New Third-Party Financing Documents and such other documents as may be required to effectuate the treatment afforded by the New Third-Party Financing.

The obligations under the New Third-Party Financing Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Concessionaire, enforceable in accordance with the terms thereof. The financial accommodations to be extended pursuant to the New Third-Party Financing Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to recharacterization for any purposes whatsoever, and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Third-Party Financing Documents shall be deemed to be approved, shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Third-Party Financing Documents, shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Third-Party Financing Documents, and shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law. The Reorganized Concessionaire and the persons and entities granted such Liens and security interests are authorized to

make all filings and recordings, and to obtain all governmental approvals and consents (including all governmental approvals and consents reasonably requested by the counsel to the Committee of Secured Parties) necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. As of the Effective Date, the Liens and security interests securing the New Third-Party Financing shall be governed by the terms of the New Security Documents and the relative Lien, payment, and enforcement priorities of the New Third-Party Financing shall be governed by the terms of the New Intercreditor Agreement.

      (c)      **Second Lien Loan Purchase Election**.

Each Consenting Interest Holder seeking to exercise a Second Lien Loan Purchase Election shall deliver an irrevocable written notice to the Debtors of its intent to make such purchase pursuant to the Second Lien Loan Purchase Election together with the purchase price in cash in United States dollars not later than three Business Days prior to the Effective Date. Upon the Effective Date, the Debtors shall deliver to each such Consenting Interest Holder the Second Lien Loans purchased pursuant to its Second Lien Loan Purchase Election. Any Second Lien Loans purchased pursuant to a Second Lien Loan Purchase Election shall reduce the amount of Second Lien Loans distributed to holders of Allowed Senior Secured Claims and all Second Lien Loan Purchase Proceeds shall be distributed to the holders of Allowed Senior Secured Claims in accordance with Article III.B.3(c)(ii). Nothing herein shall in any way affect the rights of the Required Consenting Secured Parties under Article IV.E.1 and Article IV.E.2 and the New Debt Term Sheet.

      (d)      **Treatment of Holders of Statewide Interests under a Reorganization Transaction**.

For the avoidance of doubt, Statewide in its capacity as a Holder of Holdings Interests shall receive the same treatment under the Plan regardless of whether a Reorganization Transaction is implemented either by (a) the entry into the New Credit Agreement or (b) the receipt of New Third-Party Financing.

      (e)      **New Holdings Interests**.

      (i)      Issuance.

The issuance of the New Holdings Interests by Reorganized Holdings is authorized without the need for any further corporate action or without any further action by the Holders of Claims or Interests. Reorganized Holdings shall be authorized to issue a certain number of shares of New Holdings Interests pursuant to the Reorganized Holdings LLC Agreement. On the Effective Date, the Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares of New Holdings Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The Holders of New Holdings Interests may be parties to the New Organizational Documents.

      (ii)      Capital Contributions; Distributions.

Except as otherwise required by law, no holder of the New Holdings Interests will be required to make any capital contributions to Reorganized Holdings or any subsidiary thereof.

From and after the Effective Date, Reorganized Holdings will make *pro rata* tax distributions to the holders of the New Holdings Interests to the extent Cash is available to do so. In addition, Reorganized Holdings will make distributions of additional available Cash at the times and in the amounts determined by the board of directors.

KE 32728595

(iii)    Transfers.

The New Holdings Interests will not be subject to rights of first refusal, rights of first offer, or any similar restrictions on transfer; however, prior to any transfer of New Holdings Interests, the board of directors of Reorganized Holdings must first affirmatively determine that such transfer will not violate the Securities Act of 1933 or any other applicable securities laws, negatively affect the tax status of Reorganized Holdings, or trigger any change of control provisions in any of its or its subsidiaries' material contracts.

In the event that any holder(s) of New Holdings Interests proposes to transfer an amount of such interests to a person or a group of affiliated persons, in a single transaction or series of related transactions, such that after such transaction or transactions such transferee(s) would hold more than 50 percent of the total New Holdings Interests, each other holder will have the right to sell all of their New Holdings Interests to such buyer, on the same terms and subject to the same conditions as the initiating holder(s).

In the event that either (x) any holder(s) of more than 50 percent of the New Holdings Interests propose to transfer all of the outstanding New Holdings Interests to a third party or (y) any holder(s) of New Holdings Interests propose to transfer to an existing holder all of the New Holdings Interests not then held by such transferee holder, and the transferring holder(s) and the transferee holder together hold more than 50 percent of the then outstanding New Holdings Interests, then the initiating holder(s) will have a drag-along right to cause all of the other holders to transfer all of their New Holdings Interests to such transferee, on the same terms and subject to the same conditions as the initiating holder(s), subject to reasonable and customary minority protections.

(iv)    Preemptive Rights.

Each holder of New Holdings Interests will be entitled to reasonable and customary preemptive rights, subject to customary exceptions.

(f)    **Continued Corporate Existence**.

The Reorganized Debtors shall adopt the New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary or appropriate to consummate the Plan.

(g)    **Vesting of Assets in the Reorganized Debtors**.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action (unless otherwise released or discharged pursuant to the Plan), and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the New Credit Agreement and the Liens securing obligations on account of Other Secured Claims that are Reinstated pursuant to the Plan, if any).  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(h)    **New Organizational Documents**.

Each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation or formation in accordance with the corporate laws of the respective state, province, or country of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of nonvoting equity securities.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective state, province, or country of incorporation and their respective New Organizational Documents.

KE 32728595

(i)        **Directors, Managers, and Officers of the Reorganized Debtors**.

As of the Effective Date, the officers and members of the board of managers of the Reorganized Debtors shall be appointed in accordance with the respective New Organizational Documents.  To the extent any such director, manager, or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer.  Each such director, manager, and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

(j)        **Section 1145 Exemption**.

Pursuant to section 1145 of the Bankruptcy Code, the issuance of the New Holdings Interests as contemplated by the Plan is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration prior to the offering, issuance, distribution, or sale of securities. The New Holdings Interests are not "restricted securities" (as defined in rule 144(a)(3) under the Securities Act) and are freely tradable and transferable by any initial recipient thereof that (x) is not an "affiliate" of the Reorganized Debtors (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Holdings Interests through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Holdings Interests under applicable securities laws.   The DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Holdings Interests are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, the DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Loans or the New Holdings Interests are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

(k)        **Put Option**.

Upon a Change In Control of Reorganized Holdings during the 18-month period following the Effective Date, in each case in accordance with Section 7.9 of the Reorganized Holdings LLC Agreement, (a) each Holder of Holdings Interests shall have the right to put its share of the Statewide Interest Equity Distribution to Reorganized Holdings for such Holder's share of $80,000,000 in Cash; and (b) Reorganized Holdings shall have the right to call the New Holdings Interests on account of the Statewide Interest Equity Distribution for $100,000,000 in Cash.

6.        *General Settlement of Claims and Interests*.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

7.        *Corporate Existence*.

Except as otherwise provided in the Plan, each Debtor, as reorganized pursuant to the Plan, shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under or in connection with the Plan or otherwise, and to the extent such

KE 32728595

documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### 8.      *Cancellation of Existing Securities and Agreements*.

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including the Senior Secured Claims and the Holdings Interests (in the event no Sale Transaction takes place), shall be deemed cancelled and surrendered without any need for a Holder to take further action with respect thereto and the obligations of the Debtors or Reorganized Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full and discharged; *provided*, *however*, that notwithstanding Confirmation or Consummation, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan; *provided further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable.  Notwithstanding anything to the contrary in the Plan, including this section, the Liens of the Senior Secured Parties shall become liens under the New Security Documents and New Debt Documents, or the New Third-Party Financing Documents, to the extent applicable, and shall not be discharged hereby.

### 9.      *Corporate Action*.

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including:  (1) adoption or assumption, as applicable, of the agreements with existing management to the extent provided in the Omnibus Services Agreement; (2) selection of the directors, managers, and officers for the Reorganized Debtors; (3) implementation of the Restructuring Transactions; (4) the Reorganized Concessionaire's entry into (a) the New Debt Documents or the New Third-Party Financing Documents, as applicable, and the New Security Documents, and (b) the Omnibus Services Agreement; (5) the issuance of the New Holdings Interests; and (6) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Debt Documents or the New Third-Party Financing Documents, as applicable, the New Security Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article IV.I of the Plan shall be effective notwithstanding any requirements under nonbankruptcy law.

### 10.      *Effectuating Documents; Further Transactions*.

On and after the Effective Date, the Debtors and the Reorganized Debtors and the officers and members of the boards of managers thereof, as applicable, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan in the name of and on behalf of the Debtors and the Reorganized Debtors, as applicable, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 11.      *Section 1146 Exemption*.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property or Interests pursuant to the Plan, including the recording of any amendments to such transfers, or any new mortgages or liens placed on the property in connection with such transfers, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax,

30

or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

**12.**       *Preservation of Causes of Action*.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Debtors and the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the rights of the Debtors and Reorganized Debtors, as applicable, to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the following Causes of Action, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date: (1) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII; and (2) all Causes of Action that arise under (a) sections 544, 547, and 548 of the Bankruptcy Code and (b) state fraudulent conveyance law, in each case, solely related to payments made in the 90 days prior to the Petition Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled pursuant to the Plan or a Final Order, the Debtors and Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors and Reorganized Debtors, as applicable, reserve and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3)(B) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Debtors or Reorganized Debtors, as applicable. The applicable Debtors or Reorganized Debtors through their respective authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. On or after the Effective Date, the Debtors and Reorganized Debtors, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**13.**       *Payment of Certain Fees and Expenses*.

On the Effective Date, the Reorganized Debtors shall pay in Cash in full the Committee of Secured Parties Restructuring Fees to the extent not already paid.

**D.**     **Treatment of Executory Contracts and Unexpired Leases**.

**1.**       ***Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases***.

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases (including, for the avoidance of doubt, the Restructuring Support Agreement) will be deemed assumed and, if the Sale Transaction occurs, assigned to the party(ies) set forth in the Sale Transaction Documents, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) are identified on the Rejected Executory Contract and Unexpired Lease List; (2) previously were assumed, assumed and assigned, or rejected by the Debtors; (3) are the subject of a motion to assume, or to assume and assign, Executory Contracts or Unexpired Leases that is pending on the Effective Date;

31

or (4) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such assumption is after the Effective Date; *provided* that no Insider Executory Contracts or Insider Unexpired Leases shall be assumed other than the Insider Executory Contracts and Insider Unexpired Leases identified on the Assumed Insider Executory Contract and Unexpired Lease List. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, subject to the occurrence of the Effective Date, of the assumption, pursuant to section 365(a) of the Bankruptcy Code, of the Executory Contracts and Unexpired Leases other than those identified in parts (1) through (4) of the preceding sentence, as well as any Insider Executory Contracts and Insider Unexpired Leases listed on the Assumed Insider Executory Contract and Unexpired Lease List, and shall constitute the Bankruptcy Court's approval of the rejection, on the Effective Date, of the Executory Contracts and Unexpired Leases identified on the Rejected Executory Contract and Unexpired Lease List, as well as any Insider Executory Contracts and Insider Unexpired Leases not listed on the Assumed Insider Executory Contract and Unexpired Lease List. Any motions to assume or assume and assign Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed or assumed and assigned pursuant to Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Debtors or the Reorganized Debtors, as applicable, in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Notwithstanding anything herein to the contrary, the Confirmation Order will, and will be deemed to, approve the assumption of the Restructuring Support Agreement, effective as of the date of such order.

