## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ITR CONCESSION COMPANY LLC, *et al.*,[1] | ) | Case No. 14-34284 (PSH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### DECLARATION OF FERNANDO REDONDO IN SUPPORT OF CONFIRMATION OF THE  JOINT PREPACKAGED PLAN OF REORGANIZATION OF ITR CONCESSION COMPANY LLC, *ET AL.*, PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE (WITH TECHNICAL MODIFICATIONS)

I, Fernando Redondo, make this declaration and state:

1.      I am the Chief Executive Officer of ITR Concession Company LLC, a limited liability company formed under the laws of the State of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").  In this capacity, I am familiar with the Debtors' day-to-day operations, financial affairs, and books and records, as well as the Debtors' restructuring efforts.  I am over the age of 18, and I am competent to testify.

2.      I submit this declaration (this "Declaration") in support of the *Debtors' Memorandum of Law in Support of an Order Approving the Disclosure Statement for, and Confirming, the Joint Prepackaged Plan of Reorganization of ITR Concession Company LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code (With Technical Modifications)* (the "Confirmation Brief"), filed contemporaneously herewith, and in support of confirmation of

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: ITR Concession Company LLC (0293); ITR Concession Company Holdings LLC (0285); and Statewide Mobility Partners LLC (1312).  The location of the Debtors' service address for the purposes of these chapter 11 cases is:  c/o ITR Concession Company LLC, 205 North Michigan Avenue, Suite 2510, Chicago, Illinois 60601.

the *Joint Prepackaged Plan of Reorganization of ITR Concession Company LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code (With Technical Modifications)* [Docket No. 134] (as may be amended, modified, or supplemented from time to time, the "<u>Plan</u>").[2]  I am authorized to submit this Declaration on behalf of the Debtors.  Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, information learned from my review of relevant documents, and information I have received from other members of the Debtors' management or the Debtors' advisors.  If I were called upon to testify, I could and would competently testify to the facts set forth herein on that basis.

I.      **Plan Negotiations and Solicitation**.

1.      The Plan results from nearly two years of good-faith, arm's-length discussions among the Debtors and their major stakeholders.  It provides a substantial recovery to the Debtors' secured creditors and equity sponsors as well as payment in full of Allowed General Unsecured Claims.

2.      The Debtors' collaborative approach in negotiating the Plan is evident by the fact that not a single party has objected to confirmation.  The Plan accomplishes the Debtors' twin aims in commencing these chapter 11 cases:  it preserves the value of their key asset—the right to manage the Indiana Toll Road until 2081—and it maximizes value by putting in place a competitive post-confirmation marketing process, with a backstopped debt restructuring supported by the Debtors' equity sponsors and current lenders.  More specifically, the Plan provides that the Debtors will commence a competitive marketing process overseen by a special committee of independent directors (the "<u>Special Committee</u>"), in consultation with the Indiana Finance Authority (the "<u>IFA</u>") and a steering group of the Committee of Secured Parties, through

---

[2]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or the Confirmation Brief.

which the Debtors may sell substantially all of their assets (the "Sale Transaction"). The Debtors and other parties in interest hope to consummate a Sale Transaction, and believe the 10-month process put in place under the Plan is well-designed to achieve that goal. Even if the Sale Transaction does not occur, however, the Plan provides for a comprehensive reorganization of the Debtors' capital structure (the "Reorganization Transaction") to ensure the Debtors' continued viability post-emergence.

3.      Given the Plan's favorable treatment of Claims and Interests and its post-confirmation dual-track structure aimed at maximizing recoveries, it is no surprise that the Debtors' existing equity sponsors and an overwhelming majority of the Debtors' senior secured creditors have voted to support confirmation of the Plan. As set forth herein and in the documents filed contemporaneously herewith, the Plan satisfies each requirement for confirmation and should be confirmed.

## II.      The Lead-Up to the Chapter 11 Cases.

4.      The Debtors operate a 157-mile toll road in northern Indiana commonly referred to as the Indiana Toll Road (the "Toll Road") pursuant to that certain Indiana Toll Road Concession and Lease Agreement, dated as of April 12, 2006 (as amended, modified, or supplemented from time to time, the "Concession Agreement"), between ITR Concession Company LLC and the IFA.[3] The Toll Road, extending from the Ohio state line to the Illinois state line and comprising portions of U.S. Interstates 80 and 90, provides fast and convenient access to and from communities in northern Illinois and northern Indiana. Nearly 130,000 customers use the Toll Road each day. The Debtors have approximately 283 employees and maintain headquarters in Chicago, Illinois, and Granger, Indiana. For the fiscal year ending

---

[3]      I understand that nothing in the Plan is intended to impair or alter the IFA's rights under the Concession Agreement, and such rights are fully preserved.

December 31, 2013, the Debtors had total revenues of approximately $206 million. As of the Petition Date, the Debtors had outstanding funded debt of approximately $6.0 billion comprising approximately $3.86 billion in principal amount of first-priority syndicated bank-debt obligations and approximately $2.15 billion in principal amount of *pari passu* first-lien interest-rate hedging obligations.

5.      In December 2013, after nearly a year of discussion, negotiation, and proposals being exchanged, the Debtors, their existing equity sponsors, and a steering committee of certain major European banks holding significant secured claims (the "Steering Committee") reached an agreement in principle regarding the terms of a balance-sheet restructuring. This consensual resolution cleared the way for the Debtors to make approximately $104.5 million in debt payments on December 30, 2013, that, if not made, would have caused an event of default under the Debtors' senior secured credit facility and potentially enabled creditors to exercise remedies against the Debtors and their assets. In early 2014, the parties finalized the terms of a restructuring proposal to be implemented through a prepackaged chapter 11 process. The parties later began to seek support for the proposal from other lenders and swap counterparties. Unfortunately, this proposal did not ultimately achieve sufficient support, after which certain lenders of record represented by the Steering Committee traded secured claims to other financial institutions (including hedge funds) at a discount to par.

