IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| ITR CONCESSION COMPANY LLC, *et al.*,[1] | Case No. 14-34284 (PSH) |
| Debtors. | Jointly Administered |

**JOINT PRELIMINARY OBJECTION AND RESERVATION OF
RIGHTS OF THE E-ZPASS INTERAGENCY GROUP AND
THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY
TO PROPOSED ASSUMPTION AND ASSIGNMENT OF
INTERAGENCY GROUP AGREEMENTS**

The E-ZPass Interagency Group ("IAG") and The Port Authority of New York and New Jersey (the "Port Authority"), by and through their undersigned counsel, submit this joint preliminary objection and reservation of rights with respect to the Debtors' (as defined below) proposed assumption and/or assignment of the IAG Agreements (as defined below) in connection with the *Joint Prepackaged Plan of Reorganization of ITR Concession Company LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code (with Technical Modifications)* [D.I. 134] (the "Plan"), and respectfully state as follows:[2]

**PRELIMINARY STATEMENT**

1. On April 12, 2007, Debtor ITR Concession Company LLC ("ITR" or the "Concessionaire") became the first ever private company admitted to the IAG as a Full Member

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: ITR Concession Company LLC (0293); ITR Concession Company Holdings LLC (0285); and Statewide Mobility Partners LLC (1312). The location of the Debtors' service address for the purposes of these chapter 11 cases is: c/o ITR Concession Company LLC, 205 North Michigan Avenue, Suite 2510, Chicago, Illinois 60601.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Plan.

1

Company (as defined below). As a Full Member Company of the IAG, ITR obtained voting and other privileges that, until then, had only been afforded to government agency members of the IAG. At present, ITR remains the only non-governmental agency full voting member of the IAG.

2.  Full membership in the IAG also carries with it a host of duties and responsibilities that are essential to the IAG's mission in the public interest to "to provide the public with a seamless, accurate, interoperable electronic method of paying tolls and fees while preserving and enhancing the E-ZPass program."[3] Indeed, the IAG was established precisely because its original public agency members had "identified a mutual need for cooperation and coordination to ensure the efficient and effective operation of the E-ZPass system for the benefit of the Agencies."[4]

3.  It is against this backdrop that the IAG and the Port Authority are now confronted with a scenario that was inconceivable before the admission of ITR as the IAG's sole Full Member Company – the bankruptcy of a full, voting member of the IAG. This unprecedented situation necessitates that the IAG and the Port Authority, as an IAG Full Member Agency (as defined below) and the owner and licensor of the "E-ZPass," "E-ZPass Plus," and "E-Z Pass+" service marks, carefully consider the implications of ITR's bankruptcy and the as yet not fully identified restructuring transactions that ITR may pursue under its Plan if confirmed and effective. The IAG and the Port Authority have every reason to want operation of the Indiana Toll Road to continue uninterrupted and appreciate that ITR's successful reorganization and emergence from bankruptcy provides the greatest assurances of that outcome.

---

[3] *See* http://www.e-zpassiag.com/about-us/overview (last accessed Oct. 23, 2014).

[4] Base Operating Agreement (as defined below), at 2.

2

At the same time, the IAG must be mindful of its mission in the public interest and the needs of its public agency constituent members. To that end, the IAG and the Port Authority file this joint limited objection to ensure that events in these bankruptcy cases and the further restructuring transactions that are contemplated to follow ITR's emergence from bankruptcy do not in any way impair the operation of the E-ZPass system or the rights of the IAG and its constituent members under the various agreements pursuant to which the E-ZPass system operates.

4. The Plan's treatment of the Operating Agreement, the Reciprocity Agreements, the License Agreement (each as defined below) and other implementing agreements to which the IAG and/or its members are parties or in which the IAG and/or its members have an interest is a matter of great concern to the IAG and the Port Authority. As currently drafted, the Plan says virtually nothing about what will become of such agreements after the Plan is confirmed and becomes effective by its terms. Indeed, though the term "E-ZPass Agreement" is defined in the Plan, Plan, Art. I.A.55, the term "E-ZPass Agreement" never appears again in the Plan. Accordingly, the IAG and the Port Authority file this preliminary objection to ensure that their respective rights under the IAG Agreements, including without limitation the right to consent or withhold consent to any purported assignment of any of the IAG Agreements, are fully preserved. Nothing in the Plan, any related documents or any order confirming the Plan should modify and/or prejudice the rights of the IAG, the Port Authority, and the IAG's other constituent members in any way in connection with the IAG Agreements.

