# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ITR CONCESSION COMPANY LLC, *et al.*,[1] | ) | Case No. 14-34284 (PSH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF FIRST AND FINAL FEE APPLICATION OF UBS SECURITIES LLC AS INVESTMENT BANKER AND FINANCIAL ADVISOR FOR THE SPECIAL COMMITTEE OF STATEWIDE MOBILITY PARTNERS LLC

**PLEASE TAKE NOTICE** that on June 1, 2015, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *First and Final Fee Application of UBS Securities LLC as Investment Banker and Financial Advisor for the Special Committee of Statewide Mobility Partners LLC* (the "Fee Application") on behalf of UBS Securities LLC.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Fee Application will take place on **June 23, 2015, at 10:00 a.m. (prevailing Central Time)**, or as soon thereafter as counsel may be heard, before the Honorable Pamela S. Hollis in Courtroom 644 in the United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, or before any other judge who may be sitting in her place and stead, at which time and place you may appear.

**PLEASE TAKE FURTHER NOTICE** that any objection to the Fee Application must be filed with the Court and served so as to be actually received by each of the following entities, by **June 16, 2015, at 4:00 p.m. (prevailing Central Time)**: (a) the Office of the U.S. Trustee for the Northern District of Illinois; and (b) any party that has requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

**PLEASE TAKE FURTHER NOTICE** that additional copies of the Fee Application and any other document filed in these chapter 11 cases are available free of charge by visiting the case website maintained by Kurtzman Carson Consultants LLC, the notice and balloting agent for these chapter 11 cases, available at http://www.kccllc.net/ITR or by calling (877) 634-7181. You may also obtain copies of any pleadings by visiting the Court's website at

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  ITR Concession Company LLC (0293); ITR Concession Company Holdings LLC (0285); and Statewide Mobility Partners LLC (1312).  The location of the Debtors' service address for the purposes of these chapter 11 cases is: c/o ITR Concession Company LLC, 205 North Michigan Avenue, Suite 2510, Chicago, Illinois 60601.

www.ilnb.uscourts.gov in accordance with the procedures and fees set forth therein.  Please be advised that the Notice, Claims, and Solicitation Agent is not permitted to provide legal advice.

Dated:    June 1, 2015                    /s/ Marc Kieselstein
      Chicago, Illinois                James H.M. Sprayregen, P.C.
                                     Marc Kieselstein, P.C.
                                     Gregory F. Pesce
                                     **KIRKLAND & ELLIS LLP**
                                     **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                     300 North LaSalle
                                     Chicago, Illinois 60654
                                     Telephone:  (312) 862-2000
                                     Facsimile:  (312) 862-2200

                                     *Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ITR CONCESSION COMPANY LLC, *et al.*,[1] | ) | Case No. 14-34284 (PSH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SUMMARY COVER SHEET TO THE FINAL FEE APPLICATION OF UBS
SECURITIES LLC AS INVESTMENT BANKER AND FINANCIAL ADVISOR
FOR THE SPECIAL COMMITTEE OF STATEWIDE MOBILITY PARTNERS LLC**

In accordance with the Local Rules of the United States Bankruptcy Court for the Northern District of Illinois (the "Local Bankruptcy Rules"), UBS Securities LLC ("UBS Securities"), as investment banker and financial advisor for the Special Committee of the Board of Directors of Debtor Statewide Mobility Partners LLC ("Statewide" and together with the other debtors in the above-captioned chapter 11 cases, the "Debtors"), submits this summary (this "Summary") of fees and expenses sought as actual, reasonable and necessary in the fee application to which this Summary is attached (the "Application")[2] for the period from September 21, 2014, through and including October 28, 2014 (the "Fee Period").[3]

**GENERAL INFORMATION**

| | |
|---|---|
| Name of Applicant: | UBS Securities LLC |
| Authorized to Provide Services to: | Special Committee of the Board of Directors of Statewide Mobility Partners LLC |
| Petition Date (the "Petition Date"): | September 21, 2014 |
| Date of Order Authorizing Retention of UBS | October 28, 2014 |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  ITR Concession Company LLC (0293); ITR Concession Company Holdings LLC (0285); and Statewide Mobility Partners LLC (1312).  The location of the Debtors' service address for the purposes of these chapter 11 cases is: c/o ITR Concession Company LLC, 205 North Michigan Avenue, Suite 2510, Chicago, Illinois 60601.

[2]  UBS Securities reserves the right to supplement the Application prior to the hearing on proper notice.  The Application is without prejudice to UBS Securities' right to seek additional expenses incurred during the Fee Period or thereafter.

[3]  Defined terms used but not defined in this Summary shall have the meanings given to them in the Application.

| | |
|---|---|
| Securities (the "Retention Order") [D.I. 182]: | |
| Plan Confirmation Date (the "Confirmation Date"): | October 28, 2014 |
| Plan Effective Date (the "Effective Date"): | May 27, 2015 |
| This Application is a: | First and final application for professional compensation. |

**SUMMARY OF FEES AND EXPENSES SOUGHT IN THE FEE APPLICATION**

| Period: | September 21, 2014 through and including October 28, 2014 (the "Fee Period")[4] |
|---|---|
| Amount of Compensation Sought: | $400,000 |
| Amount of Expense Reimbursement Sought: | $57,753.05 |
| Total Compensation and Expense Reimbursement Requested: | $457,753.05 |
| Amount of Compensation Received by UBS Securities: | $400,000 |
| Amount of Expense Reimbursement Received by UBS Securities: | $57,753.05 |
| Amount of Compensation and Expense Reimbursement Remaining Unpaid: | $0 |

---

[4]    The Plan and Confirmation Order require that final fee applications cover the "period from [the] Petition Date through the Confirmation Date." Plan Art.II.B.2. UBS Securities has, therefore, set forth its fees and expenses separately for the period from the Petition Date (September 21, 2014) through and including the Confirmation Date (October 28, 2014). UBS Securities has invoiced or will invoice the Debtors directly for any post-Confirmation Date fees and expenses incurred on behalf of the Special Committee, including the Transaction Fee (as and to the extent provided in the Engagement Letter, which totals $29,437,500 to which the Monthly Fees paid to date of $1,400,000 will be applied) and expenses incurred preparing this Application, pursuant to the applicable procedures set forth in the Plan. *See* Plan Art.II.B.4.