### 2.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*.

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be Filed with the Claims and Balloting Agent no later than the later of 30 days after the Confirmation Date or the effective date of rejection. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court no later than 30 days after the later of the Effective Date or the effective date of rejection. Any such objection will be scheduled to be heard by the Bankruptcy Court at the request of the Debtors or Reorganized Debtors, as applicable, as soon as practicable thereafter. Claims arising from the rejection of any Executory Contract or Unexpired Lease other than any Hedging Agreement (which shall be treated exclusively in accordance with Article III.B.2 of the Plan) shall be classified as a General Unsecured Claim and shall be treated in accordance with Article III, as applicable.

### 3.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned, as applicable, pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.

No later than fifteen (15) Business Days prior to the Confirmation Hearing, the Debtors shall serve notices of proposed assumption or (if applicable) assumption and assignment and the proposed cure amounts to the applicable counterparties to Executory Contracts and Unexpired Leases, and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, proposed assumption and assignment, or related cure amount must be Filed, served, and actually received by the counsel to the Debtors, counsel to the Committee of Secured Parties, the clerk of the Bankruptcy Court, and the U.S. Trustee on or before the later of (1) the commencement of the Confirmation Hearing and (2) ten (10) Business Days following receipt of notice of such proposed assumption or assumption and assignment. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, and/or related cure amount will be deemed to have assented to such assumption or cure amount. Any such objection will be scheduled to be heard by the Bankruptcy Court as soon as reasonably practicable after such objection is Filed.

In the event of a dispute regarding: (1) the amount of any payments to cure a default in connection with a proposed assumption or assumption and assignment of an Executory Contract or Unexpired Lease; (2) the ability of

the Debtors, the Reorganized Debtors, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or to be assumed and assigned; or (3) any other matter pertaining to assumption or assumption and assignment, as applicable, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or Final Orders resolving the dispute and approving the assumption or assumption and assignment, as applicable.

Assumption, rejection, or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assumed and assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any proofs of claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

### 4.    *Indemnification Obligations*.

Each Indemnification Obligation for the benefit of current and former directors, managers, officers, and employees of the Debtors who served in such capacity prior to, on, or after the Petition Date shall be assumed to the extent any such Indemnification Obligation is executory pursuant to sections 365 and 1123 of the Bankruptcy Code (or honored or reaffirmed, as the case may be) by the applicable Debtor, effective as of the Effective Date.  Each Indemnification Obligation that is assumed, deemed assumed, honored, or reaffirmed shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

### 5.    *Insurance Policies*.

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.  Furthermore, as of the Effective Date, the Debtors shall (if not already purchased) purchase and maintain directors, officers, managers, and employee liability tail coverage for the six-year period following the Effective Date on terms no less favorable than the Debtors' existing director, officer, and manager coverage and with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, and manager coverage upon placement.

### 6.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*.

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned, as applicable, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 7.    *Reservation of Rights*.

Nothing contained in the Plan, including identification in the Rejected Executory Contract and Unexpired Lease List, shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease subject to assumption or rejection pursuant to section 365(a) of the Bankruptcy Code, or that any of the Reorganized Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is

KE 32728595

or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, if necessary.

**8.    *Nonoccurrence of Effective Date*.**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

**9.    *Contracts and Leases Entered Into After the Petition Date*.**

Contracts and leases entered into after the Petition Date by any Debtor shall be assumed or assumed and assigned by such Debtor in accordance with the Plan and/or the Purchase Agreement, as applicable.

**E.    Provisions Governing Distributions.**

**1.    *Disbursing Agent*.**

All distributions under the Plan shall be made by the Disbursing Agent on or after the Effective Date, except as otherwise provided in the Plan.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

**2.    *Rights and Powers of Disbursing Agent*.**

**(a)    Powers of the Disbursing Agent.**

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary or appropriate to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

**(b)    Expenses Incurred On or After the Effective Date.**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

**3.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*.**

**(a)    Delivery of Distributions in General.**

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the sole discretion of the Reorganized Debtors; *provided further*, *however*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in the Debtors' books and records as of the date of any such distribution.

**(b)    Undeliverable Distributions and Unclaimed Property.**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at

34

which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

### 4.    *Compliance with Tax Requirements*.

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary or appropriate to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

### 5.    *Allocations*.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### 6.    *No Postpetition Interest on Claims*.

Unless otherwise specifically provided for in the Plan, including, for the avoidance of doubt, Article IV.B.2(d) of the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.

### 7.    *Setoffs and Recoupment*.

The Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the Holder of any such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors, as applicable, of any such Claim it may have against the Holder of such Claim.

### 8.    *Claims Paid or Payable by Third Parties*.

### (a)    **Claims Paid by Third Parties**.

The Debtors, the Reorganized Debtors, or the Purchaser, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or the Purchaser, as applicable. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or the Purchaser, as applicable, on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor or the Purchaser, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or Reorganized Debtor or the Purchaser annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

**(b)** **Claims Payable by Third Parties**.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**(c)** **Applicability of Insurance Policies**.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**F.** **Settlement, Release, Injunction, and Related Provisions**.

**1.** **Discharge of Claims and Termination of Interests**.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.  Notwithstanding anything to the contrary in the Plan, including this section, the Liens of the Senior Secured Parties shall be replaced by liens granted by the Reorganized Concessionaire under the New Security Documents and the New Debt Documents or the New Third-Party Financing Documents, as applicable, and the terms of the Plan and such replacement liens shall not be discharged under the Plan.

**2.** **Release of Liens**.

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns in accordance with the Plan.

**3.** **Releases by the Debtors**.

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released by the Debtors, the Estates, and the Reorganized Debtors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors or the Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Estates, or the Reorganized Debtors

36

would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence or any breach of the Restructuring Support Agreement by a Released Party.

**4.      *Releases by Holders of Claims and Interests*.**

As of the Effective Date, except as otherwise provided in the Plan, the Releasing Parties are deemed to have released the Debtors, the Estates, the Reorganized Debtors, and the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors or Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion), upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence or any breach of the Restructuring Support Agreement by a Released Party.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**5.      *Exculpation*.**

Except as otherwise specifically provided in the Plan, each Debtor, each Reorganized Debtor, each Estate, and each Released Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for any Exculpated Claim, except to the extent such claim, obligation, Cause of Action, or liability arises from the willful misconduct or gross negligence or the breach of the Restructuring Support Agreement (notwithstanding advice of counsel), but in all respects (other than with respect to any breach of the Restructuring Support Agreement) such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors, the Reorganized Debtors, the Estates, and the Released Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the restructuring of Claims and Interests in the Chapter 11 Cases and in connection with the Restructuring Transactions, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments, or other documents (including the New Debt Documents or New Third-Party Financing Documents, as applicable, and documents and instruments related thereto and any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) in connection with the Plan, and the solicitation and distribution of the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or

KE 32728595

regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

6.     *Injunction*.

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan (including any obligations under the Plan and the New Debt Documents or New Third-Party Financing Documents, as applicable, and documents and instruments related thereto), or Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released pursuant to Article VIII.C or Article VIII.D of the Plan, discharged pursuant to Article VIII.A of the Plan, or are subject to exculpation pursuant to Article VIII.E of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

7.     *Protections Against Discriminatory Treatment*.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

8.     *Setoffs*.

Except as otherwise expressly provided for in the Plan, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.

9.     *Recoupment*.

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless (1) such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date or (2) such Claim or Interest is Reinstated under the Plan.

KE 32728595

10.    *Subordination Rights*.

The classification and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and any such rights shall be settled, compromised, and released pursuant to the Plan.

11.    *Document Retention*.

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

G.    **Conditions Precedent to Consummation of the Plan**.

1.    *Conditions Precedent to the Effective Date*.

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.B of the Plan:

1.    the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance satisfactory to the Required Consenting Secured Parties and reasonably satisfactory to the Consenting Interest Holders, in full force and effect, and not be subject to any stay or injunction;

2.    no Other Secured Claim or General Unsecured Claim shall be Allowed in an amount in excess of $25,000,000 and the Debtors have objected to any General Unsecured Claim asserted in an amount in excess of $25,000,000;

3.    all actions, documents, Certificates, and agreements necessary or appropriate to implement the Plan, including documents contained in the Plan Supplement, shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws; and

4.    all authorizations, consents, regulatory approvals, rulings, or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received.

2.    *Waiver of Conditions*.

The conditions to Consummation set forth in Article X of the Plan may be waived only by consent of the Debtors and the Required Consenting Secured Parties; *provided* that the conditions to Consummation set forth in Section X.A.1 of the Plan and, with respect to any actions, documents, Certificates, and agreements that require the consent of the Consenting Interest Holders under the terms of the Plan, Section X.A.3 of the Plan, may only be waived by consent of the Debtors, the Required Consenting Secured Parties, and the Consenting Interest Holders. Such waiver may be effectuated without notice to or entry of an order of the Bankruptcy Court and without notice to any other parties in interest.

3.    *Effect of Failure of Conditions*.

If Consummation does not occur on or prior to September 1, 2015, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by the Debtors, Holders of Claims, or Holders of Interests or any Causes of Action; (2) prejudice in any manner the rights of the Debtors, any Holders, the Consenting Secured Parties, the Consenting Interest Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, the Consenting Secured Parties, the Consenting Interest Holders, or any other Entity in any respect, including with respect to substantive consolidation and similar arguments.

## V.    Confirmation of the Plan

A.    **The Combined Hearing**.

At the Combined Hearing, the Bankruptcy Court will determine whether to approve the Disclosure Statement and whether the Plan should be Confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed. **The Combined Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Combined Hearing or any adjournment thereof.**

B.    **Deadline to Object to Approval of the Disclosure Statement and Confirmation of the Plan**.

Upon commencement of the Chapter 11 Cases and scheduling of the Combined Hearing, the Debtors will provide notice of the Combined Hearing, which notice will provide that objections to the Disclosure Statement and Confirmation of the Plan must be filed and served at or before 4:00 p.m., prevailing Central Time, on the date that is seven days prior to the initial date of the Combined Hearing, or such other date as the Bankruptcy Court may direct. Unless objections to the Disclosure Statement or Confirmation are timely served and filed, they may not be considered by the Bankruptcy Court.

C.    **Requirements for Approval of the Disclosure Statement**.

Pursuant to section 1126(b) of the Bankruptcy Code, a prepetition solicitation of votes to accept or reject a chapter 11 plan must comply with "any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation" or, if such laws and regulations do not apply, provide "adequate information" as defined in section 1125(a) of the Bankruptcy Code. At the Combined Hearing, the Debtors will seek a determination from the Bankruptcy Court that the Disclosure Statement satisfies section 1126(b) of the Bankruptcy Code. In addition, at the Combined Hearing, the Debtors will seek Confirmation of the Plan. The requirements for Confirmation are detailed below.