6.      When it became clear that the Steering Committee no longer represented a majority of secured claims, and as part of the Debtors' continuing effort to forge a consensual resolution, the Debtors and their advisors engaged in discussions with the Debtors' existing equity sponsors and a committee of certain Holders of Senior Secured Claims and participation and sub-participation interests in Senior Secured Claims (the "Committee of Secured Parties")

4

regarding potential restructuring alternatives. These extensive discussions were productive, resulting in the parties exchanging multiple proposals over several months and paving the way for an 83-day forbearance following the Debtors' failure to make an interest payment of approximately $102 million on June 30, 2014. The Debtors, their existing equity sponsors, and the Committee of Secured Parties used the forbearance period to finalize the terms of the global settlement memorialized in the Restructuring Support Agreement.[4] The Restructuring Support Agreement and the exhibits thereto form the bedrock of these chapter 11 cases and describe in detail the restructuring transactions that will be consummated if the Court confirms the Plan.

7.    More specifically, through the Restructuring Support Agreement, the Debtors, their existing equity sponsors, and the Committee of Secured Parties have agreed to pursue timely confirmation of the Plan, which provides for two alternative transactions: the Sale Transaction and the Reorganization Transaction.

8.    The Sale Transaction contemplates a competitive sale process for substantially all of the Debtors' assets following Confirmation. The Special Committee will conduct the sale process, potentially extending through, at the latest, August 1, 2015. The Special Committee, in good-faith consultation with a steering group of the Committee of Secured Parties, will adopt and implement procedures to facilitate the solicitation and evaluation of potential sale proposals. The Debtors expect the IFA to play an important role in this sale process.

9.    Following the sale process, the Special Committee will determine whether any asset-sale proposal provides greater value to the Debtors and their stakeholders than the Reorganization Transaction or is otherwise in the best interests of all stakeholders. If the Special Committee, with the approval of the IFA and consent of a majority of certain Senior Secured

---

[4]    The Restructuring Support Agreement is attached as <u>Exhibit F</u> to the Disclosure Statement.

Parties, determines to pursue and implement the Sale Transaction, the Debtors will consummate the Sale Transaction on the Effective Date. Following consummation of the Sale Transaction, the Debtors will make distributions to Holders of Claims and Interests in accordance with the Plan.

10.    Alternatively, if no Sale Transaction occurs, the Debtors will consummate the Reorganization Transaction. The Reorganization Transaction contemplates, among other things, that: (a) the Reorganized Debtors will incur $2.75 billion in new senior secured indebtedness in the form of either a new loan facility, which loans will be distributed *pro rata* to the Debtors' prepetition senior secured creditors, or new third-party financing, the cash proceeds of which will be distributed *pro rata* to the Debtors' prepetition senior secured creditors; (b) the Debtors' prepetition senior secured creditors will receive 95.75 percent of the equity interests in reorganized ITR Concession Company Holdings LLC (the "New Holdings Interests") and the Debtors' existing equity sponsors will receive the remaining 4.25 percent of the New Holdings Interests; and (c) the Debtors' existing equity sponsors will have the right to operate and manage the Toll Road for an initial term of 10 years in exchange for consideration in the form of either cash reimbursement or up to 3 percent of additional New Holdings Interests.[5]

11.    Following the execution of the Restructuring Support Agreement, the Debtors solicited acceptances in support of their proposed Plan from the Holders of the Senior Secured Claims and Holders of Statewide Interests—the only Holders of Claims and Interests entitled to vote to accept or reject the Plan. Nearly 99 percent of the Holders of Senior Secured Claims, and every Holder of Statewide Interests, that voted on the Plan voted to accept the Plan.

---

[5]    I understand that if the principal amount of the new debt or the new third-party financing is less than or greater $2.75 billion, the amount of equity interests distributed to the Debtors' senior secured creditors and existing equity sponsors is subject to adjustment.

KE 33724450

Consummation of the Plan will allow the Debtors to maximize stakeholder value and produce a stronger, more successful business enterprise.

**III.    The Solicitation Process, Voting Results, and Commencement of the Cases**.

12.    On September 11, 2014, and prior to commencing these chapter 11 cases, as described more fully in the *Motion of ITR Concession Company LLC, et al., for Entry of an Order (A) Scheduling a Combined Disclosure Statement Approval and Confirmation Hearing, (B) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (C) Approving the Solicitation Procedures, (D) Approving the Combined Hearing Notice and the Cure Notice, and (E) Directing That a Meeting of Creditors Not Be Convened* [Docket No. 26] (the "Scheduling Motion"), the Debtors commenced a prepackaged solicitation of the Plan by delivering solicitation packages (the "Solicitation Packages") (including the Disclosure Statement, the Plan, the Ballots and, if applicable, the Class 3 Master Ballot) to the Administrative Agent that maintains a registry of Senior Secured Parties (for subsequent distribution to such creditors) and Holders of Interests in Statewide, the only Holders of Claims or Interests entitled to vote on the Plan.  The Debtors established September 17, 2014, at 4:00 p.m., prevailing Pacific Time (the "Voting Deadline"), as the deadline by which the Holders entitled to vote on the Plan must provide their votes to Kurtzman Carson Consultants LLC ("KCC") or the Administrative Agent, as applicable.  The Debtors did not distribute Solicitation Packages to Holders of Claims or Interests in Classes 1, 2, 4, 5, and 6 because they are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

13.    The Debtors completed their solicitation on the Voting Deadline, four days prior to the Petition Date.  As shown in the Voting Report, 100 percent of equity holders and nearly 99 percent of senior secured creditors voting on the Plan cast their votes in favor of the Plan.