**BACKGROUND**

5. The IAG operates the largest, most successful toll interoperability network in the world, with more than 26 million toll transponders in use and over $6 billion in annual toll revenues in 2013. Since 1990, the IAG has grown to a regional consortium across 15 states of 26

3

members consisting of no less than 19 full member agencies (the "Full Member Agencies"), one full member private company (a "Full Member Company") (*i.e.,* the Concessionaire), and certain associate and affiliate members. The Full Member Agencies and ITR, as a Full Member Company (together with the Full Member Agencies, the "Full Members"), utilize the same technology, allowing E-ZPass customers of each Full Member to use a single transponder while traveling throughout the E-ZPass toll road network. The E-ZPass network is integral to both the economies of participating states and the national economy by providing intra- and interstate regional mobility and convenience for travelers and creating efficiencies for commercial and recreational travel.

     A.     **The IAG Agreements**

     6. Each of the Full Members is a party to that certain E-ZPass Operations Interagency Agreement dated as of February 20, 1998 (the "Base Operating Agreement"), as amended by Amendment No. 1 dated as of November 1, 1998, Amendment No. 2 dated as of June 8, 2000 (also known as Amendment No. 2 dated August 3, 2000), Amendment No. 3 dated as of August 3, 2000, Amendment No. 4 dated as of June 23, 2005, Amendment No. 5 dated as of August 29, 2005, Amendment No. 6 dated as of December 14, 2006, Amendment No. 7 dated as of August 11, 2011, Amendment No. 8 dated as of February 9, 2012, Amendment No. 9 dated as of June 13, 2012 and Amendment No. 10 dated as of November 13, 2013 (collectively with the Base Operating Agreement, the "Operating Agreement"). A copy of the Operating Agreement is attached hereto as **Exhibit A**.

     7. In addition to the Operating Agreement, the Concessionaire also is a party to certain related agreements (together with the Operating Agreement, the "IAG Agreements") including, but not limited to the following agreements:

(i) The Reciprocity Agreement dated as of July 30, 1998 (as amended, the "Base Reciprocity Agreement"); the E-ZPass Interagency Group Public Parking Services Program Agreement dated as of April 5, 2001 (as amended, "Reciprocity II"), and the E-ZPass Interagency Group Parking Services Program Agreement dated as of June 15, 2006 (as amended, "Reciprocity III," and collectively with the Base Reciprocity Agreement and Reciprocity II, the "Reciprocity Agreements");

(ii) A License Agreement as licensee of certain Service Marks, including "E-ZPass," "E-ZPass Plus" and "E-Z Pass+" licensed for use by the Port Authority in connection with operation of the E-ZPass system (the "License Agreement");

(iii) The Mark IV Irrevocable Offer; and

(iv) The Credit Card Equity Policy.

8. Pursuant to Amendment No. 6 to the Operating Agreement, dated as of December 14, 2006 ("Amendment No. 6"), the then-existing Full Member Agencies approved the creation of a new class of IAG membership of private companies in the IAG. Amendment No. 6 provides, in relevant part, that:

> Section 4A of the Operating Agreement, as added to the Base Operating Agreement by Amendment No. 1 and subsequently further amended by Amendment No. 5, shall be deemed further amended by adding the following at the end thereof: "In addition there shall be a class of Full Member Companies with the rights and obligations as set forth in Appendix D."

9. As the only privatized toll road member of the IAG, the Concessionaire's rights and obligations as an IAG member are governed by Appendix D to the Operating Agreement ("Appendix D"). In addition to setting forth other rights and obligations of a Full Member Company, paragraph 9 of Appendix D provides that:

> License Agreement. Each Full Member Company shall execute the E-ZPass$^{sm}$ and E-ZPass Plus$^{sm}$ License Agreements required by the Operating Agreement. A Full Member Company may, at its discretion, use a name other than E-ZPass as its primary name for toll collection. In that event, the Full Member Company shall post the E-ZPass and E-ZPass Plus logo on appropriate signage as specified in a signage plan approved by the [Executive Management Committee or] EMC.

5

Appendix D, ¶ 9.