Dated:   May 29, 2015                **UBS SECURITIES LLC**


Larry Grafstein
Managing Director


Rory Murphy
Associate Director

UBS Securities LLC
1285 Avenue of the Americas,
New York, New York 10019
(212) 713-2000

*Investment Bank and Financial Advisor for the Special*
*Committee of Statewide Mobility Partners LLC*

3

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ITR CONCESSION COMPANY LLC, *et al.*,[1] | ) | Case No. 14-34284 (PSH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**FIRST AND FINAL FEE APPLICATION OF UBS SECURITIES LLC AS**
**INVESTMENT BANKER AND FINANCIAL ADVISOR FOR THE SPECIAL**
**COMMITTEE OF STATEWIDE MOBILITY PARTNERS LLC**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  ITR Concession Company LLC (0293); ITR Concession Company Holdings LLC (0285); and Statewide Mobility Partners LLC (1312).  The location of the Debtors' service address for the purposes of these chapter 11 cases is: c/o ITR Concession Company LLC, 205 North Michigan Avenue, Suite 2510, Chicago, Illinois 60601.

UBS Securities LLC ("UBS Securities"), as investment banker and financial advisor for

the Special Committee (the "Special Committee") of the Board of Directors of Debtor Statewide

Mobility Partners LLC ("Statewide" and together with the other above-captioned debtors, the

"Debtors"), hereby submits this final application (the "Application") for allowance of

compensation for professional services provided in the amount of $400,000 and reimbursement

of actual and necessary expenses in the amount of $57,753.05 that UBS Securities incurred for

the period from September 21, 2014 through and including October 28, 2014 (the "Fee Period").[2]

In support of this Application, UBS Securities respectfully states as follows:

## I.

### JURISDICTION

1.      The United States Bankruptcy Court for the Northern District of Illinois (the

"Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]     The Plan and Confirmation Order (both as defined below) require that final fee applications
cover the "period from [the] Petition Date through the Confirmation Date."  Plan Art.II.B.2.
UBS Securities has, therefore, set forth its fees and expenses separately for the period from
the Petition Date (September 21, 2014) through and including the Confirmation Date
(October 28, 2014).  UBS Securities has invoiced or will invoice the Debtors directly for any
post-Confirmation Date fees and expenses incurred on behalf of the Special Committee,
including the Transaction Fee (defined below) and expenses incurred preparing this
Application, pursuant to the applicable procedures set forth in the Plan.  *See* Plan Art.II.B.4.
In addition to the compensation earned during the Fee Period, UBS Securities is entitled to
the Transaction Fee of $29,437,500, less the $1,400,000 in Monthly Fees (defined below)
paid to date, under the terms of the Engagement Letter, as well as reimbursement of its
reasonable and documented out-of-pocket expenses.  UBS Securities is disclosing the terms
of its post-Confirmation Date fees and expenses in the interests of full disclosure and is not
seeking allowance of any such fees and expenses by this Application except to the extent not
already paid by the Debtors in accordance with the terms of the Engagement Letter.

3.     The bases for the relief requested herein are section 328(a) of title 11 of the

United States Code (as amended, the "Bankruptcy Code")[3], Rule 2016 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Local Bankruptcy Rule 5082-1.

## II.

## PRELIMINARY STATEMENT[4]

4.     The Debtors initiated these chapter 11 cases with the primary goal of

consummating a sale of substantially all of the Debtors' assets prior to August 1, 2015. Due in

significant part to the expertise and the tireless efforts of UBS Securities' Deal Team to design,

orchestrate and execute a robust and highly competitive sale process, that goal was accomplished

in a manner that exceeded any reasonable expectations. On May 27, 2015, over two months

ahead of schedule, the Debtors consummated the IFM Transaction, consisting of a sale of the

Debtors' interests in the Toll Road for a total cash payment of $5.725 billion, with the full

support of all key constituencies including the IFA and the Committee of Secured Parties. To

achieve this result, UBS Securities' professionals performed over 16,000 hours of services on

behalf of the Special Committee, including, without limitation, structuring a sale process

designed to generate maximum competition among potential Bidders, working with expert traffic

and infrastructure consultants to prepare key analyses of the Toll Road, creating various

marketing materials (including a "teaser," confidential information memorandum and

management presentation), managing a substantial due diligence process and monitoring

inspections of the Toll Road and other site visits, working closely with the Bidders and the IFA

---

[3]    Solely as to the United States Trustee for the Northern District of Illinois (the "U.S.
Trustee"), UBS Securities' final compensation is subject to review under section 330 of the
Bankruptcy Code.

[4]    Defined terms used but not defined above or in this Section II shall have the meanings given
to them below.

to ensure the winning Bidder was in a position to receive IFA approval to assume control of the

Toll Road, advising the Special Committee regarding the comparative advantages and

disadvantages of the Bidders' proposals, and assisting IFM with closing and transition logistics.