D.    **Requirements for Confirmation**.

1.    ***Requirements of Section 1129(a) of the Bankruptcy Code***.

Among the requirements for Confirmation are the following: (a) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims or Interests has voted to accept the Plan and the bankruptcy court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (b) the Plan is feasible; and (c) the Plan is in the "best interests" of Holders of Impaired Claims and Interests (i.e., Holders of Allowed Class 3 Claims and Allowed Class 7 Interests).

At the Combined Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment: (a) made before

40

Confirmation will be reasonable or (b) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

## 2. *Best Interests of Creditors/Liquidation Analysis*.

Pursuant to section 1129(a)(7) of the Bankruptcy Code, often called the "best interests test," holders of impaired allowed claims or interests must either (a) accept the plan of reorganization, or (b) receive or retain under the plan property of a value, as of the plan's assumed effective date, that is not less than the value such non-accepting holders would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

The Debtors believe that the Plan provides the same or a greater recovery for Holders of Allowed Claims and Interests as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code. This belief is based on a number of considerations, including: (a) the Debtors' primary asset is a government concession that would have a substantially reduced value in a chapter 7 liquidation; (b) the additional Administrative Claims generated by conversion to a chapter 7 case; (c) the administrative costs of liquidation and associated delays in connection with a chapter 7 liquidation; and (d) the negative impact on the market for the Debtors' assets caused by attempting to sell such assets in a short time frame, each of which likely would also diminish the value of the Debtors' assets available for distributions.

The Debtors have prepared an unaudited liquidation analysis, attached hereto as **Exhibit E**, to assist Holders of Claims and Interests in evaluating the Plan. The liquidation analysis compares the projected creditor recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan. The liquidation analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings. Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the liquidation analysis.

In applying the "best interests" test, it is possible that the claims and interests in a chapter 7 case may not be classified according to the priority of such claims and interests, but instead be subjected to contractual or equitable subordination.

Since the Plan provides for payment to Holders of Allowed Senior Secured Claims in excess of the liquidation value of the Debtors' assets and also provides a distribution of the New Holdings Interests to Holders of Statewide Interests, the amount proposed to be paid is not less than the amount each Holder of a Claim or Interest would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

### 3.    *Feasibility/Financial Projections*.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization). To determine whether the Plan meets the feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared certain unaudited pro forma financial statements (the "**Financial Projections**") with regard to the Reorganized Debtors, which projections and the assumptions upon which they are based are attached hereto as **Exhibit C**. Based upon the Financial Projections, the Debtors believe that the deleveraging contemplated by the Plan will enable their businesses to be viable following the Effective Date of the Plan. Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

### 4.    *Acceptance by Impaired Classes*.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the interest entitles the holder of the claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of non-insider allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

### 5.    *Confirmation without Acceptance by All Impaired Classes/Fair and Equitable Test*.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, provided that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

#### (a)    No Unfair Discrimination.

This test applies with respect to classes of claims or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its

42

treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  Under certain circumstances, a proposed plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### (b)     Fair and Equitable Test.

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.

Section 1129(b) of the Bankruptcy Code does not apply to Classes 1, 2, 4, 5, and 6 because those Classes are conclusively presumed to accept the Plan.  To the extent that Classes 3 and 7, which are entitled to vote to accept or reject the Plan, vote to reject the Plan, the fair and equitable test sets different standards for confirming the Plan notwithstanding such rejection thereof depending upon the type of Claims or Interests in each such Class.

### (i)     Secured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (A) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (B) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the claimant's liens.

### (ii)     Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (A) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (B) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

### (iii)     Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either:  (A) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of:  (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (B) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

# VI. Voting Instructions

A. **Overview**.

Holders of Claims and Interests entitled to vote to accept or reject the Plan should carefully review the following description of the voting process, as well as the voting instructions attached to each Ballot.

B. **Solicitation Procedures**.

1. *Claims and Balloting Agent*.

The Debtors retained the Claims and Balloting Agent to act, among other things, as the Debtors' voting agent in connection with the out-of-court solicitation of votes to accept or reject the Plan.

2. *Solicitation of Holders of Class 3 Claims through the Administrative Agent*.

The Debtors are soliciting the votes of Holders of Class 3 Claims through the Administrative Agent, which will submit the Class 3 Master Ballot identifying the votes of all Holders of Class 3 Claims. The Administrative Agent will distribute individual Ballots to Holders of Class 3 Claims as of the Voting Record Date. Holders of Class 3 Claims will return their Ballots to the Administrative Agent, which will compile such Holders' votes and submit the Class 3 Master Ballot.

3. *Claim and Interest Holder Solicitation Package*.

The votes of the Holders of Class 3 Claims and Class 7 Interests on the Plan are being solicited on an out-of-court basis using a package of solicitation materials (the "**Solicitation Package**"). The following materials constitute the Solicitation Package, which the Debtors have distributed to the Administrative Agent that maintains a registry of Class 3 Claims and Holders of Class 7 Interests:

- the appropriate Class 3 Master Ballot or Ballot(s), as applicable, and applicable voting instructions, together with directions for returning such Class 3 Master Ballot or Ballot(s) to the Claims and Balloting Agent; and

- this Disclosure Statement, including the Plan with all exhibits.

4. *Distribution of the Solicitation Package and Plan Supplement*.

The Debtors, with the assistance of the Claims and Balloting Agent, distributed the Solicitation Packages to the Administrative Agent and Holders of Class 7 Interests on September 11, 2014.

The Solicitation Package (except the Ballots) may also be obtained from the Claims and Balloting Agent by: (a) calling the Debtors' restructuring hotline at (877) 634-7181 within the United States or Canada or, outside of the United States or Canada, by calling +1 (424) 236-7226; (b) writing to Indiana Toll Road Claims Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; or (c) e-mailing ITRinfo@kccllc.com. When the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, http://www.kccllc.net/ITR, or for a fee via PACER at http://www.ecf.ilnb.uscourts.gov.

No later than five days prior to the Combined Hearing, the Debtors intend to file the Plan Supplement. As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims and Balloting Agent by: (a) calling the Debtors' restructuring hotline at one of the telephone numbers set forth above; (b) visiting the Debtors' restructuring website, http://www.kccllc.net/ITR; and/or (c) writing to the Debtors' address set forth above.

44

C.      **Voting Procedures**.

      1.      *Holders of Claims and Interests Entitled to Vote to Accept or Reject the Plan*.

      Under the applicable provisions of the Bankruptcy Code, not all Holders of Claims against and Interests in the Debtors are entitled to vote to accept or reject the Plan.  The Debtors are soliciting votes to accept or reject the Plan **only** from Holders of Claims in Class 3 and Holders of Interests in Class 7.  The Debtors are **not** soliciting votes from Holders of the remaining Classes of Claims and Interests, each of whom is presumed to accept the Plan because its Claims or Interests are being either satisfied in full or otherwise rendered Unimpaired.  Accordingly, the Classes of Claims and Interests other than in Classes 3 and 7 are not entitled to vote on the Plan.

      2.      *Voting on a Plan*.

      **The Voting Record Date was September 5:00 p.m., prevailing Eastern Time, on September 10, 2014**.  The Voting Record Date is the date on which it was determined which Holders of Claims in Class 3 and Interests in Class 7 are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred such that an assignee can vote as the Holder of a Claim.

      In order for the Holder of a Claim in **Class 3** to have such Holder's Ballot included on the Class 3 Master Ballot identifying the votes of all Holders of Class 3 Claims, such Holder's Ballot must be properly completed, executed, and delivered to the Administrative Agent by: electronic mail to jjames@wilmingtontrust.com and rkuhl@wilmingtontrust.com; or facsimile to +1 (612) 217-5651 (Attn.: Josh James and Renee Kuhl).  Such Holder's Ballot must be **actually received** by the Administrative Agent **on or before the Voting Deadline, which is 4:00 p.m., prevailing Pacific Time / 6:00 p.m., prevailing Central Time, on September 17, 2014**.

      In order for the Holder of an Interest in **Class 7** to have such Holder's Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by electronic mail to ITRinfo@kccllc.com.  Such Holder's Ballot must be **actually received** by the Claims and Balloting Agent **on or before the Voting Deadline, which is 4:00 p.m., prevailing Pacific Time / 6:00 p.m., prevailing Central Time, on September 17, 2014**.

      In order for the votes reflected on the Class 3 Master Ballot identifying the votes of all Holders of Class 3 Claims to be counted as votes to accept or reject the Plan, the Administrative Agent's Class 3 Master Ballot must be properly completely, executed, and delivered by electronic mail to ITRinfo@kccllc.com.  The Class 3 Master Ballot must be **actually received** by the Claims and Balloting Agent **on or before the Class 3 Master Ballot Deadline, which is 4:00 p.m., prevailing Pacific Time / 6:00 p.m., prevailing Central Time, on September 19, 2014**.

      As noted earlier, the Debtors are soliciting the votes of Holders of Class 3 Claims through the Administrative Agent, which will submit the Class 3 Master Ballot identifying the votes of all Holders of Class 3 Claims.  **Holders of Class 3 Claims should follow the instructions provided by the Administrative Agent regarding the return of their Ballots to the Administrative Agent.**

      **SUBJECT TO THE REASONABLE CONSENT OF THE REQUIRED CONSENTING SECURED PARTIES, IF A BALLOT OR CLASS 3 MASTER BALLOT IS RECEIVED AFTER THE VOTING DEADLINE OR THE CLASS 3 MASTER BALLOT DEADLINE, AS APPLICABLE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.**

      **ANY BALLOT OR CLASS 3 MASTER BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM OR THE ADMINISTRATIVE AGENT BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.**

      **EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT OR CLASS 3 MASTER BALLOT, EACH HOLDER OF A CLAIM OR THE ADMINISTRATIVE AGENT, AS APPLICABLE, WILL CERTIFY TO THE**

KE 32728595

**BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER OR THE ADMINISTRATIVE AGENT CASTS MULTIPLE BALLOTS OR CLASS 3 MASTER BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS AND THOSE BALLOTS OR CLASS 3 MASTER BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS OR CLASS 3 MASTER BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.**

**IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE INSTRUCTIONS ATTACHED THERETO.**

46

## VII.    Risk Factors

BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.    EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.

A.    **Risks Related to the Restructuring**.

1.    *The Restructuring Could Involve Either the Sale Transaction or the Reorganization Transaction.*

The Plan provides that the Restructuring could take the form of the Sale Transaction or the Reorganization Transaction, as determined by the Special Committee in good-faith consultation with and subject to the reasonable consent of the Required Consenting Secured Parties.  The Majority Secured Parties, however, may elect to pursue the Reorganization Transaction notwithstanding the Special Committee's selection of a Successful Bid.  As discussed in greater detail below, the form of the Restructuring could materially affect the form and amount of recoveries to Holders of Senior Secured Claims and Statewide Interests.