7

The voting results on the Plan were as follows (all percentages are with respect to votes actually cast).

| Class | Number Voted to Accept | Amount Voted to Accept |
|---|---|---|
| Class 3 (Senior Secured Claims) | 91 (98.91%) | $5,256,692,380 (97.79%) |
| Class 7 (Statewide Interests) | 4 (100%) | N/A |

14.     I understand that on the Petition Date, the Debtors filed their chapter 11 petitions, as well as, among other pleadings, the Plan, the Disclosure Statement, and the Scheduling Motion, by which the Debtors sought a combined hearing on approval of the Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing").  I understand that on September 23, 2014, the Court entered the *Order (A) Scheduling a Combined Disclosure Statement Approval and Confirmation Hearing, (B) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (C) Approving the Solicitation Procedures, (D) Approving the Combined Hearing Notice and the Cure Notice, and (E) Directing That a Meeting of Creditors Not Be Convened* [Docket No. 81] (the "Scheduling Order"), which, among other things, established October 14, 2014, at 4:00 p.m., prevailing Central Time, as the deadline to object to the Disclosure Statement or the Plan (the "Objection Deadline") and approved the form and manner of the Confirmation Hearing Notice and the Publication Notice.  I understand that on September 25, 2014, the Debtors caused KCC to serve the Confirmation Hearing Notice in accordance with the terms of the Scheduling Order.  I understand that the Debtors also caused the Publication Notice to be published in *The Wall Street Journal (National Edition)*, the *Chicago Tribune*, and *The Indianapolis Star* on September 29, 2014.

8

15.     I understand that on October 21, 2014, the Debtors filed the Plan Supplement [Docket No. 145], which includes: (a) the form of the proposed New Organizational Documents; (b) the form of the proposed New Debt Documents; (c) to the extent known, the identity of the directors, managers, officers, and other management of the Reorganized Debtors; (d) the form of the proposed Omnibus Services Agreement; (e) the form of the proposed New Security Documents; (f) the proposed Confirmation Order Findings of Fact and Conclusions of Law; and (g) the Reorganization Transactions Steps Memorandum.  In advance of the Confirmation Hearing, the Debtors may file with the Court certain amendments to the Plan Supplement. Concurrently with the filing of this Memorandum, the Debtors submitted a proposed confirmation order (the "Proposed Confirmation Order").

## IV.     The Disclosure Statement Demonstrates That the Debtors Complied with Applicable Nonbankruptcy Law.

16.     I understand that under section 1126(b) of the Bankruptcy Code, a disclosure statement employed in a prepetition solicitation of votes to accept or reject a chapter 11 plan must comply with "any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation," or, if such laws and regulations do not apply, provide "adequate information" as defined in section 1125(a) of the Bankruptcy Code. For the reasons discussed below, the Disclosure Statement fully complies with section 1126(b) of the Bankruptcy Code.

17.     I understand that the Disclosure Statement and all other materials in the Solicitation Packages sent to Holders of Claims and Interests entitled to vote, comply with generally applicable securities laws pertaining to the accuracy and completeness of disclosure. As described in detail below, I understand that the Disclosure Statement contains extensive disclosures regarding all of the facts material to voting to accept or reject the Plan.  Accordingly,

9

I believe that the Disclosure Statement satisfies the disclosure requirements of all applicable nonbankruptcy law under the terms of section 1126(b)(1) of the Bankruptcy Code.

**A.     The Disclosure Statement Contains Adequate Information**.

18.     I understand that a disclosure statement should provide material information that allows parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.  I have been advised that the "adequate information" standard is flexible and based on the facts and circumstances of each case.  I have been advised that that courts in the Seventh Circuit and elsewhere acknowledge that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court.  I have been further advised that that, for exercising such discretion, courts evaluate, among other things:

      a.     the events which led to the filing of a bankruptcy petition;

      b.     the relationship of a debtor with its affiliates;

      c.     the anticipated future of the company;

      d.     the source of information stated in the disclosure statement;

      e.     the present condition of a debtor while in chapter 11;

      f.     the claims asserted against a debtor;

      g.     the estimated return to creditors under a chapter 7 liquidation;

      h.     the future management of a debtor;

      i.     the chapter 11 plan or a summary thereof;

      j.     the information relevant to the risks posed to claimants under the plan;

      k.     the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

      l.     the litigation likely to arise in a nonbankruptcy context; and

      m.     the tax attributes of a debtor.

KE 33724450

19.     Here, I believe that the Disclosure Statement contains adequate information to

enable an informed vote on the Plan, including:

a.      a summary of the Plan, including the classifications and treatment of all Classes of Claims and Interests (*see* Disclosure Statement, Art. IV);

b.      the events leading to the commencement of these chapter 11 cases (*see* Disclosure Statement, Art. III);

c.      the history of the Debtors' businesses and management (*see* Disclosure Statement, Art. II);

d.      a description of the Claims asserted against the Estates and an estimated amount of Claims that will ultimately be allowed (*see* Disclosure Statement, Art. IV);

e.      a list of certain risk factors to consider that may affect the Plan (*see* Disclosure Statement, Art. VII);

f.      a description of certain federal income tax consequences of the Plan (*see* Disclosure Statement, Art. IX);

g.      a description of the provisions governing distributions under the Plan (*see* Disclosure Statement, Art. IV);

h.      a description of the means for implementation of the Plan (*see* Disclosure Statement, Art. IV);

i.      a liquidation analysis of the Debtors (*see* Disclosure Statement, Exhibit D);

j.      financial statements of the Debtors from the preceding three fiscal years (*see* Disclosure Statement, Exhibit E); and

k.      financial projections for the Reorganized Debtors (*see* Disclosure Statement, Exhibit C).