    10.    Paragraph 11 of Appendix D further provides that:

<u>Assignment.</u> Unless otherwise approved in writing by the EMC a Full Member Company may not assign any of its rights or obligations under the IAG Agreements, whether by agreement, merger, or sale of assets or of stock. The EMC shall not recognize any such assignment made without its written approval.

Appendix D, ¶ 11.

    11.    Paragraph 12 of Appendix D additionally provides, in part, that:

<u>Financial Obligations.</u> Each Full Member Company shall be required to post a bond or other financial instrument, satisfactory in form and substance to the EMC, for the benefit of the other members of the IAG to cover any obligations of such Full Member Company to any or all other IAG members in the event the Full Member Company defaults in the payment of monetary obligations due to any or all other IAG members under the Reciprocity Agreements or any other IAG agreement. The amount of such a financial instrument shall be equal to the average three-month payment obligations of the Full Member Company to all other IAG members for the tolls incurred by the Full Member Company's customers at other IAG toll facilities. . . . .

Appendix D, ¶ 12.

    12.    Appendix D also includes a termination provision that states as follows:

<u>Termination.</u> The EMC may terminate the membership of any Full Member Company on ten days written notice following the default by the Full Member Company under any of the IAG Agreements. Such termination shall not relieve the Full Member Company of any obligation which arose out of an occurrence on or prior to the date of termination. The provisions of the Reciprocity Agreements governing financial settlement and the confidentiality requirements set forth in the Reciprocity Agreements and in any other IAG Agreement shall survive any such termination.

Appendix D, ¶ 16.

    13.    Prior to the Petition Date (as defined below), the Concessionaire posted a

surety bond for the benefit of the other members of the IAG as required under Appendix D to the

6

Operating Agreement. The surety bond was allowed to expire prior to the Petition Date. Thereafter, a certified check in the amount of $2.9 million was tendered to IAG on behalf of the Concessionaire. The IAG is maintaining the $2.9 million cash in its bank account to protect the IAG and the E-ZPass system against any potential loss associated with the Concessionaire's failure to pay future settlement obligations or other breaches under the Reciprocity Agreements.

### B.     Debtors' Bankruptcy

14. On September 21, 2014 (the "Petition Date"), the Concessionaire and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") in this Court.

15. Post-petition, to the best of the IAG's and the Port Authority's knowledge, the Concessionaire has continued to operate under the IAG Agreements.

16. On September 22, 2014, the Debtors filed their *Joint Prepackaged Plan of Reorganization of ITR Concession Company LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 24] (the "Original Plan") and *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of ITR Concession Company LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 25] (the "Disclosure Statement").

17. On September 23, 2014, the Court entered the *Order (A) Scheduling a Combined Disclosure Statement Approval and Confirmation Hearing, (B) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (C) Approving the Solicitation Procedures, (D) Approving the Combined Hearing Notice and the Cure Notice, and (E) Directing that a Meeting of Creditors Not be Convened* [D.I. 81] (the "Order"). Among other things, the Order set a Combined Hearing Date of October 28, 2014 at 11:00 a.m.

(prevailing Central Time) as the date that the Court will consider the adequacy of the Disclosure Statement and confirmation of the Plan (the "Combined Hearing") and set an objection deadline for any objections to the Solicitation Procedures, the adequacy of the information in the Disclosure Statement, or confirmation of the Plan of October 14, 2014 at 4:00 p.m. (prevailing Central Time). The Order further provided that "[n]o later than 15 Business Days prior to the Combined Hearing, the Debtors shall mail to counterparties to the Debtors' Executory Contracts and Unexpired Leases the Cure Notice and the Combined Hearing Notice." Order, ¶ 10.

18. On October 20, 2014, counsel to the IAG received the Notice to Counterparties of Executory Contracts and Unexpired Leases (the "Notice"), identifying the E-ZPass License Agreement and E-ZPass Interagency Agreement as executory contracts that the Debtors may seek to assume or assume and assign. The Notice provides a proposed cure amount of $0 for both the E-ZPass License Agreement and the E-ZPass Interagency Agreement.[5] Although the Notice is dated October 6, 2014, it was not received by the IAG or its counsel until October 20, 2014. Moreover, the Affidavit of Service regarding service of the Notice of Counterparties of Executory Contracts and Unexpired Leases dated October 7, 2014 [*See* D.I. 130] does not list the IAG as a service party.