5.     By this Application, UBS Securities requests approval and allowance of its fees

and expenses in accordance with the Engagement Letter previously approved by the Court, to

which no party objected.  UBS Securities respectfully submits that that such amounts are

reasonable and appropriate under section 328(a) of the Bankruptcy Code considering the vast

experience of the Deal Team, the time and effort expended on behalf of the Special Committee,

the highly professional manner in which UBS Securities conducted the sale process, and the

tremendously successful results achieved on behalf of the Debtors and creditors.

## III.

## RELIEF REQUESTED

6.     By this Application, UBS Securities seeks the entry of an order, substantially in

the form attached hereto as **Exhibit A**: (a) approving and allowing UBS Securities compensation

for professional services provided during the Fee Period in the amount of $400,000 (which shall

be applied against the Transaction Fee, as defined below), and reimbursement of actual,

reasonable, and necessary expenses incurred during the Fee Period, in the amount of $57,753.05

(which shall be applied against the total expenses payable to UBS Securities for the period from

the Petition Date through the Effective Date (defined below as May 27, 2015) (the "Engagement

Period")); (b) authorizing and directing the Debtors to remit payment to UBS Securities of any

unpaid portion of the Transaction Fee, in the amount of $28,037,500.00 (which amount reflects

application of the $1,400,000 in Monthly Fees, as defined below, including $400,000 in Monthly

Fees earned during the Fee Period), and the total expenses for the Engagement Period; and (c)

granting such other relief as is appropriate under the circumstances.[5]

## IV.

## BACKGROUND

**A.      The Toll Road Operated by the Debtors**

7.      The Debtors operated a 157-mile toll road in northern Indiana commonly referred

to as the Indiana Toll Road (the "Toll Road") pursuant to that certain Indiana Toll Road

Concession and Lease Agreement dated as of April 12, 2006 (the "CLA") between Debtor ITR

Concession Company LLC ("ICTRCC") and the Indiana Finance Authority (the "IFA").  The

Toll Road, which extends from the Ohio state line to the Illinois state line and comprises portions

of U.S. Interstates 80 and 90, provides fast and convenient access to and from communities in

northern Illinois and northern Indiana.  A more detailed description of the Debtors' businesses

and the events leading up to the commencement of the chapter 11 cases is set forth in the

*Declaration of Fernando Redondo, Chief Executive Officer of ITR Concession Company, LLC,*

*in Support of Chapter 11 Petitions and First-Day Pleadings* [D.I. 6] incorporated herein by

reference.

**B.      The Debtors Sought Bankruptcy Protection and the Court Confirmed the Joint**

**Prepackaged Plan**

8.      On September 21, 2014 (the "Petition Date"), each of the Debtors filed a

voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors

---

[5]    For the avoidance of any doubt, UBS Securities shall not request, and the Debtors shall not
be required to pay to UBS Securities, any fees or expenses in excess of the amount reserved
in the Professional Fee Account on behalf of UBS Securities in accordance with the Plan (as
such term is defined in the Plan).

operated their businesses and managed their properties as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code through the Effective Date (as defined below)

and as revested Debtors after the Effective Date.  No trustee or examiner was appointed in these

chapter 11 cases, and the U.S. Trustee did not appoint a statutory committee of unsecured

creditors in these chapter 11 cases.

9.       Prior to the commencement of these chapter 11 cases, the Debtors, an ad hoc

group of certain holders of claims under the Debtors' senior secured credit facility (collectively,

the "Committee of Secured Parties") and the Debtors' equity sponsors entered into a

Restructuring Support Agreement dated as of September 4, 2014 (as amended, modified, or

supplemented from time to time, the "Restructuring Support Agreement") pursuant to which the

parties agreed to support and seek confirmation of a joint prepackaged chapter 11 plan.  On the

Petition Date, the Debtors simultaneously filed the *Joint Prepackaged Plan of Reorganization of

ITR Concession Company LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 24]

(as amended, supplemented, or modified from time to time in accordance with the terms thereof,

the "Plan") and *Disclosure Statement for Debtors' Joint Prepackaged Plan of Reorganization

Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 25] (the "Disclosure Statement").  The

Plan contemplated, among other things, the consummation of one of two potential restructuring

alternatives: (a) a sale of substantially all of the Debtors' assets prior to August 1, 2015

following a competitive sale process (a "Sale Transaction"); or (b) in the absence of a Sale

Transaction, a comprehensive balance-sheet restructuring (a "Reorganization Transaction").  The

Restructuring Support Agreement and Plan provided that the Special Committee had the sole and

exclusive authority to supervise the sale process and, subject to certain terms and conditions,

determine whether the Debtors would seek to consummate a Sale Transaction.  The Plan

provides for payment in full, in cash, of all general unsecured claims.

10.     On October 28, 2014 (the "Confirmation Date"), the Court entered the *Order*

*Approving the Debtors' Disclosure Statement for, and Confirming, the Joint Prepackaged Plan*

*of Reorganization of ITR Concession Company LLC, et al., Pursuant to Chapter 11 of the*

*Bankruptcy Code (With Technical Modifications)* [D.I. 183] (the "Confirmation Order").