2.    *Voting on and Confirmation of the Plan Will Occur Prior to the Conclusion of the Sale Process.*

The Plan contemplates that the sale process for potential Sale Transactions may continue until August 1, 2015.  Holders of Senior Secured Claims and Statewide Interests will vote on the Plan, and the Debtors will seek Confirmation of the Plan, before the terms of potential Sale Transactions are known and before any Sale Transaction is consummated.  As discussed in greater detail below, there is no guarantee that the sale process will be successful.

3.    *The Sale Process Will Take Place over Several Months, and the Sale Transaction May Not Occur.*

The sale process for substantially all of the Debtors' assets will take place after Confirmation of the Plan but prior to Consummation of the Plan.  There is no guarantee that any Person will express interest in acquiring the Debtors' assets.  Even assuming the Debtors were to execute the Purchase Agreement with a bidder, the Sale Transaction may not be consummated.  For example, the potential purchaser could breach the asset purchase agreement, or other conditions to consummation of the agreement could fail to be satisfied.  In addition, the consummation of the Sale Transaction may be subject to prior consent of or approval by certain governmental entities that may delay or withhold such consent or approval.

4.    *The Majority Secured Parties May Elect to Pursue the Reorganization Transaction Even if the Special Committee Designates a Successful Bid.*

As noted above, the Plan provides that the Majority Secured Parties may elect to pursue the Reorganization Transaction even if the Special Committee selects a Successful Bid.  In other words, even if the Special Committee deems the sale process to be a success, the Majority Secured Parties may nevertheless elect to pursue the Reorganization Transaction.

5.     *The Debtors Will Consider All Available Restructuring Alternatives If the Restructuring Is Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors*.

If the Restructuring is not implemented, the Debtors will consider all other restructuring alternatives available at that time, which may include the filing of an alternative plan of reorganization, conversion to chapter 7, commencement of section 363 sales of the Debtors' assets, or any other transaction that would maximize the value of the Debtors' estates.  Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Chapter 11 Cases, the Confirmation of the Plan, or the threat of rejection of the Plan by the Bankruptcy Court, could add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring could also have other adverse effects on the Debtors. For example, it could also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies; and

- the Debtors' enterprise value.

6.     *Even if the Restructuring is Successful, the Debtors Will Continue to Face Risks*.

The Restructuring is generally designed to reduce the amount of the Debtors' funded debt obligations and cash interest expense and improve the Debtors' liquidity and financial and operational flexibility to generate long-term growth.  Even if the Restructuring is implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, changes in the Debtors' industry, and changes in commodity prices.  As a result of these risks and others, there is no guarantee that the Restructuring will achieve the Debtors' stated goals.

7.     *The Consideration under the Plan Does Not Reflect any Independent Valuation of the Plan*.

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration under the Plan.

8.     *Risks Related to the New Loans That May Be Entered into and the New Third-Party Financing That May Be Obtained in the Reorganization Transaction*.

The following are some of the risks attendant to the New Loans or the New Third-Party Financing, as applicable.  In particular, Holders of Senior Secured Claims against the Debtors, who will become holders of the New Loans should the New Loans be entered into, and Holders of Statewide Interests, who may in their discretion exercise the Second Lien Loan Purchase Election, should pay careful attention to the risk factors related to the New Loans before deciding to vote to accept or reject the Plan.

(a)     **Covenants in the New Debt Documents and the New Organizational Documents, or the New Third-Party Financing Documents, May Contain Restrictions That Limit Flexibility in Operating the Reorganized Debtors' Businesses**.

The New Debt Documents or the New Third-Party Financing Documents, as applicable, and the New Organizational Documents contemplated under the Reorganization Transaction may contain various covenants and other restrictions that could limit the Reorganized Debtors' flexibility in operating the Toll Road.  A breach of any of these covenants or restrictions could result in a significant portion of the Reorganized Debtors' debt becoming immediately due and payable.  The Reorganized Debtors' ability to comply with certain of their covenants and restrictions can be affected by events beyond their control.  These covenants and other restrictions may limit their ability to, among other things:

48

- incur additional debt or issue preferred shares;

- pay dividends on, repurchase, or make distributions in respect of their capital stock or make other restricted payments;

- make investments;

- sell or transfer assets;

- create liens on assets to secure debt;

- consolidate, merge, sell, or otherwise dispose of all or substantially all of their assets;

- enter into transactions with affiliates;

- designate subsidiaries as unrestricted subsidiaries; and

- repay, repurchase, or modify certain subordinated and other material debt.

     **(b)**     **The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt, Including the New Loans or the New Third-Party Financing, and May Be Forced to Take Other Actions to Satisfy their Obligations, Which Actions May Not Be Successful**.

If the Reorganization Transaction is implemented, the Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the Reorganized Debtors' control, including traffic demand uncertainty, population shifts, and other demographic patterns, changes in economic activity on the local, national, and global levels, and regulatory uncertainty.  The Reorganized Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt, including the New Loans or the New Third-Party Financing.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the New Loans or the New Third-Party Financing.  These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due. Additionally, the New Debt Documents or the New Third-Party Financing Documents may limit the use of the proceeds from the disposition of assets.  As a result, the Reorganized Debtors may not be permitted to use the proceeds from these dispositions other than to satisfy obligations under the New Loans or the New Third-Party Financing.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

     **(c)**     **The New Loans Will Have a Later Maturity Than the Loans and Any Holder of the New Loans May Increase Its Risk That the Debtors Will Be Unable to Repay or Refinance the New Loans When They Mature**.

If the Reorganization Transaction is implemented and the New Loans are issued, following the Effective Date, the New Loans will have a later maturity than the Loans.  Holders of New Loans will be exposed to the risk of nonpayment on such notes for a longer period than the Lenders with respect to the Loans.

KE 32728595

      (d)      **The New Loans Will Be Secured Only to the Extent of the Value of the Assets Granted as Security for the New Loans, and the Fair Market Value of the Reorganized Debtors upon Any Foreclosure May Not Be Sufficient to Repay the Holders of the New Loans in Full**.

If the Reorganization Transaction is implemented, the New Loans will be secured by substantially all of the Debtors' assets (the "**Collateral**"); however, the fair market value of the Collateral may not be sufficient to repay the holders of the New Loans and all of the holders of other debt secured by a security interest in the Collateral, if any, upon any foreclosure.  The fair market value of the Collateral is subject to fluctuations based on factors that include, among other things, traffic demand, changes in economic activity, population shifts and other demographic changes, and regulatory uncertainty.  The amount to be received by creditors upon a sale of any Collateral would be dependent on numerous factors, including the value obtainable by selling the Collateral at the time, general market and economic conditions, and the timing and the manner of the sale.

In the event a subsequent bankruptcy or similar proceeding is commenced by or against the Reorganized Debtors, holders of the New Loans may be deemed to have an unsecured claim if the Reorganized Debtors' obligation under the New Loans exceeds the value of the Collateral securing the New Loans.  Upon a finding by a bankruptcy court that any New Loans are under-collateralized, the claims in the bankruptcy proceeding with respect to such New Loans, absent an election by holders of New Loans claims pursuant to section 1111(b) of the Bankruptcy Code, would be bifurcated between a secured claim and an unsecured claim, and the unsecured claim would not be entitled to the benefits of security in the Collateral.  Additionally, some or all accrued but unpaid interest may be disallowed in any bankruptcy proceeding.

The security interest granted in favor of the collateral agent under the New Debt Documents is subject to practical problems generally associated with the realization of security interests in collateral.  For example, the collateral agent may need to obtain the consent of a third party to obtain or enforce a security interest in a contract, and the Debtors cannot assure holders of the New Loans that the collateral agent will be able to obtain any such consent.  The consents of any third parties may not be given when required to facilitate a foreclosure on any particular assets.  Accordingly, the collateral agent may not have the ability to foreclose upon such assets, and the value of the Collateral may significantly decrease.

      (e)      **A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt and Could Affect the Trading Price of the New Loans**.

If the Reorganization Transaction is implemented and the New Loans are entered into or the New Third-Party Financing is obtained, the Debtors' or the Reorganized Debtors' credit ratings and, if applicable, the ratings for the New Loans could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable.  Downgrades in the Reorganized Debtors' long-term debt ratings may make it more difficult to refinance their debt and increase the cost of any debt that they may incur in the future.

In addition, a downgrade or withdrawal, or the announcement of a possible downgrade or withdrawal, of the credit ratings for the New Loans may cause the trading price of assignments or participations of the New Loans to decline significantly.

    **9.**      *Risks Related to the Offer and Issuance of the New Holdings Interests under the Reorganization Transaction*.

      (a)      **The Debtors Do Not Intend to Offer to Register the New Holdings Interests or to Exchange the New Holdings Interests in a Registered Exchange Offer**.

The New Holdings Interests have not been registered under the Securities Act or any state securities laws and, unless so registered, may not be reoffered or resold except pursuant to an exemption from the registration requirements of the Securities Act and applicable state securities laws.  The Debtors do not intend to register the New Holdings Interests under the Securities Act or to offer to exchange the New Holdings Interests in an exchange

KE 32728595

offer registered under the Securities Act.  As a result, for so long as the New Holdings Interests remain outstanding, they may be transferred or resold only in transactions exempt from the securities registration requirements of federal and applicable state laws.  In addition, the Debtors are not be subject to the reporting requirements of the Securities Exchange Act of 1934, and holders of the New Holdings Interests may be entitled to receive only certain information about the Debtors, including the information required by rule 144A(d)(4), 17 C.F.R. § 230.144A(d)(4), promulgated under the Securities Act.

The information that the Debtors are required to provide in order to issue the New Holdings Interests may be less than the Debtors would be required to provide if the New Holdings Interests were registered.  Among other things, the Debtors may not be required to provide:  (a) separate financial information for any subsidiary; (b) selected historical consolidated financial data of Holdings; (c) selected quarterly financial data of Holdings; (d) certain information about the Debtors' disclosure controls and procedures and their internal control over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers.  This lack of information could impair your ability to evaluate your ownership of the New Holdings Interests.

(b)        **There Is No Established Market for the New Holdings Interests**.

The New Holdings Interests will be a new issuance of securities, and there is no established trading market for such securities.  The Debtors do not intend to apply for the New Holdings Interests to be listed on any securities exchange or to arrange for quotation on any automated dealer quotation system.  You may not be able to sell your New Holdings Interests at a particular time or at favorable prices.  As a result, the Debtors cannot assure you as to the liquidity of any trading market for the New Holdings Interests.  Accordingly, you may be required to bear the financial risk of your ownership of the New Holdings Interests indefinitely.  If a trading market were to develop, future trading prices of the New Holdings Interests may be volatile and will depend on many factors, including: (a) the Debtors' operating performance and financial condition; (b) the interest of securities dealers in making a market for them; and (c) the market for similar securities.

10.        *Risks Related to Confirmation and Consummation of the Plan*.

(a)        **The Debtors May Not Commence the Chapter 11 Cases**.