20.     I also understand that the Debtors' existing equity sponsors and the Committee of

Secured Parties were provided with the opportunity for extensive review and comment on the

Disclosure Statement and the Plan before the Petition Date.  Furthermore, I understand that no

party in interest has objected to the Court's approval of the Disclosure Statement.  Accordingly, I

believe that the Disclosure Statement contains adequate information within the meaning of

section 1125(a) of the Bankruptcy Code in satisfaction of section 1126(b)(2) of the Bankruptcy Code and should, therefore, be approved.

### B.     The Debtors Complied with the Scheduling Order.

#### 1.     The Debtors Complied with the Notice Requirements Set Forth in the Scheduling Order.

21.     I believe that the Debtors satisfied the notice requirements set forth in the Scheduling Order and in Bankruptcy Rule 3017.     *First*, I understand that, on September 25, 2014, the Debtors mailed the Confirmation Hearing Notice to all parties on the Debtors' creditor matrix, informing the recipients of, among other things:  (a) the commencement of these chapter 11 cases; (b) the date and time set for the hearing to consider approval of the Disclosure Statement and confirmation of the Plan; and (c) the deadline for filing objections to the Plan and the Disclosure Statement.  *Second*, I understand that the Debtors caused the Publication Notice to be published in *The Wall Street Journal (National Edition)*, the *Chicago Tribune*, and *The Indianapolis Star* on September 29, 2014.  I understand that no party in interest has objected to the adequacy of notice of the Confirmation Hearing.

#### 2.     The Debtors Solicited Votes for the Plan in Good Faith and in Accordance with the Bankruptcy Code.

22.     I understand that section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.

23.     I understand that the Debtors, KCC, and the Administrative Agent (solely with respect to Holders of Senior Secured Claims) at all times took appropriate and good-faith actions in connection with the solicitation of the Plan in compliance with section 1125 of the Bankruptcy

KE 33724450

Code.  Therefore, the Debtors respectfully request that the Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

**V.      The Plan Satisfies Each Requirement for Confirmation**.

> **A.      The Plan Complies with the Applicable Provisions of the Bankruptcy Code as Required by Section 1129(a)(1) of Bankruptcy Code**.

3.      Based on my understanding of the requirements of the Bankruptcy Code as well as the advice of the Debtors' legal counsel and other advisors, I believe that the Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123(a)(1) of the Bankruptcy Code.

> **2.      The Plan Properly Classifies Claims and Interests as Required by Sections 1122 and 1123(a)(1) of the Bankruptcy Code**.

4.      I understand that a plan must classify claims and interests in a manner that is consistent with section 1122(a) of the Bankruptcy Code.  I understand that the Plan places Claims and Interests into seven separate Classes, with each Class differing from the Claims and Interests in each other Class in a legal or factual nature or based on other relevant criteria. Specifically, I understand that the Plan provides for the separate classification of Claims and Interests into the following Classes:

- **Class 1 (Other Priority Claims)**.  I understand that this Class includes any Claim against any Debtor entitled to priority in right of payment under section 507 of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

- **Class 2 (Other Secured Claims)**.  I understand that this Class includes any Secured Claim against any Debtors that is not a Senior Secured Claim.

- **Class 3 (Senior Secured Claims)**.  I understand that this Class consists of the Loan Claims and the Hedging Claims.

- **Class 4 (General Unsecured Claims)**.  I understand that this Class includes any Unsecured Claim, other than an Intercompany Claim, an Administrative Claim, an Accrued Professional Compensation Claim, a Priority Tax Claim, or an Other Priority Claim.

13

- **Class 5 (Intercompany Claims)**.  I understand that this Class includes any Claim against a Debtor held by another Debtor.

- **Class 6 (Intercompany Interests)**.  I understand that this Class includes any Interest in a Debtor held by another Debtor.

- **Class 7 (Statewide Interests)**.  I understand that this Class includes any Interest in Statewide Mobility Partners LLC, a Delaware limited liability company and a Debtor in these chapter 11 cases.

5.      I understand that Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in their respective Class.  I further understand that the Debtors have classified Claims separately from Interests.  I further understand that the Debtors have classified Secured Claims separately from Unsecured Claims, because the Debtors' obligations with respect to the former are secured by collateral, and further grouped Secured Claims into Classes based on, for example, the collateral securing the Claim and the governing credit documents under which the Claim arises.  I further understand that the Debtors also grouped Intercompany Claims separately from other Unsecured Claims because they arise from intercompany transactions.   Accordingly, I believe that the Plan satisfies section 1122(a) of the Bankruptcy Code.

### 1.      The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

1.      I understand that section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.  I believe that the Plan satisfies each of these requirements.

### a.      Designation of Classes of Claims and Equity Interests (11 U.S.C. § 1123(a)(1)).

2.      For the reasons set forth above, I believe that Article III of the Plan properly designates Classes of Claims and Interests and thus satisfies the requirement of section 1123(a)(1) of the Bankruptcy Code.