19. Under the Notice and the Order, the IAG's deadline to file an objection to the Debtors' proposed assumption or assignment or related cure claim is the later of (a) the commencement of the Combined Hearing and (b) ten Business Days following receipt of the Notice. The IAG and the Port Authority timely submit this joint preliminary objection and reservation of rights and oppose the assumption or assignment of the IAG Agreements.

---

[5] The Notice does not identify the Port Authority as a contract counterparty to the E-ZPass License Agreement and the Port Authority did not receive notice of the potential assumption or assignment of the License Agreement.

**PRELIMINARY OBJECTION**

20. Debtors are not entitled to assume and/or assign the IAG Agreements without first obtaining the consent of the IAG (and the Port Authority as to the License Agreement) and without fully complying with all of the terms if the of the IAG Agreements. First, under section 365(c)(1) of the Bankruptcy Code, the Debtors cannot assume or assign the IAG Agreements without the consent of the IAG (and the Port Authority as to the License Agreement) because, as set forth below, applicable law excuses the IAG and the Port Authority from accepting performance from or rendering performance to a party other than the Concessionaire. Second, the Debtors must cure monetary and nonmonetary defaults under the IAG Agreements. The Concessionaire's failure to maintain a surety bond as required under Appendix D to the Operating Agreement constitutes a nonmonetary default under the IAG Agreements. Third, the Debtors and the prospective purchaser must carry their burden to show adequate assurance of future performance of the IAG Agreements. At this time, the IAG and the Port Authority have not consented to assignment of the IAG Agreements to an as yet unidentified potential purchaser of the Debtors' assets, and will be unable to consider whether to consent to assignment to any potential bidder until they have been provided with copies of the bids, the identity of prospective purchasers, financial and other information about any prospective purchasers sufficient to allow IAG to determine whether they are proper assignees of the IAG Agreements and have ability to fully perform under such agreements and appropriately detailed proposals for curing all outstanding defaults and providing adequate assurance of future performance.

### A. The IAG Agreements Cannot Be Assumed or Assigned Under Applicable Law Without the IAG's and the Port Authority's Consent.

21. Section 365(c)(1) of the Bankruptcy Code prohibits a debtor from assuming or assigning a contract if applicable law excuses the nondebtor party to the contract from accepting performance from, or rendering performance to, a party other than debtor, regardless of whether or not the contract prohibits or restricts assignment. 11 U.S.C § 365(c). Specifically, section 365(a) of the Bankruptcy Code provides: "Except as provided in . . . subsections (b), (c) and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

22. The ability of a debtor to assume an executory contract is limited by section 365(c) of the Bankruptcy Code, which provides in relevant part:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
> (B) such party does not consent to such assumption and assignment
> . . . .

11 U.S.C. § 365(c)(1).

23. Applicable law for purposes of section 365(c)(1) is any nonbankruptcy law applicable to the contract, and includes the laws governing personal services contracts, trademark licenses, and copyright licenses. *See*, *e.g.*, *In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011) (Posner, J.) (finding that "[t]he term 'applicable law' means any law applicable to a contract, other than bankruptcy law," including trademark licensing law); *Matter of Midway*

10

*Airlines Inc.*, 6 F.3d 492, 495 (7th Cir. 1993) (stating that section 365(c)(1) contemplates personal services contracts and any other applicable law prohibiting assignment); *In re Travelot Co.*, 286 B.R. 447 (Bankr. S.D. Ga. 2002) (federal trademark law) (citing *Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.)*, 165 F.3d 747, 750 (addressing patent license); *In re Golden Books Family Entm't, Inc.*, 269 B.R. 300, 308-10 (Bankr. D. Del. 2001) (addressing copyright license).

24.    The IAG Agreements lay the groundwork for the interagency cooperation and complex activities necessary to properly operate the E-ZPass highway toll system on an interstate basis. At the core of the E-ZPass program is the concept of interoperability, which allows the 26 IAG members to exchange and reconcile tag and toll data among their separate systems.[6] For purposes of interoperability, all agencies are connected to each other by a secure network. This network provides the means to exchange tag data and process toll transactions across the various agencies. Tag data is exchanged among the agencies on a nightly basis.

25.    Although there is no precise equivalent for the IAG in applicable law, the law governing unincorporated associations and joint ventures furnishes close analogues to the present context.[7] Such applicable law establishes without a doubt that ITR's position as a Full Member Company and its rights under the IAG Agreements are not freely assignable.