**C.      The Court Approved the Retention of UBS Securities and Terms of Compensation**

**1.      Retention of UBS Securities**

11.     Given the complexity associated with a potential Sale Transaction, the Special

Committee retained UBS Securities to provide financial advisory services in connection with all

aspects of the sale process, including the negotiation and documentation of a potential Sale

Transaction, based upon, among other things, UBS Securities' extensive experience and

excellent reputation in providing investment banking services to a wide range of clients who

specialize in infrastructure related markets.  The Debtors, the Special Committee, the Committee

of Secured Parties and UBS Securities engaged in significant discussions and negotiations with

regard to the terms and conditions of UBS Securities' employment, resulting in an engagement

letter dated as of September 4, 2014 between UBS Securities, the Special Committee and

Statewide (the "Engagement Letter").  The Engagement Letter reflected the parties' mutual

agreement as to the substantial efforts that would be required of UBS Securities in the

engagement and the compensation that would be payable in exchange for such services.

12.     On October 7, 2014, the Debtors filed an application [D.I. 128] (the "Retention

Application") requesting that the Court enter an order authorizing the employment and retention

of UBS Securities as investment banker and financial advisor for the Special Committee in

accordance with the terms of the Engagement Letter.   On October 28, 2014, the Court entered

the *Order (A) Authorizing the Employment and Retention of UBS Securities LLC as Investment*

*Banker and Financial Advisor for the Special Committee of Statewide Mobility Partners LLC,*

*Effective Nunc Pro Tunc to the Petition Date and (B) Waiving Certain Information Requirements*

*Imposed by Local Bankruptcy Rule 5082-L(C)* [D.I. 182] (the "Retention Order"), attached

hereto as **Exhibit B** and hereby incorporated by reference.   The Retention Order authorized the

Special Committee to retain and employ UBS Securities to provide the services set forth in the

Retention Application and the Engagement Letter (attached as Exhibit 1 to the Retention Order),

which included the following services:

a.  advise and assist the Special Committee in analyzing, structuring, negotiating and effecting any Sale Transaction (including, without limitation, certain mergers, consolidations, reorganizations, or other business combinations, asset sales or equity sales), including evaluating potential Sale Transactions and assisting the Special Committee in structuring, negotiating, and effecting the terms of a Sale Transaction;

b.  at the Special Committee's request, meet with and provide information and updates on a regular basis to the Statewide Board of Directors and the Committee of Secured Parties and their respective legal counsel and financial advisors; and

c.  provide testimony in the chapter 11 cases on behalf of the Special Committee with respect to any of the foregoing, if necessary.

**2.     Terms of compensation**

13.   The Retention Order authorized the Debtors to pay UBS Securities' fees and to

reimburse UBS Securities for its reasonable out-of-pocket costs and expenses as set forth in the

Engagement Letter (the "Fee and Expense Structure"), the terms of which are summarized

below:

a.  Transaction Fee.  Upon the closing of a Sale Transaction UBS Securities earned a single fee, equal to (i) $8,000,000 plus (ii) 1.75 percent of the

Transaction Value[6] for amounts in excess of $4,500,000,000 (the "Transaction Fee").

b.   Monthly Fee.  UBS Securities was entitled to receive a monthly fee of $200,000, payable on the first day of each month during the Term[7] commencing on August 1, 2014 (collectively, the "Monthly Fees"); *provided* that (a) the aggregate of all Monthly Fees was limited to $1,400,000 and (b) all Monthly Fees paid to UBS Securities were to be credited against the Transaction Fee payable under the terms of the Engagement Letter.

14.     The Engagement Letter, approved by the Retention Order, further provides that the Debtors will reimburse UBS Securities for all reasonable out-of-pocket costs and expenses, including in-sourced document production costs, travel costs, meals, and the fees, disbursements and other charges of UBS Securities' external legal counsel (without the need for such legal counsel to be retained as a professional in these chapter 11 cases and without regard to whether such legal counsel's services satisfy section 330(a)(3)(C) of the Bankruptcy Code).[8]

---

[6]   Annex A of the Engagement Letter defined Transaction Value as the sum of: (A) "Equity Value," which shall mean (i) in the case of the sale or exchange of equity securities, the total consideration received or to be received for such securities (including, for purposes of this clause (A)(i), amounts in escrow), plus payments made in installments, plus amounts payable in connection with the Sale Transaction under agreements not to compete or similar arrangements, plus contingent payments (whether or not related to future earnings or operations), and (ii) in the case of a sale or disposition of assets, the total consideration paid or received or to be paid or received for such assets (including amounts in escrow and installment payments), plus contingent payments (whether or not related to future earnings or operations); and (B) the principal amount of all indebtedness for borrowed money assumed by an Acquiror (as defined in the Engagement Letter) as part of the Sale Transaction or owed by Statewide immediately after the closing of a Sale Transaction effected through a transfer of equity securities of Statewide.

[7]   The Engagement Letter defines the Term as commencing on July 21, 2014 and continuing until the earlier of July 21, 2016 and the date the Agreement is terminated in accordance with its terms.

[8]   UBS Securities' attorneys' fees are subject to a $75,000 cap unless otherwise expressly approved by the Special Committee.

15.     The Retention Order approved the Fee and Expense Structure pursuant to 328(a) of the Bankruptcy Code and provided that "[n]otwithstanding anything to the contrary [t]herein, the fees and expenses payable to UBS Securities pursuant to the Engagement Letter shall be subject to review only pursuant to the standards set forth in section 328(a) of the Bankruptcy Code and shall not be subject to the standard of review set forth in section 330 of the Bankruptcy Code, except by the U.S. Trustee."  Retention Order ¶ 7.[9]

### 3.     Payments to UBS Securities for the Fee Period

16.     UBS Securities has submitted invoices to Kirkland & Ellis LLP and Kirkland & Ellis International LLP (collectively, "K&E"), attorneys for the Debtors, on behalf of the Special Committee, for $400,000 in Monthly Fees and $57,753.05 in expenses incurred by UBS Securities on behalf of the Special Committee during the Fee Period.  As of the date hereof, UBS Securities has received payment in full of such amounts from the Debtors.[10]

17.     UBS Securities has received no payment and no promises for payment from any source other than the Debtors for services provided or to be provided in any capacity whatsoever in connection with these chapter 11 cases.