As described above, the Debtors are conducting this solicitation prior to the commencement of their anticipated Chapter 11 Cases.  It is possible that the Debtors will not commence the Chapter 11 Cases if, among other things, the Debtors receive insufficient acceptances for the Plan or determine to pursue an alternative restructuring proposal.

(b)        **Conditions Precedent to Confirmation May Not Occur**.

As more fully set forth in Article IX of the Plan, the occurrence of Confirmation and the Effective Date are each subject to a number of conditions precedent.  If each condition precedent to Confirmation is not met or waived, the Plan will not be Confirmed, and if each condition precedent to Consummation is not met or waived, the Effective Date will not take place.  In the event that the Plan is not Confirmed or is not consummated, the Debtors may seek Confirmation of a new plan.  However, if the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, the Debtors may be forced to liquidate their assets.

(c)        **Parties in Interest May Object to the Plan's Classification of Claims and Interests**.

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(d)      **The Debtors May Not Be Able to Satisfy Voting Requirements**.

Pursuant to section 1126(c) of the Bankruptcy Code, section 1129(a)(7)(A)(i) of the Bankruptcy Code will be satisfied with respect to the Class 3 if at least two-thirds in amount and more than one-half in number of the Allowed Claims in Class 3 that vote, vote to accept the Plan.  Pursuant to section 1126(d) of the Bankruptcy Code, section 1129(a)(7)(A)(i) of the Bankruptcy Code will be satisfied with respect to the Class 7 if at least two-thirds in amount of the Allowed Interests in Class 7 that vote, vote to accept the Plan.  There is no guarantee that the Debtors will receive the necessary acceptances from Holders of Claims or Interests in the Voting Classes.  If the Voting Classes vote to reject the Plan, the Debtors may elect to amend the Plan, commence chapter 11 cases notwithstanding rejection of the Plan by the Voting Classes in accordance with the Restructuring Support Agreement, or continue operating under the current status quo outside of chapter 11.

(e)      **The Debtors May Not Be Able to Secure Confirmation**.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that:  (i) the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) the plan is not likely to be followed by a liquidation or a need for further financial reorganization unless liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A dissenting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement and the voting results are appropriate, the Bankruptcy Court still can decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

If the Plan is not Confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive with respect to their Allowed Claims and Interests, as applicable.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation in form and substance reasonably acceptable to the Required Consenting Secured Parties and the Consenting Interest Holders.  Any modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan, such as a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan.

(f)      **Parties in Interest May Object to the Releases Contained in the Plan**.

Confirmation is also subject to the Bankruptcy Court's approval of the settlement, release, injunction, and related provisions described in Article VIII of the Plan.  Certain parties in interest may assert that the Debtors cannot demonstrate that they meet the standards for approval of releases, exculpations, and injunctions under applicable law.

(g)      **The Debtors May Pursue Nonconsensual Confirmation If Certain Other Classes Vote to Reject the Plan**.

To the extent that any Voting Class collectively votes to reject the Plan, the Debtors may seek to pursue a nonconsensual restructuring strategy under section 1129(b)(2) of the Bankruptcy Code.  There can be no assurances that the Debtors will confirm a chapter 11 plan and emerge as a reorganized company in that event, and it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive with respect to their Allowed Claims and Interests in that instance.  A nonconsensual restructuring strategy may result in, among other things, increased expenses relating to Accrued Professional Compensation Claims.

KE 32728595

(h)     **The Debtors May Object to the Amount or Classification of a Claim or Interest**.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection or dispute.  Any Holder of a Claim or Interest that is subject to an objection or dispute may not receive its expected share of the estimated distributions described in this Disclosure Statement.  For the avoidance of doubt, the Debtors may not object to the aggregate Allowed amount of the Class 3 Claims.

(i)     **The Debtors' Historical Financial Information May Not Be Comparable to the Financial Information of the Reorganized Debtors**.

As a result of Consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

(j)     **The Effective Date May Not Occur**.

Due to the sale process for substantially all of the Debtors' assets, the Effective Date may not occur until long after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

B.     **Risks Related to Recoveries under the Plan**.

1.     *The Form and Amount of Recoveries under the Plan May Vary*.

The Restructuring could take the form of the Sale Transaction or the Reorganization Transaction.  The form of the Restructuring will affect the form and amount of the recovery to Holders of Allowed Class 3 Claims and Allowed Class 7 Interests.  Should the Special Committee, in good-faith consultation with and subject to the reasonable consent of the Required Consenting Secured Parties, elect to pursue the Sale Transaction, substantially all of the Debtors' assets will be sold to the highest or otherwise best bidder, and the proceeds of the sale will be distributed in accordance with the terms of the Bankruptcy Code, the Plan, and the Restructuring Support Agreement.  The amount of proceeds available for distribution will depend on, among other things, the willingness of potential bidders to submit bids for the Debtors' assets and the amount of such bids.  If the Sale Transaction is consummated, following the Effective Date, the Debtors will be wound down and dissolved.

Should the Special Committee, in good-faith consultation with and subject to the reasonable consent of the Required Consenting Secured Parties, or the Majority Secured Parties instead elect to pursue the Reorganization Transaction, the Debtors will be reorganized, and Holders of Allowed Class 3 Claims and Reorganized Statewide will receive their respective *pro rata* shares of the New Holdings Interests, the Holders of Allowed Class 7 Interests will retain their interests in Reorganized Statewide, and the Holders of Allowed Class 3 Claims will receive either (a) their *pro rata* shares of the New Loans or (b) their *pro rata* shares of the cash proceeds of the New Third-Party Financing.  The decision that the Debtors will enter into the New Loans or instead obtain New Third-Party Financing and make cash distributions to Holders of Allowed Class 3 Claims shall be made by the Required Consenting Secured Parties.

The value of the New Holdings Interests and the New Loans or the proceeds of the New Third-Party Financing, as applicable, may not correspond to the value of the proceeds that could be realized in a Sale Transaction, and, as discussed herein, there is no established market for a holder to sell or otherwise liquidate the New Holdings Interests.

2.     *Under the Reorganization Transaction, the New Holdings Interests Distributed to Reorganized Statewide Are Subject to Certain Forced Purchase and Sale Provisions*.

The Plan provides that Reorganized Statewide shall receive 4.25 percent of the New Holdings Interests, subject to certain adjustments, if the Reorganization Transaction is consummated.  In the event of a change of control over, or a sale of substantially all of the assets of, the Reorganized Debtors during the 18-month period after

53

the Effective Date, Holders of Allowed Class 7 Interests shall have the right to cause the Reorganized Debtors to purchase some or all of New Holdings Interests distributed to Reorganized Statewide for $80 million, and the Reorganized Debtors shall have the right to purchase the New Holdings Interests held by Statewide for $100 million.  In either event, there is no guarantee that the consideration for such sale of the New Holdings Interests held by Statewide will approximate the value of the New Holdings Interests as of the date of such sale.

3.      *Under the Reorganization Transaction, the Senior Secured Party Equity Distribution May Be Affected by the Management Equity Consideration or by an Change in the Principal Amount of the New Loans or the New Third-Party Financing Above or Below $2.75 Billion.*

The Plan provides that the Consenting Interests Holders may elect to receive the Management Equity Consideration, consisting of 3 percent of the New Holdings Interests, in lieu of the Management Cash Consideration as consideration for performing under the Omnibus Services Agreement.  Such election by the Consenting Interest Holders will dilute the Senior Secured Party Equity Distribution.  Furthermore, there is no guarantee that the Management Equity Consideration will approximate the value of services performed by the Consenting Interest Holders as Manager.

Furthermore, the baseline amount of the Statewide Interest Equity Distribution (4.25 percent) and the Management Equity Consideration (3 percent) assumes that the Debtors will enter into the New Loans or obtain New Third-Party Financing in the principal amount of $2.75 billion.  If the principal amount of the New Loans or the New Third-Party Financing is greater or less than $2.75 billion, the amount of New Holdings Interests to be distributed to Reorganized Statewide and the amount of the Management Equity Consideration shall be increased or decreased *pro rata*, affecting the amount of the Senior Secured Party Equity Distribution.

4.      *Under the Reorganization Transaction, the Debtors May Not Be Able to Achieve Their Projected Financial Results or Meet Their Post-Restructuring Debt Obligations.*

The Financial Projections represent management's best estimate of the future financial performance of the Debtors or the Reorganized Debtors, as applicable, based on currently known facts and assumptions about future operations of the Debtors or the Reorganized Debtors, as applicable, as well as the U.S. and world economy in general and the industry segments in which the Debtors operate in particular.  There is no guarantee that the Financial Projections will be realized, and actual financial results may differ significantly from the Financial Projections.  To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due, or may not be able to meet their operational needs, all of which may negatively affect the value of the New Loans, if entered into, and the New Holdings Interests.  Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Debtors to seek additional working capital.  The Reorganized Debtors may be unable to obtain such working capital when it is required, or may only be able to obtain such capital on unreasonable or cost prohibitive terms.  For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Reorganized Debtors, and also have a negative effect on the value of the New Holdings Interests.  In addition, if any such required capital is obtained in the form of equity, the New Holdings Interests to be issued to Holders of Allowed Class 3 Claims and Reorganized Statewide under the Plan could be diluted.

5.      *Estimated Valuations of the Debtors, the New Loans, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.*

The Debtors' estimated recoveries to Holders of Allowed Claims and Interests are not intended to represent the market value of the Debtors' securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; and (e) the assumption that capital and equity markets remain consistent with current conditions.

54

KE 32728595

6.      *Under the Reorganization Transaction, Certain Holders of Claims That Acquire the New Holdings Interests May Assert Significant Control over the Reorganized Debtors.*

Should the Special Committee, in good-faith consultation with and subject to the reasonable consent of the Required Consenting Secured Parties, or the Majority Secured Parties elect to pursue the Reorganization Transaction, upon Consummation of the Plan, Holders of Allowed Class 3 Claims will become holders of the New Loans and a *pro rata* share of 95.75 percent of the New Holdings Interests.  In addition, Holders of Allowed Class 3 Claims will, on account of their receipt of the New Holdings Interests, be entitled to appoint the board of managers of Reorganized Holdings.  As a result, following Consummation, Holders of Allowed Class 3 Claims may potentially exercise substantial influence over the Reorganized Debtors and their affairs.

7.      *Under the Reorganization Transaction, Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors.*

Holders of Allowed Claims and Allowed Interests should carefully review Section IX of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

**C.      Risks Related to the Business Operations of the Debtors and Reorganized Debtors.**

1.      *The Debtors Plan to File Voluntary Petitions for Relief under Chapter 11 of the Bankruptcy Code and Will Be Subject to the Risks and Uncertainties Associated with Any Chapter 11 Restructuring.*

For the duration of the Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy.  These risks include:

- the Debtors' ability to obtain approval of the Bankruptcy Court with respect to pleadings filed in the Chapter 11 Cases from time to time;

- the Debtors' ability to obtain creditor and Bankruptcy Court approval for, and then to consummate, the Plan to emerge from bankruptcy;

- the occurrence of any event, change, or other circumstance that could give rise to the termination of the Restructuring Support Agreement;

- the Debtors' ability to obtain and maintain normal trade terms with service providers and maintain contracts that are critical to their operations;

- the Debtors' ability to attract, motivate, and retain key employees;

- the Debtors' ability to attract and retain customers;

- the Debtors' ability to fund and execute their business plan;

- the Debtors' ability to maintain a productive relationship with the State of Indiana and the IFA;

- adverse economic conditions that affect employment rates and income rates in the region surrounding the Toll Road; and

- development of residential and commercial property in the region surrounding the Toll Road.