14

**b.      Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2))**.

3.      I understand that section 1123(a)(2) of the Bankruptcy Code requires that a chapter 11 plan "specify any class of claims or interests that is not impaired under the plan." I believe that the Plan meets this requirement by identifying each Class in Article III that is Unimpaired.

**c.      Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))**.

4.      I understand that section 1123(a)(3) of the Bankruptcy Code requires that a chapter 11 plan "specify the treatment of any class of claims or interests that is impaired under the plan." I believe that the Plan meets this requirement by setting forth the treatment of each Class in Article III that is Impaired.

**d.      Equal Treatment within Classes (11 U.S.C. § 1123(a)(4))**.

5.      I understand that section 1123(a)(4) of the Bankruptcy Code requires that a chapter 11 plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." I believe that the Plan meets this requirement because each Holder of an Allowed Claim or Interest will receive the same rights and treatment as each other Holder of an Allowed Claim or Interest within that Holder's respective Class.

**e.      Means for Implementation (11 U.S.C. § 1123(a)(5))**.

6.      I understand that section 1123(a)(5) of the Bankruptcy Code requires that a chapter 11 plan provide "adequate means" for its implementation. I believe that the Plan satisfies this requirement because Article IV, as well as other provisions, of the Plan provides for the means by which the Plan will be implemented. I understand that, among other things, Article IV of the Plan:

15

a.        authorizes the Special Committee to oversee and manage the competitive sale process relating to any potential Sale Transaction;

b.        authorizes the Special Committee, upon completion of the competitive sale process, to pursue either the Sale Transaction or the Reorganization Transaction (except as otherwise provided by the Plan);

c.        authorizes the Debtors, upon completion of a successful sale process, to request entry of any order necessary or appropriate to implement the Sale Transaction;

a.        provides for the entry into either the New Debt Documents or the Third-Party Financing Documents in connection with the Reorganization Transaction;

b.        authorizes the Debtors and Reorganized Debtors, as applicable, to take all actions necessary to effectuate the Plan, including those actions necessary to effect the Restructuring Transactions;

c.        provides for the cancellation of existing securities and agreements and the surrender of existing securities (except as otherwise provided by the Plan);

d.        provides for the settlement of Claims and Interests;

e.        provides for the vesting of Estate assets in the Reorganized Debtors in connection with the Reorganization Transaction;

f.        provides for the preservation and retention of certain Causes of Action;

g.        authorizes the Debtors and Reorganized Debtors, as applicable, to make all payments required under the Plan; and

h.        provides for the continued corporate existence of the Debtors (except to the extent otherwise provided in the Plan).

**f.       Issuance of Nonvoting Securities (11 U.S.C. § 1123(a)(6))**.

7.     I understand that section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities. I understand that Article IV.E of the Plan provides that any New Organizational Document (as defined in the Plan) will preclude the issuance of any nonvoting equity security under the Plan to the extent required by section 1123(a)(6) of the Bankruptcy Code. Accordingly, I believe that the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

KE 33724450

**g.      Directors and Officers (11 U.S.C. § 1123(a)(7))**.

8.      I understand that section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."   I understand that Article IV.E of the Plan and the New Organizational Documents outline the manner of selecting the directors, managers, and officers of the Reorganized Debtors, thus providing for adequate representation of those whose interests are involved in these chapter 11 cases, and accord with the Bankruptcy Code, applicable nonbankruptcy law, the interests of creditors and equity security holders, and public policy. Accordingly, I believe that the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

**2.      The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code**.

**a.      Overview of the Plan's Compliance with Section 1123(b) of the Bankruptcy Code**.

9.      I understand that section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that a plan proponent may incorporate into a chapter 11 plan.   Among other things, I believe that section 1123(b) provides that a plan may impair or leave unimpaired any class of claims or interests, provide for the assumption or rejection of executory contracts and unexpired leases, provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates, and include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.

10.      I believe that the Plan is consistent with section 1123(b) of the Bankruptcy Code. Specifically, I understand that, under Article III of the Plan, Classes 1, 2, 4, 5, and 6 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims or Interests within such Classes.   On the other hand, I understand that

17

Classes 3 and 7 are Impaired because the Plan modifies the rights of the Holders of Claims or Interests within such Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code. Additionally, I understand that, in accordance with section 1123(b)(2) of the Bankruptcy Code, Article V.A of the Plan provides for the assumption of Executory Contracts and Unexpired Leases under section 365 of the Bankruptcy Code except as otherwise provided under the Plan.

> **b.     The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code**.

11.     I understand that the Plan also includes certain releases and exculpations in order to settle and compromise Claims and Interests and permanently settle certain Causes of Action.  I believe that these discretionary provisions are proper because, among other things, they resulted from extensive good-faith, arm's-length negotiations, have support from the Debtors and their key constituents, and gained overwhelming acceptance by the Holders entitled to vote on the Plan.

> **i.     The Debtor Release Is Appropriate**.

12.     I understand that Article VIII.C of the Plan provides for releases by the Debtors (the "Debtor Release"), as of the Effective Date, of, among other things, certain claims, rights, and causes of action that the Debtors and the Reorganized Debtors may have against the Released Parties.  I believe that, in this case, the Debtor Release is in the best interest of the Debtors' Estates and well within their business judgment.  Importantly, I understand that the Debtor Release forms an integral part of the negotiated Plan, and the Debtors do not believe the pursuit of any Claim or Cause of Action against the Released Parties would provide sufficient benefit to the Debtors' estates given the likelihood of success on the merits and the cost, expense, and delay required to prosecute such Claim or Cause of Action.  I understand that no party has

KE 33724450

objected to the Debtor Release provision.  For these reasons, the Debtors respectfully submit that the Court should approve the Debtor Release.