---

[6]    The U.S. government has determined that nationwide interoperability of toll taking on the nation's interstate highways is in the national interest. Section 1512(b) of the Moving Ahead for Progress in the 21st Century Act (MAP-21), P.L. 112-141 (July 6, 2012), mandates that by 2016 all toll facilities on federal-aid highways shall implement nationally interoperable electronic toll collection programs.

[7]    The absence of precedent on all fours with the facts of this case is hardly surprising. As discussed above, the IAG was originally composed exclusively of public agencies. The need to even consider admitting private company members is of quite recent vintage, driven by the attempts of some states and municipalities to raise revenues by privatizing roadways.

11

26. Applicable law governing unincorporated associations plainly recognizes that the internal affairs of unincorporated associations should be free from judicial interference. *Gorman v. St. Raphael Academy,* 853 A.2d 28, 37 (R.I. 2004) ("there should be 'no judicial interference with the internal affairs, rules and by-laws of a voluntary association unless their enforcement would be arbitrary, capricious or constitute an abuse of discretion' ") (quoting *Hebert v. Ventetuolo,* 480 A.2d 403, 407 (R.I. 1984)); *In re Election of Officers and Directors of F.I.G.H.T., Inc.,* 360 N.Y.S.2d 564, 568 (N.Y. Sup. 1974); *Bricker v. N.H. Medical Society,* 272 A.2d 614, 616 (N.H. 1970 ("Judicial interference in the internal affairs of associations is strictly limited and will not be undertaken in the absence of a showing of injustice or illegal action and resulting damage to the complaining member."); *Ace Bus Transp. Co. v. South Hudson County Blvd. Bus Owners' Ass'n,* 177 A. 360, 366 (N.J. Ch. 1935); *Engel v. Walsh,* 101 N.E. 222 (Ill. 1913) ("Courts will not interfere to control the enforcement of by-laws of such associations, but they will be left free to enforce their own rules and regulations by such means and with such penalties as they may see proper to adopt for their government.").

27. Applying this principle of non-interference with the internal affairs of unincorporated associations, courts have held over and over that positions in such unincorporated associations are not freely assignable. *See, e.g.*, *Hyde v. Woods,* 94 U.S. 523, 524-25 (1876) (holding that debtor's membership seat on stock exchange was not freely assignable because it was acquired subject to restrictions on assignment); *In re Magness*, 972 F.2d 689, 697 (6th Cir. 1992) (affirming denial of trustee's motion to assume and assign country club golf memberships because "[t]he interests of the persons presently involved in this orderly succession cannot adequately be protected in any manner except by prohibiting the sale and assignment of the membership."); *Arnstein v. Am. Soc'y of Composers, Authors & Publishers*, 29 F. Supp. 388, 393

(S.D.N.Y. 1939) (holding that voluntary unincorporated association has right to refuse a non-member's attempt to join association); *In re Dewey Ranch Hockey, LLC*, 414 B.R. 577, 591-93 (Bankr. D. Ariz. 2009) (acknowledging the league's "right to admit only new members who meet its written requirements" and denying sale of a hockey team's assets over the NHL's objection because the debtor could not provide adequate protection of the NHL's interest in enforcing its approval rights); *Schwabacher v. Ehrich,* 6 N.Y.S.2d 316, 318 (N.Y. Sup. Ct. 1938) ("From the nature of a membership ... it follows that a member's seat is a personal privilege and an unassignable intangible."); *William Jackman Sons v. Hauffman*, 287 N.Y.S. 177, 178 (N.Y. Sup. Ct. 1935) (recognizing that membership in pilots' association "by its terms and by necessity is not assignable").

28.    The applicable law governing assignment of interests in joint ventures is equally compelling.  A joint venture is a "special combination of two or more persons where in some specific venture a profit is jointly sought[.]" *Gramercy Equities Corp. v. Dumont*, 531 N.E.2d 629, 632 (N.Y. 1988) (citations omitted).  Courts normally look to partnership law for guidance in assessing the rights of members of a joint venture.  One court has observed in discussing a professional sports league as a joint venture:

> [A] league is ... like a partnership. While each club initially contributes its own capital, the various participants to a large extent share in the joint profits of the venture. This participation in profits is achieved through various arrangements, such as the pooling of television receipts . . . . Thus, a decision on access to membership is basically a decision as to whether particular individuals (or their business entities) will be allowed to participate in the partnership venture.