---

[9]    The Retention Order further provides that, in the event of such review by the U.S. Trustee, "'reasonableness' shall be evaluated by comparing (among other things) the fees payable in these cases to fees paid to comparable investment banking firms with similar experience and reputation offering comparable services in other chapter 11 cases and shall not be evaluated primarily on an hourly or length-of-case based criteria."  *Id.*

[10]   As described above, in addition to the fees earned on account of services rendered during the Fee Period and expenses incurred in connection with providing such services, UBS Securities has earned additional fees and incurred additional expenses during the post-Confirmation Date period in the following amounts: (a) $1,000,000 in Monthly Fees (bringing the total Monthly Fees to $1,400,000); (b) $28,037,500 as the net Transaction Fee, after application of the $1,400,000 in Monthly Fees, based on the application of the formula in the Engagement Letter to the IFM Transaction that was consummated (after applying 100% of the Monthly Fees); and (c) $128,344.90 in reasonable and documented out-of-pocket expenses.

18.    Pursuant to Bankruptcy Rule 2016(a), there is no agreement or understanding between UBS Securities and any other person for the sharing of compensation to be received for services rendered in these chapter 11 cases.

### 4.    The UBS Securities Deal Team

19.    UBS Securities' core deal team for the sale of the Toll Road (the "<u>Deal Team</u>") consisted of eight professionals, including five professionals from the Global Industrials Group ("<u>GIG</u>") and three professionals from the Mergers & Acquisitions Group (the "<u>M&A Group</u>"). The Deal Team was led by Charles Otton, Co-Head of GIG-Americas, Larry Grafstein, Co-Head of the M&A Group, and Alexander Greenbaum, an Executive Director in the Infrastructure group, all of whom are seasoned UBS Securities bankers with a long track record of successful and high-profile transactions. Mr. Otton has been with UBS Securities for over 20 years during which time he advised numerous marquee clients in M&A, equity and debt transactions in the aviation, transportation/travel, infrastructure and capital goods sectors. Mr. Grafstein has more than 25 years of experience on Wall Street during which time he advised clients on approximately $800 billion of completed and pending transactions. Mr. Greenbaum worked at UBS Securities from 2005 until his recent departure in 2015, during which time he played a key role on several multi-billion dollar transportation and infrastructure transactions. Biographical summaries regarding Mr. Otton and Mr. Grafstein are attached hereto as **<u>Exhibit C</u>**. The other members of the Deal Team were:

> Rory Murphy, an Associate Director in the GIG, has been with UBS Securities since 2010 and focuses on transactions across all product groups in the Infrastructure, Auto, Paper & Packaging and Mining industries. Mr. Murphy graduated from Indiana University Bloomington in 2010.

> Bobby Bal, an Associate Director in the M&A Group, has been with UBS Securities since 2010 and focuses on M&A in the Infrastructure, Industrial and Energy sectors. Mr. Bal graduated from Virginia Polytechnic Institute and State University in 2010.

Aum Dasani, an Analyst in the GIG, has been with UBS Securities since 2013 and focuses on transactions across all product groups in the Infrastructure, Travel/Transportation and Shipping sectors.  Mr. Dasani graduated from Duke University in 2010.

Petros Lekkakis, an Analyst in the GIG, has been with UBS Securities since 2014 and focuses on transactions across all product groups in the Infrastructure and Shipping sectors.  Mr. Lekkakis graduated from the National Technical University of Athens in 2012 and also received a Master's Degree in Construction Engineering & Management from Stanford University in 2014.

Eduardo Casas, an analyst in the M&A Group, has been with UBS Securities since 2014 and focuses on M&A in the Infrastructure and Industrials sectors.  Mr. Casas graduated from the Florida International University College of Business Administration in 2012.  Prior to joining UBS Securities, Mr. Casas worked at a different investment bank for two years.

**D.      Consummation of the IFM Transaction and the Plan's Effective Date**

20.     On March 11, 2015, following a robust and successful sale process designed, orchestrated and executed by UBS Securities, described in further detail below, the Debtors entered into a definitive agreement with IFM Investors ("IFM") of Australia for a Sale Transaction with a total transaction value of $5.725 billion (the "IFM Transaction").  The IFM Transaction closed and the Plan's effective date occurred on May 27, 2015 (the "Effective Date").

## V.

### SUMMARY OF SERVICES PROVIDED AND COMPENSATION REQUESTED

21.     During the Fee Period and thereafter through the Effective Date, UBS Securities rendered a broad range of professional services to the Special Committee in connection with the Sale Transaction.  The services that UBS Securities performed were substantial and necessary in the chapter 11 cases.  As set forth below, UBS Securities directed virtually every aspect of the sale process and worked extensively with the Debtors and various key constituencies, and their respective professionals, with the minimum amount of duplication with such other professionals.

UBS Securities' professionals provided more than 16,000 hours of services, as described below, and generated a sale for $5.725 billion.

22.     UBS Securities respectfully submits that the fees and expenses requested in this Application are consistent with, and typical of, compensation arrangements generally entered into by UBS Securities and other firms of similar stature in connection with the rendering of comparable services under similar circumstances, both in and out of bankruptcy proceedings, and the amount of such fees and expenses reflects the complexity, importance and nature of the services provided, and their substantial value to the Special Committee and the Debtors' estates. The total compensation requested (both during the Fee Period and through the Effective Date) is based on the straightforward application of the compensation formula in the Engagement Letter, which was approved by this Court without any objection by any party, to the proceeds of the IFM Transaction.  Accordingly, UBS Securities respectfully submits that its fees and expenses satisfy the requirements of section 328(a) of the Bankruptcy Code, made applicable to this Application by the Retention Order.