The Debtors will also be subject to risks and uncertainties with respect to the actions and decisions of the creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Plan.

These risks and uncertainties could affect the Debtors' business and operations in various ways.  For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the Debtors'

relationships with their customers, as well as their suppliers and employees, which, in turn, could adversely affect the Debtors' operations and financial condition.  Also, pursuant to the Bankruptcy Code, the Debtors need approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit their ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot predict or quantify the ultimate effect that events occurring during the Restructuring will have on their business, financial condition, and results of operations.

If the Debtors commence the Chapter 11 Cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty.  While operating as debtors in possession, and subject to approval of the Bankruptcy Court, or otherwise as permitted in the normal course of business or Bankruptcy Court order, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities.  Further, a Plan could materially change the amounts and classifications of assets and liabilities reported in the historical consolidated financial statements.  The historical consolidated financial statements do not include any adjustments to the reported amounts of assets or liabilities that might be necessary as a result of Confirmation.

## 2.    *New Omnibus Services Agreement*.

The Plan contemplates that Cintra and/or Macquarie will provide certain management services to the Reorganized Debtors if the Reorganization Transaction is implemented.  Such services shall be provided in accordance with the Omnibus Services Agreement, which shall be consistent with the terms set forth in the New Omnibus Services Agreement Term Sheet attached to the Plan and the form of which shall be included in the Plan Supplement.  The Omnibus Services Agreement has not yet been finalized.  The terms of the Omnibus Services Agreement may have a material effect on the Reorganized Debtors' business operations.

## 3.    *Potential for the Loss of Key Members of the Executive Management Team*.

The Debtors are highly dependent on the efforts and performance of their executive management team.  If the Debtors were to lose key members of this team, the Debtors' business, financial condition, liquidity, and results of operations could be adversely affected.

## 4.    *Arrangements with the Skyway Concessionaire*.

The Debtors are highly dependent on the efforts and performance of the Skyway Concessionaire under various intercompany agreements.  If the Skyway Concessionaire were to breach its obligations to the Debtors, or otherwise were to cease to perform under such arrangements, the Debtors' business, financial condition, liquidity, and results of operations could be adversely affected.

## 5.    *Economic Conditions That Are Beyond the Debtors' Control*.

The Debtors depend on their customers' willingness to pay to travel on the Toll Road.  A customer's willingness to travel on the Toll Road depends largely upon prevailing economic and traffic conditions that are influenced by numerous factors over which the Debtors' management has no control, such as:  (a) the job market in the communities surrounding the Toll Road; (b) the availability of residential building permits; (c) changes in local household incomes; and (d) the level of economic activity requiring commercial transportation and freight in the northern Indiana region.  Moreover, the Debtors' ability to increase their customer base depends on the occurrence of certain planned development projects in the region surrounding the Toll Road.  If future economic conditions result in lower than expected customer traffic on the Toll Road, the Debtors' business, financial condition, liquidity, and results of operations could be adversely affected.

## 6.    *Traffic Risk*.

Traffic levels could fall below forecast as a result of miscalculation of base case assumptions.  Factors that may cause traffic flow to fall below forecasted levels, including reduced level of traffic in northwest Indiana and northwest Illinois, national and regional economic trends, and fuel prices.  If future traffic flow falls below forecasted levels, the Debtors' business, financial condition, liquidity, and results of operations could be adversely affected.

56

7. *Concentration of Geographic Risk*.

The Debtors' only project, the Toll Road, is located in northern Indiana. Successful operation of the Toll Road is dependent upon many factors, including future population and employment growth in this area. Future growth is dependent upon the strength of the residential real estate market and the availability of financing for both home builders and home buyers. Recent turmoil in the credit and housing markets has resulted in a tightening of credit standards for residential mortgages and significantly reduced liquidity and has adversely affected the ability of home builders and home buyers to obtain financing, which in turn has adversely affected traffic on the Toll Road. The downturn in the real estate market may continue to adversely affect the performance of the Toll Road in the near future.

8. *Labor Risks*.

Increases in labor costs, potential labor disputes, and work stoppages at the Debtors' facilities could materially adversely affect the Debtors' financial performance. The Debtors' financial performance is affected by the availability of qualified personnel and the cost of labor. A majority of the Debtors' employees are represented by labor unions. If the Debtors' workers were to engage in a strike, a work stoppage, or other slowdowns, the Debtors could experience disruptions in their operations. Such disruptions could result in a loss of business and an increase in operating expenses, which could reduce profit margins. In addition, the non-unionized portion of the Debtors' workforce may become subject to union organizing efforts, which could cause the Debtors to incur additional labor costs and increase the related risks currently faced. Strikes, work stoppages, or slowdowns experienced by these suppliers and customers could result in slowdowns or closures of facilities where components of the Toll Road (*e.g.*, street lights and cement) are manufactured or delivered. Any interruption in the production or delivery of these components could reduce traffic, increase costs, and have a material adverse effect on the Debtors' business.

9. *Catastrophic Events*.

The Debtors face the risk that unforeseen catastrophic events may occur. Such events include unexpected military or terrorist attacks occurring on or around the Toll Road. Should any such event occur, it could have a material adverse effect on the Debtors' business.

10. *Extreme Weather Events*.

The Debtors' results of operations may be affected by weather conditions and may fluctuate substantially on a seasonal basis as the weather changes. In addition, the Debtors could be subject to the effects of extreme weather. Extreme weather events, including sustained cold temperatures, hurricanes, storms, floods, or other natural disasters, could be destructive and result in increased capital expenditures or costs. Moreover, an extreme weather event could cause disruption in service to customers due to downed wires and poles or damage to other operating equipment, which could result in lost revenue from toll collection by diverting customers to other roads.

D. **Miscellaneous Risk Factors and Disclaimers**.

1. *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed*.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

2. *No Legal or Tax Advice Is Provided by This Disclosure Statement*.

This Disclosure Statement is not legal advice to any person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult its own legal

57

counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

### 3.  *No Admissions Made*.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims, or any other parties in interest.

### 4.  *Failure to Identify Litigation Claims or Projected Objections*.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

### 5.  *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors*.

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

### 6.  *No Representations outside This Disclosure Statement Are Authorized*.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure voting Holders' acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by voting Holders in arriving at their decision.  Voting Holders should promptly report unauthorized representations or inducements to counsel to the Debtors.

KE 32728595

## VIII.    Important Securities Laws Disclosures

As discussed herein, Reorganized Holdings will distribute the New Holdings Interests to Holders of Allowed Class 3 Claims and Reorganized Statewide.  The Debtors believe that the New Holdings Interests may constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable Blue Sky Laws.

The Reorganized Debtors will rely on section 1145 of the Bankruptcy Code and section 4(a)(2) of the Securities Act to exempt from the registration requirements of the Securities Act the offer, issuance, and distribution of the New Holdings Interests.  Section 4(a)(2) of the Securities Act exempts the offer and sale of securities from section 5 of the Securities Act in transactions not involving a public offering such as prepetition solicitations.  Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash.  In general, securities issued under section 1145 of the Bankruptcy Code may be resold without registration unless the recipient is an "underwriter" with respect to those securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (1) with a view to distributing those securities, and (2) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

To the extent that Entities who receive the New Holdings Interests are deemed to be "underwriters," resales by those Entities would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code.  Those Entities would, however, be permitted to sell the New Holdings Interests or other securities without registration if they are able to comply with the provisions of rule 144, 17 C.F.R. § 230.144, ("**Rule 144**") under the Securities Act, as described further below.

You should confer with your own legal advisors to help determine whether or not you are an "underwriter."

Under certain circumstances, holders of the New Holdings Interests deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144, to the extent available, and in compliance with applicable state securities laws.  Generally, Rule 144 provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met.  These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker," and that notice of the resale be filed with the U.S. Securities and Exchange Commission.

KE 32728595

IX.    **Certain U.S. Federal Tax Consequences of the Plan**

A.    **Introduction**.

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and certain Holders of Claims and Interests.  This summary is based on the Internal Revenue Code (as amended, the "**IRC**"), the U.S. Treasury regulations promulgated thereunder (the "**Treasury Regulations**"), and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty exists with respect to many of the tax consequences described below.  No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling from the Internal Revenue Service (the "**IRS**") as to any of the tax consequences of the Plan discussed below.  There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

Except as specifically set forth below, this summary does not apply to Holders of Claims or Interests that are not U.S. Persons (as such term is defined in the IRC) or that are otherwise subject to special treatment under U.S. federal income tax law (including banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, employees, persons who received their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction and regulated investment companies.  The following discussion assumes that Holders of Claims or Interests hold such Claims as "capital assets" within the meaning of section 1221 of the IRC (except as described in Section IX.C.1 of this Disclosure Statement).  Moreover, this summary does not purport to address all aspects of U.S. federal income taxation that may apply to the Debtors and Holders of Claims or Interests based upon their particular circumstances.  Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local or foreign tax law.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

The U.S. federal income tax consequences of the Plan may depend in part on whether the Restructuring is implemented as a Reorganization Transaction or as a Sale Transaction and whether, in the event of a Reorganization Transaction, Statewide makes a Put Election to receive Cash instead of New Concessionaire Interests.  The discussion below will consider each alternative.  It is intended that the Reorganization Transaction be treated as (1) the forgiveness of the portion of each Class 3  Claim in excess of such Claim's fair value, (2) a taxable transfer by Statewide of a portion of its assets to Holders of Allowed Class 3 Claims in satisfaction of their remaining Claims, followed by (3) (x) a contribution of the assets treated as transferred to the Holders of Class 3 Claims to Reorganized Holdings in exchange for New Holdings Interests and New Loans and (y) a contribution to Reorganized Holdings by Reorganized Statewide of the portion of its assets not treated as transferred to Holders of Allowed Class 3 Claims in exchange for New Holdings Interests.  The remainder of this discussion assumes that the tax treatment described above will apply.

B.    **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Holders of Allowed Class 7 Interests**.

Immediately prior to the Consummation of the Plan, Statewide will be treated as a partnership for U.S. federal income tax purposes and Holdings and the Concessionaire will be treated as disregarded entities for

60

U.S. federal income tax purposes (with their assets being treated as owned by Statewide for such purposes). Accordingly, the U.S. federal income tax consequences of consummating the Plan will generally not be borne by Statewide, Holdings, or the Concessionaire, but will be borne by Statewide's partners, *i.e.*, the Holders of the Class 7 Interests.