**ii.      The Third-Party Release Is Appropriate.**

13.      Article VIII.D of the Plan provides for the Releasing Parties' release of the Released Parties (the "Third-Party Release").  I understand that the only Holders of Claims or Interests that release Claims and Causes of Action pursuant to the Third-Party Release are those Holders who are Unimpaired, voted to accept the Plan and did not opt out of the release, or abstained from voting on the Plan and did not opt out of the release.  Furthermore, I understand that the ballots used for the solicitation of votes contained clear instructions to parties wishing to opt out of the releases provided by the Plan.  Finally, I understand that the scope of the Third-Party Release compares to releases approved in numerous other cases in this district.  I understand that no party has objected to the Third-Party Release provision.  Accordingly, I believe that the Court should approve the Third-Party Release.

**iii.      The Exculpation Provision Is Appropriate**.

14.      I understand that Article VIII.E of the Plan provides for the exculpation (the "Exculpation") of each Debtor, each Reorganized Debtor, each Estate, and each Released Party (each, an "Exculpated Party").

15.      I believe that the Exculpation is appropriate and vital under the circumstances of these chapter 11 cases.  *First*, I understand that the Exculpated Parties played a critical role in formulating the Restructuring Support Agreement, the Disclosure Statement, the Plan, and related documents.  I understand that the Exculpated Parties negotiated extensively and implemented the resulting agreements in good faith with a high degree of transparency.  As a result, the Plan enjoys overwhelming support from Holders of Claims and Interests entitled to

19

KE 33724450

vote on the Plan.  Simply put, the Exculpation served an important part in the development of a feasible, confirmable plan, and the Exculpated Parties relied upon the protections afforded to the constituents involved.  *Second*, I understand that the Plan appropriately limits the scope of the Exculpation to the Exculpated Parties' acts or omissions in connection with the Restructuring Transactions, the documents related thereto, and these chapter 11 cases, and the Plan does not protect the Exculpated Parties from liability resulting from gross negligence or willful misconduct.  *Third*, I understand that the Exculpation is necessary and appropriate to protect parties who have made substantial contributions to the Debtors' reorganization from future collateral attacks related to actions taken in good faith in connection with the Debtors' restructuring.  *Fourth*, I understand that the Plan, including the Exculpation provision, enjoys overwhelming support from the Holders of Claims and Interests entitled to vote on the Plan, and no party has objected to the Exculpation provision.

16.    Accordingly, I believe that under these circumstances that the Court should approve the Exculpation and find that the Exculpated Parties have acted in good faith and in compliance with the law.

### iv.    The Injunction Provision Is Appropriate.

17.    I understand that Article VIII.F of the Plan provides for an injunction (the "Injunction") that is necessary to implement the Plan's release and exculpation provisions and to protect the Released Parties from potential litigation on or after the Effective Date from any party that has released claims under the Plan.  I understand that the Injunction does this by permanently enjoining all Entities from commencing or maintaining any action against the Debtors, the Reorganized Debtors, or the Released Parties on account of or in connection with or with respect to any such Claims or Interests released or settled by the Plan.  I understand that the

20

Injunction is thus a key provision of the Plan because it enforces the release provisions that are centrally important to the Plan.  As such, to the extent the Court finds that the release provisions are appropriate, the Debtors respectfully submit that the Injunction must also be appropriate. Moreover, the Debtors have narrowly tailored the Injunction to achieve its purpose, only extending the Injunction to Claims or Causes of Action that have been voluntarily released, and courts in other chapter 11 cases have approved similar injunctions.  I understand that no party has objected to the Injunction provision.  Accordingly, I believe that the Court should approve the Injunction.

### 3.       The Plan Complies with Section 1123(d) of the Bankruptcy Code.

18.      I understand that section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."

19.      I believe that the Plan complies with section 1123(d) of the Bankruptcy Code.  I understand that the Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned under the Plan by payment of the default amount, if any, on the Effective Date, subject to the limitations described in Article V of the Plan.  I understand that, in accordance with Article V of the Plan and section 365 of the Bankruptcy Code, the Debtors will satisfy any monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases otherwise agree.  Additionally, I understand that, in accordance with the *Order Approving Stipulation among the Debtors, the Committee of Secured Parties, and the Indiana Finance Authority* [Docket No. 121], the Plan provides for the cure, or adequate assurance of the cure, of existing

KE 33724450

monetary or nonmonetary defaults under the Concession Agreement, if any, on the Effective Date.

**B.     The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)).**

20.     I believe that the Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which I understand requires that a plan proponent comply with the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.  As discussed below, I believe that the Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and solicitation of the Plan.

21.     I understand that the Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and solicitation of the Plan.  I understand that, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders of Claims or Interests in Classes 3 and 7, the only Classes entitled to vote under the Plan.  I understand that the Debtors did not solicit votes from Holders of Claims or Interests in Classes 1, 2, 4, 5, and 6 because such Holders are Unimpaired and, in accordance with section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.  Thus, I understand that, under section 1126(a) of the Bankruptcy Code, only Holders of Claims or Interests in Classes 3 and 7 could vote to accept or reject the Plan.

22.     As described above, I understand that the Classes of Claims and Interests voting to accept the Plan did so in sufficient number and by sufficient amounts as required by the Bankruptcy Code.  Based upon the foregoing, I believe that the Debtors have satisfied the requirements of sections 1125, 1126, and 1129(a)(2) of the Bankruptcy Code.