*Mid-S. Grizzlies v. NFL*, 550 F. Supp. 558, 568 n.22 (E.D. Pa. 1982) (quoting John C. Weistart & Cym H. Lowell, *The Law of Sports* § 3.16, at 315 (1979)), *aff'd,* 720 F.2d 772 (3d Cir. 1983).

13

29. A joint venturer and partner may not assign its interests absent the consent of the other joint venturers and partners. *See In re Schick*, 235 B.R. 3 18, 325 (Bankr. S.D.N.Y. 1999) ("[T]he right to choose one's partners is a fundamental tenet of partnership law. Thus, the trustees cannot force the Objectants to accept substitute 'performance' from or render performance to a stranger."); *see also In re New Era Co.*, 115 B.R. 41, 44 (Bankr. S.D.N.Y. 1990) (holding that, notwithstanding purported assignment of partnership interest, "it is settled law in New York that unless the parties have agreed otherwise, a person cannot become a member of a partnership interest without the consent of all the partners"); *Rivlin v. Levine*, 195 Cal. App. 2d 13, 21 (Cal. Ct. App. I 961) ("No partner is admitted without unanimous approval of every other partner. A true partnership is a relation of personal confidence and is a select closed group."); *see also Rice v. Shoney's Inc. (In re Dean)*, 174 B.R. 787, 790 (Bankr. E.D. Ark. 1994) (enforcing restrictions on transfer in joint venture); *In re Todd*, 118 B.R. 432, 434 (Bankr. D.S.C. 1989) (enforcing right of first refusal in partnership agreement and recognizing that a nonselling partner has a "legitimate interest in the identity of his partner, which is worthy of protection by way of the protective provisions of … the partnership agreement"); *cf. Lusk v. Elliott*, No. 16326, 1999 WL 644 739, at *2 n.9 (Del. Ch. Aug. 13, 1999) ("assignment of an interest in an LLC does not permit the assignee to become a member of the limited liability company").

30. As stated above, the IAG maintains an unprecedented interstate toll interoperability network that is vital to the public welfare of travelers utilizing the member toll roads. Significantly, of the 26 IAG members, the Concessionaire is and has been the only private company member of the IAG since the IAG amended the Operating Agreement in December 2006 to permit a new class of Full Member Companies to join the IAG. The

predominantly public nature of the IAG's membership demonstrates the import of the IAG to maintaining efficient, safe, and convenient travel for E-ZPass customers on the member toll roads and thereby promoting both intra- and interstate commerce. Thus, due to the unique nature of the services to be rendered and the importance of the identity of the IAG members to the effective operation of the network, the Operating Agreement cannot be assigned by the Debtors without the IAG's consent.

31. Moreover, the License Agreement, governed by New York law, confers on ITR only limited, non-exclusive licenses of the "E-ZPass," "E-ZPass Plus," and "E-Z Pass+" service marks. Such intellectual property may not be assigned under applicable law without the Port Authority's consent. *See, e.g.*, *XMH*, 647 F.2d at 695 ("[T]he universal rule is that trademark licenses are not assignable in the absence of a clause expressly authorizing assignment."); *Golden Books*, 269 B.R. at 311 (holding that nonexclusive copyright licenses cannot be assigned without a licensor's consent under copyright law). The License Agreement explicitly prohibits assignment absent consent, providing that the license "shall not be assignable or transferable by Licensee or any successor or assign without Licensor's prior written consent. Licensee shall not have the right to grant any sublicenses." License Agreement, ¶ 10. The Port Authority's consent to assignment of the License has neither been sought nor obtained.

32. For these reasons, applicable law prohibits assumption or assignment of the IAG Agreements without the consent of the IAG (and the Port Authority as to the License Agreement).