23.     UBS Securities does not maintain written time records in the normal course of providing financial advisory and investment banking services to its clients because UBS Securities does not bill its clients based on the number of hours expended by its professionals. The Retention Order expressly modified the requirements of the Bankruptcy Code, the Bankruptcy Rules, Local Bankruptcy Rule 5082-l(C) and any other orders and procedures of the Court such that UBS Securities' personnel were not required to maintain detailed time records, divide time records on a "task and activity" basis, or provide or conform to any schedule of hourly rates.  Retention Order ¶ 6.  This is consistent with the fact that the Retention Order further provided that, in the event of review by the U.S. Trustee under section 330 of the

Bankruptcy Code, "'reasonableness' shall be evaluated by comparing (among other things) the fees payable in these cases to fees paid to comparable investment banking firms with similar experience and reputation offering comparable services in other chapter 11 cases and **shall not be evaluated primarily on an hourly or length-of-case based criteria**." *Id*. ¶ 7 (emphasis added).

24.     In accordance with the Retention Order, below is a summary of the substantial efforts and extensive professional services rendered by UBS Securities on behalf of the Special Committee during the Engagement Period, as set forth in footnote 2 above.

**A.     Summary of Services Provided by UBS Securities**

**1.     Launch of the sale process**

25.     Following its retention by the Debtors in September 2014, UBS Securities structured a highly tailored auction sale process designed to generate maximum competition and yield a Sale Transaction with the highest total transaction value on the most beneficial terms possible for the Debtors.  One of the unique dimensions of the sale process was the requirement under the CLA that ITRCC obtain the IFA's advance approval for any acquirer of the Debtors' assets to take over as operator of the Toll Road.  This required UBS Securities to orchestrate and manage a sale process with multiple parallel processes:  first, UBS Securities sought to generate a transaction with the highest transaction value to the satisfaction of the Special Committee and for the benefit of the Debtors' estates; second, UBS Securities worked closely with the IFA and the other Bidders (defined below) to determine whether the Bidders were or could be (by following guidance from the IFA) in a position to receive IFA approval; and third, UBS Securities sought to obtain support for any Sale Transaction from the Committee of Secured Parties as the primary beneficiaries of the net proceeds from any Sale Transaction.

14

26.     At the beginning of the sale process, UBS Securities conducted operational and financial due diligence with ITRCC's executives and management, including multiple in-person meetings in Chicago, to evaluate the asset value of the Toll Road, develop a structured auction process, and prepare marketing materials to launch the auction process.  The marketing materials included a "teaser" document that included an asset overview and a summary of the Toll Road's operational and financial performance, a Confidential Information Memorandum ("CIM") that included, in greater detail than the teaser, overviews of ITRCC and the Toll Road, revenues, and historical operating and capital expenditures, and a management presentation that provided an update on recent asset performance and covered topics that required additional detail.  UBS Securities also established a vast virtual data room of legal, operational and financial documentation, consisting of over 7,000 documents, in order to provide potential investors and buyers with access to sufficient information to formulate indicative, non-binding bids.  At its peak, over 700 users had access to the data room and documents were uploaded to the data room daily.  UBS Securities reviewed and analyzed company reports and other documentation in the virtual data room to extract useful information to include in the marketing materials and to further develop its expertise regarding central issues in the sale process.

27.     Leveraging UBS Securities' global footprint and vast knowledge base regarding the transportation and infrastructure industries, UBS Securities carefully identified and sent the teaser materials and proposed non-disclosure agreements ("NDAs") to 76 potential financial sponsors and strategic buyers between September and November 2014.  Twenty-six parties signed and returned NDAs, including 20 financial sponsors and 6 strategic investors.  Those parties were granted access to the data room.

15

28.    In November 2014, UBS Securities prepared and distributed "first round process letters" which included detailed instructions and requirements for initial "first round" bid submissions.  Seven indications of interest, including indicative non-binding proposals, were submitted during the first round of the sale process.  Following analysis and deliberation by UBS Securities and the Special Committee, five bidders (the "Bidders") were selected to progress to the second round of the process.  The Bidders included four consortiums and one standalone bidder, and consisted of a mix of global concessionaires, toll road operators and marquee financial sponsors in the infrastructure sector, each with experience in the operation of toll roads in the United States or internationally.  One of the Bidders dropped out in late December 2014, leaving the other four to proceed to the second round.

29.    Between December 2014 and February 2015, UBS Securities prepared and assisted the Debtors' management in delivering five full-day management presentations to the Bidders and their professionals regarding key issues addressed in the CIM.  The management presentations also covered various traffic, revenue and operating expense forecasts prepared by Louis Berger, an independent traffic consultant retained on behalf of the Special Committee to assess ITRCC's operations, conduct a traffic study on the Toll Road, prepare reports concerning operating and capital expenditures, and create benchmark projections for the Toll Road's revenues and operations.  Additionally, UBS Securities prepared a financial model that utilized traffic and economic data to evaluate and determine the value of the Toll Road over the life of the remaining concession term, which UBS Securities used to evaluate the Bidders' proposals and guide the Bidders regarding assumptions in their forecasts.  UBS Securities also organized and coordinated the Bidders' visits to inspect various sites and assets pertaining to the Toll Road in Indiana and elsewhere.