1.      ***COD Income***.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the IRC, a taxpayer is not required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "**Bankruptcy Exception**"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("**NOLs**"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.

Under section 108(d)(6) of the IRC, when an entity, such as Statewide, that is taxed as a partnership realizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception (and related attribute reduction) is applied at the partner level rather than at the entity level. Accordingly, the Holders of Allowed Class 7 Interests will be treated as receiving their allocable share, if any, of the COD Income realized by Statewide.

The amount of COD Income to be allocated to Statewide's partners will depend on the adjusted issue price of the debt forgiven as of the Effective Date and either (a) the fair market value as of the Effective Date of the portion of Statewide's assets deemed transferred to Holders of Allowed Class 3 Claims in satisfaction of their Claims or (b) the amount of Cash proceeds received in a Sale Transaction. These amounts cannot be known with certainty at this time.

2.      ***Gain on Sale Transaction or Reorganization Transaction***.

As noted in Section A above, a Reorganization Transaction is intended to be treated as a taxable transfer of a portion of Statewide's assets to the Holders of Allowed Class 3 Claims in satisfaction of their Claims. In addition to COD Income, any gain or loss recognized by Statewide in a Reorganization Transaction or upon on the sale of the Debtors' assets or the equity interests of the Debtors in a Sale Transaction will be allocated to Statewide's partners. In a Reorganization Transaction, Statewide should recognize gain or loss equal to the difference between the fair market value of the portion of Statewide's assets treated as transferred to the Holders of Allowed Class 3 Claims in satisfaction of their Claims and Statewide's adjusted basis in those assets. In a Sale Transaction, Statewide should recognize gain or loss equal to the difference between the proceeds of the sale and Statewide's adjusted basis in the property sold. Any such gain or loss will be allocated to Statewide's partners. The character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors including which assets of the Debtors are held as capital assets and whether and to what extent any gain on their sale represents the recapture of prior depreciation or amortization.

3.      ***Receipt of New Holdings Interests***.

In the event of a Reorganization Transaction, to the extent that Holders of Statewide Interests do not make Put Elections, pursuant to the Plan, and in satisfaction of its Interests, Statewide will receive a share of the New Holdings Interests. In that case, it is intended that Statewide's receipt of New Holdings Interests is in exchange for property (the portion of Statewide's assets not treated as transferred to Holders of Allowed Class 3 Claims) Statewide is deemed to contribute to Reorganized Holdings, if any. In that case, Statewide, and thus Statewide's partners, generally should not recognize gain or loss upon the deemed contribution of property for New Holdings

61

Interests.  Statewide's holding period for the New Holdings Interests received on the Effective Date would include the period that Statewide held the property deemed contributed.

In the event of a Reorganization Transaction in which one or more Holders of Statewide Interests makes a Put Election, pursuant to the Plan, and in satisfaction of the applicable share of its Interests, such Holders of Statewide Interests will receive Cash.  The receipt of Cash by Holders of Statewide Interests may be treated as a taxable exchange.  If receipt of Cash pursuant to a Put Election is treated as a taxable exchange, Statewide should recognize gain or loss equal to the difference between (a) the amount of Cash received and (b) Statewide's adjusted tax basis in the portion of its assets not deemed transferred to Holders of Allowed Class 3 Claims.  The character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others whether the transferred (or deemed transferred) items of property constitute capital assets in Statewide's hands.  Any such gain or loss would be allocated to Statewide's partners.  Each Holder of equity in Statewide is urged to consult its tax advisor to determine the character of any gain or loss recognized by Statewide with respect to a Reorganization Transaction.

Limitations may apply to the use of capital losses incurred in connection with the implementation of the Plan.  For corporate Holders, losses from the sale or exchange of capital assets may be used only to offset capital gains.  Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

**C.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 3 Claims**.

Although this summary generally does not apply to Holders of Allowed Class 3 Claims that are not U.S. Persons ("**Non-U.S. Holders**"), if a Non-U.S. Holder of Allowed Class 3 Claims is engaged in a trade or business in the United States (for example, through a U.S. branch) and income or gain from the Class 3 Claims is effectively connected with the conduct of such trade or business, the Non-U.S. Holder will generally be subject to regular U.S. income tax on such income and gain in the same manner as if it were a U.S. Person.  However, a Non-U.S. Holder may be subject to additional U.S. federal income tax consequences not discussed below.  For example, a Non-U.S. Holder may be subject to a branch profits tax equal to 30 percent of its effectively of connected earnings and profits for the taxable year, subject to adjustments.

As noted above in the description of the Plan, while all Holders of Allowed Class 3 Claims hold some of those Claims as a result of having been obligors on the Loans, some of the Holders of Allowed Class 3 Claims hold another portion of those Claims as a result of having been counterparties to the Hedging Agreements.  The U.S. federal income tax consequences of the Plan to a Holder of Allowed Class 3 Claims will differ depending on whether those Allowed Class 3 Claims resulted from the Holder being an obligee on the Loans ("**Class 3 Loan Claims**") or from the Holder being a counterparty to a Hedging Agreement ("**Class 3 Hedging Claims**").

**1.        *Consequences of Exchanges Pursuant to the Plan to Holders of Class 3 Loan Claims*.**

**(a)        Reorganization Transaction**.

In the event of a Reorganization Transaction, pursuant to the Plan, and in satisfaction of their respective Claims, Holders of Allowed Class 3 Loan Claims will receive a share of the New Holdings Interests, and some combination of the New Loans and/or Cash.  The following discussion assumes that the obligation underlying each Class 3 Loan Claim is properly treated as debt (rather than equity) of the Debtors. If this assumption is not correct, the tax consequences of the proposed transactions could be materially different than as described below.

The receipt of the New Holdings Interests and New Loans by Holders of Allowed Class 3 Loan Claims is intended to be treated as a taxable transaction in which such Holders are treated as receiving a portion of Statewide's assets in satisfaction of the Class 3 Loan Claims, followed by a contribution of those assets to Reorganized Holdings for New Holdings Interests and New Loans.  In that case, a Holder of a Class 3 Loan Claim should recognize gain or loss upon the exchange of its Class 3 Loan Claim in an amount equal to the difference between (i) the fair market value of the assets deemed transferred to such Holders plus the amount of Cash received, if any, and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered Allowed Class 3 Loan Claim. To the extent the Class 3 Loan Claim exchanged for the New Holdings Interests, New Loans, or Cash pertain to accrued but

62

unpaid interest (including accrued original issue discount), a Holder of such Class 3 Loan Claim should be taxed as receiving accrued but unpaid interest (including accrued original issue discount).

A Holders tax basis in the New Holdings Interests should equal their fair market value on the Effective Date and a Holder's holding period should begin on the day following the Effective Date. A Holder's tax basis in the New Loans should equal their issue price, and a Holder's holding period should begin on the day following the Effective Date.

(b)     **Sale Transaction**.

In the event of a Sale Transaction, pursuant to the Plan, and in partial satisfaction of their respective Claims, Holders of Allowed Class 3 Loan Claims will receive a share of the Cash proceeds from the Sale Transaction. The following discussion assumes that the obligation underlying each Class 3 Loan Claim is properly treated as debt of the Debtors for U.S. federal income tax purposes. If this assumption is not correct, the tax consequences of the proposed transactions could be materially different than as described below.

Based on these assumptions, the receipt of Cash by Holders of Allowed Class 3 Loan Claims should be treated as a taxable exchange. A Holder should recognize gain or loss equal to the difference between (i) the amount of Cash received not allocable to accrued but untaxed interest and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered Allowed Class 3 Loan Claim.

(c)     **Character of Gain or Loss**.

Where gain or loss is recognized by a Holder of an Allowed Class 3 Loan Claim upon the exchange of its Allowed Class 3 Loan Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, whether the Class 3 Loan Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Class 3 Loan Claim was acquired at a market discount (discussed below), whether and to what extent the Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. Each Holder of a Class 3 Loan Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Class 3 Loan Claim.

Holders of Class 3 Loan Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For corporate Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

(d)     **Accrued Interest**.

To the extent that any amount received by a Holder of a surrendered Class 3 Loan Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered Class 3 Loan Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary; however, the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Class 3 Loan Claim will be attributable to accrued interest on the debts constituting the surrendered Class 3 Loan Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the terms of the Plan, distributions in respect of Class 3 Loan Claims are allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such

63

claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for Holders.

(e)     **Market Discount**.

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Class 3 Loan Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Class 3 Loan Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of debt constituting its Class 3 Loan Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the Class 3 Loan Claims that were acquired with market discount are exchanged in a tax-free transaction for other property (as may occur here), any market discount that accrued on the Class 3 Loan Claims (i.e., up to the time of the exchange) but was not recognized by the Holder is carried over to the property received therefore and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued market discount.

2.     *Consequences of Exchanges Pursuant to the Plan of Class 3 Hedging Claims*.

Pursuant to the Plan, Holders of Allowed Class 3 Hedging Claims will receive some combination of the New Holdings Interests, the New Loans, and/or Cash. The following discussion assumes that each Class 3 Hedging Claim is properly treated as a "notional principal contract" ("**NPC**") for U.S. federal income tax purposes. It also assumes that each Class 3 Hedging Claim is treated as hedging transaction within the meaning of section 1221(b)(2)(A)(ii) of the IRC and has been properly identified as such within the meaning of section 1221(a)(7) of the IRC.

In general, a termination payment with respect to a NPC is a payment made or received to extinguish or assign all or a proportionate part of the remaining rights and obligations of any NPC party. A termination payment includes a payment made between the original parties to the NPC (referred to as an extinguishment). Any economic benefit that is given or received by a taxpayer in lieu of a termination payment is also a termination payment. The Debtors intend to treat the exchange of Class 3 Hedging Claims for either (a) New Holdings Interests and New Loans or (b) Cash, as a termination payment with respect to such claims.

A party to a NPC recognizes a termination payment in the year in which the contract is disposed of, as well as any as yet unamortized portion of any nonperiodic payment made under the NPC. The Debtors intend to treat the termination payment with respect to the Class 3 Hedging Claims as recognized over the term of the Class 3 Loan Claims, which should end as of the Effective Date. Furthermore, since the Class 3 Hedging Claims are hedging transactions, termination payments made with respect to the Class 3 Hedging Claims should generate ordinary income to Holders or deductions to the Debtors, as the case may be (i.e., they would take their character from the interest rate risk being hedged). A Holder's tax basis in the New Holdings Interests should equal their fair market value on the Effective Date and a Holder's holding period should begin on the day following the Effective Date. A Holder's tax basis in the New Loans should equal their issue price, and a Holder's holding period should begin on the day following the Effective Date.

3. *Ownership and Disposition of the New Holdings Interests.*

 (a) **General**.

 Under the Treasury Regulations, a domestic entity that has two or more members and that is not organized as a corporation under U.S. federal or state law will generally be classified as a partnership for U.S. federal income tax purposes, unless it elects to be treated as a corporation. Pursuant to the Plan and the limited liability company agreement for Reorganized Holdings, no election may be made for Reorganized Holdings to be classified as a corporation for U.S. federal income tax purposes that is effective on or prior to the Effective Date. Thus, subject to the discussion of publicly traded partnerships below, Reorganized Holdings will be treated as a partnership for U.S. federal income tax purposes.