KE 33724450

### C. The Debtors Proposed the Plan in Good Faith (11 U.S.C. § 1129(a)(3)).

23.     I understand that section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law." I understand that where the plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the plan has satisfied the good-faith requirement of section 1129(a)(3). I understand that, in order to determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.

24.     I believe that the Plan satisfies section 1129(a)(3) of the Bankruptcy Code because the Plan satisfies the purposes of the Bankruptcy Code and has a high chance of success. The Debtors entered into the Restructuring Support Agreement and proposed the Plan in an effort to seek the best possible outcome for the Estates and to maximize value for all stakeholders. I believe that the Plan's overwhelming acceptance by voting creditors and equity holders reinforces this view. And, importantly, I have been advised that the Plan complies with all applicable bankruptcy and nonbankruptcy law. Accordingly, I believe that the Debtors proposed the Plan in good faith.

### D. The Plan Provides That the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (11 U.S.C. § 1129(a)(4)).

25.     I understand that section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable. Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.

26.     I believe that the Plan satisfies section 1129(a)(4) of the Bankruptcy Code. I understand that payment of Professional fees and expenses are the only category of payments

that fall within the ambit of section 1129(a)(4) of the Bankruptcy Code in these chapter 11 cases. Further, I understand that all such Professional Claims and corresponding payments are subject to Court approval and the reasonableness requirements under sections 328(a) and 330(a) of the Bankruptcy Code. Finally, I understand that Article II.B.2 of the Plan provides that Professionals must file all final requests for payment of Professional Claims no later than 45 days after the Effective Date, thereby providing an adequate period of time for interested parties to review the Professional Claims. Accordingly, I believe that the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

**E.     The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**

27.     I understand that section 1129(a)(5)(A) of the Bankruptcy Code requires that the proponent of a chapter 11 plan disclose the identity and affiliations of the debtor's proposed officers and directors following plan confirmation and that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy. I also understand that section 1129(a)(5)(B) of the Bankruptcy Code requires the proponent of the plan to disclose the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

28.     I understand that the Debtors have disclosed the identities of the Debtors' post-confirmation directors and officers in the Plan Supplement filed with the Court. Furthermore, I understand that the continued appointments of such directors and officers is consistent with the interests of the Debtors' creditors and equity holders and with public policy.

29.     I also understand that, as of the date hereof, the identities of the Reorganized Debtors' directors and officers, if any, are not presently known because the Debtors have not

24

KE 33724450

determined whether they will consummate the Sale Transaction or the Reorganization Transaction. I understand, however, that Article IV.E of the Plan provides that, if the Sale Transaction does not occur on the Effective Date, the officers, directors, and managers of the Reorganized Debtors will be appointed in accordance with the New Organizational Documents, which sets forth the obligations and duties of such officers, directors, and managers. The Debtors submit that any insider employed by the Reorganized Debtors will be engaged and compensated in accordance with the New Organizational Documents and that no further disclosures regarding this matter are required at this time

**F.      The Plan Does Not Require Governmental Regulatory Approval (11 U.S.C. § 1129(a)(6)).**

30.      I understand that section 1129(a)(6) of the Bankruptcy Code permits confirmation of a chapter 11 plan only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan. I understand that section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan because no regulatory commission has or will have jurisdiction over any Debtor after the Confirmation Date.

**H.      The Required Classes Have Accepted the Plan (11 U.S.C. § 1129(a)(8)).**

31.      I understand that section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept the chapter 11 plan or be unimpaired under that plan. As set forth in the Voting Report, each Impaired Class of Claims or Interests voted to accept the Plan. Because each Class has either accepted the Plan or is Unimpaired under the Plan, I understand that Debtors have satisfied section 1129(a)(8) of the Bankruptcy Code.

**I.      The Plan Provides for Payment in Full of All Allowed Priority Claims (11 U.S.C. § 1129(a)(9)).**

32.      I understand that section 1129(a)(9) of the Bankruptcy Code requires that debtors pay in full certain priority claims on the effective date of a chapter 11 plan and that the holders of

certain other priority claims receive deferred cash payments.  In particular, I understand that under section 1129(a)(9)(A), holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code (administrative expenses allowed under section 503(b)) must receive on the effective date cash equal to the allowed amount of such claims.   I understand that section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code (generally wage, employee benefit, and deposit claims entitled to priority) must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of its claim (if its class has accepted the plan) or cash of a value equal to the allowed amount of its claim on the effective date of the plan (if its class has not accepted the plan).   Finally, I understand that section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code (*i.e.*, priority tax claims) must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

33.    I believe that the Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  I understand that Article II.A of the Plan satisfies section 1129(a)(9)(A) because it provides that each Holder of an Allowed Administrative Claim will receive Cash equal to the amount of such Allowed Administrative Claim:  (a) on the Effective Date, or as soon as practicable thereafter; (b) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order or as soon as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such

26

Allowed Administrative Claims. Further, I understand that the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Claims specified by 1129(a)(9)(B) were Impaired under the Plan and the Debtors have paid such Claims in the ordinary course. Finally, I understand that Article II.C of the Plan provides for treatment of Holders of Allowed Priority Tax Claims in accordance with the terms of section 1129(a)(9)(C) of the Bankruptcy Code. Accordingly, I believe that the Plan satisfies each requirement of section 1129(a)(9) of the Bankruptcy Code.