**B.      Even Assuming the Debtors Could Assume and Assign the IAG Agreements, the Debtors Would Be Required to Cure All Monetary and Nonmonetary Defaults Under the IAG Agreements.**

33.     Pursuant to sections 365(b)(1)(A) and 365(f)(2)(A), a debtor must cure, or provide adequate assurance that it will promptly cure, all monetary and nonmonetary defaults under a contract prior to assuming or assigning the contract. 11 U.S.C. § 365(b)(1)(A) & (f)(2)(A). The Debtors' Notice states that there are no monetary defaults under the E-ZPass License Agreement and E-ZPass Interagency Agreement. However, prior to the Petition Date, the Concessionaire allowed the surety bond required under the Operating Agreement to expire. The Concessionaire's failure to maintain a surety bond for the benefit of the other members of the IAG constitutes a nonmonetary default under the Operating Agreement. *See* Operating Agreement, Amendment 6, Annex D, § 12. Accordingly, even assuming the Debtors were permitted to assign the IAG Agreements under applicable law, the Debtors would be required to cure this nonmonetary default by reinstating the surety bond in accordance with the Appendix D to the Operating Agreement and cure any monetary defaults.[8] Alternatively, any order authorizing the assumption and/or assignment must provide that the IAG may retain the $2.9 million it currently holds and any interest thereon as security for the performance of ITR's obligations under the IAG Agreements for so long ITR remains a member of the IAG or any obligations under the IAG Agreements remain outstanding.[9]

---

[8]   The IAG is not aware of the existence of monetary defaults at this time, and reserves all rights with respect to the existence and cure of any monetary defaults or any other nonmonetary defaults under the IAG Agreements.

[9]   Retention of the $2.9 million should be without prejudice to the IAG's ability to require additional security if circumstances warrant.

16

### C. Even Assuming the Debtors Could Assume and Assign the IAG Agreements, the Debtors or the Prospective Purchaser Must Also Provide Adequate Assurance of Future Performance.

34. Pursuant to section 365(f)(2)(B), adequate assurance of future performance by the assignee of a contract must be provided, regardless of whether there has been a default under the contract. 11 U.S.C. § 365(f)(2)(B). The Debtors have not provided adequate assurance of future performance of the IAG Agreements in the hands of a prospective purchaser. The Plan provides no information to the IAG and the Port Authority about the structure of a potential sale process, the identity of prospective purchasers of the Debtors' assets or business, and the financial and operational wherewithal of any such potential purchaser to fully discharge its obligations as an IAG member and under the IAG Agreements and to cure any breaches that may be required to be remedied prior to the assumption and assignment of the IAG Agreements to any potential purchaser. Accordingly, even assuming the Debtors were permitted to assign the IAG Agreements under applicable law, the Debtors or the prospective purchaser would be required to carry their burden of demonstrating adequate assurance of future performance. As of the date of this preliminary objection, the IAG and the Port Authority have not been provided with adequate assurance of future performance with respect to any potential purchaser.

### RESERVATION OF RIGHTS

35. As of the filing of this limited objection, the path following confirmation of the Plan is uncertain and, in the event of a post-confirmation sale of the Debtors' assets, the identity of a successful bidder has not been determined. Additionally, the Debtors have not yet identified a definitive, binding list of contracts to be assumed and/or assigned. Accordingly, the IAG and the Port Authority reserve the right to file a further or supplemental objection on any basis, including, without limitation, objections based on the identity of any successful bidder,

any successful bidder's ability to provide adequate assurance and the performance necessary to cure defaults under the IAG Agreements. The IAG and the Port Authority reserve the right to be heard and to present evidence at any hearing on a proposed sale or assignment, including by way of declaration or witness testimony.

36. Notwithstanding the IAG's and the Port Authority's limited objections, the IAG has been discussing, and remains willing to discuss, appropriate circumstances under which it would consent to an assumption and assignment of the IAG Agreements with the Debtors or any prospective purchaser interested in bidding on the Debtors' assets.

## CONCLUSION

WHEREFORE, the IAG and the Port Authority respectfully request that the Court deny (i) assumption or assignment of the IAG Agreements absent (a) the IAG's and the Port Authority's consent, (b) Debtors' cure of all monetary and nonmonetary defaults, including, without limitation, reinstatement of the surety bond as required under the IAG Agreements, and (c) the Debtors and the prospective purchaser providing adequate assurance of future performance.

Dated: October 24, 2014
Chicago, Illinois

*/s/J. Mark Fisher*
J. Mark Fisher
Michael W. Ott
SCHIFF HARDIN LLP
233 S. Wacker Drive
Suite 6600
Chicago, Illinois 60606
Telephone: (312) 258-5570
Facsimile: (312) 258-5600

- and -

Gregory W. Werkheiser (No. 3553)
Tamara K. Minott (No. 5643)

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, 16th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel to E-ZPass Interagency Group and The Port Authority of New York and New Jersey*