30.     Throughout the sale process, UBS Securities worked closely and remained in near constant communication with the Bidders and their professionals (including traffic consultants, financial advisors, tax and audit advisors), the Special Committee and K&E to coordinate the flow of information among the parties, respond to requests for information or materials, and resolve a myriad of large and small issues on a rolling basis.  Additionally, UBS Securities coordinated and attended meetings between the IFA and the Bidders and their professionals in January and February of 2015 during which the IFA provided comments and guidance with respect to steps required of each Bidder to obtain IFA approval.  The IFA's comments and guidance covered various topics including each Bidder's proposed (a) management structure for the Toll Road and those individuals' experience managing similar assets, (b) transition plan and (c) capital expenditures and short- and long-term plans for the Toll Road.  UBS Securities continued to monitor each Bidder's responses to and compliance with the IFA's comments in order to evaluate the Bidder's likelihood of receiving IFA approval within the necessary timeframe and thus determine the viability of accepting that Bidder's proposal.

**2.      The second round of the sale process**

31.     During the second round of the sale process, UBS Securities enabled the Bidders and their professionals to engage in detailed due diligence on ITRCC and the Toll Road, including the historical and projected performance of the Toll Road, the ITRCC capital structure and its liquidity prospects, and various environmental, human resources, and other financial and legal issues.  UBS Securities received and, together with ITRCC management and Louis Berger, answered or responded to more than 1,000 due diligence questions and information requests submitted on behalf of the Bidders.

17

32.     In early December 2014, UBS Securities prepared and circulated to the Bidders "second round process letters."  UBS Securities also sent the Bidders a draft Purchase and Sale Agreement (the "PSA"), drafted by K&E with input from UBS Securities, for each Bidder to propose modifications, within certain parameters set by the Special Committee, to reflect the unique attributes of their proposal, thereby enabling them to submit the maximum possible bid.

33.     In early February 2015, UBS Securities prepared and sent "final bid process letters" to the Bidders.  Senior members of the Deal Team continued to work closely with the IFA, the Bidders and K&E to ensure each of the Bidders, if selected as the winning Bidder, was on track to obtaining IFA approval.  UBS Securities organized meetings in early February 2015 between each of the Bidders and the IFA.

34.     The four remaining Bidders submitted their final bids by March 5, 2015.  UBS Securities and the Special Committee conducted diligence and an in-depth analysis of each proposal, which required an evaluation of the various quantitative and qualitative aspects of each proposal, including the total Transaction Value, the Bidder's likelihood of receiving IFA approval within the necessary timeframe, payment and financing logistics, and other conditions and risks to consummation of each proposed Sale Transaction.  UBS Securities presented findings with respect to each proposal to the Special Committee, which, in turn, provided feedback to the Debtors regarding the terms and relative advantages and disadvantages of each proposal.  The multiple levels of review on behalf of the Debtors was a critical part of the sale process as it helped UBS Securities to identify the strengths, weaknesses and potential issues with each bid and better understand relevant industry and market trends.  UBS Securities also worked with the Special Committee to obtain certain further improvements to the bids.

35.     Significantly, UBS Securities structured and managed the sale process so as to optimize competitive tension between the Bidders while maintaining fairness and appropriate levels of transparency throughout the process.  For example, UBS Securities held weekly update meetings with the Special Committee and K&E during which the parties analyzed each Bidder's relative strengths and weakness, ability to pay, and cost of capital, among other considerations. As a result of strong competitive tension between the Bidders, all four Bidders submitted significantly improved second round bids compared to their first round bids:  Bidder "A" improved its bid 18.9%; Bidder "B" improved its bid 11.7%; Bidder "C" improved its bid 22.6%; and Bidder "D" improved its bid 6.5%.

### 3.     Selection and consummation of the IFM Transaction

36.     In early March 2015, after careful deliberation, the Special Committee determined the IFM Transaction, consisting of a sale of the LLC interests in ITRCC for a total cash payment of $5.725 billion and which allowed the Debtors to distribute all of the cash held on their balance sheet as of the sale's closing date to the Debtors' senior secured creditors, was the most beneficial to the Debtors.  UBS Securities presented the IFM Transaction to the Committee of Secured Creditors, which approved the transaction.  UBS Securities then assisted in the preparation of the definitive agreement regarding the IFM Transaction which IFM and ITRCC entered into on March 11, 2015.  UBS Securities continued to assist IFM with a wide array of closing and transition logistics, including, without limitation, obtaining the IFA's final approval of the IFM Transaction, coordinating with ITRCC management and Louis Berger regarding additional due diligence sessions for IFM, organizing meetings between ITRCC management and IFM's incoming management team in order to refine and agree upon a transition plan, and

managing the continuous information flow among IFM and ITRCC and their respective

professionals.

37.    The IFM Transaction closed on May 27, 2015 once all of the closing conditions

had been satisfied.  The terms and circumstances of the IFM Transaction were a resounding

success for the Debtors' estates and reflect UBS Securities' Herculean efforts to design,

orchestrate and consummate a highly favorable transaction on an expedited basis, well ahead of

the August 1, 2015 cutoff set forth in the Plan for selection of a winning bid.  Moreover, the sale

process did not experience any material setbacks due in significant part to the expertise,

professionalism, and tireless efforts of the Deal Team, directly benefitting the Debtors' estates

and creditors.