 Under the "publicly traded partnership" provisions of the IRC, an entity that would otherwise be treated as a partnership whose interests are considered to be publicly traded and does not meet a qualifying income test will be taxable as a corporation. It is anticipated that the Reorganized Holdings limited liability company agreement will prohibit the transfer of membership interests in Reorganized Holdings if such transfer would jeopardize the status of Reorganized Holdings as a partnership for U.S. federal income tax purposes (prior to an actual conversion for U.S. federal income tax purposes to corporate status). Any purported transfer in violation of such provisions will be null and void and would not be recognized by Reorganized Holdings.

 This discussion of the U.S. federal income tax consequences of the Plan assumes that Reorganized Holdings will be treated as a partnership for U.S. federal income tax purposes.

 As a partnership, Reorganized Holdings itself will not be subject to U.S. federal income tax. Instead, Reorganized Holdings will file an annual partnership information return with the IRS, which form will report the results of Reorganized Holdings' operations. Each member will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of Reorganized Holdings' income, gain, loss, deduction and credit for each taxable year of Reorganized Holdings ending with or within the member's taxable year. Each item generally will have the same character as if the member had realized the item directly. Members will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from Reorganized Holdings for such taxable year, and thus may incur income tax liabilities in excess of any distributions from Reorganized Holdings.

 Reorganized Holdings's tax basis in the portion of each of its assets deemed transferred to the Holders of Allowed Class 3 Claims should equal such portion's fair market value on the Effective Date as determined by the board of directors of Reorganized Holdings, and the holding period for such portion would begin on the day after the Effective Date. Reorganized Holdings's tax basis and holding period in the portion of each of its assets deemed contributed directly to Reorganized Holdings by Statewide would be the same as Statewide's basis and holding period with respect to such portion.

 A member is allowed to deduct its allocable share of Reorganized Holdings' losses (if any) only to the extent of such member's adjusted tax basis (discussed below) in its membership interest at the end of the taxable year in which the losses occur. In addition, various other limitations in the IRC may significantly limit a member's ability to deduct its allocable share of deductions and losses of Reorganized Holdings against other income.

 Reorganized Holdings will provide each member with the necessary information to report its allocable share of the Reorganized Holdings' tax items for U.S. federal income tax purposes; however, no assurance can be given that Reorganized Holdings will be able to provide such information prior to the initial due date of the members' U.S. federal income tax return and the members may therefore be required to apply to the IRS for an extension of time to file their tax returns.

 The board of directors of Reorganized Holdings will decide how items will be reported on Reorganized Holdings' U.S. federal income tax returns, and all members will be required under the IRC to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. In the event that the income tax returns of Reorganized Holdings are audited by the IRS, the tax treatment of Reorganized Holdings income and deductions generally will be determined at the Reorganized Holdings level in a single proceeding, rather than in individual audits of the members. The tax matters partner will have considerable

65

authority under the IRC and the limited liability company agreement for Reorganized Holdings to make decisions affecting the tax treatment and procedural rights of all members.

A member generally will not recognize gain or loss on the receipt of a distribution of cash or property from Reorganized Holdings (provided that the member is not treated as exchanging such member's share of Reorganized Holdings' "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the IRC, and together "ordinary income items") for other partnership property). A member, however, will recognize gain on the receipt of a distribution of money and, in some cases, marketable securities, from Reorganized Holdings (including any constructive distribution of money resulting from a reduction of the member's share of the indebtedness of Reorganized Holdings) to the extent such cash distribution or the fair market value of such marketable securities distributed exceeds such member's adjusted tax basis in its membership interest. Such distribution would be treated as gain from the sale or exchange of a membership interest, which is described below.

A member will recognize gain on the complete liquidation of its membership interest only to the extent the amount of money received exceeds its adjusted tax basis in its interest. Distributions of certain marketable securities are treated as distributions of money for purposes of determining gain. Any gain recognized by a member on the receipt of a distribution from Reorganized Holdings generally will be capital gain, but may be taxable as ordinary income under certain other circumstances. No loss can be recognized on a distribution in liquidation of a membership interest, unless the member receives no property other than money and ordinary income items.

A member's adjusted tax basis in its membership interest generally will be equal to such member's initial tax basis (discussed above), increased by the sum of (i) any additional capital contribution such member makes to Reorganized Holdings, (ii) the member's allocable share of the income of Reorganized Holdings, and (iii) increases in the member's allocable share of the indebtedness of Reorganized Holdings, and reduced, but not below zero, by the sum of (iv) the member's allocable share of the losses of Reorganized Holdings, and (v) the amount of money or the adjusted tax basis of property distributed to such member, including constructive distributions of money resulting from reductions in such member's allocable share of the indebtedness of Reorganized Holdings.

A sale of all or part of a member's interest will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such member's adjusted tax basis for the portion of the interest disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year, except to the extent (i) that the proceeds of the sale are attributable to a member's allocable share of certain ordinary income items of Reorganized Holdings and such proceeds exceed the member's adjusted tax basis attributable to such ordinary income items and (ii) of previously allowed bad debt or ordinary loss deductions (reduced by any recognized gain which the member may have received on the exchange of a Class 3 Claim for New Holdings Interests). A member's ability to deduct any loss recognized on the sale of its membership interest will depend on the member's own circumstances and may be restricted under the IRC.

>        **(b)**        **Non-U.S. Holders**.

The U.S. federal income tax treatment of a holder of New Holdings Interests that is a nonresident alien, non-U.S. corporation, non-U.S. partnership, non-U.S. estate or non-U.S. trust (a "**Non-U.S. Partner**") is complex and will vary depending on the circumstances and activities of such holder and Reorganized Holdings. Each Non-U.S. Partner is urged to consult with its own tax advisor regarding the U.S. federal, state and local and non-U.S. income, estate and other tax consequences of holding interests in Reorganized Holdings. The following discussion assumes that a Non-U.S. Partner is not subject to U.S. federal income taxes as a result of its presence or activities in the United States (other than as a holder of Interests in Reorganized Holdings).

A Non-U.S. Partner generally will be subject to U.S. federal withholding taxes at the rate of 30 percent (or such lower rate provided by an applicable tax treaty) on its share of Reorganized Holdings' income from dividends, interest (other than interest that constitutes portfolio interest within the meaning of the IRC), and certain other income that is not treated as "effectively connected with the conduct of a trade or business within the United States," as defined in section 864 of the IRC ("**ECI**").

The activities of Reorganized Holdings are likely to be treated as a U.S. trade or business, and to the extent that such activities are so treated, a Non-U.S. Partner would be deemed to be engaged in that underlying U.S. trade

or business. A Non-U.S. Partner's share of Reorganized Holdings' ECI would be subject to tax at normal graduated U.S. federal income tax rates and, if the Non-U.S. Partner is a corporation for U.S. federal income tax purposes, may also be subject to U.S. branch profits tax. In addition, some or all of the gain on a disposition of a Non-U.S. Partner's interest in Reorganized Holdings could be treated as ECI to the extent such gain is attributable to assets that generate ECI.   A Non-U.S. Partner generally will be required to file a U.S. federal income tax return if Reorganized Holdings is deemed to be engaged in a U.S. trade or business (even if no income allocated to the Non-U.S. Partner is ECI).  Reorganized Holdings would be required to withhold U.S. federal income tax with respect to the Non-U.S. Partner's share of income that is ECI.

Each holder of New Holdings Interests is urged to consult its tax advisor regarding the tax consequences of owning and disposing of membership interests in Reorganized Holdings.

**4.**        ***Ownership and Disposition of the New Loans***.

A holder of New Loans will be required to include stated interest on such New Loans, as applicable, in income in accordance with the holder's regular method of accounting to the extent such stated interest is "qualified stated interest." Stated interest is "qualified stated interest" if it is payable in cash at least annually. Where stated interest payable on the New Loans is not payable at least annually (the "deferred" interest), such portion of the stated interest will be included in the determination of the original issue discount ("**OID**") on such New Loans, as set forth below.

A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a de minimis amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than qualified stated interest. Thus, the deferred portion (if any) of the stated interest payments on a New Loans will be included in the stated redemption price at maturity and taxed as part of OID.

The issue price of the New Loans will depend on whether a substantial amount of either the New Loans or the Class 3 Claims for which they are exchanged is considered to be "traded on an established market."  In general, debt instruments such as the New Loans will be treated as traded on an established market if, at any time during the 31-day period ending 15 days after the issue date, (a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer or pricing service for property and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property; or (c) there are one or more "indicative" quotes available from at least one broker, dealer, or pricing service for property.

If the New Loans are not traded on an established market and the Class 3 Claims are traded on an established market at the time of the exchange, the issue price of the New Loans may be determined applying the "investment unit" rules and treating the New Loans as part of an investment unit (including the New Holdings Interests) issued in exchange for the existing Claims.  Generally, the issue price of an investment unit is determined by applying the issue price rules applicable to debt instruments, and the debt instrument's issue price is its allocable portion of the issue price of the investment unit, based on the relative fair market value of the debt instrument and the other property right (i.e., the New Holdings Interests).  Thus, if the Class 3 Claims are traded on an established market, the issue price of the investment unit would be equal to the fair market value of the Class 3 Claims on the date the New Loans are issued, and the issue price of the New Loans will equal the allocable portion of such investment unit's issue price determined by multiplying the investment unit's issue price by the fraction obtained by dividing the fair market value of the New Loans by the sum of the fair market value of the New Loans and the fair market value of the New Holdings Interests.  If neither the New Loans nor the Class 3 Claims are traded on an established market at the time of the exchange, the issue price of the New Loans will generally equal their stated principal amount.

A holder of New Loans that are issued with OID generally will be required to include any OID in income over the term of such New Loans in accordance with a constant yield-to-maturity method, regardless of whether the holder is a cash or accrual method taxpayer, and regardless of whether and when the holder receives cash payments of interest on the New Loans (other than cash attributable to qualified stated interest).  Accordingly, a holder could

be treated as receiving income in advance of a corresponding receipt of cash. Any OID that a holder includes in income will increase the tax basis of the holder in the New Loans. A holder of New Loans will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the New Loans by the amount of such payments.

**D.      Withholding and Reporting**.

The Debtors will withhold all amounts required by law to be withheld from distributions or payments. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest. Backup withholding of taxes, currently at a rate of 28 percent, will apply to such payments if a Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle such Holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

---

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

---

## X.      Recommendation of the Debtors

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Interests than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

Dated: September 11, 2014                        Respectfully submitted,

                                                 STATEWIDE MOBILITY PARTNERS LLC
                                                 ITR CONCESSION COMPANY HOLDINGS LLC
                                                 ITR CONCESSION COMPANY LLC


                                                 By: /s/ Fernando Redondo

                                                 Name:  Fernando Redondo
                                                 Title:  Authorized Signatory




Prepared by:

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
(312) 862-2000 (telephone)

*Proposed Counsel to the*
*Debtors and the Debtors in Possession*