**J.      At Least One Class of Impaired, Noninsider Claims Accepted the Plan (11 U.S.C. § 1129(a)(10)).**

34.      I understand that section 1129(a)(10) of the Bankruptcy Code provides that if a class of claims is impaired under a chapter 11 plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider. Because Classes 3 and 7 are Impaired, do not contain any insiders, and voted to accept the Plan with respect to each Debtor, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.      The Plan Is Feasible (11 U.S.C. § 1129(a)(11)).**

35.      I understand that section 1129(a)(11) of the Bankruptcy Code requires a court to find that a chapter 11 plan is feasible as a condition precedent to confirmation. I understand that this determination requires courts to determine that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. I further understand that, to demonstrate that a plan is feasible, a debtor need not guarantee success and that a debtor must provide only a reasonable assurance of success. Moreover, I understand that courts have established a relatively low threshold of proof necessary to satisfy the feasibility requirement.

27

36.     In determining standards of feasibility, I understand that courts typically consider, among other things:  (a) the adequacy of the capital structure; (b) the earning power of the business; (c) economic conditions; (d) the ability of management; (e) the probability of the continuation of the same management; and (f) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

37.     The Plan is feasible.  *First*, the Plan provides a straightforward and sound mechanism for the implementation of the Debtors' competitive sale process.  *Second*, the Debtors, together with their advisors, prepared projections of the Debtors' financial performance through fiscal year 2019, in the event of the Reorganization Transaction.  As set forth in the Redondo Declaration, the comprehensive balance-sheet restructuring accomplished through the Reorganization Transaction will provide the Reorganized Debtors with the means to continue generating revenue for the benefit of their stakeholders without the onus of crushing debt-service payments.  As discussed in the First-Day Declaration, since the Debtors began operating the Toll Road, the Debtors have generated significant cash revenue, earning nearly $4.00 in profit for each $1.00 in operating expenses.  Moreover, during the 10-month post-Confirmation competitive sale process, the Debtors will not be making debt-service payments, giving the Debtors' businesses even more working capital to support operation of the Toll Road.  The Debtors' financial projections, therefore, demonstrate, with more than a reasonable assurance of success, the Reorganized Debtors' ability to meet their obligations under the Plan and to continue as a going concern without a further need for reorganization.  Accordingly, I believe that the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

KE 33724450

**L.      All Statutory Fees Have Been or Will Be Paid (11 U.S.C. § 1129(a)(12))**.

38.      I understand that section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  I understand that section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.  I understand that the Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XIII.C of the Plan provides that the Reorganized Debtors will pay such fees and charges, to the extent not previously paid, for each quarter (including any fraction thereof) until these chapter 11 cases are converted, dismissed, or closed.

**M.      All Retiree Benefits Will Continue Post-Confirmation (11 U.S.C. § 1129(a)(13))**.

39.      I understand that section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  Under the Plan, all retiree benefits, as defined in section 1114 of the Bankruptcy Code, will continue after Confirmation in accordance with applicable law.  Thus, the he Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

**N.      Nonapplicability of Certain Sections (11 U.S.C. § 1129(a)(14)–(16))**.

40.      I understand that section 1129(a)(14) of the Bankruptcy Code does not apply to the Plan because no Debtor owes domestic-support obligations.  I also understand that section 1129(a)(15) of the Bankruptcy Code does not apply to the Plan because no Debtor is an "individual."  Lastly, I understand that section 1129(a)(16) of the Bankruptcy Code does not apply to the Plan because no Debtor is a nonprofit corporation.

KE 33724450

**O.      The Debtors Complied with Section 1129(d) of the Bankruptcy Code**.

41.     I understand that the purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act.  Moreover, I understand that no party has requested that the Court decline to confirm the Plan on such grounds.  Accordingly, I believe that the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**P.      Modifications to the Plan**.

42.     I understand that section 1127(a) of the Bankruptcy Code allows a plan proponent to modify its chapter 11 plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, I understand that when the plan proponent files its plan with modifications with the court, the plan as modified becomes the plan.  I understand that Bankruptcy Rule 3019 provides that modifications after creditors and interest holders have accepted a plan will be deemed accepted by all creditors and interest holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.  I understand that, in interpreting Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where a proposed immaterial modification does not adversely affect the treatment of creditors and stakeholders.

43.     I also understand that the Debtors made certain immaterial, technical modifications to the Plan (the "Plan Modifications") to address concerns raised by certain parties in interest as follows:  (a) at the request of the IFA, incorporated the terms of the IFA Stipulation, the stipulation among the Debtors, the Committee of Secured Parties, and the IFA regarding certain the IFA's involvement with the Debtors' competitive sale process; (b) at the request of the U.S. Securities and Exchange Commission, provided that, pursuant to section 1145 of the

KE 33724450

Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code does not apply, section 4(a)(2) of the Securities Act, the issuance of the New Holdings Interests as contemplated by the Plan is exempt from the registration requirements of Section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration prior to the offering, issuance, distribution, or sale of securities; (c) provided that a particular trade vendor agreement will be assumed by the Debtors as of the date of entry of the Confirmation Order; and (d) at the request of the Administrative Agent, provided for the payment its fees and expenses and the fees and expenses of its counsel.  I also understand that the Debtors also made certain immaterial clarifications and corrected certain typographical errors contained in the Plan.

44.    I believe that that the Plan Modifications are immaterial, do not adversely affect the treatment of creditors and stakeholders, and, thus, comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  Moreover, I understand that the Debtors' key constituents affected by the Plan Modifications support these changes.  Accordingly, I believe that no additional solicitation or disclosure is required on account of the Plan Modifications and that the modifications should be deemed accepted by all Holders of Claims or Interests who have previously accepted the Plan.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KE 33724450

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 24, 2014

Respectfully submitted,

_____

Fernando Redondo
Chief Executive Officer
ITR Concession Company LLC