38.    On average, the five bankers on UBS Securities' GIG team spent 50-70 hours per

week and its three professionals on the M&A team spent 40-50 hours per week performing the

services described above during the course of the sale process, which lasted approximately 38

weeks.  UBS Securities' professionals expended approximately 16,530 total hours on behalf of

the Special Committee.  Significant portions of that time were spent after hours and on weekends

to accomplish the tremendous results achieved by UBS Securities in a relatively short timeframe

and months ahead of schedule.  Viewed against this backdrop, UBS Securities respectfully

submits that the fees and expenses requested in this Application, which are 100% consistent with

and based on the formula in the Engagement Letter previously approved by this Court, are

reasonable and appropriate.

**B.    Summary of Expenses Requested**

39.    UBS Securities disbursed $57,753.05 as actual out-of-pocket expenses allocated

to or incurred on behalf of the Special Committee in providing professional services during the

20

Fee Period.[11]  The expenses include fixed and routine expenses customarily charged to UBS

Securities' clients, including, without limitation, telephone and telecopier charges, regular mail

and express mail charges, special or hand delivery charges, document processing, photocopying

charges, travel expenses, expenses for "working meals," and computerized research.  A detailed

summary of these expenses is attached hereto as **Exhibit D**.[12]  In accordance with the Retention

Order, the expenses incurred by UBS Securities also include $40,902.00 in legal fees and

expenses incurred by UBS Securities during the Fee Period in connection with its retention in

these chapter 11 cases.  In addition to the legal fees and expenses incurred during the Fee Period,

UBS Securities has incurred and will incur fees and expenses in preparing and submitting this

Application.

     40.    UBS Securities has made every effort to minimize its disbursements in these

cases.  The actual expenses incurred in providing professional services were absolutely

necessary, reasonable, and justified under the circumstances to serve the needs of the Special

Committee.  In accordance with the Retention Order and the applicable factors enumerated in the

Bankruptcy Code, UBS Securities respectfully submits that the amount of expense

reimbursement requested is fair and reasonable given (a) the nature, extent and complexity of the

---

[11]   Certain expenses incurred at the end of the Fee Period might have inadvertently been treated
as post-Confirmation Date (i.e., post-Fee Period) expenses.  UBS Securities has attempted to
categorize such expenses accurately and believes the extent of inadvertent categorization as
having been incurred during the Fee Period or after the Confirmation Date, if any, is
irrelevant and de minimis.

[12]   Note that UBS Securities' automated billing system automatically categorized certain
expenses in Exhibit D as "Entertainment" expenses.  Such expenses consist of working meals
either (a) at UBS Securities' office after 9 p.m. or (b) while travelling for work on behalf of
the Special Committee.  By this Application, UBS Securities does not request approval of
any entertainment expenses.

services provided by UBS Securities, (b) the value of such services and the results achieved, (c) the time expended, and (d) the costs of comparable services other than in a case under this title.

## VI.

## UBS SECURITIES' REQUESTED COMPENSATION AND REIMBURSEMENT SHOULD BE ALLOWED

41.     The Retention Order provides that "the fees and expenses payable to UBS Securities pursuant to the Engagement Letter shall be subject to review only pursuant to the standards set forth in section 328(a) of the Bankruptcy Code and shall not be subject to the standard of review set forth in section 330 of the Bankruptcy Code, except by the U.S. Trustee." Retention Order ¶ 7. Section 328(a) of the Bankruptcy Code provides in relevant part that:

> Notwithstanding such terms and conditions [approved by the court pursuant to § 328(a)], the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

42.     UBS Securities respectfully submits that, even with the benefit of hindsight, the terms and conditions of UBS Securities' employment have not "prove[n] to have been improvident." *Id*. The tremendously successful results achieved by UBS Securities, including, without limitation, the total value of the IFM Transaction, the effective and efficient manner in which the sale process was conducted and consummated, and the wide-ranging benefits of UBS Securities' services to the Debtors and their stakeholders, fully justify the fees and expenses requested in this Application. UBS Securities would expect to charge and receive the same or more for a comparable engagement whether in or out of court. Therefore, UBS Securities respectfully submits that the compensation requested in this Application should be approved pursuant to section 328(a) of the Bankruptcy Code.

## VII.

## RESERVATION OF RIGHTS AND NOTICE

43.      It is possible that some expenses incurred prior to the Effective Date are not

reflected in this Application.  UBS Securities reserves the right to include such amounts in a

supplement to this Application prior to the hearing on proper notice.  In addition, the Debtors

have provided notice of this Application to the U.S. Trustee and any party that has requested

notice pursuant to Bankruptcy Rule 2002.  UBS Securities submits that, in light of the nature of

the relief requested, no other or further notice need be given.

## VIII.

## NO PRIOR REQUEST

44.      No prior application for the relief requested herein has been made to this or any

other court.

WHEREFORE, UBS Securities respectfully requests that the Court enter an order,

substantially in the form attached hereto as **Exhibit A**: (a) approving and allowing UBS

Securities compensation for professional services provided during the Fee Period in the amount

of $400,000, and reimbursement of actual, reasonable, and necessary expenses incurred during

the Fee Period in the amount of $57,753.05; (b) authorizing and directing the Debtors to remit

payment to UBS Securities of any unpaid portion of the Transaction Fee, in the amount of

$28,037,500.00 (which amount reflects a reduction of the $1,400,000 in Monthly Fees), and the

total expenses for the Engagement Period, in the amount of $186,097.95; and (c) granting such

other relief as is appropriate under the circumstances.

Dated:   May 29, 2015                    **UBS SECURITIES LLC**

_____
Larry Grafstein
Managing Director

_____
Rory Murphy
Associate Director

UBS Securities LLC
1285 Avenue of the Americas,
New York, New York 10019
(212) 713-2000

*Investment Bank and Financial Advisor for the Special
Committee of Statewide Mobility Partners LLC*